## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| CARLA HAJEK and GREGORY HAMMERLUND, individually and on behalf of all others similarly situated, | Case No. 23-cv-6715 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| DATACOMP APPRAISAL SYSTEMS, INC.; EQUITY LIFESTYLE PROPERTIES, INC.; HOMETOWN AMERICA MANAGEMENT, L.L.C.; LAKESHORE COMMUNITIES, INC.; SUN COMMUNITIES, INC.; RHP PROPERTIES, INC.; YES! COMMUNITIES, INC.; INSPIRE COMMUNITIES, L.L.C.; KINGSLEY MANAGEMENT, CORP.; and CAL-AM PROPERTIES, INC., | **Public Redacted Version** |
| Defendants. | |

Plaintiffs Carla Hajek ("Hajek") and Gregory Hammerlund ("Hammerlund") (together, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action complaint to recover treble damages, injunctive relief, and other relief as appropriate, based on Defendants' Datacomp Appraisal Systems, Inc. ("Datacomp"), Equity LifeStyle Properties, Inc. ("ELS"), Hometown America Management, L.L.C. ("Hometown America"), Lakeshore Communities, Inc. ("Lakeshore"), Sun Communities, Inc. ("Sun Communities"), RHP Properties, Inc. ("RHP"), YES! Communities, Inc. ("YES! Communities"), Inspire Communities, L.L.C. ("Inspire Communities"), Kingsley Management, Corp. ("Kingsley") and

Cal-Am Properties, Inc.'s ("Cal-Am") (together, "Defendants"), violations of federal antitrust laws and common law.

## I.    NATURE OF THE ACTION

1.      This action arises from Defendants' conspiracy to fix, raise, maintain, and/or stabilize manufactured home lot rental prices. Manufactured, or mobile, homes have long been one of the country's most affordable housing options, particularly for people who do not receive government aid. According to federal data, about 20 million Americans live in manufactured homes, which make up about 6% of U.S. residences. And in 2022, nearly one-third of the 10.5 million adults living in manufactured homes were over the age of 60. The effect of Defendants' conspiracy has been devasting to manufactured home residents. These individuals—whose median annual household income is approximately $35,000—are being overcharged for what used to be affordable housing. The consequence is that two of society's most vulnerable groups—the elderly and low-income earners—face considerable financial pressures. Some residents are facing evictions.

2.      Manufactured home lots are plots of land where manufactured home residents set down their manufactured homes. Manufactured home lots are located in residential developments called "manufactured home communities" or "manufactured home parks." Manufactured home communities are specifically designed to house manufactured homes and can range in size from a few lots to hundreds. Most manufactured home residents own their manufactured homes but rent the lots on which they set down their manufactured homes from the owners of manufactured home communities.

3.      Defendants are Datacomp—the nation's largest provider of manufactured and mobile home data—and several large owners of manufactured home communities that use Datacomp's reports to coordinate their prices by sharing non-public, competitively sensitive

2

information about manufactured home lot rental prices and occupancy, among other things, throughout the United States.

4.      Defendants ELS, Hometown America, Lakeshore, Sun Communities, RHP, YES! Communities, Inspire Communities, Kingsley, and Cal-Am (together referred to as "Manufactured Home Community Defendants") are manufactured home community owners. They are part of a recent wave of large corporate owners who have acquired manufactured home communities across the United States to grow large portfolios of home sites. After acquiring the communities, these buyers have implemented steep, annual rent increases on their manufactured home lots, which have caused significant burdens on manufactured home residents.

5.      Manufactured home community owners, including the Manufactured Home Community Defendants, have coordinated with each other to increase manufactured home lot rents systematically and unlawfully by purchasing and using market reports published by Defendant Datacomp. Datacomp's reports, known as JLT Market Reports, ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████.

6.      Having access to this non-public, competitively sensitive information, and knowing that one's competitors have access to and are using the same information, allows

manufactured home community owners, including the Manufactured Home Community

Defendants, to reduce or eliminate competition amongst themselves on price, services, and

quality for manufactured home lots. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

███████████████████████████.

    7.     In recent years, manufactured home lot rents paid by manufactured home

residents have increased significantly. For example, manufactured home lot rental prices

increased by approximately 2.3% per year between 2010 and 2018, which is approximately in

line with the average annual inflation of 1.8% during this period. However, consistent with

Plaintiffs' conspiracy allegations, manufactured home lot rental prices increased at a

significantly higher rate between 2019 and 2021—9.1% per year (while inflation was only 3%).

The Manufactured Home Community Defendants could never have demanded these rental price

increases unilaterally. To implement the increases, they needed to conspire. They did this by

exchanging non-public, competitively sensitive information through Datacomp's JLT Market

Reports. In the words of Ross Partrich, CEO of Defendant RHP: **"We find the JLT Market

Reports to be . . . extremely helpful for rent increases across our portfolio throughout the

country."**

8.     The exchange of non-public, competitively sensitive information through Datacomp's JLT Market Reports allowed Defendants to carry out a price fixing conspiracy to artificially inflate manufactured home lot rents in violation of Section 1 of the Sherman Act and common law. The exchange of information through the JLT Market Reports is also separately unlawful under Section 1 of the Sherman Act as an unlawful information exchange. The supracompetitively-inflated manufactured home lot rent increases would not have been possible but for the conduct described herein.

9.     Plaintiffs bring this antitrust class action lawsuit on behalf of themselves and a nationwide Class of all similarly situated persons and entities who paid rent for a manufactured home lot located in a manufactured home community that was included in a JLT Market Report between August 31, 2019 and the present (the "Relevant Time Period"). Because of Defendants' violations of Section 1 of the Sherman Act and common law, Plaintiffs and members of the Class were injured by paying significant overcharges on manufactured home lot rents throughout the United States.

10.     If Defendants are permitted to continue their anticompetitive scheme, Plaintiffs and members of the Class will continue to pay supracompetitive rents for manufactured home lots. Plaintiffs bring this action to seek damages and permanently enjoin Defendants' ongoing efforts to coordinate their prices by sharing competitively sensitive information for manufactured home lots.

## II.   JURISDICTION, VENUE, AND EFFECT ON INTERSTATE COMMERCE

11.     Plaintiffs bring this antitrust class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to (i) recover treble damages and the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiffs and members of the Class; (ii) enjoin Defendants' anticompetitive conduct; and (iii) for such other relief as is

5

afforded under the laws of the United States for Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

13.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all relevant times, one or more Defendants resided, transacted business, was found, is licensed to do business, and/or had agents in this District.

14.     This Court has personal jurisdiction over each Defendant pursuant to Section 12 of the Clayton Act (15 U.S.C. §§ 22), because, among other things, each Defendant: (a) transacted business throughout the United States, including in this District; (b) leased manufactured home lots to individuals throughout the United States, including in this District; and/or (c) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District. Each Defendant has purposefully availed itself of the privilege of conducting business activities within the United States and has the requisite minimum contacts therein because each Defendant committed intentional acts that were intended to cause and did cause injury within the United States.

15.     The activities of Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

16.     This action is also instituted to secure injunctive relief against Defendants to prevent them from further violations of Section 1 and 3 of the Sherman Act as hereinafter alleged.

17.     No other forum would be more convenient for the parties and witnesses to litigate this case.

### III.   THE PARTIES

18.     Plaintiff Carla Hajek is a resident of Justice, Illinois. During the Relevant Time Period, Hajek rented a manufactured home lot located in a manufactured home community named Sterling Estates, which is owned and managed by Defendant RHP. During the Relevant Time Period, Hajek paid monthly rent to RHP for this manufactured home lot. Hajek paid higher rental prices by reason of the violation alleged herein.

19.     Plaintiff Gregory Hammerlund is a resident of Monee, Illinois. During the Relevant Time Period, Hammerlund rented a manufactured home lot located in a manufactured home community named Golf Vista Estates, which is owned and managed by Defendant ELS. During the Relevant Time Period, Hammerlund paid monthly rent to ELS for this manufactured home lot. Hammerlund paid higher rental prices by reason of the violation alleged herein.

20.     Defendant Datacomp Appraisal Systems, Inc. is a Michigan corporation, headquartered in Grand Rapids, Michigan. Datacomp is the nation's largest provider of manufactured and mobile home valuations, inspections, and market data. Datacomp's client list includes the top 10 largest manufactured home community owners, regional property management companies, developers, lenders, appraisers, homeowner associations and real estate brokers. Datacomp was purchased by Defendant Equity LifeStyle Properties, Inc. in December 2021 for $43 million.

21.     Defendant Equity LifeStyle Properties, Inc. is a Maryland corporation, headquartered in Chicago, Illinois. ELS owns, operates, or has a controlling interest in more than 200 manufactured home communities across the United States, including three in this District, with approximately 70,000 manufactured home sites nationwide. Datacomp lists ELS as one of its clients on its website. Upon information and belief, ELS uses Datacomp's JLT Market Reports to price manufactured home lot rents.

22.      Defendant Hometown America Management, L.L.C. is a Delaware corporation, headquartered in Chicago, Illinois. Hometown America owns, operates, or has a controlling interest in 66 manufactured home communities across the United States, including one in this District. Datacomp lists Hometown America as one of its clients on its website. Upon information and belief, Hometown America uses Datacomp's JLT Market Reports to price manufactured home lot rents.

23.     Defendant Lakeshore Communities, Inc. is an Illinois corporation, headquartered in Skokie, Illinois. Lakeshore is one of the largest privately held owner/operators of manufactured home communities in the United States and owns manufactured home communities across the United States. Datacomp lists Lakeshore Communities as one of its clients on its website. Upon information and belief, Lakeshore uses Datacomp's JLT Market Reports to price manufactured home lot rents.

24.     Sun Communities, Inc. is a Michigan corporation headquartered in Southfield, Michigan. Sun Communities owns, operates, or has a controlling interest in 353 manufactured home communities across the United States, including two in this District, with approximately 120,000 manufactured home sites nationwide. Datacomp lists Sun Communities as one of its

clients on its website. Upon information and belief, Sun Communities uses Datacomp's JLT Market Reports to price manufactured home lot rents.

