**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE MANUFACTURED HOME LOT RENTS ANTITRUST LITIGATION**<br><br><br>**This Document Relates To:**<br><br>**All Class Actions** | **Case No. 1:23-cv-06715**<br>**Hon. Franklin U. Valderrama**<br><br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**PUBLIC REDACTED VERSION** |

# TABLE OF CONTENTS

I. NATURE OF THE ACTION ................................................................................. 1

II. JURISDICTION, VENUE, AND EFFECT ON INTERSTATE  COMMERCE................... 7

III. THE PARTIES ............................................................................................... 8

IV. FACTUAL ALLEGATIONS ............................................................................ 15

    A. Manufactured Homes in the United States.................................................... 15

    B. Manufactured Home Lots and the Business of Manufactured Home Communities...... 20

    C. The Manufactured Home Industry Has Experienced Significant Consolidation Through Acquisitions ..................................................................................................... 22

    D. High Rents and Deteriorating Conditions Follow Acquisitions..................................... 29

    E. Defendants' Anticompetitive Scheme......................................................... 33

        1. History of Datacomp ........................................................................ 34

        2. Datacomp's JLT Market Reports ................................................... 35

        3. Datacomp Offers Real-Time Information Market Reports ...................... 44

        4. Defendants Agree to Exchange Non-Public Competitively Sensitive Information through the JLT Market Reports and Artificially Increase Manufactured Home Lot Prices 45

        5. Defendants' Systematic Exchange of Competitively Sensitive Information via the JLT Market Reports Violates Section 1 of the Sherman Act................................................. 47

        6. Economic Analysis Supports the Existence of a Cartel ............................................ 51

        7. "Plus Factors" in the Manufactured Home Industry Provide Additional Evidence of a Conspiracy ..................................................................................................... 82

V. ANTICOMPETITIVE EFFECTS AND RELEVANT ANTITRUST MARKET................ 86

    A. The Relevant Product Market Is Manufactured Home Lots ......................................... 87

    B. The Relevant Geographic Market Is National.................................................. 87

    C. Regional Submarkets.................................................................................. 88

VI. CLASS ACTION ALLEGATIONS .................................................................. 110

VII. CLAIMS FOR RELIEF .................................................................................. 113

COUNT 1.............................................................................................................. 113

COUNT 2.............................................................................................................. 115

COUNT 3.............................................................................................................. 116

REQUEST FOR RELIEF ...................................................................................... 116

Plaintiffs Steven Brown, Todd Caldwell, Mary Galusha, Carla Hajek, David Klein, Colleen Levins, Ronald Kazmirzak, Kevin McDonough, Luis Melendez, Charles Neville, Deborah Norvise, Carol Rachelle Roach, Barbara Rowley, and Amber Sailer (together, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action complaint to recover treble damages, injunctive relief, and other relief as appropriate, based on Defendants' Datacomp Appraisal Systems, Inc. ("Datacomp"), Equity LifeStyle Properties, Inc. ("ELS"), Hometown America Management, L.L.C. ("Hometown America"), Lakeshore Communities, Inc. ("Lakeshore"), Sun Communities, Inc. ("Sun Communities"), RHP Properties, Inc. ("RHP"), Yes Communities, LLC ("Yes Communities"), Inspire Communities, LLC ("Inspire Communities"), Kingsley Management, Corp. ("Kingsley"), Cal-Am Properties, Inc.'s ("Cal-Am"), and Murex Properties, L.L.C. ("Murex") (together, "Defendants"), violations of federal antitrust laws and common law.

## I.    NATURE OF THE ACTION

1.      This action arises from Defendants' conspiracy to fix, raise, maintain, and/or stabilize lot rental prices for manufactured and modular homes. Manufactured homes (sometimes called "mobile homes") have long been one of the country's most affordable housing options, particularly for people who do not receive government aid. According to federal data, about 20 million Americans live in manufactured homes, which make up about 6% of U.S. residences. And in 2022, nearly one-third of the 10.5 million adults living in manufactured homes were over the age of 60. The effect of Defendants' conspiracy has been devastating to manufactured home residents. These individuals—whose median annual household income is approximately

$35,000—are being overcharged for what used to be affordable housing. The consequence is that two of society's most vulnerable groups—the elderly and low-income earners—face considerable financial pressures. Some residents are facing evictions. The same effect of the conspiracy is also being felt by people living in modular homes in Defendants' communities.

2.       Manufactured home lots (which, as used herein, encompasses modular home lots) are rentable plots of land on which manufactured and modular homes sit. Manufactured home lots are located in planned residential developments called "manufactured home communities" or "manufactured home parks." Lots in manufactured home communities (which, as used herein, encompasses communities that also contain modular homes) are specifically designed to be rented by those living in manufactured homes and/or modular homes and can range in size from a few lots to hundreds. Most manufactured home residents own their manufactured homes but rent the lots on which their manufactured homes sit from the owners of manufactured home communities. Many modular home residents also own their homes but similarly rent the lots on which their modular homes sit from the owners of manufactured home communities.

3.       Defendants ELS, Hometown America, Lakeshore, Sun Communities, RHP, Yes Communities, Inspire Communities, Kingsley, Cal-Am, and Murex (together referred to as "Manufactured Home Community Defendants") are manufactured home community owners. They are part of a recent wave of large corporate owners who have acquired manufactured home communities across the United States to grow large portfolios of home sites. After acquiring the communities, these buyers have implemented steep annual rent increases on their manufactured home lots, which have caused significant burdens on manufactured home residents.

4.       Defendant Datacomp is the nation's largest provider of manufactured and mobile home data and the Manufactured Home Community Defendants use Datacomp's reports to

coordinate their prices by sharing non-public, competitively sensitive information about manufactured home lot rental prices and occupancy, among other things, throughout the United States.

5.      Manufactured home community owners, including the Manufactured Home Community Defendants, have coordinated with each other to increase manufactured home lot rents (which, as used herein, encompass lot rents for modular homes) systematically and unlawfully by purchasing and using market reports published by Defendant Datacomp. Datacomp's reports, known as JLT Market Reports, ███████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████ █████████████████████████████████████████ █████████████████████████████████

6.      Having access to this non-public, competitively sensitive information, and knowing that one's competitors have access to and are using the same information, allows manufactured home community owners, including the Manufactured Home Community Defendants, to reduce or eliminate competition amongst themselves on price, services, and quality for manufactured home lots. ██████████████████████ █████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████

███████████████████████████████████

████████████████████████████████

████████████████████████████████████

██████████████████████████

7.     The JLT Market Reports and the non-public, competitively sensitive information contained within them are marketed toward owners of manufactured home communities, including the Manufactured Home Community Defendants. For example, in the summer of 2022, Datacomp placed an advertisement in *MHInsider*, a magazine for "Manufactured Housing Professionals," which claimed that the reports could help community owners "stay competitive." Of course, by providing manufactured home communities owners non-public, competitively sensitive information, the JLT Market Reports actually eliminate competition by enabling community owners to coordinate and raise manufactured lot rents to exorbitant prices.



**Figure 1.**

8.     In recent years, manufactured home lot rents paid by manufactured home residents have increased significantly. For example, manufactured home lot rental prices increased by approximately 2.3% per year between 2010 and 2018, which is approximately in line with the average annual inflation of 1.8% during this period. However, consistent with Plaintiffs' conspiracy allegations, manufactured home lot rental prices increased at a significantly higher rate between 2019 and 2021—9.1% per year (while inflation was only 3%).

5

The Manufactured Home Community Defendants could never have demanded these rental price increases unilaterally. To implement the increases, they needed to conspire. They did this by exchanging non-public, competitively sensitive information through Datacomp's JLT Market Reports. In the words of Ross Partrich, CEO of Defendant RHP: **"We find the JLT Market Reports to be . . . extremely helpful for rent increases across our portfolio throughout the country."**

9.      The exchange of non-public, competitively sensitive information through Datacomp's JLT Market Reports allowed Defendants to carry out a price fixing conspiracy to artificially inflate manufactured home lot rents in violation of Section 1 of the Sherman Act and common law. The exchange of information through the JLT Market Reports is also separately unlawful under Section 1 of the Sherman Act as an unlawful information exchange. The supracompetitively-inflated manufactured home lot rent increases would not have been possible but for the conduct described herein.

10.      Plaintiffs bring this antitrust class action lawsuit on behalf of themselves and a nationwide Class of all similarly situated persons and entities who paid rent for a manufactured or modular home lot situated in a manufactured home community included in a JLT Market Report or located in a Regional Submarket between August 31, 2019 and the present (the "Relevant Time Period"). Because of Defendants' violations of Section 1 of the Sherman Act, Plaintiffs and members of the Class were injured by paying significant overcharges on manufactured home lot rents throughout the United States and the Manufactured Home Community Defendants were unjustly enriched by their conduct.

11.      If Defendants are permitted to continue their anticompetitive scheme, Plaintiffs and members of the Class will continue to pay supracompetitive rents for manufactured home

lots. Plaintiffs bring this action to seek damages and permanently enjoin Defendants' ongoing efforts to coordinate their prices by sharing competitively sensitive information for manufactured home lots.

## II. JURISDICTION, VENUE, AND EFFECT ON INTERSTATE COMMERCE

12.     Plaintiffs bring this antitrust class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to (i) recover treble damages and the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiffs and members of the Class; (ii) enjoin Defendants' anticompetitive conduct; and (iii) for such other relief as is afforded under the laws of the United States for Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

14.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all relevant times, one or more Defendants resided, transacted business, was found, is licensed to do business, and/or had agents in this District.

15.     This Court has personal jurisdiction over each Defendant pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), because, among other things, each Defendant: (a) transacted business throughout the United States, including in this District; (b) leased manufactured home lots to individuals throughout the United States, including in this District; and/or (c) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District. Each Defendant has purposefully availed itself of the privilege of conducting business activities within the United States and has the

requisite minimum contacts therein because each Defendant committed intentional acts that were intended to cause and did cause injury within the United States.

16.     The activities of Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

17.     This action is also instituted to secure injunctive relief against Defendants to prevent them from further violations of Section 1 and 3 of the Sherman Act as hereinafter alleged.

18.     No other forum would be more convenient for the parties and witnesses to litigate this case.

### III.   THE PARTIES

19.     Plaintiff Steven Brown is a resident of Converse, Texas. During the Relevant Time Period, Brown rented a manufactured home lot located in a manufactured home community named Summit Ridge, which is owned and managed by Defendant Sun Communities. During the Relevant Time Period, Brown paid monthly rent to Sun Communities for this manufactured home lot. Brown paid higher rental prices by reason of the violations alleged herein.

20.     Plaintiff Todd C. Caldwell is a resident of Jacksonville, Florida. During the Relevant Time Period, Caldwell rented a manufactured home lot located in a manufactured home community named Continental Village, which is owned and managed by Defendant Inspire Communities. During the Relevant Time Period, Caldwell paid monthly rent to Inspire Communities for this manufactured home lot. Caldwell paid higher rental prices by reason of the violations alleged herein.

21.     Plaintiff Mary Galusha is a resident of Colorado Springs, Colorado. During the Relevant Time Period, Galusha rented a manufactured home lot located in a manufactured home community named Antelope Ridge, which is owned and managed by Defendant Yes Communities. During the Relevant Time Period, Galusha paid monthly rent to Yes Communities for this manufactured home lot. Galusha paid higher rental prices by reason of the violations alleged herein.

22.     Plaintiff Carla Hajek is a resident of Justice, Illinois. During the Relevant Time Period, Hajek rented a manufactured home lot located in a manufactured home community named Sterling Estates, which is owned and managed by Defendant RHP. During the Relevant Time Period, Hajek paid monthly rent to RHP for this manufactured home lot. Hajek paid higher rental prices by reason of the violations alleged herein.

23.     Plaintiff David Klein is a resident of North Fort Myers, Florida. During the Relevant Time Period, Klein rented a manufactured home lot located in a manufactured home community named Del Tura Community, which is owned and managed by Defendant Hometown America. During the Relevant Time Period, Klein paid monthly rent to Hometown America for this manufactured home lot. Klein paid higher rental prices by reason of the violations alleged herein.

24.     Plaintiff Colleen Levins is a resident of Shelby Township, Michigan. During the Relevant Time Period, Levins rented a manufactured home lot located in a manufactured home community named Lake Villa, which is owned and managed by Defendant Kingsley. During the Relevant Time Period, Levins paid monthly rent to Kingsley for this manufactured home lot. Levins paid higher rental prices by reason of the violations alleged herein.

25.     Plaintiff Ronald Kazmirzak is a resident of Justice, Illinois. During the Relevant Time Period, Kazmirzak rented a manufactured home lot located in a manufactured home community named Sterling Estates, which is owned and managed by Defendant RHP. During the Relevant Time Period, Kazmirzak paid monthly rent to RHP for this manufactured home lot. Kazmirzak paid higher rental prices by reason of the violations alleged herein.

26.     Plaintiff Kevin McDonough is a resident of Lake Worth, Florida. During the Relevant Time Period, McDonough rented a manufactured home lot located in a manufactured home community named Palm Breezes Club, which is owned and managed by Defendant Cal-Am. During the Relevant Time Period, McDonough paid monthly rent to Cal-Am for this manufactured home lot. McDonough paid higher rental prices by reason of the violations alleged herein.

27.     Plaintiff Luis Melendez is a resident of Orlando, Florida. During the Relevant Time Period, Melendez rented a manufactured home lot located in a manufactured home community named Starlight Ranch, which is owned and managed by Defendant ELS. During the Relevant Time Period, Melendez paid monthly rent to ELS for this manufactured home lot. Melendez paid higher rental prices by reason of the violations alleged herein.

