**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| IN RE MANUFACTURED HOME LOT RENTS ANTITRUST LITIGATION | Case No. 23-cv-06715 |
|  | Judge Franklin U. Valderrama |
|  | Magistrate Judge Beth W. Jantz |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO**
**DISMISS CONSOLIDATED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

Page

INTRODUCTION .................................................................................................1

SUMMARY OF THE COMPLAINT'S RELEVANT ALLEGATIONS ........................................5

    A.    The Parties .................................................................................5

    B.    Plaintiffs' Claims .........................................................................7

ARGUMENT ....................................................................................................10

    A.    Count I Should Be Dismissed Because the Complaint Does Not Plausibly Allege a Price-Fixing Conspiracy. ..........................................................11

        1.    Plaintiffs Do Not Allege Any Direct Evidence of a Conspiracy. ..............11

        2.    Plaintiffs Fail To Properly Allege Circumstantial Evidence of a Conspiracy. ........................................................................12

            a.    The Complaint Itself Belies Any Notion of Parallel Conduct. ......12

            b.    Plaintiffs' Alleged "Plus Factors" Do Not Plausibly Suggest a Conspiracy. .................................................................13

        3.    Plaintiffs Fail To Allege Even The Most Basic Elements Of a Plausible Antitrust Conspiracy, and Instead Allege Facts That Make It Implausible.........................................................................17

    B.    Count II Should Be Dismissed Because the Complaint Does Not Plausibly Allege an Unlawful Information Exchange. ........................................................19

        1.    The Rule of Reason Governs Plaintiffs' Information Exchange Claim ....19

        2.    Plaintiffs Cannot Establish a Viable Claim Under the Rule of Reason.....21

            a.    Plaintiffs Fail To Plead a Plausible Market Definition.................22

            b.    Plaintiffs Fail To Allege Market Shares That Would Support the Notion That Conspiracy Could Have Effects in the Alleged Market or Sub-Markets. ....................................................24

            c.    Plaintiffs Fail To Plausibly Allege Anticompetitive Effects .........24

    C.    Count III Must Be Dismissed Because the Complaint Does Not Properly State a Claim for Unjust Enrichment. ....................................................25

CONCLUSION....................................................................................................26

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Agnew v. NCAA*,
   683 F.3d 328 (7th Cir. 2012) ..........................................................................10, 20

*Alarm Detection Sys., Inc. v. Village of Schaumburg*,
   930 F.3d 812 (7th Cir. 2019) ....................................................................................21

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................................................25

*In re Baby Food Antitrust Litig.*,
   166 F.3d 112 (3d. Cir. 1999)........................................................................11, 12, 15

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*,
   784 F.2d 1325 (7th Cir. 1986) ..................................................................................24

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...................................................................................... *passim*

*Burtch v. Milberg Factors, Inc.*,
   662 F.3d 212 (3d Cir. 2011)......................................................................................15

*Cenedella v. Metro. Museum of Art*,
   348 F. Supp. 3d 346 (S.D.N.Y. 2018)......................................................................17

*In re Chocolate Confectionary Antitrust Litig.*,
   999 F. Supp. 2d 777 (M.D. Pa. 2014), *aff'd*, 801 F.3d 383 (3d Cir. 2015) ............13

*Cleary v. Philip Morris Inc.*,
   656 F.3d 511 (7th Cir. 2011) ....................................................................................26

*In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*,
   60 F. Supp. 3d 914 (N.D. Ill. 2014) .........................................................................11

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   313 F. Supp. 3d 931 (N.D. Ill. 2018) .......................................................................21

*In re Eur. Gov't Bonds Antitrust Litig.*,
   No. 19-CV-2601, 2022 WL 768680 (S.D.N.Y. Mar. 14, 2022),
   *reconsideration denied*, 2022 WL 2168358 (S.D.N.Y. June 16, 2022) ............13, 14

*In re GSE Bonds Antitrust Litig.*,
   396 F. Supp. 3d 354 (S.D.N.Y. 2019).......................................................................13

ii

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)..........................................................................17, 18

*Jack Walters & Sons Corp. v. Morton Bldg., Inc.*,
    737 F.2d 698 (7th Cir. 1984) ...................................................................24

*Kleen Prod. LLC v. Georgia-Pac. LLC*,
    910 F.3d 927 (7th Cir. 2018) .............................................................13, 25

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)......................................................................21

*Marion Diagnostic Center, LLC v. Becton Dickinson & Co.*,
    29 F. 4th 337 (2022)......................................................................20

*Mayor of Baltimore v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013).............................................................14

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984)................................................................10, 17

*Moore* v. *Boating Indus. Assocs.*,
    819 F.2d 693 (7th Cir. 1987) ...................................................................16

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012)......................................................................18

*O'Connor v. Ford Motor Co.*,
    477 F. Supp. 3d 705 (N.D. Ill. 2020) .......................................................26

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018)......................................................................20

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
    629 F.3d 697 (7th Cir. 2011) ...................................................................11

*In re: Opana ER Antitrust Litig.*,
    162 F. Supp. 3d 704 (N.D. Ill. 2016) .......................................................26

*Panache Broad. v. Richardson Elecs.*,
    1992 U.S. Dist. LEXIS 13069 (N.D. Ill Aug. 28, 1992) .......................................................14

*Quality Auto Body, Inc. v. Allstate Ins. Co.*,
    660 F.2d 1195 (7th Cir. 1981) ...................................................................14

*In re: Realpage, Inc., Rental Software Antitrust Litig.*,
    No. 23-MD-03071, 2023 WL 9004806, (M.D. Tenn. Dec. 28, 2023)..............................23, 24

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
    381 F.3d 717 (7th Cir. 2004) ........................................................................21

*Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*,
    87 F. Supp. 3d 874 (N.D. Ill. 2015) ........................................................21, 22

*Sandee's Catering v. Agri Stats, Inc.*,
    No. 20-CV-2295, 2020 WL 6273477 (N.D. Ill. Oct. 6, 2020) .................25

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ....................................................................................22

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) .................................................................11, 17

*In re Text Messaging Antitrust Litig.*,
    782 F.3d 867 (7th Cir. 2015) .................................................................13, 16

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) .................................................................19, 20

*Toulon v. Cont'l Cas. Co.*,
    877 F.3d 725 (7th Cir. 2017) .....................................................................25

*United States v. Citizens & S. Nat'l Bank*,
    422 U.S. 86 (1975) ......................................................................................20

*United States v. Conn. Nat'l Bank*,
    418 U.S. 656 (1974) ....................................................................................23

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978) ....................................................................................20

*Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
    328 F. Supp. 3d 824 (N.D. Ill. 2018) ...................................................12, 13

## STATUTES

Sherman Act § 1 .................................................................................... *passim*

Defendants Equity Lifestyle Properties, Inc., Cal-Am Properties, Inc., Hometown America Management, L.L.C., Inspire Communities, LLC, Kingsley Management Corp., Lakeshore Communities, Inc., Murex Properties, L.L.C., RHP Properties, Inc., Sun Communities, Inc., and Yes! Communities, LLC (collectively, "Manufactured Home Community Defendants"), along with Defendant Datacomp Appraisal Systems, Inc. ("Datacomp"), move to dismiss the Consolidated Class Action Complaint (Dkt. 126) (the "Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6).

