IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE MANUFACTURED HOME LOT
RENTS ANTITRUST LITIGATION,

No. 23-cv-06715
Judge Franklin U. Valderrama

**MEMORANDUM OPINION AND ORDER**

Manufactured and modular homes (commonly known as mobile homes) are one of the country's most affordable housing options. R. 126, Compl.[1] Manufactured homes are often situated in a Manufactured Home Community (MHC). Plaintiffs Steven Brown, Todd Caldwell, Mary Galusha, Carla Hajek, David Klein, Colleen Levins, Ronald Kazmirzak, Kevin McDonough, Luis Melendez, Charles Neville, Deborah Norvise, Carol Rachelle Roach, Barbara Rowley, and Amber Sailer (collectively, Plaintiffs) all paid rent for a manufactured or modular home located in an MHC. Plaintiffs, on behalf of themselves and a putative nationwide class of all similarly situated persons, sued Defendants Equity LifeStyle Properties, Inc. (ELS), Hometown America Management, L.L.C. (Hometown America), Lakeshore Communities, Inc. (Lakeshore), Sun Communities, Inc. (Sun Communities), RHP Properties, Inc. (RHP), Yes Communities, LLC (Yes Communities), Inspire Communities, LLC (Inspire Communities), Kingsley Management, Corp. (Kingsley), Cal-Am Properties, Inc.'s (Cal-Am), and Murex Properties, L.L.C. (Murex)

---

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

(collectively MHC Defendants), MHC owners/operators, as well as Defendant Datacomp Appraisal Systems, Inc. (Datacomp), the nation's largest provider of manufactured and mobile home data (collectively, Defendants). Plaintiffs assert violations of Sections 1 of the Sherman Act, 15 U.S.C. § 1, against all Defendants (Counts I and II), and a state law claim for unjust enrichment against the MHC Defendants (Count III). Before the Court are Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and Murex's motion to dismiss pursuant to Rules 12(b)(2), 12(b)(3), and 12(b)(6). R. 154, Mot. Dismiss; R. 151, Murex Mot. Dismiss.[2] For the reasons discussed below, the Court grants Defendants' joint motion to dismiss and denies Murex's motion to dismiss without prejudice as moot.

## Background

Manufactured homes, unlike traditional site-built homes, are pre-fabricated in a factory before being transported to and placed on a foundation on a manufactured home lot or community.[3] Compl. ¶¶ 49, 65. Manufactured homes are generally less expensive than site-built homes. *Id.* ¶ 55. Manufactured homes are considered separate pieces of property from the lots they sit on. *Id.* ¶ 66. Some individuals rent both their home and lot, while others own both their home and/or lot. *Id.* ¶ 67.

Plaintiffs are 14 individual residents of various MHCs across the United States who paid rent to the MHC Defendants to lease spaces for their manufactured homes

---

[2]Murex joined Defendants' motion to dismiss, but also filed a separate motion to dismiss advancing three separate bases for dismissal unique to Murex.

[3]The Court accepts as true all of the well-pleaded facts in the Complaint and draws all reasonable inferences in favor of Plaintiffs. *Platt v. Brown*, 872 F.3d 848, 851 (7th Cir. 2017).

(mobile home lots (MHL)). Compl. ¶¶ 19–32. The MHC Defendants are owners or operators of MHCs. *Id.* ¶¶ 34–43.

For years, the MHC market was diffuse, and many operators owned only one MHC. *Id.* ¶ 71. Recently, and particularly within the last ten years, the industry experienced considerable consolidation with large corporate owners, including the MHC Defendants, buying up communities across the United States. *Id.* ¶¶ 71–73, 77. These corporate owners, including the MHC Defendants, prioritized acquiring properties that will allow them to raise lot rents. *Id.* ¶ 76.

During the last several years, and between August 31, 2019 and the present (the Relevant Time Period), the MHC Defendants, according to Plaintiffs, have raised MHL rent to unprecedented levels, imposing increases year after year that outpace those in prior years. Compl. ¶¶ 8, 79–87, 140–42. For example, MHL rents increased around 2.3% annually (with 1.8% inflation) between 2010 and 2018, but between 2019 and 2021, by contrast, rents increased at a rate of 9.1% per year (with 3% inflation). *Id.* ¶ 142. MHL rents also increased more quickly and steeply than rental prices for detached single-family homes. *Id.* ¶¶ 145–47, Figs. 17–20. Plaintiffs allege that the MHC Defendants could not have unilaterally increased rent at such a rate, but were able to do so by sharing competitively sensitive information with each other via Datacomp's Reports. *Id.* ¶¶ 4–5, 8, 93, 110, 125.

Datacomp is an appraisal service that provides manufactured and mobile home appraisals, inspections, and market data. *Id.* ¶ 33. In 2014, Datacomp purchased JLT & Associates, a firm that published industry reports about MH Communities, under

the name "JLT Market Reports." *Id.* ¶ 96. The JLT Reports (the Reports) contain data regarding MHCs, including rental rates, occupancy rates, announced rent increases, maps and amenities. *Id.* ¶¶ 5, 96, 103, 105. Datacomp collects the data through telephone surveys and direct outreach to MHCs, as well as from the voluntary provision of the data by certain manufactured home operators, including the MHC Defendants. *Id.* ¶ 104. Datacomp creates and sells the Reports to as many as 187 different geographic areas throughout the country (the metropolitan statistical areas (MSAs)). *Id.* ¶ 98. In December 2021, MHC Defendant ELS purchased Datacomp. *Id.* ¶ 97. Plaintiffs allege that, during the Relevant Time Period, the MHC Defendants purchased and relied upon the Reports to systematically increase MHL rents and to coordinate strategic acquisitions of manufactured home communities to consolidate market share and. *Id.* ¶ 93.

Specifically, the MHC Defendants provide current and future rent pricing and other pricing-related information for their communities to Datacomp. Compl. ¶ 104. Datacomp then generates the Reports, which contain detailed, non-anonymized, disaggregated, current and future competitive pricing and pricing-related information on MHCs located across the United States. *Id.* ¶¶ 5, 105–14, Figs. 10–12. Datacomp distributes these Reports to all MHC Defendants who previously did not, but now *do* have access to competitor data. *Id.* The Reports offer granular data to any MHC owner about its competitors—the owner can identify the actual rent prices that other MHC owners are charging and, in some cases, see when and to what level competitors will increase MHL rents. *Id.* This data projects far in the future

what an MHC owner plans to charge residents for rent—between September 2022 and August 2023, for example, more than a quarter of the nearly 4,000 surveyed MHCs provided Datacomp either future rent increase information, next month rent increase information, or in many cases, both figures. *Id.* ¶ 113.

Datacomp markets the Reports to the MHC Defendants with the promise that the information they contain will ensure that the MHC Defendants "stay competitive." Compl. ¶ 7, Fig. 1. For example, the May 2022 Report for Hillsborough County, Florida informed MHC Defendants that in January 2023 competitors ELS planned a rent increase of $37 per month, and Cal-Am an increase of $60 per month. *Id.* ¶¶ 108–09, Figs. 11–12. Plaintiffs cite to statements from the MHC Defendants' executives about the usefulness of the Reports: Ross Partrich, CEO of RHP, described the Reports as "extremely helpful for rent increases across our portfolio throughout the country." *Id.* ¶¶ 8, 120. Cory Sukert, CEO of Cal-Am, praised the Reports' "comprehensive analysis of competing communities in those markets in which we operate." *Id.* ¶122. And Nate Nelson, CFO of Kingsley, emphasized the currentness of the data in the Reports which help Kingsley "determine how our communities compare to the competition." *Id.* ¶ 123. In addition to the Reports, Datacomp also provides "real-time" data with "live updates," allowing the MHC Defendants to see one another's most recent pricing and pricing-related information. *Id.* ¶ 115.

Plaintiffs allege that the MHC Defendants could not have successfully increased rents in their MHCs alone, so they conspired to raise rents to supracompetitive high levels by leveraging Datacomp as a conduit to share

competitively sensitive pricing information. According to Plaintiffs, as a result of Defendants' conspiracy, MHL rents have increased dramatically, and the MHC Defendants have reduced or eliminated competition among themselves on rent prices, services, and MHL quality. *Id.* ¶¶ 1, 6, 9.