25.     RHP Properties, Inc., is a Michigan corporation, headquartered in Farmington Hills, Michigan. RHP is the largest privately held manufactured home community owner in the United States. RHP owns, operates, or has a controlling interest in more than 370 communities across the United States, including three in this District, with approximately 80,000 manufactured home sites nationwide. Datacomp lists RHP as one of its clients on its website. Upon information and belief, RHP uses Datacomp's JLT Market Reports to price manufactured home lot rents.

26.     YES! Communities, Inc. is a Delaware corporation, headquartered in Denver, Colorado. YES! Communities owns, operates, or has a controlling interest in more than 200 communities across the United States with approximately 55,000 home sites. YES! Communities is partially owned by Stockbridge Capital Group, LLC, a private equity firm with $33.7 billion of assets under management. The remainder of the company is owned by the Government of Singapore Investment Company and the Pennsylvania Public School Employees Retirement System. Datacomp lists YES! Communities as one of its clients on its website. Upon information and belief, YES! Communities uses Datacomp's JLT Market Reports to price manufactured home lot rents.

27.     Inspire Communities, L.L.C. is a Delaware corporation, headquartered in Phoenix, Arizona. Inspire Communities owns, operates, or has a controlling interest in over 130 manufactured home communities across the United States, including three in this District. In 2017, Apollo Global Management, a private equity firm with over $500 billion of assets under management, acquired Inspire Communities. Datacomp lists Inspire Communities as one of its

clients on its website. Upon information and belief, Inspire Communities uses Datacomp's JLT Market Reports to price manufactured home lot rents.

28.     Kingsley Management, Corp. is a Utah corporation, headquartered in Provo, Utah. Kingsley is one of the largest privately held owner/operators of manufactured home communities in the United States and owns manufactured home communities across the United States. Datacomp lists Kingsley as one of its clients on its website. Upon information and belief, Kingsley uses Datacomp's JLT Market Reports to price manufactured home lot rents.

29.     Cal-Am Properties, Inc., is a California corporation, headquartered in Costa Mesa, California. Cal-Am is one of the largest privately held owner/operators of manufactured home communities in the United States and owns manufactured home communities across the United States. Datacomp lists Cal-Am as one of its clients on its website. Upon information and belief, Cal-Am uses Datacomp's JLT Market Reports to price manufactured home lot rents.

30.     Various other persons, firms, and corporations not named as Defendants use Datacomp's JLT Market Reports to price manufactured home lot rents and have participated as co-conspirators with Defendants (the "Unnamed Co-conspirators"). The Unnamed Co-conspirators have also performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of the Unnamed Co-conspirators.

31.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

32.     Each Defendant named herein acted as the agent of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

10

33.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## IV.   FACTUAL ALLEGATIONS

34.     During the Relevant Time Period, the Manufactured Home Community Defendants conspired and coordinated with each other and Datacomp to systematically increase manufactured home lot rents and thus harm manufactured home residents who paid elevated rents as a result.

### a.   Manufactured Homes in the United States

35.     Unlike traditional site-built homes, which are constructed entirely on the homeowner's property, manufactured homes are built in factories and then transported to the property, or lot, where they will be set up.

36.     Mobile homes and manufactured homes refer to the same type of home. The only difference between "mobile" and "manufactured" homes is the date they were built. In 1976, the Department of Housing and Urban Development ("HUD") imposed new codes and standards for the construction of factory-built homes. With these codes, HUD stopped using the term "mobile home" and began using "manufactured home." Therefore, a home built in a factory prior to June 15, 1976, is a "mobile" home, and one built after June 15, 1976, is a "manufactured" home. While the term "mobile home" is still commonly used, in this complaint the term "manufactured home" will refer to any factory-built home regardless of when it was built.

37.     Modular homes are another type of factory-built home. Modular homes consist of two or three components that are put together at the site of the home. Modular homes are then placed on a permanent foundation system. While manufactured homes are built to the national HUD code, modular homes are built to applicable state and local building codes. The owner of a modular home typically also owns the land on which the home is situated. For these and other

reasons, modular homes are more akin to site-built homes than to manufactured homes and are not the subject of this complaint.

38.     Manufactured homes are generally less expensive than site-built and modular homes. It is estimated that manufactured home construction costs 40-50% less per square foot than site-built homes.

39.     Following substantial cuts to federal housing budgets in the 1980s, people sought out different sources of affordable housing, and many moved into manufactured homes. Indeed, these federal housing cuts made manufactured homes the fastest-growing type of residence in the 1980s. In the 1990s, manufactured homes were responsible for 66% of new affordable housing produced in the United States. Today, manufactured homes are the largest source of unsubsidized affordable housing in the United States (and in most cases the cheapest). According to Esther Sullivan in *Manufactured Insecurity: Mobile Home Parks and Americans' Tenuous Right to Place*, due to the lack of other forms of affordable housing, manufactured homes are a crucial national affordable housing infrastructure and a primary pathway to low-income homeownership. Nearly one in four homes purchased by a first-time, low-income household is a manufactured home.

40.     Accordingly, manufactured homes provide an important source of affordable housing to a large swath of the U.S. population. Approximately 20 million Americans, or 6% of the U.S. population, live in manufactured homes. And, while all types of people live in manufactured homes, there is a high concentration of various vulnerable groups, including the elderly, low-income earners, and veterans. There is also a high concentration of people with disabilities or mobility issues living in manufactured homes, since these homes are one-story, low-maintenance, and easily ramped.

41.     According to the Consumer Financial Protection Bureau ("CFPB"), in 2022 nearly one-third of the 10.5 million adults living in manufactured homes were over the age of 60.



**Figure 1.**

42.     A study by the CFPB found that a greater proportion of households that live in manufactured homes are headed by a retiree (32%) than site-built households (24%).

43.     According to a 2020 report issued by Fannie Mae, the median annual household income of manufactured home residents who owned their homes was about $35,000. This is half of the median annual income of site-built homeowners. Over a quarter of manufactured homeowners earn less than $20,000 a year.



**Figure 2. Income Distribution of Manufactured vs. Site-Built Homeowners.**

44.    Additionally, manufactured homes provide an important source of affordable housing to people in rural areas. While approximately 6% of homes nationally are manufactured homes, 14% of homes in rural areas are manufactured homes—*i.e.*, more than double the overall national number.

**b.  Manufactured Home Lots and the Business of Manufactured Home Communities**

45.    A manufactured home is placed on a plot of land referred to as a "manufactured home lot."

46.    Unlike site-built homes where the land and the home are considered one piece of property and have one owner, manufactured homes and manufactured home lots are considered separate pieces of property and often have different owners.

47.     There are three main ownership configurations for manufactured homes: (1) **rent-rent** where both the manufactured home and the manufactured home lot are owned by a landlord and rented to the resident; (2) **own-own** where both the manufactured home and manufactured home lot are owned by the resident; and (3) **own-rent** where the manufactured home is owned by the resident, but the manufactured home lot is rented. Of the three ownership configurations, own-rent is the most common.

48.     Most "own-rent" manufactured home residents live in manufactured home communities or parks where they rent a manufactured home lot from a property manager such as the Manufactured Home Community Defendants. Manufactured home communities range in size in terms of the number of lots they contain, but some large communities contain over 700 or 800 lots. Residents of these communities pay monthly rents for the manufactured home lot and other utilities and services, such as water service and trash removal.



**Figure 3: example of a manufactured home community (Getty Images).**

49.     Moving a manufactured home can cost as much as $15,000, which means residents are sometimes beholden to the parks where they live due to financial constraints. Beyond the costs, manufactured homes are often structurally challenging to move once sited on a

lot. Since the 1950s, manufactured homes have been designed and used as permanent affordable housing. The manufactured home industry has responded to housing demand by building increasingly large and complex manufactured home units that are effectively immobile and are meant to be transported only once, from the factory to the site of installation. Many municipalities also have rules governing when and how manufactured homes can be transported, making relocation difficult. Additionally, vacancy rates in existing manufactured home communities are commonly in the single digits, making available lots hard to find. Even if vacant lots are available, many manufactured home communities refuse to accept pre-owned or older manufactured homes from other sites. Thus, once installed on a site, manufactured homes are difficult to move.

50.     For decades, the manufactured home community industry was highly fragmented with many operators each owning only a single community. More recently, and particularly within the past decade, the industry experienced considerable consolidation with large corporate owners, including the Manufactured Home Community Defendants, buying up communities across the United States. This consolidation facilitated the conspiracy alleged herein.

51.     The following is a sampling of recent large acquisitions made by the Manufactured Home Community Defendants:

> i.     **ELS:** In 2018, ELS purchased two manufactured home communities in South Florida for $50.35 million and $49.5 million respectively. These two purchases added another 1,534 manufactured home lots to ELS's portfolio. In 2020, ELS purchased a 484-lot manufactured home community in Arizona with entitlements to an additional 228 lots for development.

ii.   **Hometown America:** In 2019, Hometown America paid $237.4 million for Plaza del Rey, an 800-lot manufactured home community in Sunnyvale, California. In 2021, Hometown America spent over $100 million purchasing two manufactured home communities in California with a combined 410 manufactured home lots and a community in Claverton, New York with over 200 lots.

iii.   **Lakeshore:** In 2022, Lakeshore purchased a 150-lot community in Northfield, Minnesota.

iv.   **Sun Communities:** In 2019, Sun Communities spent over a billion dollars to acquire over 12,000 new or redeveloped lots. Among its purchases was a 31-communitiy portfolio from a Connecticut-based manager for $346.6 million. In 2022, Sun Communities purchased two manufactured home communities in Riverside County for $40 million with a total of 379 manufactured home lots. That same year it bought a community outside of Houston for $29.7 million with 255 manufactured lots.

v.   **RHP:** In 2021, RHP purchased 29 manufactured home communities in Illinois, Indiana, and Michigan containing more than 4,200 manufactured home lots for $184 million. In 2022, RHP purchased 50 manufactured home communities, composed of 41 communities in Wisconsin, seven in Minnesota, and two in Michigan. The acquisition added 5,232 manufactured home lots to RHP's portfolio. That same year, RHP purchased three manufactured home communities in Delaware.

vi. **YES! Communities:** In 2018, YES! Communities purchased 24 manufactured home communities comprising over 6,800 residential home sites in the states of Michigan, Indiana, Illinois, and Texas. In 2019, YES! Communities purchased five manufactured home communities in Indiana and Michigan, comprised of 1,460 manufactured home lots. In 2021, it purchased two manufactured home communities outside of Chicago for $43 million. The acquisitions added another 366 manufactured home lots to YES! Communities portfolio.

vii. **Inspire Communities:** During the Relevant Time Period, Inspire Communities has acquired over 100 manufactured home communities across the United States.

viii. **Kingsley:** In 2015, Kingsley purchased a manufactured home community in Palm Harbor, Florida with 213 lots for nearly $20 million.

ix. **Cal-Am:** In 2017, Cal-Am purchased Far Horizon East Mobile Home Park in Tucson, Arizona, for $33 million, gaining 415 new manufactured home lots.