28.     Plaintiff Charles Neville is a resident of Aliquippa, Pennsylvania. During the Relevant Time Period, Neville rented a manufactured home lot located in a manufactured home community named the Meadows at Countrywood, which is owned and managed by Defendant ELS. During the Relevant Time Period, Neville paid monthly rent to ELS for this manufactured home lot. Neville paid higher rental prices by reason of the violations alleged herein.

29.     Plaintiff Deborah Norvise is a resident of Las Vegas, Nevada. During the Relevant Time Period, Norvise rented a manufactured home lot located in a manufactured home

10

community named Tropicana Palms, which is owned and managed by Defendant Cal-Am. During the Relevant Time Period, Norvise paid monthly rent to Cal-Am for this manufactured home lot. Norvise paid higher rental prices by reason of the violations alleged herein.

30.     Plaintiff Carol Rachelle Roach is a resident of Clearwater, Florida. During the Relevant Time Period, Roach rented a manufactured home lot located in a manufactured home community named Bayside Waters, which is owned and managed by Defendant Murex. During the Relevant Time Period, Roach paid monthly rent to Murex for this manufactured home lot. Roach paid higher rental prices by reason of the violations alleged herein.

31.     Plaintiff Barbara Rowley is a resident of Federal Heights, Colorado. During the Relevant Time Period, Rowley rented a manufactured home lot located in a manufactured home community named Holiday Hills Village, which is owned and managed by Defendant ELS. During the Relevant Time Period, Rowley paid monthly rent to ELS for this manufactured home lot. Rowley paid higher rental prices by reason of the violations alleged herein.

32.     Plaintiff Amber Sailer is a resident of Dallas, Texas. During the Relevant Time Period, Sailer rented a manufactured home lot located in a manufactured home community named Rolling Hills which is owned and managed by Defendant Yes Communities. During the Relevant Time Period, Sailer paid monthly rent to Yes Communities for this manufactured home lot. Sailer paid higher rental prices by reason of the violations alleged herein.

33.     Defendant Datacomp Appraisal Systems, Inc. is a Michigan corporation, headquartered in Grand Rapids, Michigan. Datacomp is the nation's largest provider of manufactured and mobile home valuations, inspections, and market data. Datacomp's client list includes the top 10 largest manufactured home community owners, regional property

management companies, developers, lenders, appraisers, homeowner associations and real estate brokers. Datacomp was purchased by Defendant ELS in December 2021 for $43 million.

34.    Defendant Equity LifeStyle Properties, Inc. is a Maryland corporation, headquartered in Chicago, Illinois. ELS owns, operates, or has a controlling interest in more than 200 manufactured home communities across the United States, including three in this District, with approximately 70,000 manufactured home sites nationwide. Datacomp lists ELS as one of its clients on its website. Upon information and belief, ELS uses Datacomp's JLT Market Reports to price manufactured home lot rents.

35.    Defendant Hometown America Management, L.L.C., a wholly owned subsidiary of Hometown America, L.L.C., is a Delaware corporation, headquartered in Chicago, Illinois. Hometown America is also a subsidiary of Calzada Capital Partners, L.L.C., a private equity company that invests in real estate operating companies on a global basis. Hometown America owns, operates, or has a controlling interest in 66 manufactured home communities across the United States, including one in this District. Datacomp lists Hometown America as one of its clients on its website. Upon information and belief, Hometown America uses Datacomp's JLT Market Reports to price manufactured home lot rents.

36.    Defendant Lakeshore Communities, Inc. is an Illinois corporation, headquartered in Skokie, Illinois. Lakeshore is one of the largest privately held owner/operators of manufactured home communities in the United States and owns manufactured home communities across the United States. Datacomp lists Lakeshore Communities as one of its clients on its website. Upon information and belief, Lakeshore uses Datacomp's JLT Market Reports to price manufactured home lot rents.

37.     Sun Communities, Inc. is a Michigan corporation headquartered in Southfield, Michigan. Sun Communities owns, operates, or has a controlling interest in 353 manufactured home communities across the United States, including two in this District, with approximately 120,000 manufactured home sites nationwide. Datacomp lists Sun Communities as one of its clients on its website. Upon information and belief, Sun Communities uses Datacomp's JLT Market Reports to price manufactured home lot rents.

38.     RHP Properties, Inc., is a Michigan corporation, headquartered in Farmington Hills, Michigan. RHP is the largest privately held manufactured home community owner in the United States. RHP owns, operates, or has a controlling interest in more than 370 communities across the United States, including three in this District, with approximately 80,000 manufactured home sites nationwide, a large portion of which are owned by Brookfield Asset Management. Datacomp lists RHP as one of its clients on its website. Upon information and belief, RHP uses Datacomp's JLT Market Reports to price manufactured home lot rents.

39.     Yes Communities, LLC is a Delaware corporation, headquartered in Denver, Colorado. Yes Communities owns, operates, or has a controlling interest in more than 200 communities across the United States with approximately 55,000 home sites. Yes Communities is partially owned by Stockbridge Capital Group, LLC, a private equity firm with $33.7 billion of assets under management. The remainder of the company is owned by the Government of Singapore Investment Company and the Pennsylvania Public School Employees Retirement System. Datacomp lists Yes Communities as one of its clients on its website. Upon information and belief, Yes Communities uses Datacomp's JLT Market Reports to price manufactured home lot rents.

40.     Inspire Communities, LLC is a Delaware corporation, headquartered in Phoenix, Arizona. Inspire Communities owns, operates, or has a controlling interest in over 130 manufactured home communities across the United States, including three in this District. Inspire is wholly owned by Granite Communities, LLC. In 2017, Apollo Global Management, a private equity firm with over $500 billion of assets under management, acquired Inspire Communities. Datacomp lists Inspire Communities as one of its clients on its website. Upon information and belief, Inspire Communities uses Datacomp's JLT Market Reports to price manufactured home lot rents.

41.     Kingsley Management, Corp. is a Utah corporation, headquartered in Provo, Utah. Kingsley is one of the largest privately held owner/operators of manufactured home communities in the United States and owns manufactured home communities across the United States. Datacomp lists Kingsley as one of its clients on its website. Upon information and belief, Kingsley uses Datacomp's JLT Market Reports to price manufactured home lot rents.

42.     Cal-Am Properties, Inc., is a California corporation, headquartered in Costa Mesa, California. Cal-Am is one of the largest privately held owner/operators of manufactured home communities in the United States and owns manufactured home communities across the United States. Datacomp lists Cal-Am as one of its clients on its website. Upon information and belief, Cal-Am uses Datacomp's JLT Market Reports to price manufactured home lot rents.

43.     Murex Properties, L.L.C. is a Michigan corporation, headquartered in Fort Myers, Florida. Murex is one of the largest privately held owner/operators of manufactured home communities in the United States and owns manufactured home communities across the United States. Datacomp lists Murex as one of its clients on its website. Upon information and belief, Murex uses Datacomp's JLT Market Reports to price manufactured home lot rents.

14

44. Various other persons, firms, and corporations not named as Defendants use Datacomp's JLT Market Reports to price manufactured home lot rents and have participated as co-conspirators with Defendants (the "Unnamed Co-conspirators"). The Unnamed Co-conspirators have also performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of the Unnamed Co-conspirators.

45. Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

46. Each Defendant named herein acted as the agent of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

47. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## IV. FACTUAL ALLEGATIONS

48. During the Relevant Time Period, the Manufactured Home Community Defendants conspired and coordinated with each other and Datacomp to systematically increase manufactured home lot rents and thus harm manufactured and modular home residents who paid elevated rents as a result.

### A. Manufactured Homes in the United States

49. Unlike traditional site-built homes, which are constructed entirely on the homeowner's property, manufactured homes are built in factories and then transported to the property, or lot, where they will be set up.

50. Mobile homes and manufactured homes refer to the same type of home. The only difference between "mobile" and "manufactured" homes is the date they were built. In 1976, the

15

Department of Housing and Urban Development ("HUD") imposed new codes and standards for the construction of factory-built homes. With these codes, HUD stopped using the term "mobile home" and began using "manufactured home." Therefore, a home built in a factory prior to June 15, 1976, is a "mobile" home, and one built after June 15, 1976, is a "manufactured" home. While the term "mobile home" is still commonly used, in this complaint the term "manufactured home" will refer to any factory-built home regardless of when it was built.

51. While manufactured homes come in various styles and layouts, there are two major types of homes: single-wide or double-wide. A single-wide home is built in one long piece while a double-wide is built in two separate sections which are joined together at a home site. As their name suggests, double-wide homes are typically twice the size of single-wide homes. A double-wide home is more expensive and requires a bigger lot than a single-wide home.

52. Manufactured homes are not built on a permanent foundation. As described by FEMA, "Manufactured homes are built on a chassis consisting of main steel beams and cross members; fitted axles, leaf springs, and wheels making up the running gear; and a steel hitch assembly." The chassis foundation is covered by "skirting" or "underpinning," which goes around the home to enclose the crawl space below the home.

53. Modular homes are another type of factory-built home. Modular homes, as described by FEMA, "are prefabricated houses that consist of sections, or modules, which are constructed away from the building site. The prefabricated modules are delivered and installed on a permanent foundation on the home site."

54. Comparing manufactured and modular homes, FEMA has further stated, "One easy way to distinguish between a manufactured home and a modular home is to look at the framing. A manufactured home will generally have a metal frame while a modular home will

16

typically have a wood frame. However, the metal frame of a manufactured home may not be visible if it has been placed on a permanent foundation and skirted to look as though was a "stick-built" home constructed on site." This distinction, of course, is irrelevant in terms of the payment of manufactured home lot rents.

55.     Manufactured homes are generally less expensive than site-built homes. It is estimated that manufactured home construction costs 40-50% less per square foot than site-built homes.

56.     Following substantial cuts to federal housing budgets in the 1980s, people sought out different sources of affordable housing, and many moved into manufactured homes. Indeed, these federal housing cuts made manufactured homes the fastest-growing type of residence in the 1980s. In the 1990s, manufactured homes were responsible for 66% of new affordable housing produced in the U.S. Today, manufactured homes are the largest source of unsubsidized affordable housing in the United States (and in most cases the cheapest). According to Esther Sullivan in *Manufactured Insecurity: Mobile Home Parks and Americans' Tenuous Right to Place*, due to the lack of other forms of affordable housing, manufactured homes are a crucial national affordable housing infrastructure and a primary pathway to low-income homeownership. Nearly one in four homes purchased by a first-time, low-income household is a manufactured home.

57.     As of January 2023, the average sale price of a new manufactured home was $128,300 while the average sale price, as of February 2022, of a so-called "stick built" home was $400,500.

58.     Accordingly, manufactured homes provide an important source of affordable housing to a large swath of the U.S. population. Approximately 20 million Americans, or 6% of

the U.S. population, live in manufactured homes. And, while all types of people live in manufactured homes, there is a high concentration of various vulnerable groups, including the elderly, low-income earners, and veterans. There is also a high concentration of people with disabilities or mobility issues living in manufactured homes, since these homes are one-story, low-maintenance, and easily ramped. According to a 2022 study, 12.7% of manufactured home residents ages 60 and older have a significant mobility-related disability.

59.     According to the Consumer Financial Protection Bureau ("CFPB"), in 2022 nearly one-third of the 10.5 million adults living in manufactured homes were over the age of 60.



**Number of adults living in mobile homes by age group, February 2022 (in millions)**

**Figure 2.**

60.     A study by the CFPB found that a greater proportion of households that live in manufactured homes are headed by a retiree (32%) than site-built households (24%).

61.     In fact, 70% of ELS's portfolio of manufactured home communities are age restricted or have a resident base with an average age over 55.

62.    According to a 2020 report issued by Fannie Mae, the median annual household income of manufactured home residents who owned their homes was about $35,000. This is half of the median annual income of site-built homeowners. Over a quarter of manufactured homeowners earn less than $20,000 a year.



**Figure 3: Income Distribution of Manufactured vs. Site-Built Homeowners.**

63.    These socioeconomic statistics stand in sharp contrast to those involving Defendants. Sam Zell, the Chairman of the Board of ELS until his passing in May 2023, was reportedly worth over $5.3 billion. And the CEO of ELS, Marguerite Nader, earns over $4 million a year while the CEO of Sun Communities, Gary Shiffman, earns nearly $15 million a year—much of which compensation, for both executives, is in the form of a bonus tied to performance.

64.    Additionally, manufactured homes provide an important source of affordable housing to people in rural areas. While approximately 6% of homes nationally are manufactured

homes, 14% of homes in rural areas are manufactured homes—*i.e.*, more than double the overall national number.

### B. Manufactured Home Lots and the Business of Manufactured Home Communities

65.     A manufactured or modular home is placed on a plot of land referred to as a "manufactured home lot," or "manufactured home site."

66.     Unlike site-built homes where the land and the home are considered one piece of property and have one owner, manufactured homes and manufactured home lots are considered separate pieces of property and often have different owners.

67.     There are three main ownership configurations for manufactured and modular homes: (1) **rent-rent** where both the home and the home lot are owned by a landlord and rented to the resident; (2) **own-own** where both the home and home lot are owned by the resident; and (3) **own-rent** where the home is owned by the resident, and the home lot is rented. Of the three ownership configurations, own-rent is the most common.

68.     Most "own-rent" manufactured home residents live in manufactured home communities or parks where they rent a manufactured home lot from a property manager such as the Manufactured Home Community Defendants. Manufactured home communities range in size in terms of the number of lots they contain, but some large communities contain over 700 or 800 lots. Residents of these communities pay monthly rents for the manufactured home lot and other utilities and services, such as water service and trash removal.