## INTRODUCTION

The Manufactured Home Community Defendants are ten companies of various sizes that own and/or manage manufactured home lot communities ("MH Communities") in certain locations in the United States. These Defendants do not all own or manage MH Communities in the same mix of counties or states, and even when their MH Communities are located near one another, they typically offer different rental terms, amenities and services, cater to different clientele (*e.g.*, 55+ vs. all-age tenants), and charge vastly different rents. What makes these ten Manufactured Home Community Defendants similar for purposes of this case is they are among the several hundred MH Communities in this country that purchase from Defendant Datacomp certain manufactured home data reports (called "JLT Reports"), and a page on Datacomp's website advertises that they do so. From that, and the fact that manufactured home lot rental prices on average have increased in recent years, Plaintiffs allege a massive, nationwide, multi-year antitrust conspiracy among the Defendants to raise manufactured home lot rental prices across the country. The law requires much more for the Complaint to survive dismissal.

The Supreme Court has made clear that antitrust conspiracy plaintiffs must allege enough factual matter to *plausibly* suggest that an agreement existed, as demonstrated either through (a) direct evidence of an agreement (the rare "smoking gun") or (b) circumstantial evidence

permitting a reasonable inference that defendants consciously committed to a common scheme designed to achieve an unlawful objective. Plaintiffs do not come close to meeting those standards here. Nowhere in the Complaint do Plaintiffs identify a single communication among any Defendants to coordinate on rental prices for any locations, and thus they do not allege direct evidence. Plaintiffs likewise fail to allege any instances where Defendants raised prices in parallel, and fail to identify "plus factors" that would permit the Court to infer a conspiracy through circumstantial evidence.

Plaintiffs' conspiracy claim also fails because there are no well-pleaded allegations that Defendants ever provided, exchanged, or used any non-public or commercially-sensitive information. The Complaint carefully attempts to obscure the fact that the JLT Reports—the purported bedrock of this supposed conspiracy—are merely compilations of publicly-available information, including rental prices for MH Communities, occupancy rates, offered amenities, maps showing where certain MH Communities are located, and contact information for manufactured home lot community owners or operators—similar to the type of information one might find on Zillow if one were seeking to rent in a building in River North. There are no pricing recommendations or modeling within the JLT Reports, nor are any algorithms utilized. Indeed, it is obvious just by looking at the screenshots from the JLT Reports contained in the Complaint that the supposed "detailed information" in the reports is information *anyone* can obtain by calling or visiting an MH Community, and in some instances simply through visiting the MH Community's website or conducting other basic internet searches. Plaintiffs essentially acknowledge that those are the ways Datacomp obtains the information in question. Datacomp compiles this non-confidential information that it collects into the JLT Reports, and then makes it available to anyone for purchase, at a modest price. In fact, Plaintiffs' counsel purchased the JLT Reports cited in the

2

Complaint directly from Datacomp's website. The JLT Reports are used throughout the industry, including critically by other market participants like homeowners associations and residents (*i.e.*, members of the putative class), in their negotiations with manufactured home community owners and operators.

It is telling that despite Plaintiffs' repeated conclusory assertions that the JLT Reports include "non-public, competitively sensitive information"—and despite their having acquired such reports—nowhere in their Complaint do they ever identify a single piece of information contained in a report that fits that description.[1] It is likewise noteworthy that, despite alleging the Manufactured Home Community Defendants could use the information in the JLT Reports to coordinate price increases, Plaintiffs never allege a single instance where a Manufactured Home Community Defendant actually raised its rent after learning from a JLT Report that another Defendant had done so. The lack of any such allegations is not surprising—the Complaint does not allege any facts suggesting that the Defendants had the necessary market shares or market power to plausibly coordinate price increases in the many geographic markets that, by Plaintiffs' own allegations, are highly fragmented. In fact, the Complaint does not include a single market share.

This is not a case where Plaintiffs merely have failed to allege some necessary facts. Rather, the allegations in Plaintiffs' Complaint directly contradict, and fatally undermine, their theories of liability, particularly with regard to the pricing behavior they identify. For instance, the JLT Reports cited by Plaintiffs to show that certain Manufactured Home Community

---

[1] The closest Plaintiffs come is when they claim the JLT Reports contain information about future rental price increases. Compl. ¶¶ 108-109, 113. But Plaintiffs do not address the obvious fact that rent changes are decided well before they are implemented and, tellingly, they are careful never to claim that any JLT Report ever included a future rent increase that had not already been conveyed to prospective renters.

Defendants raised prices at a particular time in fact establish that those price increases were not uniform in any way or even similar—varying between 0% to 15% or more year-over-year among Defendants. Likewise, there is significant variation among different Manufactured Home Community Defendants' absolute lot rental prices within the same purported geographic market—sometimes as much as 100%. Plaintiffs cannot and do not explain how a plausible price-fixing conspiracy could ever involve such wide pricing divergences.

Plaintiffs claim that there must have been a conspiracy because manufactured home lot rental prices *on average* went up faster than rental prices for detached single family homes. However, the Complaint specifically alleges that renting a single family detached home is not a reasonable substitute for renting a manufactured home lot—so there is no reason why prices for those two unrelated (based on Plaintiffs' view of the world) products would ever have moved up or down in tandem. And while the law requires Plaintiffs to allege facts that tend to exclude obvious, non-collusive explanations for the pricing activity, here they do the opposite. Plaintiffs note in the Complaint that the price increases occurred when private equity moved in, markets became less fragmented, and supply stayed stagnant while demand increased. These are exactly the types of facts that courts find render implausible an inference of conspiracy.

Similarly, Plaintiffs contradict their own allegations on the relevant geographic market. Plaintiffs allege a *national* geographic market for MH Communities, yet state definitively that manufactured home lot renters in any given metropolitan statistical area ("MSA") do not consider lots outside that MSA to be relevant substitutes given factors like commuting distance to work or school. Indeed, those same allegations contradict Plaintiffs' proposed alternative "sub-markets" that span entire MSAs, which often consist of dozens or hundreds of separate neighborhoods and encompass hundreds or thousands of square miles.

4

Ultimately, the Complaint fails to state a claim because merely buying the same publication as others in the industry—even if one also provides information to that publication—does not amount to an antitrust violation, regardless of whether the claim is *per se* price-fixing (Count I), improperly exchanging information under the rule of reason (Count II), or unjust enrichment (Count III). Plaintiffs' claims are not plausible, and the Complaint should be dismissed.