Plaintiffs, on behalf of themselves and a putative class, sued Defendants, asserting violations of Section 1 of the Sherman Act against all Defendants and a state law claim for unjust enrichment against the MHC Defendants. *See* Compl. Defendants now move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Murex joined the motion to dismiss, but also filed a separate motion, raising additional bases for dismissal under Rule 12(b)(6), as well as arguing that the Court lacks personal jurisdiction over Murex under Rule 12(b)(2) and that venue is improper under Rule 12(b)(3). The fully briefed motions are before the Court.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Under Rule 8(a)(2), a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, a complaint need only contain factual allegations, accepted as true, sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id*. The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

In the antitrust context, stating a claim under Section 1 of the Sherman Act "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.

## Analysis

### I.     Count I – Price Fixing in Violation of Section 1 of the Sherman Act

In Count I, Plaintiffs allege that Defendants agreed to "fix, raise, or maintain at artificially high levels the rents they charge for manufactured home lots" in violation of Section I of the Sherman Act and that the agreement was carried out through "the exchange of competitively sensitive information between and among Defendants." Compl. ¶ 94.

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1. Section 1 does not prohibit reasonable restraints of trade, but only outlaws *unreasonable* restraints of trade. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1977). To state a Section 1 claim, a plaintiff must allege: (1) a combination

or some form of concerted action between at least two legally distinct entities that (2) unreasonably restrains trade in the relevant market, and (3) an accompanying injury. *See In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 632–33, 643 (N.D. Ill. 2020) (citing *Denny's Marina, Inc. v. Renfro Prods., Inc.,* 8 F.3d 1217, 1220 (7th Cir. 1993)); *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 191 (2010).

In order to show a *per se* violation of the Sherman Act, a plaintiff must show either direct or circumstantial evidence of an illegal agreement. *In re Text Messaging Antitrust Litg.*, 630 F.3d 622, 629 (7th Cir. 2010) (*Text Messaging I*). Direct evidence of an agreement is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Dairy Farmers of Am., Cheese Antitrust Litig.*, 60 F. Supp. 3d 914, 950 (N.D. Ill. 2014) (cleaned up).[4] As the Seventh Circuit has recognized, direct evidence is equivalent to a "smoking gun," and it is quite rare. *Omnicare, Inc., v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011). Circumstantial evidence, on the other hand, consists of facts "from which the existence of such an agreement can be inferred." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002). "[C]ircumstantial evidence is the lifeblood of antitrust law because direct evidence will rarely be available to prove the existence of a price-fixing conspiracy." *City of Rockford v. Mallinckrokdt ARD, Inc.*, 360 F. Supp. 3d 730, 749 (N.D. Ill. 2019) (cleaned up). For circumstantial evidence to indicate an agreement, the plaintiffs must allege "parallel conduct" by the defendants

---

[4]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

and "context that raises a suggestion of a preceding agreement"—often called "plus factors." *In re MultiPlan Health Ins. Provider Litig.*, 789 F. Supp. 3d 614, 637 (N.D. Ill. 2025) (quoting *Twombly*, 550 U.S. at 557).

### A. Direct Evidence of Conspiracy

As an initial matter, Defendants contend that Plaintiffs fail to plead any direct evidence of an agreement among the Defendants to raise rental prices of MHLs. R. 155, Memo. Dismiss at 11. Plaintiffs do not argue otherwise. R. 165, Resp. at 7. As such, the Court turns to whether Plaintiffs plead circumstantial evidence of a conspiracy.

### B. Circumstantial Evidence of Conspiracy

Defendants argue that Plaintiffs "fail to allege circumstantial evidence that could plausibly suggest a conspiracy among the MHC Defendants to use the JLT Reports to raise rents." Memo. Dismiss at 12. From Defendants' perspective, Plaintiffs fail to allege any "parallel conduct" or the required plus factors. *Id*.

Plaintiffs respond that they have pled a *per se* violation of Section 1 because they allege: (1) an invitation to participate in the conspiracy, and the acceptance of the invitation,[5] as well as (2) parallel conduct and plus factors. Resp. at 7–8.

---

[5]The District Court for the District of Minnesota, in an opinion cited by Plaintiffs in their notice of supplemental authority, called into question whether "evidence of an invitation and acceptance alone, without corresponding evidence of parallel conduct and plus factors, would be sufficient to survive summary judgment in a § 1 case based on circumstantial evidence," noting that the case on which the plaintiffs in that case—as well as Plaintiffs here—rely in support of the invitation and acceptance theory, *Interstate Cir. v. United States*, "was decided nearly a century ago, and since then caselaw has developed in such a way as to indicate that parallel conduct and plus factors are typically important to support a per se violation of § 1." *In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758, 800 (D. Minn. 2025) (citing *Interstate Cir. v.*

Therefore, according to Plaintiffs, the Court must deny Defendants' motion to dismiss. *Id.*

The Court begins with the invitation and acceptance to participate in the conspiracy.

### 1. Invitation to Collude

Plaintiffs assert that they have established that the MHC Defendants, through Datacomp, accepted an invitation to participate in the alleged conspiracy. Resp. at 8. According to Plaintiffs, where each conspirator is advised that their competitors were asked to participate in the conspiracy and is aware that cooperation was essential to the success of the plan, then invitation and acceptance are established. *Id.* (citing *Interstate Circuit v. United States*, 306 U.S. 208, 226–227 (1939); *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 935 (7th Cir. 2000); *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 824 (S.D.N.Y. 2016)). Here, from Plaintiffs' point of view, Datacomp's solicitation of information from the MHC Defendants constitutes the invitation and the MHC Defendants' submission of their information to Datacomp constitutes "acceptance." *Id.* (citing Compl. ¶¶ 8, 104, 110–14, 117, 166). Plaintiffs maintain that the MHC Defendants, as evidenced by their public statements, understood that, like them, their competitors were also contributing competitively sensitive pricing information to Datacomp's Reports. *Id.* at 9. Plaintiffs reason, therefore, that they have pled a

---

*United States*, 306 U.S. 208 (1939)). However, the Court need not definitively decide at this stage whether allegations of invitation and acceptance alone are sufficient to survive a motion to dismiss, because for the reasons discussed in the body of the Opinion, the Court agrees with Defendants that Plaintiffs have not adequately alleged an invitation and acceptance to adequately state a claim based on that theory.

plausible price-fixing claim through Datacomp's invitation to share competitively sensitive pricing information via its Reports and the MHC's acceptance of that invitation. *Id.*

Defendants disagree, arguing that nowhere in the Complaint do Plaintiffs allege that Datacomp invited the MHC Defendants to do anything, much less that the MHC Defendants accepted any invitation. R. 177, Reply at 3. The Court agrees with Defendants.

Here, Plaintiffs do not directly allege that Datacomp extended an invitation to (or demanded that any MHC Defendant) submit any information, nor that the MHC Defendants accepted that invitation. Nor do Plaintiffs allege that the MHC Defendants communicated among themselves. Rather, Plaintiffs allege only that the MHC Defendants provided competitively sensitive information to Datacomp via telephone surveys or other means. Compl. ¶ 104. While such an allegation supports an information exchange, as discussed in depth below, it does not support an inference of an invitation, much less an acceptance to do anything.