52. After purchasing manufactured home communities, these corporate buyers, including the Manufactured Home Community Defendants, have significantly raised manufactured home lot rents based on the unlawful conduct alleged herein, which has caused considerable financial pressure on manufactured home residents who are typically older, lower income, and less wealthy than residents of traditional site-built homes.

53. While corporate buyers, including the Manufactured Home Community Defendants, have touted the acquisitions as being beneficial to the residents of the manufactured

home communities, residents strongly disagree. Across the United States, manufactured home residents have been very vocal about issues with their new landlords, including the Manufactured Home Community Defendants. For instance, residents of Florence Commons, a manufactured home community in Tennessee owned by Defendant YES! Communities, have complained that between 2013-2019 rents increased almost 30%, but community conditions have worsened and basic requests for repairs went unanswered.

54.     Similarly, in Michigan, manufactured home residents living in communities owned by Defendants Kingsley and YES! Communities saw their lot rents increase substantially after those companies purchased manufactured home communities from small operators. According to a 2022 article from the Oakland Press, residents have complained that "[these companies] buy these parks just to make money with no intentions of doing any good for the community . . . They don't add anything to make it better. You don't see where your dollars go."

55.     The complaints have caught the attention of government officials. For instance, earlier this year, Connecticut Attorney General William Tong launched an investigation into Defendant Sun Communities over its mismanagement of a manufactured home community in Killingworth, Connecticut that it had acquired in 2019. The Attorney General's office reported that it had received, following the Sun Communities acquisition, numerous complaints from residents "who have seen sustained, escalating rent hikes despite deteriorating conditions."

56.     Last year, Minnesota Attorney General Keith Ellison investigated Defendant Lakeshore for how it handled its acquisition of Viking Terrace, a manufactured home community in Northfield, Minnesota. Shortly after purchasing Viking Terrace in April 2022, Lakeshore raised lot rents by 20% and imposed draconian rules prohibiting vegetable gardens without Lakeshore's permission, forbidding outdoor laundry lines, and banning fenced-in-yards for pets.

19

The investigation uncovered multiple violations of Minnesota law and the Attorney General demanded that Lakeshore "cease and desist enforcing its new rules and leases."

57.     Also in 2022, in response to complaints from manufactured home residents about out-of-state corporate owners controlling more and more manufactured home communities and substantially raising rents, the Colorado state legislature passed a law offering greater protections to residents, including giving residents 120 days to buy a community from landlords looking to sell their land, as well as a right of first refusal. Defendants ELS, RHP, and Kingsley were three of the manufactured home community operators in Colorado that received the most complaints on the state system. Additionally, in 2020, Kingsley reached a six-figure settlement agreement with the State of Colorado, in which it agreed to repay manufactured home residents in seven manufactured home communities for illegally withholding security deposits, imposing arbitrary fees, and improperly charging attorney fees.

58.     In 2020, New York state senators Jen Metzger, James Skoufis, and David Carlucci wrote a letter to Defendant RHP, calling on RHP to maintain current rental lot rates. Citing complaints from residents about exorbitant annual lot rent increases, ignored requests for maintenance, and unusable property amenities, the senators wrote: "The business policies and practices cited above undercut any possible justification for yet another substantial lot rent increase."

59.     Despite the flood of complaints from manufactured home residents and attention from government officials, manufactured home community owners, including the Manufactured Home Community Defendants, have continued to substantially raise rents for manufactured home lots, including during the Relevant Time Period. The large corporate owners of manufactured home communities have been clear about their intentions to turn manufactured

20

home communities into cash cows, and manufactured home community managers and investors have been hugely successful in accomplishing this. According to real estate research firm Green Street Advisors, between 2004 and 2018, operating income from manufactured home communities rose 87% and never declined, even during the 2008 financial crisis. Green Steet Advisors analyst John Pawlowski referred to players in the industry as "rocket ships" and stated: "It's baffling how good of a business it has been."

60.     Defendants ELS and Sun Communities, which are both public companies, have reported huge returns for their shareholders. Between March 2009 and February 2020, ELS and Sun Communities returned 1,186% and 4,137% respectively—far higher than the S&P 500's return of 499%. These massive returns are attributable to the business model described in this complaint: acquire more manufactured home lots and raise lot rents.

61.     This business model, which has been employed by all the Manufactured Home Community Defendants and others, crosses the line from egregious to illegal on account of Defendants' conspiracy.

### c. Defendants' Anticompetitive Scheme

62.     During the Relevant Time Period, manufactured home community owners, including the Manufactured Home Community Defendants, have coordinated with each other to systematically increase manufactured home lot rents by purchasing and relying on competitively sensitive information contained within the JLT Market Reports that are published by Defendant Datacomp. Manufactured Home Community Defendants also used the reports to coordinate strategic acquisitions of manufactured home communities to consolidate market share and acquire significant market power.

1.     **History of Datacomp**

63.     Founded in 1987 as an appraiser of pre-owned manufactured homes, Datacomp subsequently expanded its business to become the go-to source of information for all facets of the manufactured home industry.

64.     Datacomp's first major expansion was in the early 2000s when it launched MHVillage, a listing site for manufactured home sales. It is the largest manufactured home marketplace in the world, generating leads for about $3 billion in sales annually. When creating MHVillage, Datacomp leveraged the information about manufactured homes that it had gathered while appraising manufactured homes.

65.     Datacomp expanded again in 2014 when it acquired JLT & Associates, an outfit which publishes industry reports for manufactured home community operators. After acquiring JLT & Associates, Datacomp began publishing these reports under the name "JLT Market Reports," and it continues to do so today. As explained below, the JLT Market Reports provide manufactured home community operators, including the Manufactured Home Community Defendants, with a one-stop-shop for highly detailed, and highly specific, information about manufactured home communities across the United States.

66.     In December 2021, Defendant ELS purchased Datacomp and its companion website MHVillage for $43 million. With this acquisition, one of the largest manufactured home community operators, ELS, gained control of the largest database of information about the manufactured home industry, Datacomp. This made the unlawful conduct even more egregious. Prior to this acquisition, ELS was a Datacomp *customer* that used Datacomp's JLT Market Reports to price manufactured home lot rents in coordination with its direct competitors. By acquiring Datacomp, ELS became the *owner* of a product that it provided to its competitors to facilitate a price-fixing conspiracy, thus making it even easier for it and the other Manufactured

22

Home Community Defendants—direct competitors in the manufactured home lot market—to

exchange information and coordinate manufactured home lot rent pricing.

### 2. Datacomp's JLT Market Reports

67. The JLT Market Reports provide detailed research and information on

manufactured home communities located in as many as 187 geographic areas, referred to as

metropolitan statistical areas ("MSAs"), throughout the United States.

68. Datacomp holds itself out as "the nation's largest provider of manufactured and

mobile home value reports" that provides "price information":

69.     Datacomp also describes itself as the "leading provider" of "competitive market data":



70.     Datacomp sells JLT Reports for as many as 187 markets across the United States. JLT Reports are not available for free. Instead, they can only be accessed if they are purchased for prices ranging from $149.00–$419.00. For example:



71.     Each JLT Report includes "specific information about each community" including "the latest rent increase information":



72.     The reports include the following detailed information:



73.     Information published in the JLT Market Reports comes directly from Datacomp's customers, including the Manufactured Home Community Defendants and Unnamed Co-Conspirators. Datacomp and its customers exchange via telephone surveys, among other means, competitively sensitive, ordinarily non-public, information that is published in the JLT Market Reports.

74.     Each Datacomp JLT Market Report begins with a high-level summary of findings, ███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████ .

75.     The next section of the report provides tables ███████████████



**Figure 4.**

76.     ████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████ .



**Figure 5.**



**Figure 6.**

77. 

78.

79.

80.



81.

82.

83.     In sum, the JLT Market Reports provided the Manufactured Home Community

Defendants with non-public, competitively sensitive information—information that the

Manufactured Home Community Defendants would never have in a competitive market—and were the essential component of the conspiracy to artificially inflate manufactured home lot rents.

### 3. Datacomp Offers Real-Time Information Market Reports

84.     Datacomp also provides "live updates and electronic status reports" to its clients, as well as "real-time information on the web, phone calls or any combination that serves you best":



**Flexibility**

Datacomp understands that each client has unique needs. We have no set "way to do things"; we customize our processes to best serve your needs. With a simple tech request, we provide live updates and electronic status reports, real-time information on the web, phone calls, or any combination that serves you best. We conform to your program.

85.     In addition, Datacomp provides the most "accurate and comprehensive manufactured housing market data" to provide "unique custom data projects" that are used to make "informed, strategic business decisions":

**The Industry's Most Accurate & Comprehensive Manufactured Housing Market Data**

From unique custom data projects to the heralded annual and historical JLT Market Reports, Datacomp provides the precise manufactured housing data and intelligence that industry professionals rely on to make informed, strategic business decisions.