**Figure 4: example of a manufactured home community (Getty Images).**

69.     Some manufactured home communities also contain modular homes. Like other residents in the community, modular home residents typically own their own modular home but lease a lot from a property manager, such as the Manufactured Home Community Defendants.

70.     Moving a manufactured home, if it can be moved at all, is costly, which means residents are sometimes beholden to the parks where they live due to financial constraints. Beyond the costs, manufactured homes are often structurally challenging to move once sited on a lot. Since the 1950s, manufactured homes have been designed and used as permanent affordable housing. The manufactured home industry has responded to housing demand by building increasingly large and complex manufactured home units that are effectively immobile and are meant to be transported only once, from the factory to the site of installation. Indeed, many municipalities also have rules governing when and how manufactured homes can be transported, making relocation difficult. Additionally, vacancy rates in existing manufactured home communities are commonly in the single digits, making available lots hard to find. Even if vacant lots are available, many manufactured home communities refuse to accept pre-owned or

older manufactured homes from other sites. Thus, once installed on a site, manufactured homes are difficult to move.

### C. The Manufactured Home Industry Has Experienced Significant Consolidation Through Acquisitions

71. For decades, the manufactured home community industry was highly fragmented with many operators each owning only a single community. More recently, and particularly within the past decade, the industry experienced considerable consolidation with large corporate owners, including the Manufactured Home Community Defendants, buying up communities across the United States. This consolidation facilitated the conspiracy alleged herein.

72. The following is a sampling of recent large acquisitions made by the Manufactured Home Community Defendants:

  i.   **ELS:** In 2018, ELS purchased two manufactured home communities in South Florida for $50.35 million and $49.5 million respectively. These two purchases added another 1,534 manufactured home lots to ELS's portfolio. In 2020, ELS purchased a 484-lot manufactured home community in Arizona with entitlements to an additional 228 lots for development.

 ii.   **Hometown America:** In 2019, Hometown America paid $237.4 million for Plaza del Rey, an 800-lot manufactured home community in Sunnyvale, California. In 2021, Hometown America spent over $100 million purchasing two manufactured home communities in California with a combined 410 manufactured home lots and a community in Claverton, New York with over 200 lots.

22

iii.   **Lakeshore:** In 2020, Lakeshore purchased a 60-lot community in Las Vegas, Nevada. In 2022, Lakeshore purchased a 150-lot community in Northfield, Minnesota.

iv.   **Sun Communities:** In 2019, Sun Communities spent over a billion dollars to acquire over 12,000 new or redeveloped lots. Among its purchases was a 31-communitiy portfolio from a Connecticut-based manager for $346.6 million. In 2020, Sun Communities acquired an additional 24 manufactured home communities and RV resorts. In 2022, Sun Communities purchased two manufactured home communities in Riverside County for $40 million with a total of 379 manufactured home lots. That same year it bought a community outside of Houston for $29.7 million with 255 manufactured home lots, a community outside of Phoenix, Arizona for $22.4 million with 195 manufactured home lots, and a community outside of Lewiston, Maine for $15.9 million with 231 manufactured home lots. In early 2023, Sun Communities acquired a manufactured home community in Boyne City, Michigan with 68 lots and 72 more development sites.

v.   **RHP:** In early 2019, RHP announced that it acquired 17 manufactured home communities in Arizona, Colorado, Indiana, Pennsylvania, and Wisconsin for $170M. Throughout the rest of the year, RHP made several more acquisitions, including Country Club Woods, a community with 308 lots located in this District. In 2021, RHP purchased 29 manufactured home communities in Illinois, Indiana, and Michigan containing more

than 4,200 manufactured home lots for $184 million. In 2022, RHP purchased 50 manufactured home communities, composed of 41 communities in Wisconsin, seven in Minnesota, and two in Michigan. The acquisition added 5,232 manufactured home lots to RHP's portfolio. That same year, RHP purchased three manufactured home communities in Delaware and a community in Brandywine, Maryland consisting of 260 manufactured home lots with approval for expansion for a total of 400 more. In 2023, RHP acquired a manufactured home community in Imperial, Missouri, and another in Belleville, Illinois

vi.  **Yes Communities:** In 2018, Yes Communities purchased 24 manufactured home communities comprising over 6,800 residential home sites in the states of Michigan, Indiana, Illinois, and Texas. In 2019, Yes Communities purchased five manufactured home communities in Indiana and Michigan, comprised of 1,460 manufactured home lots. In 2021, it purchased two manufactured home communities outside of Chicago for $43 million. The acquisitions added another 366 manufactured home lots to Yes Communities portfolio.

vii.  **Inspire Communities:** During the Relevant Time Period, Inspire Communities has acquired over 100 manufactured home communities across the United States.

viii.  **Kingsley:** In 2015, Kingsley purchased a manufactured home community in Palm Harbor, Florida with 213 lots for nearly $20 million.

       ix.    **Cal-Am:** In 2017, Cal-Am purchased Far Horizon East Mobile Home Park in Tucson, Arizona, for $33 million, gaining 415 new manufactured home lots.

       x.    **Murex:** In 2017, Murex purchased The Gardens in Parrish, Florida, gaining 635 manufactured home lots.

73. Many of the Manufactured Home Community Defendants publicly advertise their appetite to purchase new manufactured home communities. For example, ELS and Sun Communities each offer "all cash transactions," "quick closings" and the ability for the seller to receive corporate stock or ownership to defer the seller's tax liabilities. Lakeshore advertises that it "is always actively acquiring manufactured home communities" and that it "offer[s] flexible and fast transactions, with no financing contingencies." RHP advertises that it has the "ability to close deals fast-no brokers and no commissions."

74. After purchasing manufactured home communities, these corporate buyers, including the Manufactured Home Community Defendants, have significantly raised manufactured home lot rents based on the unlawful conduct alleged herein, which has caused considerable financial pressure on manufactured home residents who are typically older, lower income, and less wealthy than residents of traditional site-built homes.

75. On ELS's Q2 2023 earnings call, CEO Marguerite Nader explained that the company's lot rent increases have historically outpaced social security cost of living adjustments ("COLA"). Nader recognized that ELS's residents, 70% of whom live in age qualified communities and are dependent on social security checks—the average social security check is $1,700 for an individual and $2,700 for a couple—are focused on COLA. Yet, ELS touts its outperformance of annual lot rent increases compared to COLA in its investor presentations.

76. The Manufactured Home Community Defendants have prioritized acquiring properties that will allow them to raise lot rents. For example, Sun Communities has specifically targeted acquiring properties with a "minimum rent growth potential of 3% per annum."

77. Over the past several years, private equity and other investment firms have become increasingly involved in the manufactured home lot space. Commentators agree that this trend, which has led to management of manufactured communities from afar (rather than by a local "mom and pop" operation) by profit-drive enterprises, has had a significant effect on conditions in the communities and on the lot rents. One investment executive noted that because "mom-and-pop owners have kept their rents more or less low," private equity firms have taken the opportunity to dramatically increase rents to quickly increase profits once those firms purchase the communities. A business school professor commented that a private equity firm's "challenge is to turn something they bought for $100 million into something that's worth $300 million. That's the end game for a private equity fund."

78. The recent involvement of private equity and other investment firms includes the following:

- One of the first private equity investors in manufactured home communities was Equity Group Investments. Defendant ELS, a publicly traded real estate investment trust (or REIT), is currently one of the largest manufactured home community owners in the United States. Large investment managers such as The Vanguard Group, Blackrock, Price T Rowe Associates, and Aristotle Capital Management are ELS's largest investors. The immediate past chairman of the board of ELS, billionaire Sam Zell, who passed away earlier this year, reportedly earned millions of dollars in director's fees and stock awards from ELS.

26

- Defendant Yes Communities was formed in 2008 by Stockbridge Capital, a private equity real estate manager which then sold 71% of Yes Communities to two institutional investors, the sovereign wealth fund Government of Singapore Investment Company (GIC) and the Pennsylvania Public School Employees Retirement System, a pension fund. Adam Gallistel, Regional Head for Americas, GIC Real Estate, said, "The manufactured housing sector is a unique and highly-attractive niche in the U.S. residential market, which GIC has been exploring for some time. Given the relative lack of consolidation, it is very difficult to enter this sector in scale." Notably, as of the end of 2017, Pennsylvania PSERS reported that its investment in Yes Communities has increased in value by 33% since the pension fund invested in August 2016. Yes Communities' home site rental business accounted for 60% of the company's revenues in 2016.

- In May 2016, Brookfield Asset Management, a real estate and private equity manager, acquired 135 manufactured home communities in 13 states with a total of 33,010 home sites for approximately $2 billion in 2017. More specifically, Brookfield Strategic Real Estate Partners II, a $9 billion private equity real estate fund, acquired four portfolios of manufactured home communities operated by Defendant RHP Properties: RHP Western Portfolio Group, American Home Portfolio Group, AMC Portfolio and MHC Portfolio IV.

- In June 2013, private equity firm Centerbridge Capital acquired National RV Communities, which, among other things, owned senior manufactured home communities. After renaming it Carefree Communities, Inc., Centerbridge continued to expand Carefree, spending, according to a Wall Street Journal report, more than $1

27

billion. In March 2016, by which point Centerbridge and Carefree had acquired more than 40 additional manufactured housing communities, Centerbridge sold Carefree for $1.68 billion to publicly-traded manufactured housing REIT Defendant Sun Communities.

- In 2013, the private equity firm the Carlyle Group, which has $382 billion in assets under management, purchased its first two manufactured home communities. Since then, the Carlyle Group has made additional purchases of manufactured home communities, reportedly owning several thousand lots or 30 communities as of 2022. The Carlyle Group's recent purchases include a community in Florida for $72 million and four in Arizona for $230 million total.

- In 2017, Apollo Global Management, a private equity firm with $631 billion in assets under management, acquired Defendant Inspire Communities, an owner of manufactured home communities around the country.

- In early 2018, private equity firm TPG Capital purchased dozens of manufactured home communities across the country that were managed by RV Horizons. According to government-sponsored mortgage lender Fannie Mae, TPG had invested $400 million in manufactured housing properties in the 24 months prior to August 2019, making it one of the top 10 investors in manufactured home communities during the two-year period. RV Horizons became Impact Communities, and TPG named their manufactured home community arm Strive Communities. Notably, the co-owner of RV Horizons, Frank Rolfe, is the person who notoriously quipped that a manufactured home community "is like a Waffle House where the customers are chained to their booths."

- In July 2018, private equity firm Blackstone Group LP acquired a portfolio of 14 manufactured home communities for approximately $172 million and subsequently, with its operating partner, Treehouse Communities, has continued to acquire additional manufactured home communities and is reportedly looking to acquire more. Notably, Blackstone, which has $1 trillion in assets under management and owns manufactured home communities in California, recently contributed $6.2 million in a campaign in California to limit rent control.

- In 2018, the Texas Employees Retirement System, a $35.9 billion public pension fund, invested $50 million in MH Legacy Fund II. MH Legacy Fund II is a real estate fund that is jointly managed by Horizon Land Company and the private equity firm Federal Capital Partners. Horizon Land Company operates more than 170 manufactured home communities in the eastern half of the United States.

**D. High Rents and Deteriorating Conditions Follow Acquisitions**

79.     While corporate buyers, including the Manufactured Home Community Defendants, have touted the acquisitions as being beneficial to the residents of manufactured home communities, residents strongly disagree. Across the United States, manufactured home residents have been very vocal about issues with their new landlords, including the Manufactured Home Community Defendants. For instance, according to a *Los Angeles Times* report, residents of Florence Commons, a manufactured home community in Tennessee owned by Defendant Yes Communities, have complained that between 2013-2019 rents increased almost 30%, but community conditions have worsened and basic requests for repairs went unanswered.

80.     Similarly, in Michigan, manufactured home residents living in communities owned by Defendants Kingsley and Yes Communities saw their lot rents increase substantially

after those companies purchased manufactured home communities from small operators. According to a 2022 article from the *Oakland Press*, residents have complained that "[these companies] buy these parks just to make money with no intentions of doing any good for the community . . . They don't add anything to make it better. You don't see where your dollars go."

81.     Likewise, after Murex Properties's 2022 purchase of Caribbean Isles, a 55+ mobile home community in Largo, Florida, lot rents for new residents nearly doubled. Real estate agents report that these extreme rent increases have made the resident-owned homes in the community virtually impossible to sell, according to reporting in a 2023 *Chattanooga Times Free Press* article.

82.     And in Florida, residents of ELS's Down Yonder manufactured home community near Tampa received a 7.5% rent increase in 2023 after rents rose an average of 4.4% over the past five years. Additionally, residents are now also charged separately for water and sewage, services that used to be included in the lot rent, according to a 2023 *The Guardian* article. These increased charges have come while residents are facing a host of issues in the community such as disrepair and lack of disability accommodations.

83.     In Minnesota, according to a report in *The Guardian*, in another ELS manufactured home community, Cimmaron, residents were faced with a 2023 lot rent increase of 7.75%, twice as much as the prior year, while similarly facing issues with lack of repairs and upkeep in the community.

84.     After Lakeshore purchased Viking Terrace in Northfield, Minnesota, a notice to "All Residents of Viking Terrace," dated March 31, 2022, increased lot rents by $65.00 per month, to $485.00, effective June 1, 2022. The notice also stated there was a $4.00 pet fee, and a late fee of $1.00 per day for late rental payments. A resident speaking on an audio report

regarding Lakeshore's ownership of the community, called the increases "horrendous." Viking Terrace contains more than 100 homes, with many residents who are low-income and who speak Spanish as their primary or only language.