## SUMMARY OF THE COMPLAINT'S RELEVANT ALLEGATIONS[2]

### A. The Parties

Plaintiffs are 14 individual residents of various MH Communities across the United States who paid rent to the Manufactured Home Community Defendants to lease spaces for their manufactured homes. Compl. ¶¶ 19-32. Unlike traditional site-built homes, manufactured homes are pre-fabricated in a factory before being transported to and placed on a foundation on a "manufactured home lot" or "community." *Id.* ¶¶ 49, 65. Manufactured homes are generally less expensive than site-built homes, sometimes by as much as 40-50% per square foot. *Id.* ¶ 55. Manufactured homes are considered separate pieces of property from the lots they sit on, and often have different owners. *Id.* ¶ 66. While some individuals rent both their manufactured home and lot, and while some own both their home and their lot, Plaintiffs allege that individuals most frequently own the manufactured home and rent the lot. *Id.* ¶ 67.

The Manufactured Home Community Defendants are owners or operators of MH Communities. *Id.* ¶¶ 34-43. Other than noting the extent to which some Manufactured Home Community Defendants own or operate MH Communities in the Northern District of Illinois, Plaintiffs do not identify the locations where each Manufactured Home Community Defendant's

---

[2] For purposes of this Motion to Dismiss only, Defendants accept the truth of the Complaint's well-pleaded factual allegations.

communities are located. *Id.* Nor do Plaintiffs even attempt to allege any Manufactured Home Community Defendant's market share either nationally or in any specific geographic region. While MH Communities once were typically owned by "mom and pop" operations and other traditional longtime owner-operators (including some of the Manufactured Home Community Defendants), over the past several years various investment firms have become increasingly involved in the manufactured home lot business. *Id.* ¶ 77. Though the previous owners supposedly kept their lot rents low, private equity firms have allegedly sought to capitalize on their investments by increasing rents and profits after acquisitions. *Id.*

Defendant Datacomp is an appraisal service founded in 1987 that provides manufactured and mobile home appraisals, inspections, and market data. *E.g.*, *id.* ¶ 33. In 2014, Datacomp acquired JLT & Associates, a firm that published industry reports about MH Communities under the name "JLT Market Reports." *Id.* ¶ 96. The JLT Reports contain data regarding MH Communities, including rental rates, occupancy rates, announced rent increases, maps and amenities. *Id.* ¶¶ 5, 96, 103, 105. Datacomp collects the data through telephone surveys and direct outreach to MH Communities, as well as from the voluntary provision of data by certain manufactured home operators, including some Manufactured Home Community Defendants. *Id.* ¶ 104. Datacomp creates and sells JLT Reports for as many as 187 different geographic areas throughout the country, *id.* ¶ 98, and the reports are available to anyone to purchase for a modest price. *Id.* ¶ 101. Plaintiffs themselves purchased several reports, which they cite throughout the Complaint. *E.g.*, *id.* ¶ 146. Other purchasers include developers, lenders, appraisers, and homeowners associations. *Id.* ¶ 118, Fig. 15. In December 2021, Manufactured Home Community Defendant Equity Lifestyle Properties purchased Datacomp. *Id.* ¶ 97.

6

## B.    Plaintiffs' Claims

The crux of Plaintiffs' claims is that the Manufactured Home Community Defendants used the JLT Reports to fix and raise manufactured home lot rents, with each Defendant (as well as unnamed co-conspirators) exchanging what Plaintiffs characterize as "non-public, competitively sensitive information about the manufactured home communities they owned." *Id.* ¶ 117. Plaintiffs claim that because Datacomp's website includes a list of clients that purchase and use its JLT Reports, the Manufactured Home Community Defendants knew "who else was purchasing the reports, thus giving additional assurances to each Defendant that its competitors were also part of the conspiracy." *Id.* ¶ 118.  Plaintiffs do not explain what information in the JLT Reports is supposedly non-public or competitively sensitive.  They also do not allege that the client list on Datacomp's website is current, or acknowledge the obvious fact that the list pre-dates the beginning of the alleged conspiracy and includes several entities that are no longer in existence. Nor do Plaintiffs allege that the Manufactured Home Community Defendants ever actually discussed rent increases (or any information) with one another or agreed to rent increases.

Plaintiffs allege that there was an acceleration in the rate at which manufactured home lot rental prices increased annually.  According to Plaintiffs, MH Communities rental prices increased at a rate of approximately 2.3% per year from 2010 to 2018.  *Id.* ¶¶ 8, 142.  In 2019, some five years after Datacomp began selling JLT Reports, *id.* ¶ 96, rental prices began increasing at a higher rate, an average of 9.1% per year across the industry from 2019 to 2021.  *Id.* ¶¶ 8, 142.  Plaintiffs do not explain why the rate of rental price increases began to rise in 2019 given that the JLT Reports were being published and utilized well before then.

Nor do Plaintiffs address non-conspiratorial explanatory factors that predictably would have contributed to rising rental prices starting in late 2019 and continuing through 2020 and 2021—including the alleged growing demand, the effects of a global pandemic, higher operating

costs, inflation or CPI increases, and the extensive M&A activity they highlight across eight pages of their Complaint. *Id.* ¶¶ 71-78.

Plaintiffs offer no plausible allegations to indicate that the Manufactured Home Community Defendants' prices were similar to one another or moved together at all. To the contrary, data from the JLT Reports expressly referenced in the Complaint shows that neither prices nor price increases among Defendants were even remotely parallel. For example, in the Hillsborough County, Florida MSA, Plaintiffs' chart shows that average rental prices in 2022 ranged from $479 to $909 (almost a 100% difference), with year-over-year increases varying between 0% (no increase at all) to 15.4% among Defendants, Compl. Fig. 21; in the Riverside and San Bernadino Counties, California MSA, average rental prices in 2022 ranged from $464 to $1,459 (more than a 200% difference), with year-over-year changes varying between -0.6% (a price reduction) and 12.9% among Defendants, Compl. Fig. 22; and in the Phoenix-Mesa-Scottsdale, Arizona MSA, average rental prices in 2023 ranged from $538 to $976, with year-over-year increases varying between 0% and 14.8% among Defendants, Compl. Fig. 23.

**EXAMPLES OF WIDE DIVERGENCE IN MOVEMENTS OF
PRICING DATA CITED IN COMPLAINT**

| MSA | Year | Average Rental Price Range | Year-over-Year Change Range |
|---|---|---|---|
| Hillsborough County, Florida | 2022 | $479 – $909 | 0% – 15.4% |
| Riverside and San Bernadino Counties, California | 2022 | $464 – $1,459 | -0.6% – 12.9% |
| Phoenix-Mesa-Scottsdale, Arizona | 2023 | $538 – $976 | 0% – 14.8% |

Plaintiffs' acknowledgement that "the amount of the changes in lot rents are not identical," Compl. ¶ 148, rather understates the degree to which the data they present actually undermines their conclusory assertion of "parallel price increases."