The two "binding" cases cited by Plaintiffs, *Interstate Circuit* and *Toys "R" Us*, are distinguishable, contend Defendants. The Court agrees, as in each case cited by Plaintiffs, there was an explicit alleged demand to participate in the anticompetitive behavior. That is, in *Interstate Circuit*, the manager of Interstate, a movie theatre company, sent the same letter to eight branch managers of film distribution companies, with each naming all eight managers as addressees and asking them to comply with two demands as a condition of Interstate's continued exhibition of the

11

distributor's films. 306 U.S. at 215–17, 222–23. "Compliance with the proposals involved a radical departure from the previous business practices of the industry and a drastic increase in admission prices of most of the subsequent-run theatres." *Id.* at 222. And in *Toys "R" Us*, Toys "R" Us (TRU) contacted some of its suppliers at a toy fair to inform them of a new policy that dictated which products the suppliers offered or sold to TRU versus TRU's competitors, which policy was "an abrupt shift from the past." 221 F.3d at 931, 935. TRU and its suppliers negotiated about the new policy, and the Seventh Circuit relied on the record of "direct evidence of communications" to uphold the Federal Trade Commission's (FTC) determination of a conspiracy. *Id.* at 935. While Defendants do not distinguish *Meyer*, the Court also finds that case inapposite. In *Meyer*, drivers entered into contracts with Uber dictating pricing algorithms that drivers could not practically change. 174 F. Supp. 3d at 820–21, 824. Finally, as Defendants point out, Plaintiffs say nothing about the precedential value—or lack thereof—of the U.S. Department of Justice (DOJ) and the FTC's statement of interest that they cite. Resp. at 8 (citing *Duffy v. Yardi Sys., Inc.*, No. 2:23-cv-01391 Dkt. No. 149 (W.D. Wash. Mar. 1, 2024)). And, even if it offered some precedential value, as Defendants also argue, that case involved allegations that a company dictated rental prices that landlords should charge.

In sum, the Court finds that Plaintiffs have not pled a *per se* violation of Section 1 based on an alleged invitation and acceptance to participate in the conspiracy.

Of course, that is not the end of the analysis. The Court next turns to whether Plaintiffs have adequately pled parallel conduct and plus factors sufficient to state a price-fixing conspiracy claim.

### 2. Parallel Conduct

Parallel behavior by competitors as well as plus factors, or "factual enhancement[s]," are enough circumstantial evidence to plead an antitrust conspiracy. *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 789–90 (N.D. Ill. 2017) (*In re Broiler Chicken I*); *see also Text Messaging I*, 630 F.3d at 627 (sufficient circumstantial evidence may include "a mixture of parallel behaviors, details of industry structure, and industry practices, that facilitate collusion"). Parallel behaviors include those which "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties' conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement." *Text Messaging I*, 630 F.3d at 628 (cleaned up).

Defendants argue that Plaintiffs fail to allege parallel conduct, as Plaintiffs make no plausible allegations that Defendants' price increases were uniform or moved together at all. Memo. Dismiss at 12. True, note Defendants, the Complaint contains "a series of charts purportedly presenting data from the JLT Reports showing parallel price increases." *Id.* (citing Compl. ¶ 148). But those charts, according to Defendants, fail to show parallel conduct. *Id.* In fact, assert Defendants, the charts show the opposite conclusion. *Id.* That is, they show that in each regional

13

submarket, the Defendants who own or operate the properties in that submarket have varied average rents, and the rent increases differed dramatically. *Id.* at 7–9, 12.

Plaintiffs counter that parallel conduct may be shown through evidence of aggregate price increases, including when such increases occur over a lengthy period of time rather than all at once. Resp. at 9 (citing *In re Broiler Chicken I*, 290 F. Supp. 3d at 790–91). And the conduct, maintain Plaintiffs, need not be perfectly synchronized to be considered parallel. *Id.* at 9–10 (citing *Interstate Cir. v. United States*, 306 U.S. 208, 227 (1939)). Here, assert Plaintiffs, they have alleged that the MHC Defendants increased MHL rent at rates "far outpacing inflation, and more quickly and steeply than rental prices for detached single-family homes, across all geographic regions." *Id.* at 10 (citing Compl. ¶¶ 142–48; Compl. Figs. 18–23). In short, from Plaintiffs' perspective, all they are required to show and have shown are "unprecedented changes in pricing structure that suddenly take place because of Defendants' conduct." *Id.* at 10–11 (citing *Twombly*, 550 U.S. at 556 n.4; *In re Loc. TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *8 (N.D. Ill. Nov. 6, 2020)). According to Plaintiffs, *In re Broiler Chicken I* is instructive, where the court rejected the same arguments advanced by Defendants here. Resp. at 11.

In reply, Defendants insist that Plaintiffs fail to plead parallel conduct because the Complaint lacks any allegations that "the MHC Defendants' prices were remotely similar or moved together at all." Reply at 4. The way Defendants see it, asserting that aggregate prices rose across ten Defendants over the course of half a decade is

14

not an allegation of parallel pricing, but rather impermissible group pleading. *Id.* at 5. In fact, argue Defendants, Plaintiffs' own allegations relating to timing—that is, that Datacomp began publishing the JLT Reports as early as 2014, but the MHC Defendants' pricing did not change at an allegedly unusual rate until 2019—contradict Plaintiffs' argument that Defendants' conspiracy caused sudden and unprecedented changes in pricing structure. *Id.* at 6–7 (citing Compl. ¶¶ 8, 96; Resp. at 4, 10–11). Here, unlike *In re Broiler Chicken I*, argue Defendants, there are no allegations that the Defendants acted all at once to raise prices. *Id.* at 7.

The Court agrees with Plaintiffs that *In re Broiler Chicken I* is instructive,[6] and indeed, Defendants do not meaningfully distinguish it in their reply. In *In re Broiler Chicken I*, the court found that the complaint sufficiently alleged parallel conduct by each defendant industrial producer of chicken meat to increase prices where defendants restricted production between 2007 and 2009 and again between 2011 and 2014, through various methods such killing or exporting breeder flocks, closing facilities, or delaying planning of new facilities. 290 F. Supp. 3d at 782–84. The court rejected the defendants' arguments that the allegations as to parallel conduct were insufficient to allege a conspiracy because the production decreases occurred in "varying amounts," by "various methods," and "at various points over many years." *Id.* at 790–92 (collecting cases). As Plaintiffs here point out, the *In re*

_____

[6]While the Court finds *In re Broiler Chicken* to be instructive as to the parallel conduct analysis, the conclusion is distinguishable, as in that case the plaintiff had pled numerous plus factors that, when considered as a whole, supported a plausible conspiracy. 290 F. Supp. 3d at 797–802. Here, on the other hand, for the reasons discussed below, the Court finds that, when viewed as a whole, the Complaint falls short in plausibly alleging that the parallel conduct alleged by Plaintiffs reflects an agreement among Defendants to increase rent prices.

15

*Broiler Chicken I* court observed that it is "more than plausible that conspirators would leave the precise means . . . up to each conspirator," because such flexibility "would enable a greater number of producers to participate in the conspiracy, and might help to conceal the collusive nature of their conduct." *Id.* at 792 (cleaned up).

Here, Plaintiffs allege that the MHC Defendants started to significantly increase MHL rental prices around 2017, which far exceeded the pace of inflation and the cost of single-family homes beginning in 2019. Compl. ¶¶ 140–47. That the percentage increases were variable and occurred over several years does not undermine the allegations that Defendants' conduct was parallel. *See, e.g.*, *In re Broiler Chicken I*, 290 F. Supp. 3d at 782–84; *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1077–78 (N.D. Ill. 2011) (*Kleen Prods. I*) ("capacity reductions need not be simultaneous to demonstrate conscious parallelism," rather, allegation of sequential conduct "is common" in such cases, and finding sufficient allegations of parallel conduct where defendants increased prices over the course of five years).

The Court also agrees with Plaintiffs that the cases cited by Defendants do not change the analysis. The two Seventh Circuit cases were decided at summary judgment,[7] not the motion to dismiss stage, and the courts found that the plaintiffs

---

[7]In reply, Defendants take issue with Plaintiffs' arguments that the Court should disregard cases cited by Defendants on summary judgment. Reply at 3 n.3. According to Defendants, this is inconsistent with Plaintiffs' own reliance on summary judgment or post-trial decisions, and also is incorrect, as a court's holdings regarding substantive law do not become irrelevant at the pleading stage, simply because they were made in later stages of a case. *Id.* While Defendants are correct that a courts' holdings regarding substantive law are applicable across all stages of cases, *how* a court applies the law to the allegations or facts depends on

had not adduced sufficient evidence to show that the defendants colluded to raise prices; the in-District case applied the heightened Rule 9(b) standard; and the out-of-Circuit case cited actually supports Plaintiffs' position. Memo. Dismiss at 13 (citing *In re Text Messaging Antitrust Litigation*, 782 F.3d 867, 877 (7th Cir. 2015) (*Text Messaging II*); *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927 (7th Cir. 2018) (*Kleen Prods. II*); *Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 832–35 (N.D. Ill. 2018); *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 787 (M.D. Pa. 2014)).