**4.    Defendants Agree to Exchange Non-Public Competitively
Sensitive Information through the JLT Market Reports
and Artificially Increase Manufactured Home Lot Prices**

86.    Through Datacomp's JLT Market Reports, each Manufactured Home Community

Defendant knew that the other Manufactured Home Community Defendants as well as Unnamed

Co-Conspirators would exchange non-public, competitively sensitive information about the

manufactured home communities they owned. Knowing their competitors would share such

information reciprocally, Defendants were certain that their conspiracy would be effective.

87.    Datacomp publicly advertises that its client list "includes the 'top 10' largest

community owners, regional property management companies, developers, lenders, appraisers,

homeowner associations and real estate brokers nationwide." Datacomp's website includes a list

of clients who purchase and use Datacomp's JLT Market Reports. By publishing this list on its

website, Datacomp communicated to the Manufactured Home Community Defendants who else

was purchasing the reports, thus giving additional assurances to each Defendant that its

competitors were also part of the conspiracy. The client list, provided below as Figure 7, includes

all the Manufactured Home Community Defendants as well as several other Unnamed Co-

Conspirators.



**Figure 7.**

88.     Manufactured home community owners, including certain Manufactured Home Community Defendants, have admitted that they use Datacomp's JLT Market Reports when making decisions about manufactured home lot rent price increases and new manufactured home community acquisitions.

89.     For instance, Ross Partrich, CEO of Defendant RHP, said: "We find the JLT Market Reports to be an excellent guide when analyzing local market conditions for acquisitions, as well as extremely helpful for rent increases across our portfolio throughout the country."

90.     Jon Colman, Executive Vice President of Defendant Sun Communities, said: "We use the surveys to gain insight into markets when analyzing an acquisition opportunity."

91.     Cory Sukert, President/CEO of Defendant Cal-Am, said: "The surveys provide a comprehensive analysis of competing communities in those markets in which we operate. The information is a valuable part of our marketing efforts nationwide. The management reports, including the comparative report, provide a quick determination of relevant market conditions."

92.     Nate Nelson, CFO of Kingsley, emphasized the fact that the information in the JLT Market Reports is current: "The surveys make our business decisions more accurate and timely. The reports are independent, unbiased and very comprehensive and provide accurate and timely information. The information helps us determine how our communities compare to the competition."

93.     David Lentz of Green Courte Partners, LLC, a private equity firm that previously owned a portfolio of manufactured home communities in several states prior to selling its portfolio of nearly 60 manufactured home communities to Defendant Sun communities in 2015, similarly said: "We use the surveys to analyze markets nationwide and to support our due diligence reviews of potential acquisitions. The surveys provide accurate and timely information about market conditions including occupancy levels and rent rates and helps us determine where a given property is positioned in the market."

94.     By exchanging non-public, competitively sensitive information through the JLT Market Reports, Defendants have been able to artificially increase the price of rent for manufactured home lots throughout the United States.

### 5.     Defendants' Systematic Exchange of Competitively Sensitive Information Violates Section 1 of the Sherman Act

95.     Defendants' information exchange amounts to an unlawful agreement in violation of Section 1 of the Sherman Act and violates the information exchange safety zone promulgated by the Federal Trade Commission ("FTC") and the U.S. Department of Justice ("DOJ").

96.     In 1996, FTC and DOJ published "Statements of Antitrust Enforcement Policy in Health Care" (the "1996 Policy"). The 1996 Policy gave guidance to the health care industry on various antitrust issues, including information sharing, and this has since been applied to industries outside of healthcare. Among other things, the 1996 Policy provided an "antitrust safety zone" for information exchanges. According to the 1996 Policy, an information exchange that fell within the safety zone was unlikely to raise antitrust concerns and would unlikely be challenged by the agencies.

97.     To qualify for the safety zone, the information exchange must meet *all* of the following requirements:

i.    The information exchange is managed by a third-party, like a trade association or government agency;

ii.   the information provided by participants is relatively old (e.g. more than three months old); ***and***

iii.  the information is aggregated to protect the identity of the underlying sources, and enough sources are aggregated to prevent competitors from linking particular data to an individual source.

98.     The agencies published this policy "to ensure that an exchange of price or cost data is not used by competing providers for discussion or coordination of provider prices or costs." It was important to the agencies that "providers [were] aware of the potential antitrust consequences of information exchanges among competitors." The agencies explained that these conditions were carefully crafted to balance a competitor's individual interests in obtaining useful information "against the risk that the exchange of such information may permit [competitors] to communicate with each other regarding a mutually acceptable level of prices."

99.     Since 1996, the agencies have used this safety zone as a general guideline for the legality of information exchanges in other industries. For instance, FTC issued general guidance in 2014 that referred to the safety zone requirements as necessary criteria for a legal data exchange. In that guidance, FTC confirmed that when "competing companies seek market intelligence by exchanging price or other commercially sensitive information, that may facilitate collusion . . . in violation of the antitrust laws."

100.    Accordingly, the safety zone requirements are a useful test for assessing the legality of the information exchange described in this complaint. The safety zone requirements are not met here.

101.    ***First***, the information exchange is not operated by a neutral third party. Defendant Datacomp operates the exchange of information through its JLT Market Reports. As described above, Datacomp was purchased by Defendant ELS for $43 million in 2021. ELS, which is one of the largest manufactured home community operators in the United States, is not a third-party because it competes with other owners of manufactured home communities for manufactured home lot renters. Even before ELS purchased Datacomp, Datacomp was not a neutral third party. Unlike a trade association or a government agency that may collect the information as a service to an industry, upon information and belief, Datacomp's business model relied on owners of manufactured home communities, such as the Manufactured Home Community Defendants, to provide it with competitively sensitive information that it could sell back to the owners for a profit. Datacomp therefore had a vested interest with an expectation of financial gain as it stood to profit from the illegal information exchange.

102.    ***Second,*** the information published in the JLT Market Reports is not old. ███

████████████████████████████████████████████████████████████



. Indeed, as the quotes from Defendants' executives above demonstrated, Defendants recognized and valued the timeliness of the information provided in the reports.

103.  ***Third,***

.

104.  Thus, Defendants' exchange of information via the JLT Market Reports fails to meet *any* of the safety zone requirements and is an illegal data exchange.

105.  DOJ recently has demonstrated a renewed focus on anticompetitive information sharing. On February 3, 2023, DOJ withdrew three antitrust policy statements, including the 1996 Policy. When announcing the withdrawal, DOJ said that "the statements *are overly permissive* on certain subjects, such as information sharing, and no longer serve their intended purposes of providing encompassing guidance to the public on relevant healthcare competition issues in today's environment." Thus, Defendants' information sharing practice violates a government policy that the DOJ deemed "too permissive," demonstrating the particularly egregious nature of the conduct being challenged here.

106.  The withdrawal of the policy statements was preceded by remarks made by principal deputy assistant attorney general Doha Mekki on February 2, 2023, in which she said

38

that "throughout its enforcement and policy work, the DOJ has had 'serious concerns' about whether the factors set out in the safety zones are appropriate for the industry as it exists today." Mekki noted that "[e]xchanges facilitated by [third-party] intermediaries can have the same anticompetitive effect as direct exchange among competitors." Additionally, she said that "the suggestion that data that's at least three months old is unlikely to be competitively sensitive or valuable is underpinned by the rise of pricing algorithms that can increase the competitive value of historical data."

107.    Following the withdrawal of the policy statements, at a conference in March 2023, Deputy Assistant Attorney General Michael Kades commented on DOJ's new position related to information sharing. Responding to questions on what proper information sharing looks like without safe harbors, Kades said that "top-of-mind questions should be what information is being shared, how it is being used, and what the impacts are of that sharing. Any time information sharing appears to be suppressing price competition or eliminating other forms of competition, 'that should send red sirens off.'"

108.    Here, Defendants' information exchange existed for the purpose of increasing manufactured home lot rents above competitive levels and aiding manufactured home community owners in consolidating market power. Accordingly, Defendants' information exchange violates Section 1 of the Sherman Act. DOJ's withdrawal of the 1996 Policy and the comments made by Mekki and Kades exemplify DOJ's current position that information exchanges can be anticompetitive regardless of their exact form.

**6.    Economic Analysis Supports the Existence of a Cartel**

109.    Economic data supports the existence of the conspiracy described in this complaint. Specifically, experts retained by Plaintiffs have analyzed U.S. Census data on manufactured home lot rental prices, and that analysis reveals that manufactured home rental lot

prices increased significantly beginning around 2017-2019 and that these price increases diverge from comparable single-family rental property prices.

110.     Plaintiffs' analysis uses the Public Use Microdata Sample from the American Community Survey ("ACS"), which is an annual supplementary survey to the decennial Census that covers a wide range of topics. The ACS surveys, among other things, the cost of ownership for a manufactured home, which primarily includes "land or site rent," as well as fees imposed on manufactured home owners, such as registration fees and license fees. This cost of ownership figure is termed "manufactured home lot rents" in the graphs below. Figure 8 below shows that, at a national level, the cost of manufactured home lot rents experienced a sharp increase beginning in 2019.



**Figure 8. Average Monthly Manufactured Home Lot Rents in the U.S.**

111.    Figure 8 above shows that the average monthly manufactured home lot rent jumped from $203 in 2019 to $257 in 2021, a 27% increase. This significant jump in prices is at odds with the long-run trend of manufactured home lot rents. Manufactured home lot rental prices steadily increased by approximately 2.3% per year between 2010 and 2018, approximately in line with the average annual inflation (CPI) of 1.8% during this period. However, consistent with Plaintiffs' conspiracy allegations, manufactured home lot rental prices have significantly increased at a rate of 9.1% per year between 2019 and 2021, while inflation was only 3%.

112.    Manufactured home lot rents increased above the rental prices for similar housing. The next most comparable rental market for manufactured home lots is the rental market for detached single family homes, because both rental properties must be large enough to support a detached home (as opposed to townhome or rowhouse) and are typically found in more suburban and rural areas. Figure 9 compares the rise in manufactured home lot rental prices to the prices of detached single-family homes. Using comparable rental price data from the ACS, Figure 9 shows the percentage increase in price experienced by both types of rentals from a 2010 baseline level.