85.     The complaints of residents have caught the attention of government officials. For instance, earlier this year, Connecticut Attorney General William Tong launched an investigation into Defendant Sun Communities over its mismanagement of a manufactured home community in Killingworth, Connecticut that it had acquired in 2019. The Attorney General's office reported that it had received, following the Sun Communities acquisition, numerous complaints from residents "who have seen sustained, escalating rent hikes despite deteriorating conditions."

86.     Last year, Minnesota Attorney General Keith Ellison investigated Defendant Lakeshore for how it handled its acquisition of Viking Terrace. Shortly after purchasing Viking Terrace in April 2022, Lakeshore raised lot rents by 20% and imposed draconian rules, including prohibiting vegetable gardens without Lakeshore's permission, forbidding outdoor laundry lines, forbidding neighborhood walks after 10:00 PM, and banning fenced-in-yards for pets. Viking Terrace residents reported to the Minnesota Attorney General's Office that the new rules felt like substantial modifications to prior rules and were being enforced against them aggressively. Each demand was accompanied with a threat that a failure to comply could result in an eviction. Even when they did not receive an eviction notice, the rules and threats alone terrified the residents. The investigation uncovered multiple violations of Minnesota law and the Attorney General demanded that Lakeshore "cease and desist enforcing its new rules and leases."

87.     Also in 2022, in response to complaints from manufactured home residents about out-of-state corporate owners controlling more and more manufactured home communities and substantially raising rents, the Colorado state legislature passed a law offering greater protections

31

to residents, including giving residents 120 days to buy a community from a landlord looking to sell its land. Defendants ELS, RHP, and Kingsley were three of the manufactured home community operators in Colorado that received the most complaints on the state system. Additionally, in 2020, Kingsley reached a six-figure settlement agreement with the State of Colorado, in which it agreed to repay manufactured home residents in seven manufactured home communities for illegally withholding security deposits, imposing arbitrary fees, and improperly charging attorney fees. Colorado's Attorney General Phil Weiser stated that the investigation served as a warning to other community managers who have also been the subject of complaints across the state.

88.     In 2020, New York state senators Jen Metzger, James Skoufis, and David Carlucci wrote a letter to Defendant RHP, calling on RHP to maintain current rental lot rates. Citing complaints from residents about exorbitant annual lot rent increases, ignored requests for maintenance, and unusable property amenities, the senators wrote, "The business policies and practices cited above undercut any possible justification for yet another substantial lot rent increase."

89.     Despite the flood of complaints from manufactured home residents and attention from government officials, manufactured home community owners, including the Manufactured Home Community Defendants, have continued to substantially raise rents for manufactured home lots, including during the Relevant Time Period. The large corporate owners of manufactured home communities have been clear about their intentions to turn manufactured home communities into cash cows, and manufactured home community managers and investors have been hugely successful in accomplishing this. According to real estate research firm Green Street Advisors, between 2004 and 2018, operating income from manufactured home

communities rose 87% and never declined, even during the 2008 financial crisis. Green Street Advisors analyst John Pawlowski referred to players in the industry as "rocket ships" and stated, "It's baffling how good of a business it has been."

90.     Indeed, in communications with Plaintiffs about rent increases, the Manufactured Home Community Defendants do not cite objective criteria to justify rent increases. Oftentimes, the Manufactured Home Community Defendants do not give any reason at all for a rent increase, and the increase is provided to residents on a take-it-or-leave-it basis. Other times, Manufactured Home Community Defendants cite nebulous "market conditions" or "market rates."

91.     Defendants ELS and Sun Communities, which are both public companies, have reported huge returns for their shareholders. Between March 2009 and February 2020, ELS and Sun Communities returned 1,186% and 4,137% respectively—far higher than the S&P 500's return of 499%. These massive returns are attributable to the business model described in this complaint: acquire more manufactured home lots and raise lot rents.

92.     This business model, which has been employed by all the Manufactured Home Community Defendants and others, crosses the line from egregious to illegal on account of Defendants' conspiracy.

**E. Defendants' Anticompetitive Scheme**

93.     During the Relevant Time Period, manufactured home community owners, including the Manufactured Home Community Defendants, have coordinated with each other to systematically increase manufactured home lot rents by purchasing and relying on competitively sensitive information contained within the JLT Market Reports that are published by Defendant Datacomp. Manufactured Home Community Defendants also used the reports to coordinate strategic acquisitions of manufactured home communities to consolidate market share and acquire significant market power.

### 1.     History of Datacomp

94.     Founded in 1987 as an appraiser of pre-owned manufactured homes, Datacomp subsequently expanded its business to become the go-to source of information for all facets of the manufactured home industry.

95.     Datacomp's first major expansion was in the early 2000s when it launched MHVillage, a listing site for manufactured home sales. It is the largest manufactured home marketplace in the world, generating leads for about $3 billion in sales annually. When creating MHVillage, Datacomp leveraged the information about manufactured homes that it had gathered while appraising manufactured homes.

96.     Datacomp expanded again in 2014 when it acquired JLT & Associates, a firm which published industry reports for manufactured home community operators. After acquiring JLT & Associates, Datacomp published these reports under the name "JLT Market Reports," and it continues to do so today. As explained below, the JLT Market Reports provide manufactured home community operators, including the Manufactured Home Community Defendants, with a one-stop-shop for highly detailed, and highly specific, information about manufactured home communities across the United States.

97.     In December 2021, Defendant ELS purchased Datacomp and its companion website MHVillage for $43 million. With this acquisition, one of the largest manufactured home community operators, ELS, gained control of the largest database of information about the manufactured home industry, Datacomp. This made the unlawful conduct even more egregious. Prior to this acquisition, ELS was a Datacomp *customer* that used Datacomp's JLT Market Reports to price manufactured home lot rents in coordination with its direct competitors. By acquiring Datacomp, ELS became the *owner* of a product that it provided to its competitors to facilitate a price fixing conspiracy, thus making it even easier for it and the other Manufactured

Home Community Defendants—direct competitors in the manufactured home lot market—to exchange information and coordinate manufactured home lot rent pricing.

### 2. Datacomp's JLT Market Reports

98.     The JLT Market Reports provide detailed research and information on manufactured home communities located in as many as 187 geographic areas, referred to as metropolitan statistical areas ("MSAs"), throughout the United States. The reports include MSAs throughout the country and, in some states—Florida, for instance—the reports cover *the entire state*.

99.     Datacomp holds itself out as "the nation's largest provider of manufactured and mobile home value reports" that provides "price information":



**Figure 5.**

35

100.    Datacomp also describes itself as the "leading provider" of "competitive market data":



**Figure 6**.

101.    Datacomp sells JLT Reports for as many as 187 markets across the United States. JLT Reports are not available for free. Instead, they can only be accessed if they are purchased for prices ranging from $149.00–$419.00. For example:



**Figure 7.**

102.    Each JLT Report includes "specific information about each community" including "the latest rent increase information":



**Figure 8**.

103.    The reports include the following detailed information:



**DATACOMP**
Publisher of JLT Market Reports

800.588.5426    Search...

Home    Market Reports ▾    Free Sample Report    News    Clients ▾    About Us    Contact Us

Order    🛒 Cart

## Market Reports

**Order JLT Market Reports**

**Download Sample Report**

JLT Market Reports are the industry standard for the manufactured housing industry and include the following detailed information:

○ Identification of communities by "All Ages" and "55+"
○ Homesite analysis
○ Occupancy rate
○ Community marketing programs and customer incentives
○ List of community amenities
○ Monthly rents by category/classification
○ Services, if any, included in rents and the value of each service
○ Latest rent increase date and amount
○ Type of water and sewer system and method of trash collection
○ Other data deemed appropriate for the community
○ Management reports ranking communities by number of homesites, occupancy % and highest to lowest rent for "All Ages" and "55+" communities
○ Management report comparing current year rents and occupancy to the prior year for "All Ages" and "55+" communities
○ Historical summary management report showing average rents and occupancy rates from since inception of the surveys to the most current year for "All Ages" and "55+" communities
○ Executive summary of survey findings and observations

**Figure 9**.

104.    Information published in the JLT Market Reports comes directly from Datacomp's customers, including the Manufactured Home Community Defendants and Unnamed Co-Conspirators. Datacomp and its customers exchange via telephone surveys, among other means, competitively sensitive, ordinarily non-public, information that is published in the JLT Market Reports.

105.    Each Datacomp JLT Market Report begins with a high-level summary of findings, ██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████

106.    The next section of the report provides tables ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████



**Figure 10.**

107.    ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████



**Figure 11.**



**Figure 12.**





112.

113.

████████████████████████████████████████████

████████████████████████████████

114.     In sum, the JLT Market Reports provided the Manufactured Home Community

Defendants with non-public, competitively sensitive information—information that the

Manufactured Home Community Defendants would never have in a competitive market—and

were the essential component of the conspiracy to artificially inflate manufactured home lot

rents.

### 3.     Datacomp Offers Real-Time Information Market Reports

115.     Datacomp also provides "live updates and electronic status reports" to its clients,

as well as "real-time information on the web, phone calls or any combination that serves you

best":



**Figure 13.**

44

116.     In addition, Datacomp provides the most "accurate and comprehensive manufactured housing market data" to provide "unique custom data projects" that are used to make "informed, strategic business decisions":

**The Industry's Most Accurate & Comprehensive Manufactured Housing Market Data**

From unique custom data projects to the heralded annual and historical JLT Market Reports, Datacomp provides the precise manufactured housing data and intelligence that industry professionals rely on to make informed, strategic business decisions.

**Figure 14.**

**4.     Defendants Agree to Exchange Non-Public Competitively Sensitive Information through the JLT Market Reports and Artificially Increase Manufactured Home Lot Prices**

117.     Through Datacomp's JLT Market Reports, each Manufactured Home Community Defendant knew that the other Manufactured Home Community Defendants as well as Unnamed Co-Conspirators would exchange non-public, competitively sensitive information about the manufactured home communities they owned. Knowing that their competitors would share such information reciprocally, Defendants were certain that their conspiracy would be effective.

118.     Datacomp publicly advertises that its client list "includes the 'top 10' largest community owners, regional property management companies, developers, lenders, appraisers, homeowner associations and real estate brokers nationwide." Datacomp's website includes a list of clients who purchase and use Datacomp's JLT Market Reports. By publishing this list on its website, Datacomp communicated to the Manufactured Home Community Defendants who else was purchasing the reports, thus giving additional assurances to each Defendant that its competitors were also part of the conspiracy. The client list, provided below as Figure 15, includes all the Manufactured Home Community Defendants as well as several other Unnamed Co-Conspirators.

45



**Figure 15.**

119.     Manufactured home community owners, including certain Manufactured Home Community Defendants, have admitted that they use Datacomp's JLT Market Reports when making decisions about manufactured home lot rent price increases and new manufactured home community acquisitions.

120.     For instance, Ross Partrich, CEO of Defendant RHP, said, "We find the JLT Market Reports to be an excellent guide when analyzing local market conditions for acquisitions, as well as extremely helpful for rent increases across our portfolio throughout the country."

121.     Jon Colman, Executive Vice President of Defendant Sun Communities, said, "We use the surveys to gain insight into markets when analyzing an acquisition opportunity."

46

122.     Cory Sukert, President/CEO of Defendant Cal-Am, said, "The surveys provide a comprehensive analysis of competing communities in those markets in which we operate. The information is a valuable part of our marketing efforts nationwide. The management reports, including the comparative report, provide a quick determination of relevant market conditions."

123.     Nate Nelson, CFO of Kingsley, emphasized the fact that the information in the JLT Market Reports is current: "The surveys make our business decisions more accurate and timely. The reports are independent, unbiased and very comprehensive and provide accurate and timely information. The information helps us determine how our communities compare to the competition."

124.     David Lentz of Green Courte Partners, LLC, a private equity firm that previously owned a portfolio of nearly 60 manufactured home communities in several states prior to selling that portfolio to Defendant Sun Communities in 2015, similarly said, "We use the surveys to analyze markets nationwide and to support our due diligence reviews of potential acquisitions. The surveys provide accurate and timely information about market conditions including occupancy levels and rent rates and helps us determine where a given property is positioned in the market."

125.     By exchanging non-public, competitively sensitive information through the JLT Market Reports, Defendants have been able to artificially increase the price of rent for manufactured home lots throughout the United States.

### 5.     Defendants' Systematic Exchange of Competitively Sensitive Information via the JLT Market Reports Violates Section 1 of the Sherman Act

126.     Defendants' information exchange amounts to an unlawful agreement in violation of Section 1 of the Sherman Act and violates the information exchange safety zone promulgated by the Federal Trade Commission ("FTC") and the U.S. Department of Justice ("DOJ").

127.    In 1996, FTC and DOJ published "Statements of Antitrust Enforcement Policy in Health Care" (the "1996 Policy"). The 1996 Policy gave guidance to the health care industry on various antitrust issues, including information sharing, and this has since been applied to industries outside of healthcare. Among other things, the 1996 Policy provided an "antitrust safety zone" for information exchanges. According to the 1996 Policy, an information exchange that fell within the safety zone was unlikely to raise antitrust concerns and would unlikely be challenged by the agencies.

128.    To qualify for the safety zone, the information exchange must meet *all* of the following requirements:

  i.    The information exchange is managed by a third-party, like a trade association or government agency;

  ii.   the information provided by participants is relatively old (e.g. more than three months old); ***and***

  iii.  the information is aggregated to protect the identity of the underlying sources, and enough sources are aggregated to prevent competitors from linking particular data to an individual source.