Nor do Plaintiffs offer any allegations to support their assertion that the geographic market spans the entire country or even an entire MSA, or allegations showing that renters across the many, highly varied communities were affected similarly. To the contrary, Plaintiffs' allegations lead inevitably to the conclusion that the markets for manufactured home lot rentals are intensely local.

Plaintiffs purport to represent a class of all persons who paid rent directly to a Manufactured Home Community Defendant or an unnamed co-conspirator for a manufactured home lot situated in an MH Community included in a JLT Report or located in an alleged regional submarket between August 31, 2019 and the present. *Id.* ¶ 184.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint must state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plaintiffs must plead "more

than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555.

To state a claim under Section 1 of the Sherman Act, a plaintiff must allege "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in a relevant market; and (3) an accompanying injury." *Agnew v. NCAA*, 683 F.3d 328, 335 (7th Cir. 2012) (internal quotation marks and punctuation omitted). Satisfying the first element "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. "[T]he crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express. While a showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, it falls short of conclusively establishing agreement or itself constituting a Sherman Act offense." *Id.* at 553 (internal quotation marks and citations omitted). Thus, "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557. Plaintiffs must therefore plausibly allege that each defendant "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984).

## ARGUMENT

Plaintiffs allege three separate claims. *First*, Count I alleges that Defendants and their co-conspirators, through their alleged use of the JLT Reports, entered into a *per se* illegal price-fixing agreement in violation of Section 1 of the Sherman Act. Compl. ¶¶ 194-200. *Second*, Count II alleges that Defendants' use of the JLT Reports is itself an unlawful agreement to exchange information in violation of Section 1. *Id.* ¶¶ 201-206. *Third*, Plaintiffs assert an unjust enrichment

claim that is derivative of their antitrust claims. *Id.* ¶¶ 207-212. All three claims are legally infirm and should be dismissed.

> **A.  Count I Should Be Dismissed Because the Complaint Does Not Plausibly Allege a Price-Fixing Conspiracy.**

Count I alleges that Defendants agreed "to fix, raise, stabilize, or maintain at artificially high levels the rents they charge for manufactured home lots," in violation of Section 1 of the Sherman Act, and that the agreement was carried out through "the exchange of competitively sensitive information between and among Defendants." Compl. ¶ 196. An antitrust conspiracy under Section 1 may be pleaded with either "direct evidence" of an anticompetitive agreement or "circumstantial evidence" from which the existence of such an agreement can be inferred. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628-29 (7th Cir. 2010). Plaintiffs do not properly plead a conspiracy with either form of evidence, and in fact, fail to plead even the most basic elements of a plausible antitrust conspiracy. Accordingly, Count I should be dismissed.

> **1.  Plaintiffs Do Not Allege Any Direct Evidence of a Conspiracy.**

Plaintiffs fail to plead any direct evidence of an agreement among Defendants to raise rental prices of manufactured home lots. Direct evidence of an agreement "'is explicit and requires no inferences to establish the proposition or conclusion being asserted.'" *In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 60 F. Supp. 3d 914, 950 (N.D. Ill. 2014) (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d. Cir. 1999)). It is equivalent to a "smoking gun" and is rare. *Omnicare, Inc. v. UnitedHealth Grp., Inc.,* 629 F.3d 697, 706 (7th Cir. 2011). Plaintiffs obviously allege nothing of the sort here. Indeed, Plaintiffs do not identify even a single communication between any Defendants, let alone a "smoking gun" evidencing a price-fixing agreement.

> ### 2. Plaintiffs Fail To Properly Allege Circumstantial Evidence of a Conspiracy.

Plaintiffs also fail to allege circumstantial evidence that could plausibly suggest a conspiracy among the Manufactured Home Community Defendants to use the JLT Reports to raise rents. In the absence of an express agreement to restrain trade, a plaintiff may allege facts showing "parallel conduct" together with "plus factors" that "push the alleged conspiracy across the line separating the possible from the plausible." *Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 831 (N.D. Ill. 2018). Dismissal is warranted here because Plaintiffs fail to plead either parallel conduct or the required plus factors.

> ### a. *The Complaint Itself Belies Any Notion of Parallel Conduct.*

To state a Section 1 claim based on parallel conduct, Plaintiffs must allege "'parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties[,]' … [or] 'conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement.'" *Twombly*, 550 U.S. at 557 n.4. In other words, to support an inference of conspiracy with plausible allegations of parallel conduct, Plaintiffs must allege well-pleaded facts that show either "uniform conduct of pricing by competitors," *In re Baby Food Antitrust Litig.*, 166 F.3d at 121, or "unprecedented changes in pricing structure," *Twombly*, 550 U.S. at 557 n.4. They do neither.

Plaintiffs make no plausible allegations that Defendants' prices were uniform (or even similar) or moved together at all. The Complaint does contain a series of charts purportedly presenting data from the JLT Reports showing "parallel price increases." Compl. ¶ 148. Those charts, however, show nothing that could be construed as parallel. *See generally* Compl. Fig. 21-35 and *supra* pp. 7-9. To the contrary, the charts support the opposite conclusion. What Plaintiffs'

charts actually show is that, in a given alleged regional submarket, only some subset of Manufactured Home Community Defendants will own or operate properties; some of those Defendants' average rents could be two to three times higher than others, and, to the extent those Defendants raised rents during a given time period, those average increases differed dramatically, from 0% to 15% or more. *Id.*; *see also supra* pp. 7-9.

Plaintiffs acknowledge these numbers are not "identical," Compl. ¶ 148, but that is a wild understatement: The prices and price movements of each Manufactured Home Community Defendant bear no resemblance to each other. Indeed, it is impossible to imagine any price-fixing conspiracy that would result in this pattern. *See In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 787 (M.D. Pa. 2014) (explaining that parallel pricing must be "reasonably proximate in time and value" to raise an inference of conspiracy), *aff'd*, 801 F.3d 383 (3d Cir. 2015). Plaintiffs cannot succeed on an antitrust claim when the data meant to show parallel pricing in fact shows "price differences" "for months on end." *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 877 (7th Cir. 2015); *see also Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 935-37 (7th Cir. 2018) (rejecting "price hikes" as evidence of a conspiracy where plaintiffs had "overstate[d] how coordinated these hikes actually were"); *Wash. Cnty. Health Care Auth., Inc.*, 328 F. Supp. 3d at 835-37 (alleged co-conspirators' recalls of saline bags "were not parallel" given "disparities in the magnitude . . . of the defendants' recalls."). And the price disparities here are far more significant. Plaintiffs present no plausible claim of parallel conduct.

b. ***Plaintiffs' Alleged "Plus Factors" Do Not Plausibly Suggest a Conspiracy.***

The absence of parallel conduct should itself be dispositive that Plaintiffs fail to plausibly plead a conspiracy. *See In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 363-64 (S.D.N.Y. 2019); *In re Eur. Gov't Bonds Antitrust Litig.*, No. 19-CV-2601, 2022 WL 768680, at *22

13

(S.D.N.Y. Mar. 14, 2022) ("the presence of plus factors is irrelevant" when plaintiffs fail to allege parallel conduct), *reconsideration denied*, 2022 WL 2168358 (S.D.N.Y. June 16, 2022); *see also Panache Broad. v. Richardson Elecs.*, 1992 U.S. Dist. LEXIS 13069, at *17-18 (N.D. Ill Aug. 28, 1992) (explaining that "a 'plus factor' analysis is ordinarily utilized where parallel business behavior is alleged to violate the Sherman Act" and that, "[g]iven that the case here does not involve allegations concerning parallel behavior of firms," the relevance of "plus factor[s]" is "unexplained").