For the reasons discussed above, the Court finds that Plaintiffs have done just enough to sufficiently allege that Defendants' conduct was parallel based on rent price increases that are "reasonably proximate in time and value." *Id.* That said, the Court considers the alleged disparities in the timing and amount of rent increases when determining whether this parallel conduct reflects an agreement among Defendants to raise rent. *See Hansen v. Nw. Univ.*, 2025 WL 2731378, at *9 (N.D. Ill. Sept. 24, 2025) (citing *Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 837 (N.D. Ill. 2018) ("Even if the disparities in the magnitude and timing of the defendants' recalls does not, in and of itself, render plaintiffs'

---

the stage of proceedings. That is, different standards apply at the motion to dismiss stage and the summary judgment stage. *See In re Broiler Chicken I*, 290 F. Supp. 3d at 801 (citing *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1002 (N.D. Ill. 2011)). And it matters less on a motion to dismiss when a *plaintiff* cites to a summary judgment order in support of her opposition to a motion to dismiss, because a plaintiff is required to do more to defeat summary judgment than to defeat a motion to dismiss. On the other hand, often summary judgment decisions cited by defendants are of limited value, *because* more is required of plaintiffs at that stage. So, the Court does not summarily disregard summary judgment opinions cited by Defendants, but it does so with those principles in mind.

complaint implausible, it is yet another strike against the complaint's plausibility." (cleaned up))).

Plaintiffs argue that the Court could end its analysis once it finds that Plaintiffs have plausibly alleged parallel conduct, as they need not allege plus factors in addition to parallel conduct. Resp. at 12–13 (citing *Washington Cty.*, 328 F. Supp. 3d at 840). Defendants disagree, insisting that Plaintiffs must allege more than just parallel conduct. Memo. Dismiss at 14; Reply at 7–8. The Court finds that Defendants have the better of the argument.

"[W]hile parallel conduct makes a conspiratorial agreement 'conceivable,' parallel conduct, without more, does not make an agreement 'plausible.' Plaintiffs are still required to identify additional conduct beyond parallel conduct—often referred to as 'plus factors'—to 'nudge' Plaintiffs' allegation of agreement 'across the line from conceivable to plausible.'" *In re Broiler Chicken Antitrust Litig.*, 2025 WL 461407, at *11 (N.D. Ill. Feb. 11, 2025) (*Broiler Chicken II*) (quoting *Twombly*, 550 U.S. at 570); *see also Greco v. Mallouk*, 2024 WL 4119169, at *6 (N.D. Ill. Sept. 9, 2024) ("[A] plaintiff alleging a conspiracy based on circumstantial evidence must also allege certain plus factors, which are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action.") (cleaned up). The Court agrees with Defendants that the only case cited by Plaintiffs, *Washington Cty.*, does not stand for the proposition that parallel conduct on its own can support a price-fixing conspiracy. Reply at 7. Indeed, the court held the opposite, stating that, "[e]ven if the plaintiffs' allegations sufficed to establish a

18

strong inference of parallel conduct (and, as discussed above, it does not), the complaint would still fall short because the 'plus factors' the plaintiffs identify do not make the inference of an express agreement between [the defendants] any more plausible." *Washington Cnty.*, 328 F. Supp. 3d at 840.

The Court therefore turns to the "plus factors" alleged by Plaintiffs.

### 3. Plus Factors

Courts recognize "plus factors" to include "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Greco*, 2024 WL 4119169, at *6 (cleaned up). In reviewing the allegations for a plausible agreement, the Court "views the circumstances as a whole." *In re MultiPlan Health Ins. Provider*, 789 F. Supp. 3d at 637 (citing *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99 (1962)). "If the allegations are as consistent with a wide range of lawful and independent business conduct as they are with an anticompetitive agreement, then the first element of § 1 is not satisfied." *Mirage Wine + Spirit's, Inc. v. Apple Inc.*, 2025 WL 1896006, at *3 (S.D. Ill. July 9, 2025); *see also Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 351 (7th Cir. 2022) ("*Twombly* demonstrates that courts should dismiss antitrust conspiracy complaints for failure to state a claim when the allegations, taken as true, could just as easily reflect innocent conduct or rational self-interest.").

Defendants argue that Plaintiffs' Section 1 claim fails because "they do not allege cognizable plus factors. Memo. Dismiss at 14 (quoting *Twombly*, 550 U.S. at 552). Plaintiffs, on the other hand, insist that they have alleged sufficient plus factors to support a plausible conspiracy; specifically, they contend that they have alleged circumstantial evidence in the form of: (1) information exchange among the MHC Defendants; (2) the structure of the MHL market; (3) Defendants' opportunity to collude; (4) Defendants' conduct being contrary to their self-interest; and (5) Defendants' strong motive to conspire. Resp. at 12 (citing Compl. ¶¶ 71–78, 104–14, 142, 166–72, 177).

The Court examines the plus factors alleged by Plaintiffs in turn, keeping in mind that it must view the circumstances holistically.

### a. Exchange of Pricing Information

First, Plaintiffs contend that the MHC Defendants' sharing of competitively sensitive information—including current and future rent increases in specific geographic markets—via the Reports, constitutes a plus factor. Resp. at 13–14 (citing Compl. ¶¶ 5, 107–14, 134). Information exchange, note Plaintiffs, can support an inference of a price-fixing agreement. *Id.* at 14 (citing, *inter alia*, *Omnicare*, 629 F.3d at 709; *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.)). In short, assert Plaintiffs, their information exchange allegations qualify as a plus factor because they facilitate the conspiracy at issue. Resp. at 15.

As an initial matter, in reply, Defendants contend that "the exchange of information obviously cannot be a separate plus factor in a case where the only

alleged agreement is to exchange information." Reply at 8. The Court agrees with Defendants as it relates to Count II, which alleges an information exchange conspiracy. Count I, however, alleges a price-fixing conspiracy facilitated by the information exchange. And Plaintiffs are correct that "[i]nformation exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement." Resp. at 13 (quoting *Todd*, 275 F.3d at 198); *see also In re Loc. TV*, 2020 WL 6557665, at *9 ("Plaintiffs do not urge that information exchanges are *per se* violations of antitrust law, but only that one occurred here, and that the information exchange, in conjunction with other well-pleaded plus factors give rise to an inference of an antitrust conspiracy [of price-fixing].").

Defendants also attack Plaintiffs' allegations about the exchange of confidential information as conclusory: from Defendants' point of view, Plaintiffs fail to identify *which* specific information in the Reports is actually competitively sensitive, and "[t]he reality is that the information contained in the JLT Reports could be obtained by anyone simply by calling or visiting MH Communities and doing some internet searches, or by paying a modest fee for the reports themselves." Memo. Dismiss at 14–15. Moreover, posit Defendants, the Reports themselves are available at a modest fee, and indeed, Plaintiffs allege that their counsel obtained one, which demonstrates that the information therein was neither confidential nor sensitive. *Id.* at 14. True, Plaintiffs use the broad term "non-public, competitively sensitive information" throughout the Complaint; however, the Complaint also alleges the sharing and disclosure of specific information (including, but not limited to, latest

21

rent increase and amount, future rent increases, and occupancy rates) and does *not* allege that all of the information exchanged (including, but not limited to future rent increases) is publicly available apart from the Reports. *See* Compl. ¶¶ 103, 113. And, even to the extent that such information is independently publicly available, as well as available to anyone who purchases the Reports, such availability does not eliminate this as a plus factor.