**Figure 9. Percent Increase in U.S. Rent From 2010.**

113.    Figure 9 demonstrates that rental prices of manufactured home lots and single-family detached homes followed the same trend from 2010 through 2019 but that starting in 2019 manufactured home lot rental prices spiked with no comparable increase in the rents of detached single-family homes. For example, while rental prices for manufactured home lots and detached single family housing were approximately 22% higher in 2019 than their 2010 baseline, by 2020 manufactured home lot rentals had increased by 45% over its 2010 levels while detached manufactured homes only grew by 27% over its 2010 levels. In other words, something caused the rent of manufactured home lots to rise sharply in 2019 and 2020 that did *not* affect the rent of similarly situated detached single-family homes. That something was Defendants' unlawful agreement to raise manufactured home lot rent facilitated by the exchange of information through the JLT Market Reports.

42

114.    The increase in manufactured home lot rental prices persists at the subnational level. Plaintiffs analyzed three of the largest MSAs by manufactured home site count covered by the ACS, all of which are also covered by Datacomp reports: (1) Tampa-St. Petersburg-Clearwater MSA; (2) Riverside-San Bernardino-Ontario MSA; and (3) Phoenix-Mesa-Scottsdale MSA. Figures 10-12 below compare the rent of manufactured home lots at each of the MSAs over time, juxtaposed to the rent for comparable single-family detached homes. In each case, the figures show that manufactured home lot rents in these MSAs increased significantly relative to their 2010 levels starting in 2018-2019. While detached single-family homes rental prices also increased as a percentage of their 2010 levels during this period, they did not rise as quickly or as steeply as prices for manufactured home lots.



**Figure 10: Percent Increase in Monthly Rent From 2010 Levels Tampa-St. Petersburg-Clearwater, FL MSA**



**Figure 11. Percent Increase in Monthly Rent From 2010 Values Riverside-San Bernardino-Ontario, CA MSA**



**Figure 12. Percent Increase in Monthly Rent From 2010 Values Phoenix-Mesa-Scottsdale, AZ MSA**

115.    Most of the Manufactured Home Community Defendants own manufactured

home communities in one or more of these MSAs. ███████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████ :

      i.    **Tampa-St. Petersburg-Clearwater, FL MSA:**



45



ii. **Riverside-San Bernardino-Ontario, CA MSA:**

iii. **Phoenix-Mesa-Scottsdale, AZ MSA:**



116.    The existence of manufactured home lot rent increases, at rates which exceed

price increases for detached single-family homes, is consistent with Plaintiffs' allegations of

Defendants' unlawful agreement to systemically raise the price of manufactured home lot rents above competitive levels during the Relevant Time Period.

### 7. "Plus Factors" in the Manufactured Home Industry Provide Additional Evidence of a Conspiracy

117. Prominent legal and economic antitrust scholars studying collusive behavior have identified certain "plus factors," which are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[1] Each plus factor that is present constitutes a piece of circumstantial evidence supporting active collusion, as opposed to mere conscious parallelism. The factors that provide the most probative value and lead to a strong inference of explicit collusion are referred to as "super plus factors."[2]

118. Here, several plus and super plus factors support the plausible inference that Defendants are members of a *per se* unlawful price fixing cartel. These include: (1) Defendants' exchange of competitively sensitive information; (2) the presence of a price-verification scheme; (3) a motive to conspire; (4) opportunities and invitations to collude; (5) an increasingly concentrated market; (6) high barriers to entry; and (7) high switching costs for manufactured home lot renters.

119. **First**, the reciprocal sharing of firm-specific competitively sensitive information that would normally remain private is a "super plus factor" that leads to a strong inference of

---

[1] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 393 (2011).
[2] *See id.* at 396-97.

active collusion.[3] As described above, ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████. This data, which would

normally be kept confidential, given its competitively-sensitive nature, is provided to competing

manufactured home community owners who set manufactured home lot rents. Because a

manufactured home community owner would be competitively disadvantaged by providing

private data to other manufactured home community owners unilaterally, a rational actor would

only do so with the expectation that it will benefit from similar private information shared by its

competitors.

120.     **Second**, Datacomp provides participating manufactured home community owners

with a price-verification scheme, or "the practice of a seller reporting to its competitors the

details of completed transactions with specific customers."[4] "[P]ostsale price verifications are

more likely to be used as a monitoring device because they reveal to a firm's cartel partners its

actual prices, which a firm in a competitive market would wish to keep secret."[5] ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ This type of price-verification makes little sense absent collusion.

121.     **Third**, Datacomp provides manufactured home community owners, including the

Manufactured Home Community Defendants, with a motive to conspire by advertising that JLT

---

[3] Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. Univ. L. Rev. 1581, 1608 (2021).

[4] *Id.* at 1601.

[5] *Id.* at 1601-02.

Market Reports provide valuable information to support lot rent increases and acquisition opportunities.

122. **Fourth,** Datacomp's JLT Market Reports themselves are an opportunity to coordinate prices, and Datacomp's advertisements about the reports are naked invitations to collude. Additionally, as of July 2019, Defendants Datacomp, ELS, Hometown America, Sun Communities, RHP, YES! Communities, and Inspire Communities are all members of the Manufactured Housing Institute ("MHI"). MHI is the only national trade association representing all sectors of the manufactured and modular housing industries. Executives from Defendants ELS and Sun Communities have been on the MHI Board of Directors during the Relevant Time Period. Additionally, MHI organizes numerous industry meetings and events throughout the year, including MHI Congress & Expo, the MHI National Communities Council ("NCC") Spring Forum, the MHI Annual Meeting, the NCC Fall Leadership Forum, and the MHI Winter Meeting. Defendants, including Datacomp, ELS, RHP, and YES! Communities, have all been exhibitors at MHI Congress & Expo during the Relevant Time Period. Trade association membership and events provide Defendants additional opportunities to collude.

123. **Fifth,** the manufactured home community market is increasingly becoming more concentrated. While the industry was once highly fragmented, large manufactured home community owners, including the Manufactured Home Community Defendants, have been buying up communities across the United States to create massive portfolios. A conspiracy is easier to effectuate, maintain, and enforce in a concentrated industry.

124. **Sixth**, manufactured home community owners and operators face significant entry barriers. These include the high cost of acquiring property and establishing a property management infrastructure as well as ongoing costs of maintenance and regulatory compliance.

Large manufactured home communities run into the hundreds of millions of dollars to purchase. Market analyst, Ron Trinh, noted that "barriers to entry to compete [are] very high" in this industry, giving established companies, like the Manufactured Home Community Defendants, a significant advantage. Another analyst has noted that "[o]ne of the distinct features of the [manufactured housing] sector is the complete lack of new supply expected to be constructed. With essentially zero net supply coming online for the foreseeable future, manufactured housing is relatively immune from the oversupply fears that encumber other REIT sectors." Thus, new entrants into the market are unlikely to discipline cartel pricing.

125. **Seventh**, there are significant switching costs that prevent effective price competition in the manufactured home lot rental market. In other markets with low switching costs, consumers can stop purchasing a particular manufacturer's product when its prices are no longer competitive. Manufactured homes are not easy or inexpensive to move. They require special hauling vehicles, escorts, and permits to transport. These services are costly, typically ranging from about $5,000-$15,000, depending on the size of the home and the distance the home is moving. In 2022, the average cost to move a manufactured home was $9,000. As described above, many manufactured home owners are low-income earners who may not be able to afford these high moving costs. According to a study, these costs may represent "five to seven years' worth of accrued equity for mobile homeowners." Therefore, when a manufactured home community owner raises lot rent, residents are often forced to accept the price increase—or leave their home. These factors are what led Frank Rolfe, an investor who has owned thousands of manufactured home lots, to make the controversial, and often quoted, remark that a manufactured home community "is like a Waffle House where the customers are chained to their booths."

## V.  ANTICOMPETITIVE EFFECTS AND RELEVANT ANTITRUST MARKET

126.  Defendants' anticompetitive conduct had the following effects, among others:

    i.  Competition among the Manufactured Home Community Defendants has been restrained or eliminated with respect to manufactured home lot rent prices;

    ii.  The price of manufactured home lot rent has been fixed, stabilized, or maintained at artificially high levels; and

    iii.  Individuals have been deprived of free and open competition.

127.  Defendants' violations of the antitrust laws have caused Plaintiffs and members of the Class to pay higher prices for manufactured home lot rents than they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, Plaintiffs and members of the Class have suffered damages in the form of overcharges paid on their manufactured home lot rentals. This is an injury of the type that the antitrust laws were meant to punish and prevent. Defendants' price fixing agreement and information exchange are *per se* unlawful, or alternatively are unlawful under either a quick look or rule of reason analysis.

128.  Under the *per se* standard, and additionally where, as here, there are demonstrable anticompetitive effects, a relevant product and geographic market need not be defined.

### A.  The Relevant Product Market Is Manufactured Home Lots

129.  To the extent a relevant product market needs to be defined in this action, it is the market for manufactured home lots located in manufactured home communities.

130.  There are no reasonable substitutes for manufactured home lots. While a manufactured home can be placed on private land, land ownership is prohibitively expensive for many manufactured home residents. Additionally, many jurisdictions prevent the installation of manufactured homes as infill housing in areas zoned residential or restrict placement of

manufactured homes to manufactured home communities only. By renting a manufactured home lot, manufactured home residents get to enjoy the benefit of owning their own home but are not burdened with the expense of landownership. Additionally, many manufactured home residents specifically choose to live in manufactured home parks for their community benefits, which may include special perks such as community or recreation centers, playgrounds, and dog parks. Many manufactured home communities are 55+ communities and provide other specific benefits to older residents.

### a. The Relevant Geographic Market Is National

131.    Should a geographic market need to be defined in this action, it is the United States. The Manufactured Home Community Defendants own manufactured home parks across the United States and have increased rental prices universally.