129.    The agencies published this policy "to ensure that an exchange of price or cost data is not used by competing providers for discussion or coordination of provider prices or costs." It was important to the agencies that "providers [were] aware of the potential antitrust consequences of information exchanges among competitors." The agencies explained that these conditions were carefully crafted to balance a competitor's individual interests in obtaining useful information "against the risk that the exchange of such information may permit [competitors] to communicate with each other regarding a mutually acceptable level of prices."

48

130.     Since 1996, the agencies have used this safety zone as a general guideline for the legality of information exchanges in other industries. For instance, FTC issued general guidance in 2014 that referred to the safety zone requirements as necessary criteria for a legal data exchange. In that guidance, FTC confirmed that when "competing companies seek market intelligence by exchanging price or other commercially sensitive information, that may facilitate collusion . . . in violation of the antitrust laws."

131.     Accordingly, the safety zone requirements are a useful test for assessing the legality of the information exchange described in this complaint. The safety zone requirements are not met here.

132.     ***First***, the information exchange is not operated by a neutral third party. Defendant Datacomp operates the exchange of information through its JLT Market Reports. As described above, Datacomp was purchased by Defendant ELS for $43 million in 2021. ELS, which is one of the largest manufactured home community operators in the United States, is not a third-party because it competes with other owners of manufactured home communities for manufactured home lot renters. Even before ELS purchased Datacomp, Datacomp was not a neutral third party. Unlike a trade association or a government agency that may collect information as a service to an industry, upon information and belief, Datacomp's business model relied on owners of manufactured home communities, such as the Manufactured Home Community Defendants, to provide it with competitively sensitive information that it could sell back to the owners for a profit. Datacomp therefore had a vested interest with an expectation of financial gain as it stood to profit from the illegal information exchange.

133.     ***Second,*** the information published in the JLT Market Reports is not old. ███

████████████████████████████████████████████████████████████████



Indeed, as the quotes from Defendants' executives above demonstrated, Defendants recognized and valued the timeliness of the information provided in the reports.

134.    ***Third,***

135.    Thus, Defendants' exchange of information via the JLT Market Reports fails to meet *any* of the safety zone requirements and constitutes an illegal data exchange.

136.    DOJ recently has demonstrated a renewed focus on anticompetitive information sharing. On February 3, 2023, DOJ withdrew three antitrust policy statements, including the 1996 Policy discussed above. Critically, when announcing the withdrawal, DOJ said that "the statements *are overly permissive on certain subjects, such as information sharing*, and no longer serve their intended purposes of providing encompassing guidance to the public on relevant healthcare competition issues in today's environment." Thus, Defendants' information sharing practice violates a government policy that the DOJ deemed "too permissive," demonstrating the particularly egregious nature of the conduct being challenged here.

137.    The withdrawal of the policy statements was preceded by remarks made by principal Deputy Assistant Attorney General Doha Mekki on February 2, 2023, in which she said

that "throughout its enforcement and policy work, the DOJ has had 'serious concerns' about whether the factors set out in the safety zones are appropriate for the industry as it exists today." Mekki noted that "[e]xchanges facilitated by [third-party] intermediaries can have the same anticompetitive effect as direct exchange among competitors." Additionally, she said that "the suggestion that data that's at least three months old is unlikely to be competitively sensitive or valuable is underpinned by the rise of pricing algorithms that can increase the competitive value of historical data."

138.    Following the withdrawal of the policy statements, at a conference in March 2023, Deputy Assistant Attorney General Michael Kades commented on DOJ's new position related to information sharing. Responding to questions on what proper information sharing looks like without safe harbors, Kades said that "top-of-mind questions should be what information is being shared, how it is being used, and what the impacts are of that sharing. Any time information sharing appears to be suppressing price competition or eliminating other forms of competition, 'that should send red sirens off.'"

139.    Here, Defendants' information exchange existed for the purpose of increasing manufactured home lot rents above competitive levels and aiding manufactured home community owners in consolidating market power. Accordingly, Defendants' information exchange violates Section 1 of the Sherman Act. DOJ's withdrawal of the 1996 Policy and the comments made by Mekki and Kades exemplify DOJ's current position that information exchanges can be anticompetitive regardless of their exact form.

### 6.    Economic Analysis Supports the Existence of a Cartel

140.    Economic data supports the existence of the conspiracy described in this complaint. Specifically, experts retained by Plaintiffs have analyzed U.S. Census data on manufactured home lot rental prices, and that analysis reveals that manufactured home rental lot

prices increased significantly beginning around 2017-2019 and that these price increases diverge from comparable single-family rental property prices.

141.    Plaintiffs' analysis uses the Public Use Microdata Sample from the American Community Survey ("ACS"), which is an annual supplementary survey to the decennial Census that covers a wide range of topics. The ACS surveys, among other things, the cost of ownership for a manufactured home, which primarily includes "land or site rent," as well as fees imposed on manufactured home owners, such as registration fees and license fees. This cost of ownership figure is termed "manufactured home lot rents" in the graphs below. Figure 16 below shows that, at a national level, the cost of manufactured home lot rents experienced a sharp increase beginning in 2019.



**Figure 16: Average Monthly Manufactured Home Lot Rents in the U.S.**

142.     Figure 16 above shows that the average monthly manufactured home lot rent jumped from $203 in 2019 to $257 in 2021, a 27% increase. This significant jump in prices is at odds with the long-run trend of manufactured home lot rents. Manufactured home lot rental prices steadily increased by approximately 2.3% per year between 2010 and 2018, approximately in line with the average annual inflation (CPI) of 1.8% during this period. However, consistent with Plaintiffs' conspiracy allegations, manufactured home lot rental prices have significantly increased at a rate of 9.1% per year between 2019 and 2021, while inflation was only 3%.

143.     Defendants have publicly touted their ability to raise manufactured home lot rents above the rate of inflation. In a September 2023 Investor Presentation, Sun Communities shared its "consistent, annual rental rate increases that exceeded expected inflationary cost pressures." On October 26, 2023, during Sun Communities's Q3 2023 Earnings Conference Call, CEO, President, and Chairman Gary Shiffman explained that "[l]ooking ahead to 2024, *we expect rental rate growth in our same-property portfolio to exceed inflation*" (emphasis added). Similarly, ELS's 2022 10-K explained that "[s]ubstantially all of the leases at our MH communities allow for monthly or annual rent increases which provide us with the ability to increase rent, where justified by the market. Such types of leases generally minimize our risks of inflation."

144.     Manufactured home lot rents increased above the rental prices for similar housing. The next most comparable rental market for manufactured home lots is the rental market for detached single family homes, because both rental properties must be large enough to support a detached home (as opposed to townhome or rowhouse) and are typically found in more suburban and rural areas. Figure 17 compares the rise in manufactured home lot rental prices to the prices of detached single-family homes. Using comparable rental price data from the ACS, Figure 17

shows the percentage increase in price experienced by both types of rentals from a 2010 baseline level.



**Figure 17: Percent Increase in U.S. Rent from 2010.**

145.     Figure 17 demonstrates that rental prices of manufactured home lots and single-family detached homes followed the same trend from 2010 through 2019 but that starting in 2019 manufactured home lot rental prices spiked with no comparable increase in the rents of detached single-family homes. For example, while rental prices for manufactured home lots and detached single family housing were approximately 22% higher in 2019 than their 2010 baseline, by 2020 manufactured home lot rentals had increased by 45% over its 2010 levels while detached manufactured homes only grew by 27% over its 2010 levels. In other words, something caused the rent of manufactured home lots to rise sharply in 2019 and 2020 that did *not* affect the rent of similarly situated detached single-family homes. That something was Defendants'

54

unlawful agreement to raise manufactured home lot rent facilitated by the exchange of information through the JLT Market Reports.

146.    The increase in manufactured home lot rental prices persists at the subnational level. Plaintiffs analyzed three of the largest MSAs by manufactured home site count covered by the ACS, all of which are also covered by Datacomp reports: (1) Tampa-St. Petersburg-Clearwater (Florida) MSA; (2) Riverside-San Bernardino-Ontario (California) MSA; and (3) Phoenix-Mesa-Scottsdale (Arizona) MSA. Figures 18-20 below compare the rent of manufactured home lots at each of the MSAs over time, juxtaposed to the rent for comparable single-family detached homes. In each case, the figures show that manufactured home lot rents in these MSAs increased significantly relative to their 2010 levels starting in 2018-2019. While detached single-family homes rental prices also increased as a percentage of their 2010 levels during this period, they did not rise as quickly or as steeply as rental prices for manufactured home lots.



**Figure 18: Percent Increase in Monthly Rent from 2010 Levels Tampa-St. Petersburg-Clearwater, FL MSA**



**Figure 19: Percent Increase in Monthly Rent from 2010 Values Riverside-San Bernardino-Ontario, CA MSA**



**Figure 20: Percent Increase in Monthly Rent from 2010 Values Phoenix-Mesa-Scottsdale, AZ MSA**

147.     Most of the Manufactured Home Community Defendants own manufactured

home communities in one or more of these MSAs. ████████████████████

████████████████████████████████████████████████

████████████████████████████████

    i.     **Tampa-St. Petersburg-Clearwater, FL MSA:**



ii.   **Riverside-San Bernardino-Ontario, CA MSA:**

iii. **Phoenix-Mesa-Scottsdale, AZ MSA:**



148.     During the Relevant Time Period, the Manufactured Home Community

Defendants increased rents in their manufactured home communities in each of these MSAs.

These parallel price increases can be seen in the 2022-2023 Datacomp JLT Market Reports.

Although the amount of the changes in lot rents are not identical, the data provided in the JLT

Market Reports demonstrates that rents did increase in each of the MSAs, as shown in the

following tables:

**Figure 21: Rent Changes in Tampa-St. Petersburg-Clearwater (Hillsborough County), FL MSA**





**Figure 22: Rent Changes in Riverside and San Bernardino Counties, CA MSAs**







**Figure 23: Rent Changes in Phoenix-Mesa-Scottsdale, AZ MSA**









149.     Additionally, the Manufactured Home Community Defendants increased rents in the manufactured home communities where the Plaintiffs reside, as well as in the surrounding communities.

150.     Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home Community Defendants made the following changes to lot rents in the manufactured home communities in the San Antonio, TX MSA, the MSA where Plaintiff Steven Brown resides:

**Figure 24: Rent Changes in San Antonio, TX MSA**



151.     Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home Community Defendants made the following changes to lot rents in the manufactured home communities in the Duval-St. Johns County, FL MSA, the MSA where Plaintiff Todd Caldwell resides:

**Figure 25: Rent Changes in Duval-St. Johns County, FL MSA**



152.     Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home Community Defendants made the following changes to lot rents in the manufactured home communities in the Southern Colorado MSA, the MSA where Plaintiff Mary Galusha resides:

**Figure 26: Rent Changes in Southern Colorado MSA**





153.    Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home Community Defendants made the following changes to lot rents in the manufactured home communities in the Chicago, IL MSA, the MSA where Plaintiffs Carla Hajek and Ronald Kazmirzak reside:

**Figure 27: Rent Changes in Chicago, IL MSA**





154. Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home Community Defendants made the following changes to lot rents in the manufactured home communities in the Lee County, FL MSA, the MSA where Plaintiff David Klein resides:

**Figure 28: Rent Changes in Lee County, FL MSA**





155.    Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home

Community Defendants made the following changes to lot rents in the manufactured home

communities in the Oakland County, MI MSA, the MSA where Plaintiff Colleen Levins resided:

**Figure 29: Rent Changes in Oakland County, MI MSA**





156.    Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home Community Defendants made the following changes to lot rents in the manufactured home communities in the Palm Beach County, FL MSA, the MSA where Plaintiff Kevin McDonough resides:

**Figure 30: Rent Changes in Palm Beach County, FL MSA**





157.    Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home Community Defendants made the following changes to lot rents in the manufactured home communities in the Palm Beach County, FL MSA, the MSA where Plaintiff Luis Melendez resides:

**Figure 31: Rent Changes in Orange-Seminole County, FL MSA**





158.    Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home Community Defendants made the following changes to lot rents in the manufactured home communities in the Las Vegas, NV MSA, the MSA where Plaintiff Deborah Norvise resides:

**Figure 32: Rent Changes in Las Vegas, NV MSA**





159.   Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home Community Defendants made the following changes to lot rents in the manufactured home communities in the Pinellas County, FL MSA, the MSA where Plaintiff Carol Rachelle Roach resides:

**Figure 33: Rent Changes in Pinellas County, FL MSA**







160.     Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home Community Defendants made the following changes to lot rents in the manufactured home communities in the Denver-Aurora-Boulder, CO MSA, the MSA where Plaintiff Barbara Rowley resides:

**Figure 34: Rent Changes in Denver-Aurora-Boulder, CO MSA**









161.    Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home Community Defendants made the following changes to lot rents in the manufactured home communities in the Dallas, TX MSA, the MSA where Plaintiff Amber Sailer resides:

**Figure 35: Rent Changes in Dallas, TX MSA**



162.    As shown in Figures 21-35, the Manufactured Home Defendants substantially raised lot rents in parallel to Plaintiffs and members of the Class.

163.    The existence of manufactured home lot rent increases, at rates which exceed price increases for detached single-family homes, is consistent with Plaintiffs' allegations of

Defendants' unlawful agreement to systemically raise the price of manufactured home lot rents above competitive levels during the Relevant Time Period.