However, even if Plaintiffs had sufficiently alleged parallel conduct, their Section 1 claim still fails because they do not allege cognizable "plus factors"—namely, "facts that tend to exclude independent self-interested conduct as an explanation for defendants' parallel behavior." *Twombly*, 550 U.S. at 552. "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice[; w]ithout more, parallel conduct does not suggest conspiracy[.]" *Id.* at 553-57; *see also Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1201 (7th Cir. 1981) ("Parallel behavior without more (a 'plus factor') is not enough to establish a Sherman Act violation."); *Mayor of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) ("[P]arallel conduct alone is insufficient, even at the pleading stage.").

For starters, Plaintiffs refer to the Defendants' "reciprocal sharing" of "competitively sensitive information" as a "super plus factor." Compl. ¶ 166. But Plaintiffs' assertion that the information is competitively sensitive is purely conclusory and is not entitled to the presumption of truth. As noted above, Plaintiffs fail to identify *which* specific information in the JLT Reports is actually competitively sensitive, and the fact that their counsel indisputably obtained these publicly available reports shows that none of this information was confidential or sensitive. The reality is that the information contained in the JLT Reports could be obtained by anyone simply

by calling or visiting MH Communities and doing some internet searches, or by paying a modest fee for the reports themselves.

Plaintiffs' assertion that the information was "reciprocal[ly] shar[ed]" is also conclusory. The Complaint does not make a single allegation that any Manufactured Home Community Defendant shared anything, directly or indirectly, with any other Defendant. The fact that Datacomp, a market research company that derives its entire value from collecting market rent information, would know a Manufactured Home Community Defendant's publicly-available rent prices is hardly surprising and does not suggest any agreement among the Manufactured Home Community Defendants.

Nor are Defendants' motives a significant plus factor. Plaintiffs claim that "Datacomp provides manufactured home community owners with a motive to conspire by advertising that JLT Market Reports provide valuable information to support lot rent increases and acquisition opportunities." Compl. ¶ 168. But landlords are motivated to increase rent for the same reason that all companies are motivated to maximize their profits. "In a free capitalistic society, … [p]rofit is a legitimate motive in pricing decisions, and something more is required before a court can conclude that competitors conspired to fix pricing in violation of the Sherman Act." *In re Baby Food Antitrust Litig.*, 166 F.3d at 134-35; *see also Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 229 (3d Cir. 2011). The allegation that Defendants were "motivated" to conspire because conspiring would result in greater profits than not conspiring is plainly insufficient for the plus-factors analysis.[3]

---

[3] In the antitrust context, a "motive to conspire" is ordinarily understood to be a suggestion that the market is susceptible to collusion—not a claim that companies are motivated to maximize profits. But even in its traditional formulation, a "motive to conspire" does not make it any more likely than not that parallel conduct is the result of collusion, because such a "motive" is equally

Plaintiffs' allegations regarding trade association membership, Compl. ¶ 169, are similarly deficient. "[M]ere membership in a trade association, attendance at trade association meetings and participation in trade association activities are not, in and of themselves, condemned or even discouraged by the antitrust laws." *Moore* v. *Boating Indus. Assocs.*, 819 F.2d 693, 712 (7th Cir. 1987) (citation omitted); *see also In re Text Messaging Antitrust Litig.*, 782 F.3d at 878 (absent "evidence of what information was exchanged at these [trade association] meetings, there is no basis for an inference that they were using the meetings to plot prices [sic] increases"). Far from being a significant plus factor, participation in trade associations is common and benign.

Plaintiffs further point to increasing industry concentration as a plus factor, because concentrated industries are more susceptible to collusion. Compl. ¶ 170. But Plaintiffs' allegations regarding concentration actually doubly contradict their allegation of a conspiracy. *First*, Plaintiffs' allegations undermine any notion that the industry is presently "concentrated," as the Complaint is devoid of any allegations of market shares—before or during the alleged conspiracy. But in any event, with ten Defendants and numerous "unnamed co-conspirators" present in the market, and numerous manufactured home operators in each of the example MSAs described in the Complaint, the market for MH Communities is decidedly *un*concentrated for antitrust purposes. *Second*, Plaintiffs' allegations of a trend towards greater consolidation during the complaint period (from the "once highly fragmented" market, Compl. ¶ 170) undermines any inference of a conspiracy, as the trend itself provides the "obvious alternative explanation" for increasing rent prices. *Twombly*, 550 U.S. at 567. As an individual Manufactured Home

---

consistent with consciously parallel behavior—which is not actionable under the antitrust laws. *See In re Text Messaging Antitrust Litig.*, 782 F.3d at 871-72 ("Tacit collusion, also known as conscious parallelism, does not violate section 1 of the Sherman Act. Collusion is illegal only when based on agreement.").

Community Defendant allegedly gained market share, it might test its ability to raise rents, but would remain subject to any market pressures that could defeat those efforts.

At best, Plaintiffs have pleaded a few purported facts that are entirely consistent with lawful, interdependent conduct. Thus, even had they pleaded parallel conduct, Plaintiffs would have done nothing to demonstrate, at the pleading stage, that such conduct was more likely than not the result of conspiracy. *Id*. at 556-57.

*     *     *

Plaintiffs have failed to plausibly plead either direct or circumstantial evidence of an antitrust conspiracy, and Count I should be dismissed as a result.

### 3. Plaintiffs Fail To Allege Even The Most Basic Elements Of a Plausible Antitrust Conspiracy, and Instead Allege Facts That Make It Implausible.

A Section 1 violation requires "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement," *Monsanto*, 465 U.S. at 764 n.9, rather than "independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," *In re Text Messaging Antitrust Litig.*, 630 F.3d at 628. Thus, Plaintiffs' burden at this stage is to plead "facts that tend to exclude independent self-interested conduct as an explanation for defendants' parallel behavior." *Twombly*, 550 U.S. at 552*; see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322-23 (3d Cir. 2010) ("[A]llegations of conspiracy are deficient if there are obvious alternative explanations for the facts alleged."). Plaintiffs have not done so, and in fact their own allegations suggest that independent action is the much more plausible explanation for any rent increases.