Although not binding, the Court finds the cases cited by Plaintiffs on this point to be persuasive, in particular, *Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp. 2d 119, 166 (D.D.C. 2004). There, the plaintiffs, medical school graduates, alleged "that there exist[ed] an agreement to fix the compensation of resident physicians at an improperly depressed level and that the [Association of American Medical Colleges] ha[d] participated in the conspiracy by facilitating the anticompetitive agreement through the creation and dissemination of the COTH Survey, which provides a mechanism by which compensation levels remain stabilized and depressed." *Id.* The court found that "the fact that the information is publicly disseminated does not insulate the activity from consideration in the larger price-fixing claim." *Id.* at 167–68 (citing *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation,* 906 F.2d 432 (9th Cir. 1990) ("The fact that it is feasible for the appellees to communicate the necessary price information through press releases does not immunize the exchange of price information from legal sanction [where] the conditions of the market suggest that the exchange promotes collusive rather than competitive pricing.") (cleaned up))). The *Jung* court noted that, "[i]n an unrestrained

market, prospective residents ostensibly could use the information in the COTH Survey to better evaluate competing offers among institutional defendants," however, in the market as alleged in the complaint, "prospective residents cannot utilize the information in such a manner because there are no competing offers; the Match requires prospective residents to commit to one position before their receive any offer of employment." *Id.* at 168. Here, Plaintiffs allege that switching—*i.e.*, moving one's home—in this market is cost prohibitive. Compl. ¶ 172. So, even if an MHL lot renter purchases the Reports or otherwise has access to the data contained therein, he or she is not able to use that data to move to a more competitively priced MHL because doing so is cost prohibitive. *See In re Coordinated Pretrial Proc. in Petroleum Prods.*, 906 F.2d at 448 (recognizing the importance of the fact that the public information being exchanged was not of use to anyone other than defendants).[8]

Finally, Defendants contend that Plaintiffs only allege in conclusory fashion that the information was "reciprocally shared," as "the Complaint does not make a single allegation that any Manufactured Home Community Defendant shared anything, directly or indirectly, with any other Defendant." Memo. Dismiss at 15. But Defendants ignore Plaintiffs' allegations that the MHC Defendants provide the

---

[8]The Ninth Circuit noted that the conclusion would be different if the plaintiff's price-fixing theory was based on the dissemination of retail prices, as "permitting an inference of conspiracy from such evidence would make it more difficult for retail consumers to get the information they need to make efficient market decisions." *In re Coordinated Pretrial Proc. in Petroleum Prods.*, 906 F.2d at 448 n.14. The Court recognizes there is a fine line between rental prices and retail prices and inferring a conspiracy from the dissemination of such information. However, the Court must draw all reasonable inferences in favor of Plaintiffs, *Platt*, 872 F.3d at 851, and, as stated above, Plaintiffs allege that MHL renters cannot switch lots, which is enough, at this stage, to allow the Court to consider the publicly available rental price information as supporting a price-fixing conspiracy.

information published in the Reports to Datacomp, which they then use to coordinate increased prices. Compl. ¶¶ 4, 104. Such an allegation of information exchange through a third party is sufficient. *See, e.g.*, *In re Loc. TV*, 2020 WL 6557665, at *9 ("Plaintiffs have pleaded that a third-party called Kantar facilitated the Broadcaster Defendants' ability to exchange competitively sensitive information with one another and that the Sales Rep Firms also facilitated such exchanges."); *In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758, 815 (D. Minn. 2025) (holding that sharing sensitive pricing information through a third party that then consolidates and distributes the information through reports, is a plus factor that supports the inference of a conspiracy). Therefore, the Court finds that Plaintiffs' information exchange allegations qualify as a plus factor because they facilitate the conspiracy at issue.

### b. Structure of the MHL Market

Second, Plaintiffs contend that the characteristics of the MHL market qualify as a plus factor because "an industry structure that facilitates collusion constitutes supporting evidence of collusion." Resp. at 15 (quoting *Text Messaging I*, 630 F.3d at 627–28). Plaintiffs point out that they allege that the MHC Defendants are horizontal competitors in a market that has become significantly concentrated; that the that the manufactured housing market carries a significant barrier to entry, as large corporate owners have acquired most of the smaller businesses that used to run

MHLs; and that switching—i.e., moving one's home—in this market is cost prohibitive. *Id*. (citing Compl. ¶¶ 71–82, 170–72).

Defendants retort that, contrary to Plaintiffs' contention, the Complaint is devoid of allegations of market share before or during the alleged conspiracy period. Reply at 9; Memo. Dismiss at 16. From Defendants' perspective, this absence is fatal to Plaintiffs' "market concentration plus factor, because a concentrated market is defined as one with high market shares." Reply at 9. The Court agrees; while Plaintiffs allege how many MHCs each Defendant owns or purchased in certain years, Compl. ¶ 72, they do not allege the specific (or even approximate) market share each MHC Defendant has. In each case cited by Plaintiffs in support of this plus factor, the plaintiffs alleged the percentage market share that defendants possessed. *See In re Loc. TV*, 2020 WL 6557665, at *10 ("Plaintiffs allege market concentration—with market shares as high as 100 percent in certain DMAs"); *Todd*, 275 F.3d at 208 ("If the relevant market in this case is defined as the plaintiff contends, the defendants would control collectively a 80–90% market share."); *In re Broiler Chicken I*, 290 F. Supp. 3d at 779 ("As of 2015, Defendants controlled 88.8% of Broiler production in the United States."); *In re Turkey Antitrust Litig.*, 642 F. Supp. 3d 711, 727 (N.D. Ill. 2022) ("Defendants and the five named Co-Conspirators control approximately 80 percent of turkey production and processing."); *United States v. Container Corp. of America*, 393 U.S. 333, 342 (1969) (18 defendants made up 90 percent of the market).

Plaintiffs do, however, adequately allege high barriers to entry in the market and the difficulty for MHL renters to switch. *See* Compl. ¶¶ 171–72. But is hard to

see (and Plaintiffs do not explain) how high barriers to entry matter if Defendants do not have a concentrated share of the market (that is, if Defendants make up only 30% of the market, it matters less that new entities cannot buy MHLs to rent out, since 70% of the market is made up of non-conspirators). And, as Defendants point out in reply, none of the cases cited by Plaintiffs stand for the proposition that switching costs bear on the plausibility of a conspiracy. Reply at 10. Therefore, the Court finds that the characteristics of the MHL market do not qualify as a plus factor.

### c. Defendants' Opportunities to Conspire

For their third plus factor, Plaintiffs posit that Defendants had multiple opportunities to collude in various ways. Resp. at 16–18. Specifically, Plaintiffs allege that Defendants had opportunities to collude because: (1) they all received the same third-party report with competitor data; and (2) almost all of the MHC Defendants are members of the Manufactured Housing Institute (MHI), which organizes many industry events throughout the year. *Id.*

For the first basis, Defendants point out that Plaintiffs cite no case that reflects that—without some other relevant evidence regarding an "illegal scheme"—the Reports *themselves* offer an "opportunity to collude by sharing competitively sensitive pricing information." Reply at 11. The Court agrees that receiving the Reports shows not an opportunity to collude, but rather an exchange of information, which, for the reasons discussed above, is a plus factor.

As to the second basis, Defendants argue that, without more, Defendants' membership in an industry group does not increase the likelihood of a price-fixing

conspiracy, and Plaintiffs do not allege that subsequent price changes were correlated to industry group meetings. Reply at 10 (citing *Twombly*, 550 U.S. at 567 n.12 (mere allegation that defendants "belong[ed] to various trade associations" insufficient to permit inference of "conspir[acy] to restrain trade"); *In re Local TV*, 2020 WL 6557665, at *10 ("[A]bsent additional facts addressing the content of defendants' discussions at or the (nefarious) subjects of trade organization meetings, allegations that defendants [a]re members of the same trade organizations are unspectacular and fail to move the needle.") (cleaned up)).

Defendants correctly point out that the cases cited by Plaintiffs in support of this plus factor all include allegations beyond mere membership in trade associations and attendance at industry events. For example, in *In re Turkey*, 642 F. Supp. 3d at 727, the complaint contained a "series of allegations"—including that the trade association created a special team "to lead an industry approach of 'coopetition' to increase turkey consumption in the United States while maintaining historic profit levels"—that supported the premise that the trade association memberships were not in fact typical, but rather a method for facilitating cooperation." And in *In re Broiler Chicken I*, 290 F. Supp. 3d at 798, the court observed that the plaintiffs' "reliance on industry meetings and public statements must be evaluated in the context of all their allegations," and found them to constitute a plus factor where, "immediately after an industry convention, the large producers made public statements calling for industry-wide production cuts," and the same thing happened several years later with an unprecedented killing of breeder flocks. Here, Plaintiffs allege only that the MHC

27

Defendants were members of a trade organization and attended industry meetings, which does not "move the needle." *In re Local TV*, 2020 WL 6557665, at *10; *see also Hansen*, 2025 WL 2731378, at *9–10 (collecting cases). This, without more, will not do. Therefore, the Court finds that the opportunity to conspire does not qualify as a plus factor.