### b. Regional Submarkets

132.    In addition, there are the 187 markets for which Datacomp produces (or has produced) JLT Market Reports (the "Regional Submarkets").

133.    Given that commuting distance to a place of work or school is a geographic constraint on where a manufactured home lot renter chooses to live, the manufactured home housing market can be regional and tied to a center of commerce or education and the immediately surrounding areas.

134.    Additionally, manufactured home lot renters, particularly elderly residents who require assistance, will choose to live within close distances to their relatives and health care providers for support.

135.    Manufactured home lot renters in any given Regional Submarket do not consider leases in other Regional Submarket as adequate substitutes for manufactured home lot leases in their own submarket. Leases outside a Regional Submarket are not substitutable for leases inside

a submarket because they would leave renters with inordinately long commutes to schools, jobs, family, or doctors. Consequently, manufactured home lots outside the Regional Submarket are not within the relevant geographic markets for antitrust purposes.

136.    Plaintiffs allege upon information and belief that Defendants' scheme harmed competition nationally, including in at least the following Regional Submarkets (listed in order of the number of manufactured home communities, following the Chicago, IL MSA), each of which comprises a separate and distinct relevant regional geographic market:

i.      **Chicago, IL MSA:** Regional Submarket consists of at least 57 manufactured home communities and approximately 18,000 manufactured home lots.

ii.     **Phoenix-Mesa-Scottsdale, AZ MSA:** Regional Submarket consists of at least 108 manufactured home communities and approximately 28,000 manufactured home lots.

iii.    **Orange County, CA:** Regional Submarket consists of at least 100 manufactured home communities and approximately 19,000 manufactured home lots.

iv.     **San Diego County, CA:** Regional Submarket consists of at least 100 manufactured home communities and approximately 19,000 manufactured home lots.

v.      **Los Angeles County, CA:** Regional Submarket consists of at least 94 manufactured home communities and approximately 21,000 manufactured home lots.

vi. **Riverside County, CA:** Regional Submarket consists of at least 94 manufactured home communities and approximately 21,000 manufactured home lots.

vii. **Polk County, FL:** Regional Submarket consists of at least 90 manufactured home communities and approximately 22,000 manufactured home lots.

viii. **Pinellas County, FL:** Regional Submarket consists of at least 87 manufactured home communities and approximately 20,000 manufactured home lots.

ix. **San Bernadino County, CA:** Regional Submarket consists of at least 78 manufactured home communities and approximately 15,000 manufactured home lots.

x. **Minneapolis-Saint Paul, MN MSA:** Regional Submarket consists of at least 57 manufactured home communities and approximately 15,000 manufactured home lots.

xi. **Santa Clara County, CA:** Regional Submarket consists of at least 55 manufactured home communities and approximately 14,000 manufactured home lots.

xii. **Tampa-St. Petersburg-Clearwater (Hillsborough County), FL MSA:** Regional Submarket consists of at least 53 manufactured home communities and approximately 13,000 manufactured home lots.

xiii. **Volusia County, FL:** Regional Submarket consists of at least 52 manufactured home communities and approximately 14,000 manufactured home lots.

xiv. **Denver-Aurora-Boulder, CO MSA:** Regional Submarket consists of at least 49 manufactured home communities and approximately 16,000 manufactured home lots.

xv. **Broward County, FL:** Regional Submarket consists of at least 47 manufactured home communities and approximately 11,000 manufactured home lots.

xvi. **Las Vegas, NV MSA:** Regional Submarket consists of at least 46 manufactured home communities and approximately 11,000 manufactured home lots.

xvii. **Sacramento County, CA:** Regional Submarket consists of at least 46 manufactured home communities and approximately 9,000 manufactured home lots.

xviii. **Seattle-Tacoma, WA MSA:** Regional Submarket consists of at least 45 manufactured home communities and approximately 8,000 manufactured home lots.

xix. **Kent County, MI:** Regional Submarket consists of at least 44 manufactured home communities and approximately 9,000 manufactured home lots.

xx.  **Rochester, NY MSA:** Regional Submarket consists of at least 43 manufactured home communities and approximately 6,000 manufactured home lots.

xxi.  **Allegan-Muskegon-Ottawa Counties, MI:** Regional Submarket consists of at least 42 manufactured home communities and approximately 11,000 manufactured home lots.

xxii.  **Baltimore, MD MSA:** Regional Submarket consists of at least 42 manufactured home communities and approximately 10,000 manufactured home lots.

xxiii.  **Houston, TX MSA:** Regional Submarket consists of at least 42 manufactured home communities and approximately 9,000 manufactured home lots.

xxiv.  **Columbus, OH MSA:** Regional Submarket consists of at least 42 manufactured home communities and approximately 8,000 manufactured home lots.

xxv.  **Southern New Hampshire:** Regional Submarket consists of at least 41 manufactured home communities and approximately 6,000 manufactured home lots.

xxvi.  **Cleveland-Akron, OH MSA:** Regional Submarket consists of at least 41 manufactured home communities and approximately 9,000 manufactured home lots.

xxvii. **Philadelphia, PA MSA:** Regional Submarket consists of at least 41 manufactured home communities and approximately 9,000 manufactured home lots.

xxviii. **Portland, OR MSA:** Regional Submarket consists of at least 41 manufactured home communities and approximately 7,000 manufactured home lots.

xxix. **Oakland County, MI:** Regional Submarket consists of at least 39 manufactured home communities and approximately 14,000 manufactured home lots.

xxx. **St Louis, MO MSA:** Regional Submarket consists of at least 39 manufactured home communities and approximately 8,000 manufactured home lots.

xxxi. **Albany-Schenectady, NY MSA**: Regional Submarket consists of at least 38 manufactured home communities and approximately 6,000 manufactured home lots.

xxxii. **Lake County, FL:** Regional Submarket consists of at least 38 manufactured home communities and approximately 10,000 manufactured home lots.

xxxiii. **Pasco County, FL:** Regional Submarket consists of at least 38 manufactured home communities and approximately 10,000 manufactured home lots.

xxxiv.  **Virginia Beach, VA MSA:** Regional Submarket consists of at least 37 manufactured home communities and approximately 7,000 manufactured home lots.

xxxv.  **Eugene-Springfield, OR MSA:** Regional Submarket consists of at least 37 manufactured home communities and approximately 6,000 manufactured home lots.

xxxvi.  **Genesee County, MI:** Regional Submarket consists of at least 36 manufactured home communities and approximately 11,000 manufactured home lots.

xxxvii.  **Indianapolis-Anderson, IN MSA:** Regional Submarket consists of at least 36 manufactured home communities and approximately 9,000 manufactured home lots.

xxxviii.  **Palm Beach County, FL:** Regional Submarket consists of at least 34 manufactured home communities and approximately11,000 manufactured home lots.

xxxix.  **Jersey Shore, NJ:** Regional Submarket consists of at least 34 manufactured home communities and approximately 8,000 manufactured home lots.

xl.  **San Antonio, TX MSA:** Regional Submarket consists of at least 34 manufactured home communities and approximately 7,000 manufactured home lots.

xli. **Lancaster, PA MSA:** Regional Submarket consists of at least 34 manufactured home communities and approximately 5,000 manufactured home lots.

xlii. **Wayne County, MI:** Regional Submarket consists of at least 33 manufactured home communities and approximately 12,000 manufactured home lots.

xliii. **Sussex County, DE:** Regional Submarket consists of at least 33 manufactured home communities and approximately 10,000 manufactured home lots.

xliv. **Atlanta GA, MSA:** Regional Submarket consists of at least 33 manufactured home communities and approximately 9,000 manufactured home lots.

xlv. **Manatee County, FL:** Regional Submarket consists of at least 33 manufactured home communities and approximately 9,000 manufactured home lots.

xlvi. **Toledo, OH MSA:** Regional Submarket consists of at least 33 manufactured home communities and approximately 7,000 manufactured home lots.

xlvii. **Buffalo-Niagara, NY MSA:** Regional Submarket consists of at least 33 manufactured home communities and approximately 7,000 manufactured home lots.

xlviii. **Ventura County, CA:** Regional Submarket consists of at least 33 home communities and approximately 6,000 manufactured home lots.

xlix. **Madison, WI MSA:** Regional Submarket consists of at least 33 manufactured home communities and approximately 5,000 manufactured home lots.

l. **Orange-Seminole Counties, FL:** Regional Submarket consists of at least 32 manufactured home communities and approximately 13,000 manufactured home lots.

li. **Salt Lake City, UT MSA:** Regional Submarket consists of at least 31 manufactured home communities and approximately 7,000 manufactured home lots.

lii. **Pittsburgh, PA MSA:** Regional Submarket consists of at least 31 manufactured home communities and approximately 6,000 manufactured home lots.

liii. **Arlington-Fort Worth, TX MSA:** Regional Submarket consists of at least 31 manufactured home communities and approximately 5,000 manufactured home lots.

liv. **York-Hannover, PA MSA:** Regional Submarket consists of at least 30 manufactured home communities and approximately 4,000 manufactured home lots.

lv. **Cincinnati, OH MSA:** Regional Submarket consists of at least 29 manufactured home communities and approximately 6,000 manufactured home lots.

lvi.     **Dallas County, TX:** Regional Submarket consists of at least 29 manufactured home communities and approximately 5,000 manufactured home lots.

lvii.    **Orange-Ulster, NY MSA:** Regional Submarket consists of at least 28 manufactured home communities and approximately 3,000 manufactured home lots.

lviii.   **Oklahoma City, OK MSA:** Regional Submarket consists of at least 28 manufactured home communities and approximately 5,000 manufactured home lots.

lix.     **Macomb County, MI:** Regional Submarket consists of at least 27 manufactured home communities and approximately 12,000 manufactured home lots.

lx.      **Lee County, FL:** Regional Submarket consists of at least 26 manufactured home communities and approximately 11,000 manufactured home lots.