### 7. "Plus Factors" in the Manufactured Home Industry Provide Additional Evidence of a Conspiracy

164. Prominent legal and economic antitrust scholars studying collusive behavior have identified certain "plus factors," which are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[1] Each plus factor that is present constitutes a piece of circumstantial evidence supporting active collusion, as opposed to mere conscious parallelism. The factors that provide the most probative value and lead to a strong inference of explicit collusion are referred to as "super plus factors."[2]

165. Here, several plus and super plus factors support the plausible inference that Defendants are members of a *per se* unlawful price fixing cartel. These include: (1) Defendants' exchange of competitively sensitive information; (2) the presence of a price-verification scheme; (3) a motive to conspire; (4) opportunities and invitations to collude; (5) an increasingly concentrated market; (6) high barriers to entry; and (7) high switching costs for manufactured home lot renters.

166. ***First***, the reciprocal sharing of firm-specific competitively sensitive information that would normally remain private is a "super plus factor" that leads to a strong inference of

---

[1] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 393 (2011).

[2] *See id.* at 396-97.

active collusion.[3]  This data, which would normally be kept confidential, given its competitively-sensitive nature, is provided to competing manufactured home community owners who set manufactured home lot rents. Because a manufactured home community owner would be competitively disadvantaged by providing private data to other manufactured home community owners unilaterally, a rational actor would only do so with the expectation that it will benefit from similar private information shared by its competitors.

167.    **Second**, Datacomp provides participating manufactured home community owners with a price-verification scheme, or "the practice of a seller reporting to its competitors the details of completed transactions with specific customers."[4] "[P]ostsale price verifications are more likely to be used as a monitoring device because they reveal to a firm's cartel partners its actual prices, which a firm in a competitive market would wish to keep secret."[5] This type of price-verification makes little sense absent collusion.

168.    **Third**, Datacomp provides manufactured home community owners, including the Manufactured Home Community Defendants, with a motive to conspire by advertising that JLT

---

[3] Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. Univ. L. Rev. 1581, 1608 (2021).

[4] *Id.* at 1601.

[5] *Id.* at 1601-02.

Market Reports provide valuable information to support lot rent increases and acquisition opportunities.

169.     **Fourth,** Datacomp's JLT Market Reports themselves are an opportunity to coordinate prices, and Datacomp's advertisements about the reports are naked invitations to collude. Additionally, as of July 2019, Defendants Datacomp, ELS, Hometown America, Sun Communities, RHP, Yes Communities, Inspire Communities, and Murex are all members of the Manufactured Housing Institute ("MHI"). MHI is the only national trade association representing all sectors of the manufactured and modular housing industries. Executives from Defendants ELS and Sun Communities have been on the MHI Board of Directors during the Relevant Time Period. Additionally, MHI organizes numerous industry meetings and events throughout the year, including MHI Congress & Expo, the MHI National Communities Council ("NCC") Spring Forum, the MHI Annual Meeting, the NCC Fall Leadership Forum, and the MHI Winter Meeting. Defendants, including Datacomp, ELS, RHP, and Yes Communities, have all been exhibitors at MHI Congress & Expo during the Relevant Time Period. Trade association membership and events provide Defendants additional opportunities to collude.

170.     **Fifth,** the manufactured home community market is increasingly becoming more concentrated. While the industry was once highly fragmented, in recent years large, manufactured home community owners, including the Manufactured Home Community Defendants, have been buying up communities across the United States to create massive portfolios. A conspiracy is easier to effectuate, maintain, and enforce in a concentrated industry.

171.     **Sixth**, manufactured home community owners and operators face significant entry barriers. These include the high cost of acquiring property and establishing a property management infrastructure as well as ongoing costs of maintenance and regulatory compliance.

Large manufactured home communities run into the hundreds of millions of dollars to purchase. Market analyst, Ron Trinh, noted that "barriers to entry to compete [are] very high" in this industry, giving established companies, like the Manufactured Home Community Defendants, a significant advantage. Another analyst has noted that "[o]ne of the distinct features of the [manufactured housing] sector is the complete lack of new supply expected to be constructed. With essentially zero net supply coming online for the foreseeable future, manufactured housing is relatively immune from the oversupply fears that encumber other REIT sectors." Further, ELS has admitted that the supply of new properties in locations it targets "will be constrained by barriers to entry" in particular, securing zoning permits, and that "growing demand coupled with almost no new supply is a strategic advantage for ELS." Likewise, Sun Communities has explained that the manufactured home segment has "low supply, outsized demand, and high barriers to entry" and that "virtually no new supply has been added for years." Thus, new entrants into the market are unlikely to discipline cartel pricing.

172. **Seventh**, there are significant switching costs that prevent effective price competition in the manufactured home lot rental market. In other markets with low switching costs, consumers can stop purchasing a particular manufacturer's product when its prices are no longer competitive. Manufactured homes are not easy or inexpensive to move, if they can be moved at all. They require special hauling vehicles, escorts, and permits to transport. These services are costly, typically ranging from about $5,000-$15,000, depending on the size of the home and the distance the home is moving. In 2022, the average cost to move a manufactured home was $9,000. As described above, many manufactured home owners are low-income earners who may not be able to afford these high moving costs. According to a study, these costs may represent "five to seven years' worth of accrued equity for mobile homeowners." In its 2022

10-K, ELS explained that "moving a factory-built home from one property involves substantial cost and effort." On its Q2 2023 Earnings Call, ELS's CEO Marguerite Nader explained that a customer picking out a manufactured home community is "making a long-term commitment for themselves and a long-term commitment to the home that they're putting in the community or buying." Likewise, Sun Communities acknowledges that the cost to move a manufactured home results in low turnover. Therefore, when a manufactured home community owner raises lot rent, residents are often forced to accept the price increase—or leave their home. These factors are what led Frank Rolfe, an investor who has owned thousands of manufactured home lots, to make the controversial, and often quoted, remark that a manufactured home community "is like a Waffle House where the customers are chained to their booths."

## V. ANTICOMPETITIVE EFFECTS AND RELEVANT ANTITRUST MARKET

173. Defendants' anticompetitive conduct had the following effects, among others:

  i. Competition among the Manufactured Home Community Defendants has been restrained or eliminated with respect to manufactured home lot rent prices;

  ii. The price of manufactured home lot rent has been fixed, stabilized, or maintained at artificially high levels; and

  iii. Individuals have been deprived of free and open competition.

174. Defendants' violations of the antitrust laws have caused Plaintiffs and members of the Class to pay higher prices for manufactured home lot rents than they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, Plaintiffs and members of the Class have suffered damages in the form of overcharges paid on their manufactured home lot rentals. This is an injury of the type that the antitrust laws were meant to

punish and prevent. Defendants' price fixing agreement and information exchange are *per se* unlawful, or alternatively are unlawful under either a quick look or rule of reason analysis.

175.    Under the *per se* standard, and additionally where, as here, there are demonstrable anticompetitive effects, a relevant product and geographic market need not be defined. However, Plaintiffs define such markets below in case their allegations are ultimately analyzed under a quick look or rule of reason analysis.

## A.  The Relevant Product Market Is Manufactured Home Lots

176.    To the extent a relevant product market needs to be defined in this action, it is the market for manufactured home lots located in manufactured home communities.

177.    There are no reasonable substitutes for manufactured home lots. While a manufactured or modular home can be placed on private land, land ownership is prohibitively expensive for many manufactured home residents. Additionally, many jurisdictions prevent the installation of manufactured homes as infill housing in areas zoned residential or restrict placement of manufactured homes to manufactured home communities only. By renting a manufactured home lot, manufactured home residents get to enjoy the benefit of owning their own home but are not burdened with the expense of landownership. Additionally, many manufactured home residents specifically choose to live in manufactured home parks for their community benefits, which may include community or recreation centers, playgrounds, and dog parks. Many manufactured home communities are 55+ communities and provide other specific benefits to older residents.

## B.  The Relevant Geographic Market Is National

178.    Should a geographic market need to be defined in this action, it is the United States. The Manufactured Home Community Defendants own manufactured home parks across the United States and have increased rental prices universally.

### C. Regional Submarkets

179.    In addition, there are the 187 markets for which Datacomp produces (or has produced) JLT Market Reports (the "Regional Submarkets").

180.    Given that commuting distance to a place of work or school is a geographic constraint on where a manufactured home lot renter chooses to live, the manufactured home housing market can be regional and tied to a center of commerce or education and the immediately surrounding areas.

181.    Additionally, manufactured home lot renters, particularly elderly residents who require assistance, will choose to live within close distances to their relatives and health care providers for support.

182.    Manufactured home lot renters in any given Regional Submarket do not consider leases in other Regional Submarkets as adequate substitutes for manufactured home lot leases in their own submarket. Leases outside a Regional Submarket are not substitutable for leases inside a submarket because they would leave renters with inordinately long commutes to schools, jobs, family, or doctors. Consequently, manufactured home lots outside the Regional Submarket are not within the relevant geographic markets for antitrust purposes.

183.    Plaintiffs allege upon information and belief that Defendants' scheme harmed competition nationally, including in at least the following Regional Submarkets (listed in order of the number of manufactured home communities, following the Chicago, IL MSA), each of which comprises a separate and distinct relevant regional geographic market:

> i.   **Chicago, IL MSA:** Regional Submarket consists of at least 57 manufactured home communities and approximately 18,000 manufactured home lots.

ii.   **Phoenix-Mesa-Scottsdale, AZ MSA:** Regional Submarket consists of at least 108 manufactured home communities and approximately 28,000 manufactured home lots.

iii.   **Orange County, CA:** Regional Submarket consists of at least 100 manufactured home communities and approximately 19,000 manufactured home lots.

iv.   **San Diego County, CA:** Regional Submarket consists of at least 100 manufactured home communities and approximately 19,000 manufactured home lots.

v.   **Los Angeles County, CA:** Regional Submarket consists of at least 94 manufactured home communities and approximately 21,000 manufactured home lots.

vi.   **Riverside County, CA:** Regional Submarket consists of at least 94 manufactured home communities and approximately 21,000 manufactured home lots.

vii.   **Polk County, FL:** Regional Submarket consists of at least 90 manufactured home communities and approximately 22,000 manufactured home lots.

viii.   **Pinellas County, FL:** Regional Submarket consists of at least 87 manufactured home communities and approximately 20,000 manufactured home lots.

ix. **San Bernadino County, CA:** Regional Submarket consists of at least 78 manufactured home communities and approximately 15,000 manufactured home lots.

x. **Minneapolis-Saint Paul, MN MSA:** Regional Submarket consists of at least 57 manufactured home communities and approximately 15,000 manufactured home lots.

xi. **Santa Clara County, CA:** Regional Submarket consists of at least 55 manufactured home communities and approximately 14,000 manufactured home lots.

xii. **Tampa-St. Petersburg-Clearwater (Hillsborough County), FL MSA:** Regional Submarket consists of at least 53 manufactured home communities and approximately 13,000 manufactured home lots.

xiii. **Volusia County, FL:** Regional Submarket consists of at least 52 manufactured home communities and approximately 14,000 manufactured home lots.

xiv. **Denver-Aurora-Boulder, CO MSA:** Regional Submarket consists of at least 49 manufactured home communities and approximately 16,000 manufactured home lots.

xv. **Broward County, FL:** Regional Submarket consists of at least 47 manufactured home communities and approximately 11,000 manufactured home lots.

xvi.   **Las Vegas, NV MSA:** Regional Submarket consists of at least 46 manufactured home communities and approximately 11,000 manufactured home lots.

xvii.   **Sacramento County, CA:** Regional Submarket consists of at least 46 manufactured home communities and approximately 9,000 manufactured home lots.

xviii.   **Seattle-Tacoma, WA MSA:** Regional Submarket consists of at least 45 manufactured home communities and approximately 8,000 manufactured home lots.

xix.   **Kent County, MI:** Regional Submarket consists of at least 44 manufactured home communities and approximately 9,000 manufactured home lots.

xx.   **Rochester, NY MSA:** Regional Submarket consists of at least 43 manufactured home communities and approximately 6,000 manufactured home lots.

xxi.   **Allegan-Muskegon-Ottawa Counties, MI:** Regional Submarket consists of at least 42 manufactured home communities and approximately 11,000 manufactured home lots.

xxii.   **Baltimore, MD MSA:** Regional Submarket consists of at least 42 manufactured home communities and approximately 10,000 manufactured home lots.

xxiii.   **Houston, TX MSA:** Regional Submarket consists of at least 42 manufactured home communities and approximately 9,000 manufactured home lots.

xxiv.   **Columbus, OH MSA:** Regional Submarket consists of at least 42 manufactured home communities and approximately 8,000 manufactured home lots.

xxv.   **Southern New Hampshire:** Regional Submarket consists of at least 41 manufactured home communities and approximately 6,000 manufactured home lots.

xxvi.   **Cleveland-Akron, OH MSA:** Regional Submarket consists of at least 41 manufactured home communities and approximately 9,000 manufactured home lots.

xxvii.   **Philadelphia, PA MSA:** Regional Submarket consists of at least 41 manufactured home communities and approximately 9,000 manufactured home lots.

xxviii.   **Portland, OR MSA:** Regional Submarket consists of at least 41 manufactured home communities and approximately 7,000 manufactured home lots.

xxix.   **Oakland County, MI:** Regional Submarket consists of at least 39 manufactured home communities and approximately 14,000 manufactured home lots.

xxx. **St Louis, MO MSA:** Regional Submarket consists of at least 39 manufactured home communities and approximately 8,000 manufactured home lots.

xxxi. **Albany-Schenectady, NY MSA**: Regional Submarket consists of at least 38 manufactured home communities and approximately 6,000 manufactured home lots.

xxxii. **Lake County, FL:** Regional Submarket consists of at least 38 manufactured home communities and approximately 10,000 manufactured home lots.

xxxiii. **Pasco County, FL:** Regional Submarket consists of at least 38 manufactured home communities and approximately 10,000 manufactured home lots.

xxxiv. **Virginia Beach, VA MSA:** Regional Submarket consists of at least 37 manufactured home communities and approximately 7,000 manufactured home lots.

xxxv. **Eugene-Springfield, OR MSA:** Regional Submarket consists of at least 37 manufactured home communities and approximately 6,000 manufactured home lots.

xxxvi. **Genesee County, MI:** Regional Submarket consists of at least 36 manufactured home communities and approximately 11,000 manufactured home lots.

xxxvii.   **Indianapolis-Anderson, IN MSA:** Regional Submarket consists of at least 36 manufactured home communities and approximately 9,000 manufactured home lots.

xxxviii.   **Palm Beach County, FL:** Regional Submarket consists of at least 34 manufactured home communities and approximately11,000 manufactured home lots.

xxxix.   **Jersey Shore, NJ:** Regional Submarket consists of at least 34 manufactured home communities and approximately 8,000 manufactured home lots.

xl.   **San Antonio, TX MSA:** Regional Submarket consists of at least 34 manufactured home communities and approximately 7,000 manufactured home lots.

xli.   **Lancaster, PA MSA:** Regional Submarket consists of at least 34 manufactured home communities and approximately 5,000 manufactured home lots.

xlii.   **Wayne County, MI:** Regional Submarket consists of at least 33 manufactured home communities and approximately 12,000 manufactured home lots.

xliii.   **Sussex County, DE:** Regional Submarket consists of at least 33 manufactured home communities and approximately 10,000 manufactured home lots.