Plaintiffs do not even attempt to allege the basic facts of "who agreed with whom, to what, and when." *Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 358-59 (S.D.N.Y. 2018). All Plaintiffs note is that the Manufactured Home Community Defendants owned or operated MH

17

Communities, Compl. ¶ 3; that information about their properties was contained in JLT Reports, *id.* ¶ 5; that in certain instances some unidentified set of them provided unidentified information to Datacomp for inclusion in the JLT Reports, *id.* ¶ 104; and that in recent years manufactured home lot rents overall have increased, *id.* ¶ 140. From those facts, Plaintiffs leap to the conclusion that Defendants must have agreed with each other to fix rent prices. But that inference is as conclusory as it gets, and simply is not plausible based on the facts alleged. Plaintiffs' allegations are perfectly consistent with independent conduct, and thus are precisely the kind of allegations that *Twombly* rejected, on the pleadings, as a basis for Section 1 liability.

Far from "tending to exclude" the likelihood of independent action, Plaintiffs' own allegations provide alternative explanations for the alleged high prices. That is sufficient to doom their case. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 322-23 ("[A]llegations of conspiracy are deficient if there are 'obvious alternative explanation[s]' for the facts alleged."). For example, Plaintiffs' allegations indicate that over the supposed conspiracy period, demand for manufactured home rentals increased while supply decreased or remained stagnant, resulting in record low vacancy rates. *E.g.*, Compl. ¶ 171 (market has "outsized demand" and "virtually no new supply has been added for years"). Basic economics dictate that an increase in demand combined with a decrease in supply leads to price increases. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 553 (2012) ("[P]rice can be supported by increasing demand as well as by decreasing supply."). Similarly, Plaintiffs' chronicle of industry consolidation as "mom-and-pop" owners gave way to private equity firms and other institutional investors that were more focused on obtaining a return on their investment, Compl. ¶ 77, provides multiple legitimate reasons for rent increases that have nothing to do with a price-fixing conspiracy. In the words of the Supreme Court in *Twombly*, after noting a similar market-driven explanation for challenged behavior, "there

is no reason to infer that the employees had agreed among themselves to do what was only natural anyway." 550 U.S. at 566.

**B.      Count II Should Be Dismissed Because the Complaint Does Not Plausibly Allege an Unlawful Information Exchange.**

In Count II, Plaintiffs largely recycle their rote allegations from Count I, but instead of alleging an agreement to fix manufactured home lot prices, they allege that the agreement was to "exchange competitively sensitive information." Compl. ¶ 203. While an agreement to share information can form the basis of a Sherman Act Section 1 violation, exchanges of information are not inherently anticompetitive—and often are *procompetitive*[4]—and therefore must be adjudicated under the rule of reason. In order to maintain a rule of reason claim, a plaintiff must not only allege a plausible agreement to exchange information, but also that the overall effect of that exchange was to harm competition. Here, Plaintiffs have not pled the necessary elements that would permit the Court to evaluate their claim under the rule of reason and Count II therefore should be dismissed.

**1.      The Rule of Reason Governs Plaintiffs' Information Exchange Claim.**

While Plaintiffs assert that the alleged "information exchange has been undertaken in furtherance of a price fixing agreement," which they claim is "unlawful *per se*," Compl. ¶ 205, Count II in fact amounts to a pure information-exchange claim—that is, a claim that an exchange of information on its own violates the antitrust laws.[5] Black letter law holds that such Section 1

---

[4] In particular, courts recognize information exchanges as procompetitive when the information is made publicly available, as it is here through the publication of the JLT Reports. *See, e.g.*, *Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001) ("Public dissemination is a primary way for data exchange to realize its procompetitive potential.").

[5] To the extent Plaintiffs claim that Count II instead alleges a price-fixing agreement that is *facilitated* by an information exchange, such a claim would be entirely duplicative of Count I, and should be dismissed for the same reasons.

information-exchange claims are evaluated under the "rule of reason." As the Supreme Court has made clear, "exchanges of information do not constitute a *per se* violation of the Sherman Act" because "[t]he exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978); *see also United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975) (explaining that "the dissemination of price information is not itself a *per se* violation of the Sherman Act"); *Todd v. Exxon Corp.*, 275 F.3d at 211 (information exchange cannot be considered under *per se* rule or "quick-look" approach).

The Supreme Court also has made clear that, when conducting a rule of reason analysis regarding an alleged information exchange, "[a] number of factors including most prominently the structure of the industry involved and the nature of the information exchanged are generally considered in divining the procompetitive or anticompetitive effects of this type of interseller communication." *U.S. Gypsum Co.*, 438 U.S. at 441 n.16. In other words, Plaintiffs must meet their "threshold burden under the [r]ule of [r]eason analysis[, which] involves the showing of a precise market definition in order to demonstrate that a defendant wields market power, which, by definition, means that the defendant can produce anticompetitive effects." *Agnew*, 683 F.3d at 337; *see also Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) ("[C]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market."). Plaintiffs must also allege that they were harmed by the anticompetitive effects caused by the challenged conduct. *Marion Diagnostic Center, LLC v. Becton Dickinson & Co.*, 29 F. 4th 337, 345 n.7 (7th Cir. 2022). Because Plaintiffs have failed to meet that burden, Count II should be dismissed.

### 2.     Plaintiffs Cannot Establish a Viable Claim Under the Rule of Reason.

For the same reasons outlined in discussing Count I, Plaintiffs do not properly allege that the Manufactured Home Community Defendants agreed to any exchange of information among themselves: the mere purchase of publicly-available data from a third party is not in any way equivalent to an agreement between competitors to exchange information. Because Plaintiffs' theory of liability is that the Manufactured Home Community Defendants used Datacomp's reports to coordinate their prices by sharing "competitively sensitive information about manufactured home lot rental prices and occupancy, among other things, throughout the United States," Compl. ¶ 4, the pleading failures that doom Count I likewise mean that Count II cannot be maintained. *See Alarm Detection Sys., Inc. v. Village of Schaumburg*, 930 F.3d 812, 827 (7th Cir. 2019) ("Section 1 liability requires an agreement or a conspiracy.").

But even if Plaintiffs had sufficiently alleged that the Manufactured Home Community Defendants agreed to share information, then under the rule of reason Plaintiffs also are required to identify the relevant market affected by the challenged conduct and allege an actual adverse effect on competition in the identified market. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 950 (N.D. Ill. 2018). As the Supreme Court has held, identification of the relevant market affected by the challenged conduct is necessary so "the factfinder [can] weigh[ ] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007).