### d. Defendants' Action Against Their Self-Interest

Fourth, Defendants, according to Plaintiffs, acted against their self-interest by sharing competitively sensitive pricing information with their competitors via the Reports, because "without a conspiracy to inflate MHL rent prices, sharing of such information would undoubtedly be disastrous for any one MHC Defendant." Resp. at 18 (citing, *inter alia*, *Local TV*, 2020 WL 6557665, at *9 ("[E]vidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators" is a plus factor)). Defendants disagree, arguing in reply that Plaintiffs' allegations that they acted against their individual self-interest by sharing competitively sensitive information through the Reports is conclusory, and not a plus factor for the same reasons they advanced relating to the sharing of sensitive information. Reply at 8. That is, Defendants only argue that sharing Defendants' data with Datacomp to be publicly disseminated is not a plus factor. For the reasons stated above, the Court disagrees. Defendants do not raise any specific arguments related to the exchange of information being against Defendants' self-interest and thus have waived the issue. *See Shipley v. Chicago Bd. of Election Commissioners,* 947 F.3d 1056, 1063 (7th Cir. 2020) ("Arguments that are underdeveloped, cursory, and lack

supporting authority are waived."); *Hendricks v. Lauber*, No. 16 C 627, 2018 WL 2445311 at *4 (N.D. Ill. May 31, 2018) (failing to respond to argument in response to a motion constitutes a waiver).

And as stated above, the Complaint does not allege that all of the information exchanged (including, but not limited to future rent increases) is publicly available apart from the Reports, so, without more from Defendants, the Court cannot find at this stage that Plaintiffs' allegations that Defendants "would be competitively disadvantaged by providing private data to other manufactured home community owners unilaterally" is not a plus factor. *See In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 510 (M.D. Tenn. 2023) ("The contribution of sensitive pricing and supply data for use by RealPage to recommend prices for competitor units is in Defendants' economic self-interest if and only if Defendants know they are receiving in return the benefit of their competitors' data in pricing their own units.). Defendants attempt to distinguish *In re RealPage* in a footnote, Reply at 9 n.5, pointing out that the court emphasized that the "heart and soul" of the alleged horizontal agreement was the "delegat[ion] [of] their rental price and supply decisions to a common decision maker, RealPage[,]" and the defendants' agreement to "abide by RealPage's price and supply decisions generated by [RealPage software]." 709 F. Supp. 3d at 503. True, here Plaintiffs do not allege that the MHC Defendants delegated their rental prices to Datacomp or any other entity; however, Defendants fail to explain why such delegation is essential to such an agreement being against the Defendants' self-interest, where, as here, Plaintiffs allege that they

shared sensitive pricing information in order to raise prices. The only difference is that here, Plaintiffs allege that each MHC Defendant raised its own prices based on the shared data. Therefore, at this stage, the Court finds that Plaintiffs adequately alleged that the MHC Defendants acted against their self-interest by sharing pricing information, which is a plus factor.

### e. Defendants' Motive to Conspire

Fifth, Plaintiffs posit that the MHC Defendants "possessed strong motive to conspire to exchange competitively sensitive pricing information and artificially inflate MHL rent prices," which is a plus factor. Resp. at 19 (citing *Tichy v. Hyatt Hotels Corp.*, 376 F. Supp. 3d 821, 835–36 (N.D. Ill. 2019)). Defendants are correct that, at bottom, Plaintiffs merely allege a motive to increase their profits, which is not a plus factor and does not give rise to an inference of a conspiracy. Memo. Dismiss at 15 (citing, *inter alia*, *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 134–35 (3d. Cir. 1999)). The Court agrees with Defendants that it matters not that *In re Baby Food* was decided at the summary judgment stage in this instance, as the legal principle holds: alleged motives to conspire that boil down to their motivation to increase profits do not give rise to an inference of a conspiracy because such motivations always exist. *See Greco*, 2024 WL 4119169, at *7. Defendants' motives do not constitute a plus factor.

### 4. Alternative Explanations

Defendants contend that Plaintiffs' "own allegations provide alternative explanations for the alleged high prices," which "is sufficient to doom their case."

Memo. Dismiss at 18 (citing *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 322–23 (3d Cir. 2010) ("[A]llegations of conspiracy are deficient if there are obvious alternative explanation[s] for the facts alleged." (cleaned up)). As the court in *In re Broiler Chicken I* pointed out, "the Supreme Court did not intend for courts to weigh the plausibility of a plaintiff's conspiracy claims against the plausibility of the defendants' alternative explanation for their conduct." 290 F. Supp. 3d at 801. However, while "Plaintiffs are not required to show that their conspiracy claims are more plausible than Defendants' alternative explanation, alternative explanations can serve to demonstrate that Plaintiffs' conspiracy claims are not plausible. But this analysis is no different than for any other plus factor." *Id.* (cleaned up).

The Complaint itself, note Defendants, alleges that over the supposed conspiracy period, demand for manufactured home rentals increased while supply decreased or remained stagnant, resulting in record low vacancy rates. Memo. Dismiss at 18 (citing Compl. ¶ 171 (market has "outsized demand" and "virtually no new supply has been added for years")). Defendants argue that "[b]asic economics dictate that an increase in demand combined with a decrease in supply leads to price increases." *Id.* (citing *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 553 (2012) ("[P]rice can be supported by increasing demand as well as by decreasing supply.")). Defendants also point to Plaintiffs' allegations that, "[o]ver the past several years, private equity and other investment firms have become increasingly involved in the manufactured home lot space," and, "because mom-and-pop owners have kept their rents more or less low, private equity firms have taken the opportunity to

31

dramatically increase rents to quickly increase profits once those firms purchase the communities." Compl. ¶ 77. Therefore, reason Defendants, in light of the other legitimate reasons for rent increases alleged by Plaintiffs, the Court should not "infer that the [Defendants] had agreed among themselves to do what was only natural anyway." *Id.* at 18–19 (quoting *Twombly*, 550 U.S. at 566).

Plaintiffs counter that the Court should not decide which explanation is more likely than not. Resp. at 20–21 (citing, *inter alia*, *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 953 (N.D. Ill. 2018)). True, the Court cannot weigh two plausible explanations for the MHL rent increases. But, as stated above, "alternative explanations can serve to demonstrate that Plaintiffs' conspiracy claims are not plausible." *In re Broiler Chicken I*, 290 F. Supp. 3d at 802.

Here, taking all well-pled factual allegations as true, drawing all reasonable inferences in Plaintiffs' favor, and in keeping with the holistic approach articulated recently in *In re MultiPlan Health Ins. Provider*, 789 F. Supp. 3d at 637, the Court finds that Plaintiffs fail to meaningfully address the "obvious alternative explanation" for the MHL rent increases, and merely allege conduct that is "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market," *Twombly*, 550 U.S. at 567, 554; *see also Mirage Wine + Spirit's*, 2025 WL 1896006, at *3. That is, as stated above, while the Court finds that Plaintiffs have plausibly pled parallel conduct, if barely, the Court still considers the fact that the

alleged rent increases differed—for example, ranging from 0% to 15.4% in one sub-market, and - 0.6% to 12.9% in another. Compl. Figs. 21–22. Such varied rent increases, while done during a similar time period, combined with the exchange of some allegedly confidential information against Defendants' self-interest, without more, is merely consistent with, rather than suggestive of, a price-fixing conspiracy. *Twombly*, 550 U.S. at 557. Section 1 demands more, even at the pleading stage. *Id.* Therefore, the Court finds that Plaintiffs have not plausibly pled a price-fixing conspiracy among Defendants.