lxi.     **Albuquerque, NM MSA:** Regional Submarket consists of at least 26 manufactured home communities and approximately 6,000 manufactured home lots.

lxii.    **Myrtle Beach, SC MSA:** Regional Submarket consists of at least 26 manufactured home communities and approximately 6,000 manufactured home lots.

lxiii. **Brevard County, FL:** Regional Submarket consists of at least 26 manufactured home communities and approximately 6,000 manufactured home lots.

lxiv. **Sonoma County, CA:** Regional Submarket consists of at least 26 manufactured home communities and approximately 5,000 manufactured home lots.

lxv. **Highlands Counties, FL:** Regional Submarket consists of at least 25 manufactured home communities and approximately 6,000 manufactured home lots.

lxvi. **South Jersey, NJ:** Regional Submarket consists of at least 25 manufactured home communities and approximately 6,000 manufactured home lots.

lxvii. **Sarasota County, FL:** Regional Submarket consists of at least 24 manufactured home communities and approximately 7,000 manufactured home lots.

lxviii. **Kansas City, MO MSA:** Regional Submarket consists of at least 24 manufactured home communities and approximately 6,000 manufactured home lots.

lxix. **Elkhart-Goshen-South Bend, ID MSA:** Regional Submarket consists of at least 24 manufactured home communities and approximately 6,000 manufactured home lots.

lxx.  **Hidalgo County, TX:** Regional Submarket consists of at least 24 manufactured home communities and approximately 6,000 manufactured home lots.

lxxi.  **Lansing, MI MSA:** Regional Submarket consists of at least 24 manufactured home communities and approximately 5,000 manufactured home lots.

lxxii.  **Western Colorado:** Regional Submarket consists of at least 24 manufactured home communities and approximately 5,000 manufactured home lots.

lxxiii.  **Salem, OR MSA:** Regional Submarket consists of at least 24 manufactured home communities and approximately 3,000 manufactured home lots.

lxxiv.  **Boise, ID MSA:** Regional Submarket consists of at least 24 manufactured home communities and approximately 3,000 manufactured home lots.

lxxv.  **Austin, TX MSA:** Regional Submarket consists of at least 23 manufactured home communities and approximately 9,000 manufactured home lots.

lxxvi.  **Wichita, KS MSA:** Regional Submarket consists of at least 23 manufactured home communities and approximately 5,000 manufactured home lots.

lxxvii.  **Bay-Midland-Saginaw, MI MSA:** Regional Submarket consists of at least 23 manufactured home communities and approximately 4,000 manufactured home lots.

lxxviii. **Medford-Grants Pass, OR MSA:** Regional Submarket consists of at least 23 manufactured home communities and approximately 3,000 manufactured home lots.

lxxix. **Olympia, WA MSA:** Regional Submarket consists of at least 23 manufactured home communities and approximately 2,000 manufactured home lots.

lxxx. **Santa Barbara County, CA:** Regional Submarket consists of at least 22 manufactured home communities and approximately 4,000 manufactured home lots.

lxxxi. **Contra Costa County, CA:** Regional Submarket consists of at least 22 manufactured home communities and approximately 4,000 manufactured home lots.

lxxxii. **Northern Colorado:** Regional Submarket consists of at least 21 manufactured home communities and approximately 6,000 manufactured home lots.

lxxxiii. **Southern Colorado:** Regional Submarket consists of at least 21 manufactured home communities and approximately 5,000 manufactured home lots.

lxxxiv. **Fort Wayne, IN MSA:** Regional Submarket consists of at least 20 manufactured home communities and approximately 6,000 manufactured home lots.

lxxxv.  **Gary-Michigan City, IN MSA:** Regional Submarket consists of at least 20 manufactured home communities and approximately 6,000 manufactured home lots.

lxxxvi.  **Marion County, FL:** Regional Submarket consists of at least 20 manufactured home communities and approximately 5,000 manufactured home lots.

lxxxvii.  **Alameda County, CA:** Regional Submarket consists of at least 20 manufactured home communities and approximately 5,000 manufactured home lots.

lxxxviii.  **Northern Michigan:** Regional Submarket consists of at least 20 manufactured home communities and approximately 4,000 manufactured home lots.

lxxxix.  **Nashville, TN MSA:** Regional Submarket consists of at least 20 manufactured home communities and approximately 3,000 manufactured home lots.

xc.  **Des Moines, IA MSA:** Regional Submarket consists of at least 19 manufactured home communities and approximately 3,000 manufactured home lots.

xci.  **Duval-St. Johns County, FL:** Regional Submarket consists of at least 18 manufactured home communities and approximately 5,000 manufactured home lots.

xcii. **Citrus-Hernando-Sumter Counties, FL MSA:** Regional Submarket consists of at least 18 manufactured home communities and approximately 4,000 manufactured home lots.

xciii. **Indian River County, FL:** Regional Submarket consists of at least 18 manufactured home communities and approximately 5,000 manufactured home lots.

xciv. **Charleston, SC MSA:** Regional Submarket consists of at least 18 manufactured home communities and approximately 3,000 manufactured home lots.

xcv. **Washtenaw County, MI:** Regional Submarket consists of at least 17 manufactured home communities and approximately 6,000 manufactured home lots.

xcvi. **Barry-Kalamazoo Counties, MI:** Regional Submarket consists of at least 17 manufactured home communities and approximately 4,000 manufactured home lots.

xcvii. **Barry-Kalamazoo Counties, MI:** Regional Submarket consists of at least 17 manufactured home communities and approximately 4,000 manufactured home lots.

xcviii. **Tulsa, OK MSA:** Regional Submarket consists of at least 17 manufactured home communities and approximately 3,000 manufactured home lots.

xcix. **Prescott, AZ MSA:** Regional Submarket consists of at least 17 manufactured home communities and approximately 3,000 manufactured home lots.

c. **Berrien County, MI:** Regional Submarket consists of at least 17 manufactured home communities and approximately 3,000 manufactured home lots.

ci. **Topeka, KS MSA:** Regional Submarket consists of at least 17 manufactured home communities and approximately 2,000 manufactured home lots.

cii. **Brownsville, TX MSA:** Regional Submarket consists of at least 17 manufactured home communities and approximately 2,000 manufactured home lots.

ciii. **Ames, IA MSA:** Regional Submarket consists of at least 17 manufactured home communities and approximately 2,000 manufactured home lots.

civ. **Greenville, SC MSA:** Regional Submarket consists of at least 17 manufactured home communities and approximately 2,000 manufactured home lots.

cv. **Birmingham, AL MSA:** Regional Submarket consists of at least 16 manufactured home communities and approximately 3,000 manufactured home lots.

cvi. **St. Clair County, MI:** Regional Submarket consists of at least 16 manufactured home communities and approximately 4,000 manufactured home lots.

cvii. **Dayton-Springfield, OH MSA:** Regional Submarket consists of at least 16 manufactured home communities and approximately 3,000 manufactured home lots.

cviii. **Monroe County, MI:** Regional Submarket consists of at least 15 manufactured home communities and approximately 6,000 manufactured home lots.

cix. **Miami Dade County, FL:** Regional Submarket consists of at least 15 manufactured home communities and approximately 5,000 manufactured home lots.

cx. **Osceola County, Fl:** Regional Submarket consists of at least 15 manufactured home communities and approximately 4,000 manufactured home lots.

cxi. **Long Island, NY:** Regional Submarket consists of at least 15 manufactured home communities and approximately 3,000 manufactured home lots.

cxii. **Kent County, DE:** Regional Submarket consists of at least 14 manufactured home communities and approximately 3,000 manufactured home lots.

cxiii. **Livingston County, MI:** Regional Submarket consists of at least 14 manufactured home communities and approximately 4,000 manufactured home lots.

cxiv. **Champaign-Urbana, IL MSA:** Regional Submarket consists of at least 14 manufactured home communities and approximately 3,000 manufactured home lots.

cxv. **St. Lucie County, FL:** Regional Submarket consists of at least 13 manufactured home communities and approximately 8,000 manufactured home lots.

cxvi. **Louisville, KY MSA:** Regional Submarket consists of at least 13 manufactured home communities and approximately 3,000 manufactured home lots.

cxvii. **Jackson County, MI:** Regional Submarket consists of at least 13 manufactured home communities and approximately 3,000 manufactured home lots.

cxviii. **Richmond, VA MSA:** Regional Submarket consists of at least 13 manufactured home communities and approximately 3,000 manufactured home lots.

cxix. **Raleigh, NC MSA:** Regional Submarket consists of at least 13 manufactured home communities and approximately 3,000 manufactured home lots.

cxx. **Santa Fe, NM MSA:** Regional Submarket consists of at least 13 manufactured home communities and approximately 2,000 manufactured home lots.

cxxi.  **Spokane County, WA:** Regional Submarket consists of at least 13 manufactured home communities and approximately 2,000 manufactured home lots.

cxxii.  **Martin County, FL:** Regional Submarket consists of at least 12 manufactured home communities and approximately 3,000 manufactured home lots.

cxxiii.  **San Luis Obispo County, CA:** Regional Submarket consists of at least 12 manufactured home communities and approximately 2,000 manufactured home lots.

cxxiv.  **Yuma, AZ MSA:** Regional Submarket consists of at least 12 manufactured home communities and approximately 2,000 manufactured home lots.

cxxv.  **Charlotte County, FL:** Regional Submarket consists of at least 11 manufactured home communities and approximately 2,000 manufactured home lots.

cxxvi.  **Denton-Lewisville, TX:** Regional Submarket consists of at least 11 manufactured home communities and approximately 3,000 manufactured home lots.

cxxvii.  **Lapeer County, MI:** Regional Submarket consists of at least 11 manufactured home communities and approximately 2,000 manufactured home lots.

cxxviii. **Las Cruces, NM MSA;** Regional Submarket consists of at least 11 manufactured home communities and approximately 2,000 manufactured home lots.

cxxix. **Napa County, CA:** Regional Submarket consists of at least 11 manufactured home communities and approximately 2,000 manufactured home lots.