94

xliv. **Atlanta GA, MSA:** Regional Submarket consists of at least 33 manufactured home communities and approximately 9,000 manufactured home lots.

xlv. **Manatee County, FL:** Regional Submarket consists of at least 33 manufactured home communities and approximately 9,000 manufactured home lots.

xlvi. **Toledo, OH MSA:** Regional Submarket consists of at least 33 manufactured home communities and approximately 7,000 manufactured home lots.

xlvii. **Buffalo-Niagara, NY MSA:** Regional Submarket consists of at least 33 manufactured home communities and approximately 7,000 manufactured home lots.

xlviii. **Ventura County, CA:** Regional Submarket consists of at least 33 home communities and approximately 6,000 manufactured home lots.

xlix. **Madison, WI MSA:** Regional Submarket consists of at least 33 manufactured home communities and approximately 5,000 manufactured home lots.

l. **Orange-Seminole Counties, FL:** Regional Submarket consists of at least 32 manufactured home communities and approximately 13,000 manufactured home lots.

li. **Salt Lake City, UT MSA:** Regional Submarket consists of at least 31 manufactured home communities and approximately 7,000 manufactured home lots.

lii.     **Pittsburgh, PA MSA:** Regional Submarket consists of at least 31 manufactured home communities and approximately 6,000 manufactured home lots.

liii.    **Arlington-Fort Worth, TX MSA:** Regional Submarket consists of at least 31 manufactured home communities and approximately 5,000 manufactured home lots.

liv.     **York-Hannover, PA MSA:** Regional Submarket consists of at least 30 manufactured home communities and approximately 4,000 manufactured home lots.

lv.      **Cincinnati, OH MSA:** Regional Submarket consists of at least 29 manufactured home communities and approximately 6,000 manufactured home lots.

lvi.     **Dallas County, TX:** Regional Submarket consists of at least 29 manufactured home communities and approximately 5,000 manufactured home lots.

lvii.    **Orange-Ulster, NY MSA:** Regional Submarket consists of at least 28 manufactured home communities and approximately 3,000 manufactured home lots.

lviii.   **Oklahoma City, OK MSA:** Regional Submarket consists of at least 28 manufactured home communities and approximately 5,000 manufactured home lots.

lix.   **Macomb County, MI:** Regional Submarket consists of at least 27 manufactured home communities and approximately 12,000 manufactured home lots.

lx.   **Lee County, FL:** Regional Submarket consists of at least 26 manufactured home communities and approximately 11,000 manufactured home lots.

lxi.   **Albuquerque, NM MSA:** Regional Submarket consists of at least 26 manufactured home communities and approximately 6,000 manufactured home lots.

lxii.   **Myrtle Beach, SC MSA:** Regional Submarket consists of at least 26 manufactured home communities and approximately 6,000 manufactured home lots.

lxiii.   **Brevard County, FL:** Regional Submarket consists of at least 26 manufactured home communities and approximately 6,000 manufactured home lots.

lxiv.   **Sonoma County, CA:** Regional Submarket consists of at least 26 manufactured home communities and approximately 5,000 manufactured home lots.

lxv.   **Highlands Counties, FL:** Regional Submarket consists of at least 25 manufactured home communities and approximately 6,000 manufactured home lots.

lxvi.    **South Jersey, NJ:** Regional Submarket consists of at least 25 manufactured home communities and approximately 6,000 manufactured home lots.

lxvii.    **Sarasota County, FL:** Regional Submarket consists of at least 24 manufactured home communities and approximately 7,000 manufactured home lots.

lxviii.    **Kansas City, MO MSA:** Regional Submarket consists of at least 24 manufactured home communities and approximately 6,000 manufactured home lots.

lxix.    **Elkhart-Goshen-South Bend, ID MSA:** Regional Submarket consists of at least 24 manufactured home communities and approximately 6,000 manufactured home lots.

lxx.    **Hidalgo County, TX:** Regional Submarket consists of at least 24 manufactured home communities and approximately 6,000 manufactured home lots.

lxxi.    **Lansing, MI MSA:** Regional Submarket consists of at least 24 manufactured home communities and approximately 5,000 manufactured home lots.

lxxii.    **Western Colorado:** Regional Submarket consists of at least 24 manufactured home communities and approximately 5,000 manufactured home lots.

lxxiii.    **Salem, OR MSA:** Regional Submarket consists of at least 24 manufactured home communities and approximately 3,000 manufactured home lots.

lxxiv.    **Boise, ID MSA:** Regional Submarket consists of at least 24 manufactured home communities and approximately 3,000 manufactured home lots.

lxxv.    **Austin, TX MSA:** Regional Submarket consists of at least 23 manufactured home communities and approximately 9,000 manufactured home lots.

lxxvi.    **Wichita, KS MSA:** Regional Submarket consists of at least 23 manufactured home communities and approximately 5,000 manufactured home lots.

lxxvii.    **Bay-Midland-Saginaw, MI MSA:** Regional Submarket consists of at least 23 manufactured home communities and approximately 4,000 manufactured home lots.

lxxviii.    **Medford-Grants Pass, OR MSA:** Regional Submarket consists of at least 23 manufactured home communities and approximately 3,000 manufactured home lots.

lxxix.    **Olympia, WA MSA:** Regional Submarket consists of at least 23 manufactured home communities and approximately 2,000 manufactured home lots.

lxxx.    **Santa Barbara County, CA:** Regional Submarket consists of at least 22 manufactured home communities and approximately 4,000 manufactured home lots.

lxxxi. **Contra Costa County, CA:** Regional Submarket consists of at least 22 manufactured home communities and approximately 4,000 manufactured home lots.

lxxxii. **Northern Colorado:** Regional Submarket consists of at least 21 manufactured home communities and approximately 6,000 manufactured home lots.

lxxxiii. **Southern Colorado:** Regional Submarket consists of at least 21 manufactured home communities and approximately 5,000 manufactured home lots.

lxxxiv. **Fort Wayne, IN MSA:** Regional Submarket consists of at least 20 manufactured home communities and approximately 6,000 manufactured home lots.

lxxxv. **Gary-Michigan City, IN MSA:** Regional Submarket consists of at least 20 manufactured home communities and approximately 6,000 manufactured home lots.

lxxxvi. **Marion County, FL:** Regional Submarket consists of at least 20 manufactured home communities and approximately 5,000 manufactured home lots.

lxxxvii. **Alameda County, CA:** Regional Submarket consists of at least 20 manufactured home communities and approximately 5,000 manufactured home lots.

lxxxviii.  **Northern Michigan:** Regional Submarket consists of at least 20 manufactured home communities and approximately 4,000 manufactured home lots.

lxxxix.  **Nashville, TN MSA:** Regional Submarket consists of at least 20 manufactured home communities and approximately 3,000 manufactured home lots.

xc.  **Des Moines, IA MSA:** Regional Submarket consists of at least 19 manufactured home communities and approximately 3,000 manufactured home lots.

xci.  **Duval-St. Johns County, FL:** Regional Submarket consists of at least 18 manufactured home communities and approximately 5,000 manufactured home lots.

xcii.  **Citrus-Hernando-Sumter Counties, FL MSA:** Regional Submarket consists of at least 18 manufactured home communities and approximately 4,000 manufactured home lots.

xciii.  **Indian River County, FL:** Regional Submarket consists of at least 18 manufactured home communities and approximately 5,000 manufactured home lots.

xciv.  **Charleston, SC MSA:** Regional Submarket consists of at least 18 manufactured home communities and approximately 3,000 manufactured home lots.

xcv.     **Washtenaw County, MI:** Regional Submarket consists of at least 17 manufactured home communities and approximately 6,000 manufactured home lots.

xcvi.    **Barry-Kalamazoo Counties, MI:** Regional Submarket consists of at least 17 manufactured home communities and approximately 4,000 manufactured home lots.

xcvii.   **Barry-Kalamazoo Counties, MI:** Regional Submarket consists of at least 17 manufactured home communities and approximately 4,000 manufactured home lots.

xcviii.  **Tulsa, OK MSA:** Regional Submarket consists of at least 17 manufactured home communities and approximately 3,000 manufactured home lots.

xcix.    **Prescott, AZ MSA:** Regional Submarket consists of at least 17 manufactured home communities and approximately 3,000 manufactured home lots.

c.       **Berrien County, MI:** Regional Submarket consists of at least 17 manufactured home communities and approximately 3,000 manufactured home lots.

ci.      **Topeka, KS MSA:** Regional Submarket consists of at least 17 manufactured home communities and approximately 2,000 manufactured home lots.

cii.     **Brownsville, TX MSA:** Regional Submarket consists of at least 17 manufactured home communities and approximately 2,000 manufactured home lots.

ciii.    **Ames, IA MSA:** Regional Submarket consists of at least 17 manufactured home communities and approximately 2,000 manufactured home lots.

civ.     **Greenville, SC MSA:** Regional Submarket consists of at least 17 manufactured home communities and approximately 2,000 manufactured home lots.

cv.      **Birmingham, AL MSA:** Regional Submarket consists of at least 16 manufactured home communities and approximately 3,000 manufactured home lots.

cvi.     **St. Clair County, MI:** Regional Submarket consists of at least 16 manufactured home communities and approximately 4,000 manufactured home lots.

cvii.    **Dayton-Springfield, OH MSA:** Regional Submarket consists of at least 16 manufactured home communities and approximately 3,000 manufactured home lots.

cviii.   **Monroe County, MI:** Regional Submarket consists of at least 15 manufactured home communities and approximately 6,000 manufactured home lots.

cix.     **Miami Dade County, FL:** Regional Submarket consists of at least 15 manufactured home communities and approximately 5,000 manufactured home lots.

cx. **Osceola County, Fl:** Regional Submarket consists of at least 15 manufactured home communities and approximately 4,000 manufactured home lots.

cxi. **Long Island, NY:** Regional Submarket consists of at least 15 manufactured home communities and approximately 3,000 manufactured home lots.

cxii. **Kent County, DE:** Regional Submarket consists of at least 14 manufactured home communities and approximately 3,000 manufactured home lots.

cxiii. **Livingston County, MI:** Regional Submarket consists of at least 14 manufactured home communities and approximately 4,000 manufactured home lots.

cxiv. **Champaign-Urbana, IL MSA:** Regional Submarket consists of at least 14 manufactured home communities and approximately 3,000 manufactured home lots.

cxv. **St. Lucie County, FL:** Regional Submarket consists of at least 13 manufactured home communities and approximately 8,000 manufactured home lots.

cxvi. **Louisville, KY MSA:** Regional Submarket consists of at least 13 manufactured home communities and approximately 3,000 manufactured home lots.

cxvii.   **Jackson County, MI:** Regional Submarket consists of at least 13 manufactured home communities and approximately 3,000 manufactured home lots.

cxviii.  **Richmond, VA MSA:** Regional Submarket consists of at least 13 manufactured home communities and approximately 3,000 manufactured home lots.

cxix.    **Raleigh, NC MSA:** Regional Submarket consists of at least 13 manufactured home communities and approximately 3,000 manufactured home lots.

cxx.     **Santa Fe, NM MSA:** Regional Submarket consists of at least 13 manufactured home communities and approximately 2,000 manufactured home lots.

cxxi.    **Spokane County, WA:** Regional Submarket consists of at least 13 manufactured home communities and approximately 2,000 manufactured home lots.

cxxii.   **Martin County, FL:** Regional Submarket consists of at least 12 manufactured home communities and approximately 3,000 manufactured home lots.

cxxiii.  **San Luis Obispo County, CA:** Regional Submarket consists of at least 12 manufactured home communities and approximately 2,000 manufactured home lots.

cxxiv. **Yuma, AZ MSA:** Regional Submarket consists of at least 12 manufactured home communities and approximately 2,000 manufactured home lots.

cxxv. **Charlotte County, FL:** Regional Submarket consists of at least 11 manufactured home communities and approximately 2,000 manufactured home lots.

cxxvi. **Denton-Lewisville, TX:** Regional Submarket consists of at least 11 manufactured home communities and approximately 3,000 manufactured home lots.

cxxvii. **Lapeer County, MI:** Regional Submarket consists of at least 11 manufactured home communities and approximately 2,000 manufactured home lots.