A precise definition of "[t]he relevant market has both a product and a geographic dimension." *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 738 (7th Cir. 2004). "Although market definition is a deeply fact-intensive inquiry, failure to offer a plausible relevant market is a proper ground for dismissing an antitrust claim." *Right Field Rooftops, LLC v. Chicago*

21

*Baseball Holdings, LLC*, 87 F. Supp. 3d 874, 886 (N.D. Ill. 2015) (internal quotation marks and citations omitted).  Because Plaintiffs fail to plausibly allege relevant markets, their rule of reason claim cannot be maintained.

a.      ***Plaintiffs Fail To Plead a Plausible Market Definition.***

A fundamental problem that dooms Plaintiffs' Count II rule of reason claim is that their alleged geographic markets are implausible.  Plaintiffs first assert that the relevant geographic market is a national market, encompassing the entire United States.  Compl. ¶ 178.  But the notion that there is a national market for manufactured home lots defies credulity.  As the Supreme Court has noted, "the area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies."  *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327 (1961).  Thus, for there to be a national market, it must be the case that, in the event a manufactured home lot renter in one state was priced out of a community, that renter would consider a lot *anywhere* else in the country as a substitute.  That, of course, is implausible.  Logic dictates that a lot in El Paso, Texas and a lot in Salem, Oregon are not substitutes for one another.  But even more so, Plaintiffs' own allegations contradict their alleged national market.  As the Complaint itself states, "the commuting distance to a place of work or school is a geographic constraint on where a manufactured home lot renter chooses to live," Compl. ¶ 180, and manufactured home lot renters also "will choose to live within close distance to their relatives and health care providers for support, *id.* ¶ 181.  Accordingly, by Plaintiffs' own admission, even leases in different regional submarkets are not substitutes for one another "because they would leave renters with inordinately long commutes to schools, jobs, family or doctors."  *Id.* ¶ 182.

In addition (or as an alternative) to their national market, Plaintiffs allege that there are 187 relevant regional "submarkets."  But the same allegations in the Complaint that contradict the

national market also render these regional submarkets implausible. The regional submarkets are defined by reference to "metropolitan statistical areas" or MSAs, which is how JLT organizes the data in the JLT Reports. *Id.* ¶ 98. But many of these regional submarkets are far too large to define the area of effective competition. For example, the Phoenix-Scottsdale MSA that Plaintiffs describe in Figure 23 is 14,587 square miles in size. Given Plaintiffs' assertion that "commuting distance to a place of work or school is a geographic constraint on where a manufactured home lot renter chooses to live," *id*. ¶ 180, all 14,587 square miles are obviously not interchangeable. *See United States v. Conn. Nat'l Bank*, 418 U.S. 656, 670 (1974) (plaintiff "cannot rely, without more, on Standard Metropolitan Statistical Areas (SMSAs) as defining the geographic markets").

Just last month, another court was faced with precisely the same types of geographic market allegations. In *In re: Realpage, Inc., Rental Software Antitrust Litig.*, plaintiffs attempted to support their rule of reason price fixing conspiracy claim by alleging "a geographic market scope of the entire United States" and "27 regional submarkets comprising cities and towns home to colleges and universities around which RMS Client Defendants operate student housing rental properties." No. 23-MD-03071, 2023 WL 9004806, at *30-31 (M.D. Tenn. Dec. 28, 2023). The court held that plaintiffs' relevant market allegations were "contradictory and self-defeating." *Id.* at *30. Specifically, the court determined that based on plaintiffs' allegations, which acknowledged that students needed to live near their campuses, a nationwide market [did] not contend with, and in fact confounded … reality." *Id.* at *31. The court also went on to find that the alleged regional submarkets were likewise implausibly broad because, in certain instances, they comprised entire cities that contained multiple universities. Looking to the allegations in the complaint, the court held that "[f]or this same reason, the regional submarkets comprising entire cities are overbroad, as students would likely forgo student housing near a different university on

23

the opposite side of town in favor of other housing options closer to the institution they attend, such as dormitories or multifamily housing." *Id.* at *30.

The rationale behind the *Realpage* decision on this issue is fully applicable to the allegations here, and mandates dismissal of Plaintiffs' rule of reason claim.[6]

> b. ***Plaintiffs Fail To Allege Market Shares That Would Support the Notion That a Conspiracy Could Have Effects in the Alleged Market or Sub-Markets.***

As noted above, in addition to alleging relevant markets, Plaintiffs must also allege market power to properly plead a rule of reason claim. Market power "is a necessary ingredient in every case under the Rule of Reason." *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986); *see also Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 702 (7th Cir. 1984) (market power "is a prerequisite to being able to restrain trade unreasonably") (internal citation omitted). Here, Plaintiffs do not plead *any* allegation regarding *any* Defendant's share of *any* of the alleged markets or submarkets. Absent such allegations, there is no way this Court could possibly determine the extent to which the alleged conspiracy affected any manufactured home lot market or submarket. That yawning gap in pleading is an additional reason why Count II must be dismissed.

> c. ***Plaintiffs Fail To Plausibly Allege Anticompetitive Effects.***

Nor do Plaintiffs plausibly allege that publication of the JLT Reports caused anticompetitive effects.

---

[6] In *Realpage*, plaintiffs attempted to excuse their failure to allege a relevant geographic market by arguing that any errors benefitted defendants since overbroad markets would potentially understate market concentration levels. The court rejected that argument, noting that "[t]his commonsense broadness argument, however, does not negate a plaintiffs' [*sic*] requirement to plead a plausible geographic market." *Id.* at *31.

As discussed above, Plaintiffs' allegations regarding increasing demand in an era of flat supply and repeated mergers provide an "obvious alternative explanation" for increased rents that renders Plaintiffs' claim implausible. *Twombly*, 550 U.S. at 567. As the Supreme Court held in *Twombly,* the presence of such obvious alternative explanations for the price increases means that any inference of causation is speculative at best. *Id.* at 567-68, 570; *see also Kleen Prods.*, 910 F.3d at 937 (holding similar allegations of increasing prices to be insufficient where they may be "explained by external factors"). The same is true here.

### C. Count III Must Be Dismissed Because the Complaint Does Not Properly State a Claim for Unjust Enrichment.

Count III alleges that "[t]hrough the systematic exchange of competitively sensitive non-public information, the Manufactured Home Community Defendants have artificially increased the price of manufactured home lot rents charged to Plaintiffs" and have been unjustly enriched. Compl. ¶¶ 209-11. As an initial matter, Plaintiffs fail to identify under which laws or in which states Plaintiffs wish to bring their unjust enrichment claims. That failure means that "Plaintiff[s] ha[ve] not met [their] Rule 8 pleading requirements." *Sandee's Catering v. Agri Stats, Inc.*, No. 20-CV-2295, 2020 WL 6273477, at *12 (N.D. Ill. Oct. 6, 2020) (noting that the failure to identify the relevant state law "has made it exceedingly difficult for the Court and the Defendants to know … what Plaintiff needs to allege in order to bring a claim under the state-specific unjust enrichment laws"). While "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Plaintiffs here have not even pled the threadbare elements of the cause of action. *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 734 (7th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

But beyond their failure to identify the laws under which they are suing, Plaintiffs also do not properly plead an unjust enrichment claim. Plaintiffs base this claim on the same factual

foundation as their antitrust claims, but improperly relabel it under an unjust enrichment theory. That too is insufficient under Rule 8. *See In re: Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 726 (N.D. Ill. 2016) (dismissing unjust enrichment claims where plaintiffs "pleaded antitrust claims and the factual foundation for them," but "merely alleged that those claims are also actionable under state consumer protection laws and as unjust enrichment"). But even if it were, it necessarily would mean that the claim should fail for the same reasons Plaintiffs' antitrust claims must be dismissed. *See Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011) ("[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim."); *O'Connor v. Ford Motor Co.*, 477 F. Supp. 3d 705, 720 (N.D. Ill. 2020) ("While an unjust enrichment claim may be pursued as an independent cause of action, where the claim rests on the same improper conduct alleged in another claim, it will stand or fall with the related claim").