## II.     Count II

In Count II, Plaintiffs allege an information exchange in violation of Section I of the Sherman Act, 15 U.S.C § 1. FAC ¶ 122. That is, that Defendants' exchange of information on its own violates the antitrust law. The parties dispute which mode of antitrust analysis the Court should apply—*per se*, as with the price-fixing claim, or rule of reason. *Compare* Memo. Dismiss at 19–20 *with* Resp. at 21–22. The Court agrees with Defendants that binding precedent establishes that Section 1 information-exchange claims are evaluated under the rule of reason. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978); *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975); *see also Todd*, 275 F.3d at 211; *In re Pork*, 781 F. Supp. 3d at 791.

"Rule-of-reason violations . . . require that a plaintiff plead anticompetitive effects, and that the injury complained of be of a type that the antitrust laws were designed to guard against, and further that the antitrust violation be the direct cause

of plaintiff's injury." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 950 (N.D. Ill. 2018). "A number of factors including most prominently the structure of the industry involved and the nature of the information exchanged are generally considered in divining the procompetitive or anticompetitive effects of this type of interseller communication." *U.S. Gypsum Co.*, 438 U.S. at 443 n.16; *see also Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 337 (7th Cir. 2012) ("[A] plaintiff's threshold burden under the Rule of Reason analysis involves the showing of a precise market definition in order to demonstrate that a defendant wields market power, which, by definition, means that the defendant can produce anticompetitive effects.").

Defendants argue that Plaintiffs' information-exchange claim should be dismissed because Plaintiffs fail to allege: (1) an agreement between the MHC Defendants to exchange any information[9]; (2) a relevant market definition; (3) the MHC Defendants' market power; and (4) anticompetitive effects in any of the alleged markets or submarkets. Memo. Dismiss at 21–24. Defendants fail to develop or support their first argument, that "the mere purchase of publicly-available data from

---

[9]Defendants also contend that Plaintiffs' Section II claim—premised on a theory of liability that the MHC Defendants used Datacomp's reports to coordinate their prices by sharing "competitively sensitive information about manufactured home lot rental prices and occupancy, among other things, throughout the United States"—fails for the same reason as Count I because the Complaint fails to allege an agreement between Defendants. Memo. Dismiss at 21 (citing *Alarm Detection Sys., Inc. v. Village of Schaumburg*, 930 F.3d 812, 827 (7th Cir. 2019) ("Section 1 liability requires an agreement or a conspiracy.")). Defendants also argue in their motion that while a claim that an exchange of information on its can violate the antitrust laws, "[t]o the extent Plaintiffs claim that Count II instead alleges a price-fixing agreement that is *facilitated* by an information exchange, such a claim would be entirely duplicative of Count I." *Id.* at 19 & n.5. Defendants' argument that Count II must be dismissed for the same reason as Count I appears to "obfuscate which alleged 'conspiracy' they are talking about" by conflating the information-exchange claim with the price-fixing claim, as Defendants accuse Plaintiffs of doing. Reply at 3 n.2. The Court therefore does not consider this argument, at least as currently presented, as it pertains to Count II.

a third party is not in any way equivalent to an agreement between competitors to exchange information," and thus have waived the argument. *See Shipley,* 947 F.3d at 1063. The Court therefore starts with Plaintiffs' market definitions.

## A. Market Definition

Plaintiffs allege both a national geographic market as well as regional submarkets. Resp. at 25–26 (citing Compl. ¶¶ 140–42). Defendants maintain that both of Plaintiffs' alleged geographic markets are implausible. Memo. Dismiss at 22. A complaint, however, need only allege "one plausible geographic market to survive a motion to dismiss." *Vasquez v. Indiana Univ. Health, Inc.*, 40 F.4th 582, 584 (7th Cir. 2022).

Starting with the national market, Defendants cite to *Tampa Elec. Co. v. Nashville Coal Co.,* in which the Supreme Court stated, "the area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." Memo. Dismiss at 22 (quoting 365 U.S. 320, 327 (1961)); *see also Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916 (7th Cir. 2020) ("A relevant market under the Sherman Act is comprised of the commodities reasonably interchangeable by consumers for the same purposes.") (cleaned up). Therefore, argue Defendants, in order for there to be a national market, in the event that an MHL renter in one state was priced out of a community, that renter would

consider renting an MHL anywhere in the country as a substitute. *Id.* The Court agrees that this is implausible.

Indeed, as Defendants point out, the Complaint alleges that, in relation to the area of effective competition, "the commuting distance to a place of work or school is a geographic constraint on where a manufactured home lot renter chooses to live," Compl. ¶ 180, and manufactured home lot renters also "will choose to live within close distance to their relatives and health care providers for support, *id.* ¶ 181. In fact, the Complaint explicitly alleges that "Manufactured home lot renters in any given Regional Submarket do not consider leases in other Regional Submarkets as adequate substitutes for manufactured home lot leases in their own submarket." *Id.* ¶ 182.

Plaintiffs respond, without citation to any authority, only that their national market allegations are supported by MHL rental prices increasing significantly across the United States beginning around 2017, and that Defendants own communities throughout the United States and advertise a desire to purchase even more. Resp. at 25–26 (citing Compl. ¶¶ 34–43, 73, 140–42). As stated above, "[a]rguments that are underdeveloped, cursory, and lack supporting authority are waived." *Shipley,* 947 F.3d at 1063. Waiver aside, the Court agrees with Defendants that a national market is not appropriate because renters are not likely to move to an MHL across the country if they become priced out of their current MHL.

Turning to the regional submarkets, Plaintiffs allege that there are 187 regional submarkets, which are defined by reference to "metropolitan statistical

areas" (MSAs), which are how Datacomp organizes data in the Reports. Compl. ¶¶ 98, 179; *see* Resp. at 26. Defendants argue that "many of these regional submarkets are far too large to define the area of effective competition," and point out that, as an example, the Phoenix-Scottsdale MSA that Plaintiffs describe in Figure 23 is 14,587 square miles in size. Memo. Dismiss at 23. As a point of reference, the entire state of Maryland is 12,306 square miles. *See Geography of Maryland*, https://sos.maryland.gov/mdkids/pages/geography.aspx (last visited Nov. 26, 2025). Defendants maintain that, for the same reasons the national market fails, so too do the MSAs, as the Complaint alleges that "commuting distance to a place of work or school is a geographic constraint on where a manufactured home lot renter chooses to live," Compl. ¶ 180, so all 14,587 square miles are not interchangeable. Memo. Dismiss at 23. The Court agrees.

Both parties rely on different analyses of geographic markets in *In re RealPage,* 709 F. Supp. 3d 478. While *In re RealPage* is persuasive authority only, the Court, like the parties, finds it instructive. Defendants focus on the court's analysis of the geographic market for student renters, in which the court found that the alleged regional submarkets were overly broad because, in certain instances, they comprised entire cities that contained multiple universities, meaning that, based on the plaintiffs' allegations that the markets for student housing are tied to the institutions students attend, in the large cities, students would likely forgo student housing near a different university on the opposite side of town in favor of other housing options closer to the institution they attend, such as dormitories or multifamily housing. *In*

*re RealPage,* 709 F. Supp. 3d at 529. Plaintiffs, on the other hand, focus on the court's analysis of the geographic scope of the multifamily housing market, which was broken into MSAs established by the United States Census Bureau and the Office of Management and Budget, which defined an MSA as "a geographic entity associated with at least one core urbanized area of 50,000 or more population, plus adjacent territory that has a high degree of social and economic integration with the core as measured by commuting ties." *Id.* at 523 (cleaned up). The court rejected the defendants' argument that the New York City MSA was too broad based on a hypothetical renter who works in New York City's financial district, does not own a car, and would not want to live in Pennsylvania. The court found that, at the motion to dismiss stage, MSAs were an appropriately defined geographic area. *Id.* at 523–24. Of note, Defendants independently raised the example of the hypothetical New York City renter; the plaintiffs' complaint did not allege anything about such renters. *Id.*

Because, as Defendants point out, Plaintiffs specifically allege that "commuting distance to a place of work or school is a geographic constraint on where a manufactured home lot renter chooses to live," Compl. ¶ 180, the Court finds the *In re RealPage* court's analysis of student housing markets more applicable here. Similar to the court's finding there, here, it was Plaintiffs' decision to plead large MSAs such as the Phoenix-Scottsdale MSA, which contradicts their allegations that MHL renters are unlikely to look at alternative MHLs that are a significant commute from work or school. *See In re RealPage,* 709 F. Supp. 3d at 529–30. While Plaintiffs

are correct that often market definitions are questions of fact more appropriately decided at summary judgment, Resp. at 26 (citing, *inter alia*, *Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, 2020 WL 6134982, at *7 (N.D. Ill. Oct. 19, 2020)), the definition still must be plausible to survive a motion to dismiss. As currently pled, the Court finds that the alleged geographic markets are not plausible.