cxxx. **Columbia, SC MSA:** Regional Submarket consists of at least 11 manufactured home communities and approximately 2,000 manufactured home lots.

cxxxi. **New Castle County, DE:** Regional Submarket consists of at least 10 manufactured home communities and approximately 3,000 manufactured home lots.

cxxxii. **Charlotte, NC MSA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 2,000 manufactured home lots.

cxxxiii. **Greensboro, NC MSA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 2,000 manufactured home lots.

cxxxiv. **Omaha, NE MSA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 2,000 manufactured home lots.

cxxxv.    **Fresno County, CA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 2,000 manufactured home lots.

cxxxvi.   **Savanah, GA MSA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 2,000 manufactured home lots.

cxxxvii.  **Gillette, WY MSA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 2,000 manufactured home lots.

cxxxviii. **El Paso County, TX:** Regional Submarket consists of at least 10 manufactured home communities and approximately 2,000 manufactured home lots.

cxxxix.   **Dauphin County, PA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 1,000 manufactured home lots.

cxl.      **Bend, OR MSA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 1,000 manufactured home lots.

cxli.     **Tyler, TX MSA;** Regional Submarket consists of at least 10 manufactured home communities and approximately 1,000 manufactured home lots.

cxlii.    **Calhoun County, MI:** Regional Submarket consists of at least nine manufactured home communities and approximately 2,000 manufactured home lots.

cxliii.    **Solano County, CA:** Regional Submarket consists of at least nine manufactured home communities and approximately 1,000 manufactured home lots.

cxliv.    **Monterey County, CA:** Regional Submarket consists of at least nine manufactured home communities and approximately 1,000 manufactured home lots.

cxlv.    **Hendry-Okeechobee Counties, FL:** Regional Submarket consists of at least nine manufactured home communities and approximately 1,000 manufactured home lots.

cxlvi.    **Collier County, FL:** Regional Submarket consists of at least eight manufactured home communities and approximately 2,000 manufactured home lots.

cxlvii.    **Flagstaff, AZ MSA:** Regional Submarket consists of at least eight manufactured home communities and approximately 1,000 manufactured home lots.

cxlviii.    **Memphis, TN MSA:** Regional Submarket consists of at least seven manufactured home communities and approximately 2,000 manufactured home lots.

cxlix.  **Albany, GA MSA:** Regional Submarket consists of at least seven manufactured home communities and approximately 1,000 manufactured home lots.

cl.  **Sant Cruz County, CA:** Regional Submarket consists of at least seven manufactured home communities and approximately 1,000 manufactured home lots.

cli.  **Gettysburg, PA MSA:** Regional Submarket consists of at least seven manufactured home communities and approximately 1,000 manufactured home lots.

clii.  **Leon County, FL:** Regional Submarket consists of at least seven manufactured home communities and approximately 1,000 manufactured home lots.

cliii.  **Alachua County, Fl:** Regional Submarket consists of at least six manufactured home communities and approximately 1,000 manufactured home lots.

cliv.  **Lexington-Fayette, KY MSA:** Regional Submarket consists of at least six manufactured home communities and approximately 2,000 manufactured home lots.

clv.  **Escambia County, FL:** Regional Submarket consists of at least five manufactured home communities and approximately 1,000 manufactured home lots.

clvi. **Bay County, FL:** Regional Submarket consists of at least four manufactured home communities and approximately 500 manufactured home lots.

clvii. **Lynchburg, VA MSA:** Regional Submarket consists of at least four manufactured home communities and approximately 500 manufactured home lots.

## VI. CLASS ACTION ALLEGATIONS

137. Plaintiffs bring this action individually and on behalf of all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages, as well as equitable and injunctive relief, on behalf of the following Class:

> All persons and entities who paid rent directly to a Manufactured Home Community Defendant or an Unnamed Co-Conspirator for a manufactured home lot located in a manufactured home community which was included in a JLT Market Report between August 31, 2019 and the present.

138. The following persons and entities are excluded from the above-described proposed Class:

i. Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

ii. All governmental entities;

iii. All Counsel of Record; and

iv. The Court, Court personnel, and any member of their immediate families.

139. The Class is so numerous as to make joinder impracticable. Plaintiffs do not know the exact number of Class members because such information presently is in the exclusive control of Defendants. Plaintiffs believe that due to the nature of the manufactured home

76

industry there are likely hundreds of thousands of Class members in the United States and its territories.

140.    Common questions of law and fact exist as to all members of the Class. Plaintiffs and the Class were injured by the same unlawful scheme, Defendants' anticompetitive conduct was generally applicable to all the members of the Class, and relief to the Class as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

    i.    Whether Defendants exchanged competitively sensitive information;

    ii.    Whether Defendants and their Unnamed Co-conspirators engaged in a combination or conspiracy to fix, raise, maintain or stabilize manufactured home lot rents;

    iii.    The duration of the conspiracy alleged herein and the acts performed by Defendants and their Unnamed Co-conspirators in furtherance of the conspiracy;

    iv.    Whether such combination or conspiracy violated the federal antitrust laws;

    v.    Whether the conduct of Defendants and their Unnamed Co-conspirators, as alleged in this complaint, caused injury to the Plaintiffs and other members of the Class;

    vi.    Whether Defendants caused Plaintiffs and the Class to suffer damages in the form of overcharges on manufactured home lot rents;

    vii.    The appropriate class-wide measure of damages; and

    viii.    The nature of appropriate injunctive relief to restore competition in the manufactured home lot market.

141. Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated rent for manufactured home lots.

142. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

143. Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

144. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

145. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

146.    Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## VII.  CLAIMS FOR RELIEF

### COUNT 1

**Price Fixing in Violation of**
**Section 1 of the Sherman Act (15 U.S.C. § 1)**

**(Against All Defendants)**

147.    Plaintiffs repeat the allegations set forth in Paragraphs 1-146, above, as if fully set forth herein.

148.    Beginning at a time currently unknown to Plaintiffs, but at least as early as August 31, 2019 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

149.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the rents they charge for manufactured home lots and involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

150.    Plaintiffs and members of the Class have been injured and will continue to be injured in the form of overcharges on manufactured home lot rent.

151.    Defendants' anticompetitive conduct had the following effects, among others:

   i.    Competition among Defendants has been restrained or eliminated with respect to manufactured home lots;

    ii.    The price of manufactured home lot rents has been fixed, stabilized, or maintained at artificially high levels; and

    iii.    Manufactured home residents have been deprived of the benefits of free and open competition between and among Defendants.

152.    This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

153.    Plaintiffs and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT 2

### Information Exchange in Violation of
### Section 1 of the Sherman Act (15 U.S.C. § 1)

### (Against All Defendants)

154.    Plaintiffs repeat the allegations set forth in Paragraphs 1-146, above, as if fully set forth herein.

155.    Beginning at a time currently unknown to Plaintiffs, but at least as early as August 31, 2019 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

156.     The contract, combination, or conspiracy involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

157.     Plaintiffs and members of the Class have been injured and will continue to be injured in the form of overcharges on manufactured home lot rent.

158.     This information exchange has been undertaken in furtherance of a price-fixing agreement, which is unlawful *per se*. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the exchange is factually anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

159.     Plaintiffs and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT 3

### Unjust Enrichment

### (Against the Manufactured Home Community Defendants)

160.     Plaintiffs repeat the allegations set forth in Paragraphs 1-146, above, as if fully set forth herein.

161.     Alternatively, from the acts of Defendants as alleged above, the Manufactured Home Community Defendants have been unjustly enriched at the expense of Plaintiffs and members of the Class.

162.     Through Defendants' systematic exchange of competitively sensitive non-public information, the Manufactured Home Community Defendants have artificially increased the price of manufactured home lot rents charged to Plaintiffs and members of the Class.

163.    The Manufactured Home Community Defendants have collected from Plaintiffs and members of the Class artificially high manufactured home lot rents.

164.    The Manufactured Home Community Defendants have been unjustly enriched by retaining the artificially high manufactured home lot rents collected from Plaintiffs and members of the Class.

165.    The retention of these rents by the Manufactured Home Community Defendants violates the fundamental principles of justice, equity, and good conscience and should be returned to Plaintiffs and members of the Class.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully request that:

A.    The Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.    The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal under a quick look or full-fledged rule of reason standard) of Section 1 of the Sherman Act (15 U.S.C. § 1);

C.    The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or

renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D. The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications;

E. The Court grants Plaintiffs and members of the Class all other equitable relief in the nature of disgorgement, restitution, and/or the creation of a constructive trust to remedy the Manufactured Home Community Defendants' unjust enrichment;

F. The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this complaint to the extent provided by law; and

G. The Court award Plaintiffs and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: August 31, 2023

Respectfully submitted,

*/s/ Adam J. Levitt*

Adam J. Levitt
Brian M. Hogan
John E. Tangren
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
(312) 214-7900
alevitt@dicellolevitt.com
bhogan@dicellolevitt.com
jtangren@dicellolevitt.com

Gregory S. Asciolla*
Karin E. Garvey*
Jonathan S. Crevier*
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
(646) 933-1000
gasciolla@dicellolevitt.com
kgarvey@dicellolevitt.com
jcrevier@dicellolevitt.com

Reena Gambhir*
**HAUSFELD LLP**
888 16th Street NW, Suite 300
Washington, DC 20006
(202) 540-7200
rgambhir@hausfeld.com

Scott Martin*
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, New York 10004
(646) 357-1100
smartin@hausfeld.com

Megan E. Jones*
**HAUSFELD LLP**
600 Montgomery Street, #3200
San Francisco, California  94111
(415) 633-1908
mjones@hausfeld.com

Myron M. Cherry
Jacie Zolna
Benjamin Swetland

**MYRON M. CHERRY & ASSOCIATES
LLC**
30 North LaSalle Street, Suite 2300
Chicago, Illinois 60602
mcherry@cherry-law.com
jzolna@cherry-law.com
bswetland@cherry-law.com

*pro hac vice* applications forthcoming

***Counsel for Plaintiffs and the Proposed
Class***