cxxviii. **Las Cruces, NM MSA;** Regional Submarket consists of at least 11 manufactured home communities and approximately 2,000 manufactured home lots.

cxxix. **Napa County, CA:** Regional Submarket consists of at least 11 manufactured home communities and approximately 2,000 manufactured home lots.

cxxx. **Columbia, SC MSA:** Regional Submarket consists of at least 11 manufactured home communities and approximately 2,000 manufactured home lots.

cxxxi.  **New Castle County, DE:** Regional Submarket consists of at least 10 manufactured home communities and approximately 3,000 manufactured home lots.

cxxxii.  **Charlotte, NC MSA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 2,000 manufactured home lots.

cxxxiii.  **Greensboro, NC MSA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 2,000 manufactured home lots.

cxxxiv.  **Omaha, NE MSA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 2,000 manufactured home lots.

cxxxv.  **Fresno County, CA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 2,000 manufactured home lots.

cxxxvi.  **Savanah, GA MSA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 2,000 manufactured home lots.

cxxxvii.  **Gillette, WY MSA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 2,000 manufactured home lots.

cxxxviii. **El Paso County, TX:** Regional Submarket consists of at least 10 manufactured home communities and approximately 2,000 manufactured home lots.

cxxxix. **Dauphin County, PA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 1,000 manufactured home lots.

cxl. **Bend, OR MSA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 1,000 manufactured home lots.

cxli. **Tyler, TX MSA;** Regional Submarket consists of at least 10 manufactured home communities and approximately 1,000 manufactured home lots.

cxlii. **Calhoun County, MI:** Regional Submarket consists of at least nine manufactured home communities and approximately 2,000 manufactured home lots.

cxliii. **Solano County, CA:** Regional Submarket consists of at least nine manufactured home communities and approximately 1,000 manufactured home lots.

cxliv. **Monterey County, CA:** Regional Submarket consists of at least nine manufactured home communities and approximately 1,000 manufactured home lots.

cxlv. **Hendry-Okeechobee Counties, FL:** Regional Submarket consists of at least nine manufactured home communities and approximately 1,000 manufactured home lots.

cxlvi. **Collier County, FL:** Regional Submarket consists of at least eight manufactured home communities and approximately 2,000 manufactured home lots.

cxlvii. **Flagstaff, AZ MSA:** Regional Submarket consists of at least eight manufactured home communities and approximately 1,000 manufactured home lots.

cxlviii. **Memphis, TN MSA:** Regional Submarket consists of at least seven manufactured home communities and approximately 2,000 manufactured home lots.

cxlix. **Albany, GA MSA:** Regional Submarket consists of at least seven manufactured home communities and approximately 1,000 manufactured home lots.

cl. **Sant Cruz County, CA:** Regional Submarket consists of at least seven manufactured home communities and approximately 1,000 manufactured home lots.

cli. **Gettysburg, PA MSA:** Regional Submarket consists of at least seven manufactured home communities and approximately 1,000 manufactured home lots.

clii.    **Leon County, FL:** Regional Submarket consists of at least seven manufactured home communities and approximately 1,000 manufactured home lots.

cliii.    **Alachua County, Fl:** Regional Submarket consists of at least six manufactured home communities and approximately 1,000 manufactured home lots.

cliv.    **Lexington-Fayette, KY MSA:** Regional Submarket consists of at least six manufactured home communities and approximately 2,000 manufactured home lots.

clv.    **Escambia County, FL:** Regional Submarket consists of at least five manufactured home communities and approximately 1,000 manufactured home lots.

clvi.    **Bay County, FL:** Regional Submarket consists of at least four manufactured home communities and approximately 500 manufactured home lots.

clvii.    **Lynchburg, VA MSA:** Regional Submarket consists of at least four manufactured home communities and approximately 500 manufactured home lots.

## VI.   CLASS ACTION ALLEGATIONS

184.    Plaintiffs bring this action individually and on behalf of all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages, as well as equitable and injunctive relief, on behalf of the following Class:

> All persons and entities who paid rent directly to a Manufactured Home Community Defendant or an Unnamed Co-Conspirator for a manufactured or modular home lot situated in a manufactured

110

home community included in a JLT Market Report or located in a
Regional Submarket between August 31, 2019 and the present.

185.    The following persons and entities are excluded from the above-described

proposed Class:

     i.     Defendants and their counsel, officers, directors, management, employees,
subsidiaries, or affiliates;

     ii.     All governmental entities;

     iii.     All Counsel of Record; and

     iv.     The Court, Court personnel, and any member of their immediate families.

186.    The Class is so numerous as to make joinder impracticable. Plaintiffs do not know

the exact number of Class members because such information is presently in the exclusive

control of Defendants. Plaintiffs believe that due to the nature of the manufactured home

industry there are likely, at a minimum, hundreds of thousands of Class members in the United

States and its territories.

187.    Common questions of law and fact exist as to all members of the Class. Plaintiffs

and the Class were injured by the same unlawful scheme, Defendants' anticompetitive conduct

was generally applicable to all the members of the Class, and relief to the Class as a whole is

appropriate. Common issues of fact and law include, but are not limited to, the following:

     i.     Whether Defendants exchanged competitively sensitive information;

     ii.     Whether Defendants and their Unnamed Co-conspirators engaged in a
combination or conspiracy to fix, raise, maintain or stabilize manufactured
home lot rents;

      iii.     The duration of the conspiracy alleged herein and the acts performed by Defendants and their Unnamed Co-conspirators in furtherance of the conspiracy;

      iv.     Whether such combination or conspiracy violated the federal antitrust laws;

      v.     Whether the conduct of Defendants and their Unnamed Co-conspirators, as alleged in this complaint, caused injury to the Plaintiffs and other members of the Class;

      vi.     Whether Defendants caused Plaintiffs and the Class to suffer damages in the form of overcharges on manufactured home lot rents;

      vii.     The appropriate class-wide measure of damages; and

      viii.     The nature of appropriate injunctive relief to restore competition in the manufactured home lot market.

188. Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated rent for manufactured home lots.

189. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

190. Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

191.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

192.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

193.    Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## VII.  CLAIMS FOR RELIEF

### COUNT 1

**Price Fixing in Violation of
Section 1 of the Sherman Act (15 U.S.C. § 1)**

**(Against All Defendants)**

194.    Plaintiffs repeat the allegations set forth in Paragraphs 1-193, above, as if fully set forth herein.

195.    Beginning at a time currently unknown to Plaintiffs, but at least as early as August 31, 2019 (further investigation and discovery may reveal an earlier date), and continuing

through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

196. The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the rents they charge for manufactured home lots and involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

197. Plaintiffs and members of the Class have been injured and will continue to be injured in the form of overcharges on manufactured home lot rent.

198. Defendants' anticompetitive conduct had the following effects, among others:

   i.   Competition among Defendants has been restrained or eliminated with respect to manufactured home lots;

   ii.  The price of manufactured home lot rents has been fixed, stabilized, or maintained at artificially high levels; and

   iii. Manufactured home residents have been deprived of the benefits of free and open competition between and among Defendants.

199. This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

200.     Plaintiffs and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT 2

### Information Exchange in Violation of
### Section 1 of the Sherman Act (15 U.S.C. § 1)

### (Against All Defendants)

201.     Plaintiffs repeat the allegations set forth in Paragraphs 1-193, above, as if fully set forth herein.

202.     Beginning at a time currently unknown to Plaintiffs, but at least as early as August 31, 2019 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

203.     The contract, combination, or conspiracy involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

204.     Plaintiffs and members of the Class have been injured and will continue to be injured in the form of overcharges on manufactured home lot rent.

205.     This information exchange has been undertaken in furtherance of a price fixing agreement, which is unlawful *per se*. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the exchange is facially anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

206.    Plaintiffs and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT 3

### Unjust Enrichment

### (Against the Manufactured Home Community Defendants)

207.    Plaintiffs repeat the allegations set forth in Paragraphs 1-193, above, as if fully set forth herein.

208.    Alternatively, from the acts of Defendants as alleged above, the Manufactured Home Community Defendants have been unjustly enriched at the expense of Plaintiffs and members of the Class.

209.    Through Defendants' systematic exchange of competitively sensitive non-public information, the Manufactured Home Community Defendants have artificially increased the price of manufactured home lot rents charged to Plaintiffs and members of the Class.

210.    The Manufactured Home Community Defendants have collected from Plaintiffs and members of the Class artificially high manufactured home lot rents.

211.    The Manufactured Home Community Defendants have been unjustly enriched by retaining the artificially high manufactured home lot rents collected from Plaintiffs and members of the Class.

212.    The retention of these rents by the Manufactured Home Community Defendants violates the fundamental principles of justice, equity, and good conscience and should be returned to Plaintiffs and members of the Class.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully request that:

116

A.     The Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Co-Lead Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.     The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal under a quick look or rule of reason standard) of Section 1 of the Sherman Act (15 U.S.C. § 1);

C.     The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.     The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications;

E.      The Court grant Plaintiffs and members of the Class all other equitable relief in the nature of disgorgement, restitution, and/or the creation of a constructive trust to remedy the Manufactured Home Community Defendants' unjust enrichment;

F.      The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this complaint to the extent provided by law; and

G.      The Court award Plaintiffs and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: December 15, 2023

Respectfully submitted,

*/s/ Brian M. Hogan*

Brian M. Hogan
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
(312) 214-7900
bhogan@dicellolevitt.com

*Liaison Counsel for Plaintiffs*

Adam J. Levitt
John E. Tangren
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
(312) 214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com

Gregory S. Asciolla*
Karin E. Garvey*
Jonathan S. Crevier*
Noah Cozad*
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
(646) 933-1000
gasciolla@dicellolevitt.com
kgarvey@dicellolevitt.com
jcrevier@dicellolevitt.com
ncozad@dicellolevitt.com

Reena Gambhir*
**HAUSFELD LLP**
888 16th Street NW, Suite 300
Washington, DC 20006
(202) 540-7200
rgambhir@hausfeld.com

Scott Martin*
Kartik S. Madiraju**
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, New York 10004
(646) 357-1100
smartin@hausfeld.com
kmadiraju@hausfeld.com

Megan E. Jones*
Kyle G. Bates*
**HAUSFELD LLP**
600 Montgomery Street, #3200
San Francisco, California 94111
(415) 633-1908
mjones@hausfeld.com
kbates@hausfeld.com

***Interim Co-Lead Class Counsel for the
Proposed Class***

Shannon M. McNulty
**CLIFFORD LAW OFFICES, P.C.**
120 N. LaSalle Street, 36th Floor
Chicago, Illinois 60602
(312) 899-9090
smm@cliffordlaw.com

Marc H. Edelson*
**EDELSON LECHTZIN LLP**
411 S. State Street
Suite N300
Newtown, Pennsylvania 18940
(215) 867-2399
medelson@edelson-law.com

John G. Emerson**
**EMERSON FIRM, PLLC**
2500 Wilcrest, Suite 300
Houston, Texas 77042
(800) 551-8649
jemerson@emersonfirm.com

Kimberly A. Justice
**FREED KANNER LONDON
& MILLEN LLC**
923 Fayette Street
Conshohocken, Pennsylvania 19428
(610) 234-6487
kjustice@fklmlaw.com

Michael Moskovitz
Robert Wozniak
Nia Barberousse Binns
**FREED KANNER LONDON
& MILLEN LLC**
100 Tri-State Dr, 128
Lincolnshire, Illinois 60069
(224) 632-4500
mmoskovitz@fklmlaw.com
rwozniak@fklmlaw.com
nbinns@fklmlaw.com

Joshua H. Grabar*
**GRABAR LAW OFFICE**
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(267) 507-6085
jgrabar@grabarlaw.com

Heidi M. Silton*
Jessica N. Servais*
Joseph C. Bourne*
Eura Chang*
**LOCKRIDGE GRINDAL NAUEN
P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401
(612) 339-6900
hmsilton@locklaw.com
jnservais@locklaw.com
jcbourne@locklaw.com
echang@locklaw.com

Vincent Briganti*
Raymond Girnys*
Nicole A. Veno*
**LOWEY DANNENBERG P.C.**
44 South Broadway, Suite 1100
White Plains, New York 10601
(914) 997-0500
vbriganti@lowey.com
rgirnys@lowey.com
nveno@lowey.com

Myron M. Cherry
Jacie Zolna
Benjamin Swetland
**MYRON M. CHERRY & ASSOCIATES
LLC**
30 North LaSalle Street, Suite 2300
Chicago, Illinois 60602
(312) 372-2100
mcherry@cherry-law.com
jzolna@cherry-law.com
bswetland@cherry-law.com

Charles Barrett*
Daniella Bhadare-Valente**
**NEAL & HARWELL, PLC**
1201 Demonbreun St.
Suite 1000
Nashville, Tennessee 37203
(615) 244-1713
cbarrett@nealharwell.com
dbhadare-valente@nealharwell.com

Garrett D. Blanchfield**
**REINHARDT WENDORF &
BLANCHFIELD**
222 So. 9th Street, Suite 1600
Minneapolis, MN 55402
(651) 287-2100
g.blanchfield@rwblawfirm.com

William G. Caldes**
**SPECTOR ROSEMAN & KODROFF PC**
2001 Market Street Suite 3420
Philadelphia, PA 19103
(215) 496-0300
bcaldes@srkattorneys.com

Bruce W. Steckler **
**STECKLER WAYNE
CHERRY & LOVE PLLC**
12720 Hillcrest Road, Suite 1045
Dallas, Texas 75230
(972) 387-4040
bruce@swclaw.com

122

***Counsel for the Proposed Class***

*Admitted pro hac vice
** Pro hac vice applications forthcoming