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint.


Dated:  January 29, 2024                    Respectfully submitted,


                                            By:  */s/ Lawrence E. Buterman*
                                            LATHAM & WATKINS LLP

                                            Lawrence E. Buterman (*pro hac vice*)
                                            1271 Avenue of the Americas
                                            New York, NY 10020
                                            Telephone: 212-906-1200
                                            lawrence.buterman@lw.com

                                            Sadik Huseny (*pro hac vice*)
                                            300 Colorado St., Suite 2400
                                            Austin, TX 78701

Telephone: 737-910-7300
sadik.huseny@lw.com

Belinda S Lee (*pro hac vice*)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: 415-391-0600
belinda.lee@lw.com

Gary S. Feinerman (IL6206906)
Brittany M. Liesman (IL 6336682)
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: 312-777-7110
gary.feinerman@lw.com
brittany.liesman@lw.com

*Attorneys for Defendants Datacomp Appraisal
Systems, Inc. and Equity LifeStyle Properties,
Inc.*


ARMSTRONG TEASDALE LLP

By: */s/ Stephen J. Siegel (with consent)*
Stephen J. Siegel
Julie Johnston-Ahlen
100 North Riverside Plaza
Chicago, IL 60606
Telephone: 312-419-6900
SSiegel@atllp.com
JJohnston@Atllp.com

HOGAN LOVELLS US LLP

William L. Monts III
555 Thirteenth Street NW
Washington, D.C. 20004
Telephone: 202-637-5600
william.monts@hoganlovells.com

*Attorneys for Defendant Cal-Am Properties,
Inc.*


WINSTON & STRAWN LLP

27

By: */s/ James F. Herbison (with consent)*
James F. Herbison
Michael P. Mayer
35 West Wacker Drive
Chicago, IL 60601
Telephone: 312-558-5600
JHerbison@winston.com
MMayer@winston.com

*Attorneys for Defendant Hometown America Management, L.L.C.*


BRYAN CAVE LEIGHTON PAISNER

By: */s/ Timothy R. Beyer (with consent)*
Timothy R. Beyer (*pro hac vice*)
1700 Lincoln Street, Suite 4100
Denver, CO 80203
Telephone: 303-866-0481
Tim.beyer@bclplaw.com

Sarah L. Hartley (*pro hac vice*)
1155 F Street N.W.
Washington, D.C. 20004
Telephone: 303-866-0363
Sarah.hartley@bclplaw.com

Ashley Hyun-Jeong Kim
161 N. Clark Street, Suite 4300
Chicago, IL 60601
Telephone: 312-602-5113
Ashley.kim@bclplaw.com

*Attorneys for Defendant Inspire Communities, LLC*


MUCH SHELIST, P.C.

By: */s/ Steven P. Blonder (with consent)*
Steven Blonder
Laura Ann Elkayam
191 North Wacker Drive, Suite 1800
Chicago, IL 60606

28

Telephone: 312-521-2402
sblonder@muchlaw.com
lelkayam@muchlaw.com

*Attorneys for Defendant Kingsley Management, Corp.*

SHOOK, HARDY & BACON L.L.P.

By: /s/ Lynn H. Murray (with consent)
Lynn H. Murray
Kailin Liu
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Telephone: 312-704-7700
lhmurray@shb.com
kliu@shb.com

Ryan Sandrock
555 Mission St.
San Francisco, CA 94105
Telephone: 415-544-1900
rsandrock@shb.com

*Attorneys for Defendant Lakeshore Communities, Inc.*

SIVYER BARLOW WATSON & HAUGHEY, P.A.

By: /s/ Mahlon Herbert Barlow, III (with consent)
Mahlon Herbert Barlow, III (*pro hac vice*)
401 E. Jackson Street
Suite 2225
Tampa, FL 33602
Telephone: 813-221-4242
mbarlow@sbwhlegal.com

HOLLAND & KNIGHT LLP

David C. Kully (*pro hac vice*)
800 17th St. NW; Suite 1100
Washington, DC 20006

29

Telephone: 202-469-5415
david.kully@hklaw.com

*Attorneys for Defendant Murex Properties,*
*L.L.C.*


HONIGMAN LLP

By: */s/ David Ettinger (with consent)*
David Ettinger (*pro hac vice*)
660 Woodward Avenue
Detroit, MI 48226
Telephone: 313-465-7368
dettinger@honigman.com

William B. Berndt
155 North Upper Wacker Drive
Suite 3100
Chicago, IL 60606
Telephone: 312-701-9376
wberndt@honigman.com

*Attorneys for Defendant RHP Properties, Inc.*


SIMPSON THACHER & BARTLETT LLP

By: */s/ John Terzaken (with consent)*
John Terzaken (*pro hac vice*)
Abram J. Ellis (*pro hac vice*)
Joshua Hazan (*pro hac vice*)
900 G Street NW
Washington, D.C. 2001
Telephone: 202-636-5579
john.terzaken@stblaw.com
aellis@stblaw.com
Joshua.hazan@stblaw.com

TAFT STETTINIUS & HOLLISTER LLP

Kim R. Walberg
Elizabeth A. Winkowski
111 E. Wacker Drive, Suite 2800
Chicago, IL 60601
Telephone: 312-527-4000

kwalberg@taftlaw.com
ewinkowski@taftlaw.com

*Attorneys for Defendant Sun Communities, Inc.*

WILLIAMS & CONNOLLY LLP

By: */s/ Jonathan B. Pitt (with consent)*
Jonathan B. Pitt
680 Maine Avenue SW
Washington, D.C. 20024
Telephone: 202-434-5000
jpitt@wc.com

*Attorneys for Defendant Yes! Communities, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 29, 2024, a true and accurate copy of the foregoing was electronically filed with the CM/ECF system of the United States District Court for the Northern District of Illinois, which sends notice to counsel of record via e-mail.

Dated: January 29, 2024

By: */s/ Lawrence E. Buterman*
LATHAM & WATKINS LLP

Lawrence E. Buterman (*pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212-906-1200
lawrence.buterman@lw.com