Because the Court finds that Plaintiffs have failed to allege a plausible market, the Court does not address Defendants' remaining arguments relating to Count II.[10]

## III.    Count III (Unjust Enrichment)

In Count III, Plaintiffs assert a state law claim for unjust enrichment in the alternative. "To state a claim for unjust enrichment under Illinois law, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Banco Panamericano, Inc. v. City of Peoria, Ill.*, 880 F.3d 329, 333 (7th Cir. 2018) (cleaned up).

Defendants argue that Plaintiffs' unjust enrichment claim must be dismissed for three reasons. First, Plaintiffs fail to identify under which laws or in which states they bring their unjust enrichment claims. Memo. Dismiss at 25 (citing *Sandee's Catering v. Agri Stats, Inc.*, 2020 WL 6273477, at *12 (N.D. Ill. Oct. 6, 2020)). Second, according to Defendants, Plaintiffs base their claim on the same factual foundation as their antitrust claims, but improperly relabel it under an unjust enrichment

---

[10]Although the Court does not address Defendants' remaining arguments for dismissal of Count II, "to the extent that Plaintiffs choose to replead this claim, they should carefully consider those arguments and address any other potential pleading deficiencies in an amended complaint." *Hansen*, 2025 WL 2731378, at *10.

theory, which is insufficient under Rule 8. *Id.* at 25–26 (citing *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 726 (N.D. Ill. 2016)). Lastly, even if Plaintiffs had properly pled an unjust enrichment claim, it nonetheless fails for the same reasons Plaintiffs' antitrust claims must be dismissed. *Id.* at 26 (citing, *inter alia*, *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011) ("[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim.")).

The Court agrees with Plaintiffs that Defendants' first two arguments miss the mark. First, at the motion to dismiss stage, Plaintiffs need not specify which state's law applies. Resp. at 29 (citing *Mirza v. Ignite USA, LLC*, 439 F. Supp. 3d 1058, 1067, n.4 (N.D. Ill. 2020) (rejecting argument that unjust enrichment claim should be dismissed because complaint failed to specify which state's law applied); *Kostovetsky v. Ambit Energy Holdings, LLC*, 2016 WL 105980, at *8 (N.D. Ill. Jan. 8, 2016) (denying motion to dismiss unjust enrichment claim in a multi-state class action, finding an inquiry into applicable states' laws "premature" and noting that, because the plaintiff lived in Illinois, Illinois law likely applied to his unjust enrichment claim, and the respective state laws of the state in which each class member resided would apply to their unjust enrichment claims)). *Sandee's Catering*, cited by Defendants, does not change the analysis, as in that case, the plaintiff sued on behalf of a nationwide class but pled unjust enrichment under the laws of only a few "indirect purchaser" states, and then "muddled" the matter by simultaneously and

40

contradictorily alleging that they were pleading unjust enrichment under the laws of 47 states. 2020 WL 6273477, at *12. Plaintiffs do not do so here.

Second, Plaintiffs are correct that courts in this District have held that, "[i]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim." *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1074 (N.D. Ill. 2016); *see also Flores v. Motorola Solutions, Inc.*, 2021 WL 232627, at *4 (N.D. Ill. Jan. 8, 2021); *In re Broiler Chicken I*, 290 F. Supp. 3d at 818 ("The Court will not address Defendants' arguments with respect to the consumer protection statutes and unjust enrichment laws of the states for which antitrust claims are proceeding, because the fact that the antitrust claims are going forward in those jurisdictions is sufficient for the parties to proceed with discovery relevant to those jurisdictions."). Plaintiffs' allegations are unlike those in *In re Opana*, cited by Defendants, in which indirect purchasers simply "listed" a single unjust enrichment claim that implicated the antitrust laws of multiple states alongside antitrust claims. 162 F. Supp. 3d at 726.

But the Court agrees with Defendants—and indeed, Plaintiffs do not dispute— that an unjust enrichment claim that rests on the same alleged conduct in another claim will "stand or fall with the related claim." *Cleary*, 656 F.3d at 517; *O'Connor v. Ford Motor Co.*, 477 F. Supp. 3d 705, 720 (N.D. Ill. 2020). Critically, Plaintiffs do not deny that their unjust enrichment claim is based on the same factual foundation as their antitrust claims. *See* Resp. at 29–30. Therefore, because the Court has found

41

that Plaintiffs have not sufficiently pled antitrust violations, their unjust enrichment claim must likewise fall.

## IV.    Murex Motion to Dismiss

As stated above, Murex joined in the motion to dismiss, but also filed a separate motion, raising two additional bases for dismissal for failure to state a claim. First, Florida's Mobile Home Act (the Act) requires MHCs to defend rent increases by reference to rents charged by competitor communities, meaning it is especially clear in Florida that information about rents is not, as asserted by Plaintiffs, "non-public, competitively sensitive information"—so their conspiracy allegations as to Murex, which operates in Florida, are particularly implausible. R. 152, Murex Memo. Dismiss at 1. Second, the regulatory framework in the Act confers immunity upon Murex under the state-action doctrine. *Id.* Murex additionally argues that it should be dismissed for lack of personal jurisdiction and venue under Rules 12(b)(2) and 12(b)(3) because Murex has no contacts with the State of Illinois. *Id.*

Because the Court has found that Plaintiffs fail to state a claim based on the arguments raised in Defendants' joint motion to dismiss, it need not address Murex's additional arguments in favor of dismissal based on the Act. As to the personal jurisdiction arguments, while courts ordinarily address challenges to personal jurisdiction before addressing the merits of a claim, "a court may instead decide a case on the merits when the 'jurisdictional question is complex or difficult' or even when the case 'clearly must be decided in favor of the party challenging jurisdiction, thereby obviating any need to decide the [jurisdictional] question.'" *Prewett Enters.,*

*Inc. v. Grand Trunk W. R.R. Co.*, 2019 WL 6310495, at *2 (N.D. Ill. Nov. 25, 2019) (quoting 4 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1067.6 and citing *Evangelical Benefit Trust v. Lloyd's Underwriters Syndicate Nos. 2987, 1607, 1183 & 2001*, 2010 WL 2927404, at *3 (N.D. Ill. July 19, 2010)); *see also Chevron Corp. v. Naranjo*, 667 F.3d 232, 247 n.17 (2d Cir. 2012) ("[I]n cases such as this one with multiple defendants—over some of whom the court indisputably has personal jurisdiction—in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action, we may address first the facial challenge to the underlying cause of action and, if we dismiss the claim in its entirety, decline to address the personal jurisdictional claims made by some defendants. This is particularly true when the personal jurisdictional challenges are based on factual allegations that are, in this early posture, still under development."); *In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F. Supp. 3d 681, 745–46 (N.D. Ohio 2025) (collecting cases). Accordingly, because the Court grants the motion to dismiss for failure to state a claim, as well as the fact that the jurisdictional issue only applies to one of the eleven Defendants, it denies as moot Murex's motion to dismiss for lack of personal jurisdiction.

## Conclusion

For the reasons given above, Defendants' motion to dismiss [154] is granted without prejudice. The Court denies without prejudice Murex's motion to dismiss [151] as moot. Plaintiffs may file an amended consolidated complaint on or before

January 5, 2026. Defendants' answer or other responsive pleading is due on or before

January 27, 2026.

Dated: December 4, 2025

United States District Judge
Franklin U. Valderrama