**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE MANUFACTURED HOME LOT RENTS ANTITRUST LITIGATION**<br><br><br>**This Document Relates To:**<br><br>**All Class Actions** | **Case No. 1:23-cv-06715**<br>**Hon. Franklin U. Valderrama**<br><br>**SECOND AMENDED** **CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**FILED UNDER SEAL** |

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ................................................................ 11

II.     JURISDICTION, VENUE, and effect on interstate commerce ........................................... 8

III.    THE PARTIES ......................................................................... 9

IV.     FACTUAL ALLEGATIONS .............................................................. 17

   A.   Manufactured Homes in the United States ................................................. 17

   B.   Manufactured Home Lots and the Business of Manufactured Home Communities ........ 22

   C.   The Manufactured Home Industry Has Experienced Significant Consolidation Through Acquisitions .......................................................................... 24

   D.   High Rents and Deteriorating Conditions Follow Acquisitions ................................. 31

   E.   Defendants' Anticompetitive Scheme ................................................... 36

      1.   History of Datacomp ............................................................ 36

      21.   Manufactured Home Community Defendants Shared Competitively Sensitive Information Through the JLT Market Reports to Increase Lot Rent Prices .................. 36

      a.   History of Datacomp ......................................................... 36

      b.   Datacomp's JLT Market Reports ............................................... 37

      3c.   Datacomp Offers Real-Time Information Market Reports ........................... 53

      4d.   Defendants Agree to Exchange Non-Public Competitively Sensitive Information through the JLT Market Reports and Artificially Increase Manufactured Home Lot Prices 54

      52.   Manufactured Home Community Defendants Engaged in Regular Direct Communications Involving Rental Lot Pricing ........................................ 57

      3.   Defendants' Systematic Exchange of Competitively Sensitive Information via the JLT Market Reports Violates Section 1 of the Sherman Act ................................. 57

      6.   4. Preliminary Pricing Analysis by Consulting Economic Analysis Experts Supports the Existence of a Cartel .......................................................... 63

      75.   "Plus Factors" in the Manufactured Home Industry Provide Additional Evidence of a Conspiracy ................................................................... 94

V.     ANTICOMPETITIVE EFFECTS AND RELEVANT ANTITRUST MARKET ............. 101

   A.   The Relevant Product Market Is Manufactured Home Lots ................................. 102

   B.   The Defendants' Market Power in the Manufactured Home Lot Market ..................... 104

   C.   Relevant Geographic Market Is NationalMarkets ........................................ 110

      C.   1. ............................................................ Phoenix Regional SubmarketsMarket 114

      2.   Denver Regional Market ...................................................... 120

      3.   Hillsborough County Regional Market ........................................... 125

      4.   Orange-Seminole Regional Market .............................................. 129

5.    Lee County Regional Market ........................................................................ 131

6.    Lake County Regional Market ..................................................................... 134

7.    Pasco County Regional Market .................................................................... 137

8.    Austin Regional Market .............................................................................. 140

9.    Salt Lake City Regional Market .................................................................. 143

10.    Washtenaw County Regional Market ......................................................... 146

11.    Northern Colorado Regional Market .......................................................... 148

12.    Monroe County Regional Market ............................................................... 151

13.    Brevard County Regional Market ............................................................... 154

14.    Duval-St. Johns Regional Market .............................................................. 158

15.    Indian River County Regional Market ....................................................... 161

16.    Citrus-Hernando-Sumter Regional Market ................................................ 163

17.    Osceola County Regional Market .............................................................. 165

18.    Long Island Regional Market .................................................................... 167

19.    Denton–Lewisville Regional Market .......................................................... 169

20.    Collier County Regional Market ................................................................ 171

21.    Charlotte County Regional Market ............................................................ 174

22.    Charlotte (NC) Regional Market ............................................................... 176

23.    Alachua County Regional Market .............................................................. 178

24.    Escambia County Regional Market ............................................................ 179

25.    Additional Regional Markets ..................................................................... 198

D.    Preliminary Analysis by Consulting Economic Experts—Showing Low Pricing
Variance—Supports Plaintiffs' Allegations of Collusion in Regional Markets ................ 198

VI.   CLASS ACTION ALLEGATIONS ................................................................... 201

VII.  CLAIMS FOR RELIEF ...................................................................................... 204

COUNT 1 .......................................................................................................................... 204

COUNT 2 .......................................................................................................................... 205

COUNT 3 .......................................................................................................................... 206

REQUEST FOR RELIEF ................................................................................................. 207

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Plaintiffs Steven Brown, Todd Caldwell, Mary Galusha, Carla Hajek, David Klein, Colleen Levins, Ronald Kazmirzak, Kevin McDonough, Luis Melendez, Charles Neville, Deborah Norvise, Carol Rachelle Roach, Barbara Rowley, and Amber Sailer (together, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel and on econometric analysis, bring this class action complaint to recover treble damages, injunctive relief, and other relief as appropriate, based on Defendants' Datacomp Appraisal Systems, Inc. ("Datacomp"), Equity LifeStyle Properties, Inc. ("ELS"), Hometown America Management, L.L.C. ("Hometown America"), Lakeshore Communities, Inc. ("Lakeshore"), Sun Communities, Inc. ("Sun Communities"), RHP Properties, Inc. ("RHP"), Yes Communities, LLC ("Yes Communities"), Inspire Communities, LLC ("Inspire Communities"), Kingsley Management, Corp. ("Kingsley"), Cal-Am Properties, Inc.'s ("Cal-Am"), Ascentia Real Estate Holding Company, LLC ("Ascentia"), and Murex Properties, L.L.C. ("MurexRiverstone Communities LLC's ("Riverstone") (together, "Defendants"), violations of federal antitrust laws and common law.[1]

## I.   NATURE OF THE ACTION

1.      This action arises from Defendants' conspiracy to fix, raise, maintain, and/or stabilize lot rental prices for manufactured and modular homes. Manufactured homes (sometimes called "mobile homes") have long been one of the country's most affordable housing options,

---

[1] As described in Plaintiffs' Notice of Settlement filed concurrently herewith (*see* ECF 220), Plaintiffs have reached a settlement with Murex Properties, L.L.C., that includes the provision of certain cooperation information and documents that inform the allegations in Plaintiffs' Second Amended Consolidated Class Action Complaint.

particularly for people who do not receive government aid. According to federal data, about 20 million Americans live in manufactured homes, which make up about 6% of U.S. residences. And in 2022, nearly one-third of the 10.5 million adults living in manufactured homes were over the age of 60. The effect of Defendants' conspiracy has been devastating to manufactured home residents. These individuals—whose median annual household income is approximately $3540,000—are being overcharged for what used to be affordable housing. The consequence is that two of society's most vulnerable groups—the elderly and low-income earners—face considerable financial pressures. Some residents are facing evictions. The same effect of the conspiracy is also being felt by people living in modular homes in Defendants' communities.

2.     Manufactured home lots (which, as used herein, encompasses modular home lots) are rentable plots of land on which manufactured and modular homes sit. Manufactured home lots are located in planned residential developments called "manufactured home communities" or "manufactured home parks." Lots in manufactured home communities (which, as used herein, encompasses communities that also contain modular homes) are specifically designed to be rented by those living in manufactured homes and/or modular homes and can range in size from a few lots to hundreds. Most manufactured home residents own their manufactured homes but rent the lots on which their manufactured homes sit from the owners of manufactured home communities. Many modular home residents also own their homes but similarly rent the lots on which their modular homes sit from the owners of manufactured home communities.

3.     Defendants ELS, Hometown America, Lakeshore, Sun Communities, RHP, Yes Communities, Inspire Communities, Kingsley, Cal-Am, Ascentia, and MurexRiverstone (together referred to as "Manufactured Home Community Defendants") are manufactured home community owners and/or operators (i.e. community managers). They are part of a recent wave

2

of large corporate owners who have acquired manufactured home communities across the United States to grow large portfolios of home sites. After acquiring the communities, these buyers have implemented steep annual rent increases on their manufactured home lots, which have caused significant burdens on manufactured home residents. The Manufactured Home Community Defendants have been able to implement supercompetitive lot rent price increases by sharing competitively sensitive information with each other through two methods: (1) providing information to Defendant Datacomp which publishes comprehensive manufactured home market reports; and (2) direct competitor-to-competitor communications.

4.     *First*, the Manufactured Home Community Defendants rely on and use the competitively sensitive information contained in Defendant Datacomp's market reports to maximize their own future rent increases. Datacomp is the nation's largest provider of data regarding manufactured and mobile home data and the communities. The Manufactured Home Community Defendants use Datacomp's reports to coordinate their prices by sharing non-public, competitively sensitive information about manufactured home lot rental prices and occupancy, among other things throughout the United States.

5.     Manufactured home community owners, including the Manufactured Home Community Defendants, have coordinated with each other to increase manufactured home lot rents (which, as used herein, encompass lot rents for modular homes) systematically and unlawfully by purchasing and using market reports published by Defendant Datacomp. Datacomp's reports, known as JLT Market Reports, provide detailed, non-anonymized, and current—indeed, at times *future*—competitive information on manufactured home communities located across the United States, including information about lot rents and occupancy in any given community. The reports allow competing manufactured home community operators to

3

identify the rent prices that their rivals are charging and, in some cases, see when and to what level competitors will increase lot rents. Additionally, competitors can identify exactly how many manufactured home lots there are in a given competitor's community, the occupancy level in that community, and whether their competitors include certain services with lot rent. These reports can and do, for these reasons, help the Manufactured Home Community Defendants identify which communities are most comparable to their own for the purpose of soliciting rent-related information directly.

6.    *Second*, cooperation materials and documents from a settling Defendant reveal that the Manufactured Home Community Defendants and their agents directly communicated with each other and with other community owners and operators within the same local market to obtain and exchange competitively sensitive information about lot rent pricing. These communications occurred through manager-to-manager contacts in advance of annual rent-increase cycles and included the exchange of current rent levels. These communications reduced uncertainty about rivals' pricing and facilitated parallel rent increases that would be less likely in a competitive market. Upon information and belief, these communications occur within each Regional Market (defined below), and they were used to calibrate and implement rent increases that track or match competitors' pricing rather than compete on price.

6.7.    Having access to this non-public, competitively sensitive information, obtained through the JLT Market Reports or through direct competitor communications—and knowing that one's competitors have access to and are using the same information, allows manufactured home community owners, including the Manufactured Home Community Defendants, to reduce or eliminate competition amongst themselves on price, services, and quality for manufactured home lots. For example, if a Manufactured Home Community Defendant knows the amount of a

4

specific competitor's recent or future manufactured home lot rent increases, then it can use that information to calculate the amount of its own rent increases, knowing that its competitor is doing the same, thus eliminating price competition. Or if a Manufactured Home Community Defendant knows the occupancy rates of a competitor's manufactured home lots, and vice versa, then it knows whether residents living in their respective communities have nearby alternative communities to which they could move if lot rents increased, information that facilitates a price increase that will stick.

7.8.    TheNotably, the JLT Market Reports and the non-public, competitively sensitive information contained within them are marketed toward owners of manufactured home communities, including the Manufactured Home Community Defendants. For example, in the summer of 2022, Datacomp placed an advertisement in *MHInsider*, a magazine for "Manufactured Housing Professionals," which claimed that the reports could help community owners "stay competitive." Of course, by providing manufactured home communities owners non-public, competitively sensitive information, the JLT Market Reports actually eliminate competition by enabling community owners to coordinate and raise manufactured lot rents to exorbitant prices.

5



**Figure 1.**

8.9.    In recent years, manufactured home lot rents paid by manufactured home residents have increased significantly. For example, manufactured home lot rental prices increased by approximately 2.3% per year between 2010 and 2018, which is approximately in line with the average annual inflation of 1.8% during this period. However, consistent with Plaintiffs' conspiracy allegations, manufactured home lot rental prices increased at a significantly higher rate between *2019 and 2021—9.1% per year* (while inflation was only 3%).

6

After 2021, rents continued increasing. Between 2019-2024, rents increased annually by 7.2% on average (while the average annual inflation rate was 3.8%). The Manufactured Home Community Defendants could never have demanded these rental price increases unilaterally. To implement the increases, they needed to conspire. They did this by exchanging non-public, competitively sensitive information ~~through Datacomp's JLT Market Reports.~~about lot rent pricing. In the words of Ross Partrich, CEO of Defendant RHP: **"We find the JLT Market Reports to be . . . extremely helpful for rent increases across our portfolio throughout the country."**

~~9.~~10.    The exchange of non-public, competitively sensitive information about lot rent pricing through Datacomp's JLT Market Reports and through direct competitor communications allowed Defendants to carry out a price fixing conspiracy to artificially inflate manufactured home lot rents in violation of Section 1 of the Sherman Act and common law. The exchange of information ~~through the JLT Market Reports~~ is also separately unlawful under Section 1 of the Sherman Act as an unlawful information exchange. The supracompetitively-inflated manufactured home lot rent increases would not have been possible but for the conduct described herein.

~~10.~~11.  Plaintiffs bring this antitrust class action lawsuit on behalf of themselves and a nationwide Class of all similarly situated persons and entities who paid rent for a manufactured ~~or modular~~ home lot situated in a manufactured home community included in a JLT Market Report or located in a Regional ~~Submarket~~Market between August 31, 2019 and the present (the "Relevant Time Period"). Because of Defendants' violations of Section 1 of the Sherman Act, Plaintiffs and members of the Class were injured by paying significant overcharges on

manufactured home lot rents throughout the United States and the Manufactured Home Community Defendants were unjustly enriched by their conduct.

11. 12.  If Defendants are permitted to continue their anticompetitive scheme, Plaintiffs and members of the Class will continue to pay supracompetitive rents for manufactured home lots. Plaintiffs bring this action to seek damages and permanently enjoin Defendants' ongoing efforts to coordinate their prices by sharing competitively sensitive information for manufactured home lots.

## II.  JURISDICTION, VENUE, AND EFFECT ON INTERSTATE COMMERCE

12. 13.  Plaintiffs bring this antitrust class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to (i) recover treble damages and the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiffs and members of the Class; (ii) enjoin Defendants' anticompetitive conduct; and (iii) for such other relief as is afforded under the laws of the United States for Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

13. 14.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

14. 15.  Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all relevant times, one or more Defendants resided, transacted business, was found, is licensed to do business, and/or had agents in this District.

15. 16.  This Court has personal jurisdiction over each Defendant pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), because, among other things, each Defendant: (a) transacted business throughout the United States, including in this District; (b) leased manufactured home lots to individuals throughout the United States, including in this District; and/or (c) engaged in

8

an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District. Each Defendant has purposefully availed itself of the privilege of conducting business activities within the United States and has the requisite minimum contacts therein because each Defendant committed intentional acts that were intended to cause and did cause injury within the United States.

16.17.  The activities of Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

17.18.  This action is also instituted to secure injunctive relief against Defendants to prevent them from further violations of Section 1 and 3 of the Sherman Act as hereinafter alleged.

18.19.  No other forum would be more convenient for the parties and witnesses to litigate this case.

### III.   THE PARTIES

19.20.  Plaintiff Steven Brown is a resident of Converse, Texas. During the Relevant Time Period, Brown rented a manufactured home lot located in a manufactured home community named Summit Ridge, which is owned and managed by Defendant Sun Communities. During the Relevant Time Period, Brown paid monthly rent to Sun Communities for this manufactured home lot. Brown paid higher rental prices by reason of the violations alleged herein.

20.21.  Plaintiff Todd C. Caldwell is a resident of Jacksonville, Florida. During the Relevant Time Period, Caldwell rented a manufactured home lot located in a manufactured home community named Continental Village, which is owned and managed by Defendant Inspire

9

Communities. During the Relevant Time Period, Caldwell paid monthly rent to Inspire Communities for this manufactured home lot. Caldwell paid higher rental prices by reason of the violations alleged herein.

21.22.  Plaintiff Mary Galusha is a resident of Colorado Springs, Colorado. During the Relevant Time Period, Galusha rented a manufactured home lot located in a manufactured home community named Antelope Ridge, which is owned and managed by Defendant Yes Communities. During the Relevant Time Period, Galusha paid monthly rent to Yes Communities for this manufactured home lot. Galusha paid higher rental prices by reason of the violations alleged herein.

22.23.  Plaintiff Carla Hajek is a resident of Justice, Illinois. During the Relevant Time Period, Hajek rented a manufactured home lot located in a manufactured home community named Sterling Estates, which is owned and managed by Defendant RHP. During the Relevant Time Period, Hajek paid monthly rent to RHP for this manufactured home lot. Hajek paid higher rental prices by reason of the violations alleged herein.

23.24.  Plaintiff David Klein is a resident of North Fort Myers, Florida. During the Relevant Time Period, Klein rented a manufactured home lot located in a manufactured home community named Del Tura Community, which is owned and managed by Defendant Hometown America. During the Relevant Time Period, Klein paid monthly rent to Hometown America for this manufactured home lot. Klein paid higher rental prices by reason of the violations alleged herein.

24.25.  Plaintiff Colleen Levins is a resident of ShelbyOxford Township, Michigan. During the Relevant Time Period, Levins rented a manufactured home lot located in a manufactured home community named Lake Villa, which is owned and managed by Defendant

10

Kingsley. During the Relevant Time Period, Levins paid monthly rent to Kingsley for this manufactured home lot. Levins paid higher rental prices by reason of the violations alleged herein.

25.26.  Plaintiff Ronald Kazmirzak is a resident of Justice, Illinois. During the Relevant Time Period, Kazmirzak rented a manufactured home lot located in a manufactured home community named Sterling Estates, which is owned and managed by Defendant RHP. During the Relevant Time Period, Kazmirzak paid monthly rent to RHP for this manufactured home lot. Kazmirzak paid higher rental prices by reason of the violations alleged herein.

26.27.  Plaintiff Kevin McDonough is a resident of Lake Worth, Florida. During the Relevant Time Period, McDonough rented a manufactured home lot located in a manufactured home community named Palm Breezes Club, which is owned and managed by Defendant Cal-Am. During the Relevant Time Period, McDonough paid monthly rent to Cal-Am for this manufactured home lot. McDonough paid higher rental prices by reason of the violations alleged herein.

27.28.  Plaintiff Luis Melendez is a resident of Orlando, Florida. During the Relevant Time Period, Melendez rented a manufactured home lot located in a manufactured home community named Starlight Ranch, which is owned and managed by Defendant ELS. During the Relevant Time Period, Melendez paid monthly rent to ELS for this manufactured home lot. Melendez paid higher rental prices by reason of the violations alleged herein.

28.29.  Plaintiff Charles Neville is a resident of Aliquippa, Pennsylvania. During the Relevant Time Period, Neville rented a manufactured home lot located in a manufactured home community named the Meadows at Countrywood, which is owned and managed by Defendant

11

ELS. During the Relevant Time Period, Neville paid monthly rent to ELS for this manufactured home lot. Neville paid higher rental prices by reason of the violations alleged herein.

29.30.  Plaintiff Deborah Norvise is a resident of Las Vegas, Nevada.Oregon. During the Relevant Time Period, Norvise rented a manufactured home lot located in a manufactured home community named Tropicana Palms, which is owned and managed by Defendant Cal-Am. During the Relevant Time Period, Norvise paid monthly rent to Cal-Am for this manufactured home lot. Norvise paid higher rental prices by reason of the violations alleged herein.

30.31.  Plaintiff Carol Rachelle Roach is a resident of Clearwater, Florida. During the Relevant Time Period, Roach rented a manufactured home lot located in a manufactured home community named Bayside Waters, which is owned and managed by Defendant Murex Properties, L.L.C., a Michigan corporation, headquartered in Fort Myers, Florida. During the Relevant Time Period, Roach paid monthly rent to Murex for this manufactured home lot. Roach paid higher rental prices by reason of the violations alleged herein.

31.32.  Plaintiff Barbara Rowley is a resident of Federal Heights, Colorado. During the Relevant Time Period, Rowley rented a manufactured home lot located in a manufactured home community named Holiday Hills Village, which is owned and managed by Defendant ELS. During the Relevant Time Period, Rowley paid monthly rent to ELS for this manufactured home lot. Rowley paid higher rental prices by reason of the violations alleged herein.

32.33.  Plaintiff Amber Sailer is a resident of Dallas, Texas. During the Relevant Time Period, Sailer rented a manufactured home lot located in a manufactured home community named Rolling Hills which is owned and managed by Defendant Yes Communities. During the Relevant Time Period, Sailer paid monthly rent to Yes Communities for this manufactured home lot. Sailer paid higher rental prices by reason of the violations alleged herein.

33.34.   Defendant Datacomp Appraisal Systems, Inc. is a Michigan corporation, headquartered in Grand Rapids, Michigan. Datacomp is the nation's largest provider of manufactured and mobile home valuations, inspections, and market data. Datacomp's client list includes the top 10 largest manufactured home community owners, regional property management companies, developers, lenders, appraisers, homeowner associations and real estate brokers. Datacomp was purchased by Defendant ELS in December 2021 for $43 million.

34.35.   Defendant Equity LifeStyle Properties, Inc. is a Maryland corporation, headquartered in Chicago, Illinois. ELS owns, operates, or has a controlling interest in more than 200 manufactured home communities across the United States, including three in this District, with approximately 7075,000 manufactured home sites nationwide. Datacomp lists ELS as one of its clients on its website. Upon information and belief, ELS uses Datacomp's JLT Market Reports to price manufactured home lot rents.

35.36.   Defendant Hometown America Management, L.L.C., a wholly owned subsidiary of Hometown America, L.L.C., is a Delaware corporation, headquartered in Chicago, Illinois. Hometown America is also a subsidiary of Calzada Capital Partners, L.L.C., a private equity company that invests in real estate operating companies on a global basis. Hometown America owns, operates, or has a controlling interest in 66over 80 manufactured home communities across the United States, including one in this District. Datacomp lists Hometown America as one of its clients on its website. Upon information and belief, Hometown America uses Datacomp's JLT Market Reports to price manufactured home lot rents.

36.37.   Defendant Lakeshore Communities, Inc. is an Illinois corporation, headquartered in Skokie, Illinois. Lakeshore is one of the largest privately held owner/operators of manufactured home communities in the United States and owns manufactured home

13

communities across the United States. Datacomp lists Lakeshore Communities as one of its

clients on its website. Upon information and belief, Lakeshore uses Datacomp's JLT Market

Reports to price manufactured home lot rents.

37.38.   Sun Communities, Inc. is a Michigan corporation headquartered in Southfield,

Michigan. Sun Communities owns, operates, or has a controlling interest in 353approximately

295 manufactured home communities across the United States, including two in this District,

with approximately 120100,000 manufactured home sites nationwide. Datacomp lists Sun

Communities as one of its clients on its website. Upon information and belief, Sun Communities

uses Datacomp's JLT Market Reports to price manufactured home lot rents.

38.39.   RHP Properties, Inc., is a Michigan corporation, headquartered in Farmington

Hills, Michigan. RHP is the largest privately held manufactured home community owner in the

United States. RHP owns, operates, or has a controlling interest in more than 370 communities

across the United States, including three in this District, with approximately 80,000

manufactured home sites nationwide, a large portion of which are owned by Brookfield Asset

Management. Datacomp lists RHP as one of its clients on its website. Upon information and

belief, RHP uses Datacomp's JLT Market Reports to price manufactured home lot rents.

39.40.   Yes Communities, LLC is a Delaware corporation, headquartered in Denver,

Colorado. Yes Communities owns, operates, or has a controlling interest in more than 200250

communities across the United States with approximately 5577,000 home sites. Yes

Communities is partially owned by Stockbridge Capital Group, LLC, a private equity firm with

$33.7 billion of assets under management. The remainder of the company is owned by the

Government of Singapore Investment Company and the Pennsylvania Public School Employees

Retirement System. Datacomp lists Yes Communities as one of its clients on its website. Upon

information and belief, Yes Communities uses Datacomp's JLT Market Reports to price manufactured home lot rents.

40.41.  Inspire Communities, LLC is a Delaware corporation, headquartered in Phoenix, Arizona. Inspire Communities owns, operates, or has a controlling interest in over ~~130~~110 manufactured home communities across the United States, including three in this District. Inspire is wholly owned by Granite Communities, LLC. In 2017, Apollo Global Management, a private equity firm with ~~over $500 billion~~nearly $1 trillion of assets under management, acquired Inspire Communities. Datacomp lists Inspire Communities as one of its clients on its website. Upon information and belief, Inspire Communities uses Datacomp's JLT Market Reports to price manufactured home lot rents.

41.42.  Kingsley Management~~,~~ Corp. is a Utah corporation, headquartered in Provo, Utah. Kingsley is one of the largest privately held owner/operators of manufactured home communities in the United States and owns manufactured home communities across the United States. It is estimated that Kinglsey owns, operates, or has a controlling interest in approximately 11,600 homesites. Datacomp lists Kingsley as one of its clients on its website. Upon information and belief, Kingsley uses Datacomp's JLT Market Reports to price manufactured home lot rents.

42.43.  Cal-Am Properties, Inc., is a California corporation, headquartered in Costa Mesa, California. Cal-Am is one of the largest privately held owner/operators of manufactured home communities in the United States and owns manufactured home communities across the United States. Cal-Am owns, operates, or has a controlling interest in over 65 properties. Datacomp lists Cal-Am as one of its clients on its website. Upon information and belief, Cal-Am uses Datacomp's JLT Market Reports to price manufactured home lot rents.

15

44.     ~~Murex Properties, L.L.C.~~Ascentia Real Estate Holding Company, LLC, is a ~~Michigan~~Delaware corporation, headquartered in ~~Fort Myers, Florida. Murex is one of the largest privately held owner/operators of~~Littleton, Colorado. Ascentia owns and operates over 40 manufactured home communities ~~in the United States and owns~~, offering 7,000 homesites in seven states. Datacomp lists Ascentia as one of its clients on its website. Upon information and belief, Ascentia uses Datacomp's JLT Market Reports to price manufactured home lot rents.

~~43.~~45.  Riverstone Communities, LLC, is a Michigan corporation based in Bloomfield Hills, Michigan. Riverstone owns and operates over 70 manufactured home communities ~~across~~throughout the United States. Datacomp lists ~~Murex~~Riverstone as one of its website. Upon information and belief, ~~Murex~~Riverstone uses Datacomp's JLT Market Reports to price manufactured home lot rents.

~~44.~~46.  Various other persons, firms, and corporations not named as Defendants ~~use Datacomp's JLT Market Reports to price manufactured home lot rents and~~ have participated as co-conspirators with Defendants (the "Unnamed Co-conspirators"). The Unnamed Co-conspirators have also performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of the Unnamed Co-conspirators.

~~45.~~47.  Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

~~46.~~48.  Each Defendant named herein acted as the agent of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

16

47.49.  Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## IV.  FACTUAL ALLEGATIONS

48.50.  During the Relevant Time Period, the Manufactured Home Community Defendants conspired and coordinated with each other and Datacomp to systematically increase manufactured home lot rents and thus harm manufactured and modular home residents who paid elevated rents as a result.

### A.  Manufactured Homes in the United States

49.51.  Unlike traditional site-built homes, which are constructed entirely on the homeowner's property, manufactured homes are built in factories and then transported to the property, or lot, where they will be set up.

50.52.  Mobile homes and manufactured homes refer to the same type of home. The only difference between "mobile" and "manufactured" homes is the date they were built. In 1976, the Department of Housing and Urban Development ("HUD") imposed new codes and standards for the construction of factory-built homes. With these codes, HUD stopped using the term "mobile home" and began using "manufactured home." Therefore, a home built in a factory prior to June 15, 1976, is a "mobile" home, and one built after June 15, 1976, is a "manufactured" home. While the term "mobile home" is still commonly used, in this complaint the term "manufactured home" will refer to any factory-built home regardless of when it was built.

51.53.  While manufactured homes come in various styles and layouts, there are two major types of homes: single-wide or double-wide. A single-wide home is built in one long piece while a double-wide is built in two separate sections which are joined together at a home site. As their name suggests, double-wide homes are typically twice the size of single-wide homes. A double-wide home is more expensive and requires a bigger lot than a single-wide home.

17

52.54.  Manufactured homes are not built on a permanent foundation. As described by FEMA, "Manufactured homes are built on a chassis consisting of main steel beams and cross members; fitted axles, leaf springs, and wheels making up the running gear; and a steel hitch assembly." The chassis foundation is covered by "skirting" or "underpinning," which goes around the home to enclose the crawl space below the home.

53.55.  Modular homes are another type of factory-built home. Modular homes, as described by FEMA, "are prefabricated houses that consist of sections, or modules, which are constructed away from the building site. The prefabricated modules are delivered and installed on a permanent foundation on the home site."

54.56.  Comparing manufactured and modular homes, FEMA has further stated, "One easy way to distinguish between a manufactured home and a modular home is to look at the framing. A manufactured home will generally have a metal frame while a modular home will typically have a wood frame. However, the metal frame of a manufactured home may not be visible if it has been placed on a permanent foundation and skirted to look as though was a "stick-built" home constructed on site." This distinction, of course, is irrelevant in terms of the payment of manufactured home lot rents.

55.57.  Manufactured homes are generally less expensive than site-built homes. It is estimated that manufactured home construction costs 40-50% less per square foot than site-built homes.

56.58.  Following substantial cuts to federal housing budgets in the 1980s, people sought out different sources of affordable housing, and many moved into manufactured homes. Indeed, these federal housing cuts made manufactured homes the fastest-growing type of residence in the 1980s. In the 1990s, manufactured homes were responsible for 66% of new affordable housing

18

produced in the U.S. Today, manufactured homes are the largest source of unsubsidized affordable housing in the United States (and in most cases the cheapest). According to Esther Sullivan in *Manufactured Insecurity: Mobile Home Parks and Americans' Tenuous Right to Place*, due to the lack of other forms of affordable housing, manufactured homes are a crucial national affordable housing infrastructure and a primary pathway to low-income homeownership. Nearly one in four homes purchased by a first-time, low-income household is a manufactured home.

57.59. As of January 2023, the average sale price of a new manufactured home was $128,300 while the average sale price, as of February 2022, of a so-called "stick built" home was $400,500.

58.60. Accordingly, manufactured homes provide an important source of affordable housing to a large swath of the U.S. population. Approximately 20 million Americans, or 6% of the U.S. population, live in manufactured homes. And, while all types of people live in manufactured homes, there is a high concentration of various vulnerable groups, including the elderly, low-income earners, and veterans. There is also a high concentration of people with disabilities or mobility issues living in manufactured homes, since these homes are one-story, low-maintenance, and easily ramped. According to a 2022 study, 12.7% of manufactured home residents ages 60 and older have a significant mobility-related disability.

59.61. According to the Consumer Financial Protection Bureau ("CFPB"), in 2022 nearly one-third of the 10.5 million adults living in manufactured homes were over the age of 60.



**Figure 2.**

60.62.  A study by the CFPB found that a greater proportion of households that live in manufactured homes are headed by a retiree (32%) than site-built households (24%).

61.63.  In fact, 70% of ELS's portfolio of manufactured home communities are age restricted or have a resident base with an average age over 55.

62.64.  According to a 2020 report issued by Fannie Mae, the median annual household income of manufactured home residents who owned their homes at the time was about $35,000. This is half of the median annual income of site-built homeowners. Over a quarter of manufactured homeowners earn less than $20,000 a year.



**Figure 3: Income Distribution of Manufactured vs. Site-Built Homeowners.**

~~63.~~ 65.  These socioeconomic statistics stand in sharp contrast to those involving Defendants. Sam Zell, the Chairman of the Board of ELS until his passing in May 2023, was reportedly worth over $5.3 billion. And the CEO of ELS, Marguerite Nader, earns over $4 million a year while the CEO of Sun Communities, Gary Shiffman, earns nearly $15 million a year—much of which compensation, for both executives, is in the form of a bonus tied to performance.

~~64.~~ 66.  Additionally, manufactured homes provide an important source of affordable housing to people in rural areas. While approximately 6% of homes nationally are manufactured homes, 14% of homes in rural areas are manufactured homes—*i.e.*, more than double the overall national number.

**B. Manufactured Home Lots and the Business of Manufactured Home Communities**

~~65.~~67.  A manufactured or modular home is placed on a plot of land referred to as a "manufactured home lot," or "manufactured home site."

~~66.~~68.  Unlike site-built homes where the land and the home are considered one piece of property and have one owner, manufactured homes and manufactured home lots are considered separate pieces of property and often have different owners.

~~67.~~69.  There are three main ownership configurations for manufactured and modular homes: (1) **rent-rent** where both the home and the home lot are owned by a landlord and rented to the resident; (2) **own-own** where both the home and home lot are owned by the resident; and (3) **own-rent** where the home is owned by the resident, and the home lot is rented. Of the three ownership configurations, own-rent is the most common.

~~68.~~70.  Most "own-rent" manufactured home residents live in manufactured home communities or parks where they rent a manufactured home lot from a property manager such as the Manufactured Home Community Defendants. Manufactured home communities range in size in terms of the number of lots they contain, but some large communities contain over 700 or 800 lots. Residents of these communities pay monthly rents for the manufactured home lot and other utilities and services, such as water service and trash removal.



**Figure 4: example of a manufactured home community (Getty Images).**

~~69.~~71.  Some manufactured home communities also contain modular homes. Like other residents in the community, modular home residents typically own their own modular home but lease a lot from a property manager, such as the Manufactured Home Community Defendants.

~~70.~~72.  Moving a manufactured home, if it can be moved at all, is costly, which means residents are sometimes beholden to the parks where they live due to financial constraints. Beyond the costs, manufactured homes are often structurally challenging to move once sited on a lot. Since the 1950s, manufactured homes have been designed and used as permanent affordable housing. The manufactured home industry has responded to housing demand by building increasingly large and complex manufactured home units that are effectively immobile and are meant to be transported only once, from the factory to the site of installation. Indeed, many municipalities also have rules governing when and how manufactured homes can be transported, making relocation difficult. Additionally, vacancy rates in existing manufactured home communities are commonly in the single digits, making available lots hard to find. Even if vacant lots are available, many manufactured home communities refuse to accept pre-owned or

older manufactured homes from other sites. Thus, once installed on a site, manufactured homes are difficult to move.

**C. The Manufactured Home Industry Has Experienced Significant Consolidation Through Acquisitions**

~~71.~~73.  For decades, the manufactured home community industry was highly fragmented with many operators each owning only a single community. More recently, and particularly within the past decade, the industry experienced considerable consolidation with large corporate owners, including the Manufactured Home Community Defendants, buying up communities across the United States. This consolidation facilitated the conspiracy alleged herein.

~~72.~~74.  The following is a sampling of recent large acquisitions made by the Manufactured Home Community Defendants:

    i.    **ELS:** In 2018, ELS purchased two manufactured home communities in South Florida for $50.35 million and $49.5 million respectively. These two purchases added another 1,534 manufactured home lots to ELS's portfolio. In 2020, ELS purchased a 484-lot manufactured home community in Arizona with entitlements to an additional 228 lots for development.

    ii.    **Hometown America:** In 2019, Hometown America paid $237.4 million for Plaza del Rey, an 800-lot manufactured home community in Sunnyvale, California. In 2021, Hometown America spent over $100 million purchasing two manufactured home communities in California with a combined 410 manufactured home lots and a community in Claverton, New York with over 200 lots.

24

iii.   **Lakeshore:** In 2020, Lakeshore purchased a 60-lot community in Las Vegas, Nevada. In 2022, Lakeshore purchased a 150-lot community in Northfield, Minnesota.

iv.   **Sun Communities:** In 2019, Sun Communities spent over a billion dollars to acquire over 12,000 new or redeveloped lots. Among its purchases was a 31-communitiy portfolio from a Connecticut-based manager for $346.6 million. In 2020, Sun Communities acquired an additional 24 manufactured home communities and RV resorts. In 2022, Sun Communities purchased two manufactured home communities in Riverside County for $40 million with a total of 379 manufactured home lots. That same year it bought a community outside of Houston for $29.7 million with 255 manufactured home lots, a community outside of Phoenix, Arizona for $22.4 million with 195 manufactured home lots, and a community outside of Lewiston, Maine for $15.9 million with 231 manufactured home lots. In early 2023, Sun Communities acquired a manufactured home community in Boyne City, Michigan with 68 lots and 72 more development sites. In 2025, Sun Communities acquired 14 more communities for around $457 million.

v.   **RHP:** In early 2019, RHP announced that it acquired 17 manufactured home communities in Arizona, Colorado, Indiana, Pennsylvania, and Wisconsin for $170M. Throughout the rest of the year, RHP made several more acquisitions, including Country Club Woods, a community with 308 lots located in this District. In 2021, RHP purchased 29 manufactured

home communities in Illinois, Indiana, and Michigan containing more than 4,200 manufactured home lots for $184 million. In 2022, RHP purchased 50 manufactured home communities, composed of 41 communities in Wisconsin, seven in Minnesota, and two in Michigan. The acquisition added 5,232 manufactured home lots to RHP's portfolio. That same year, RHP purchased three manufactured home communities in Delaware and a community in Brandywine, Maryland consisting of 260 manufactured home lots with approval for expansion for a total of 400 more. In 2023, RHP acquired a manufactured home community in Imperial, Missouri, and another in Belleville, Illinois

vi. **Yes Communities:** In 2018, Yes Communities purchased 24 manufactured home communities comprising over 6,800 residential home sites in the states of Michigan, Indiana, Illinois, and Texas. In 2019, Yes Communities purchased five manufactured home communities in Indiana and Michigan, comprised of 1,460 manufactured home lots. In 2021, it purchased two manufactured home communities outside of Chicago for $43 million. The acquisitions added another 366 manufactured home lots to Yes Communities portfolio. In 2025, it was reported that Brookfield Asset Management, which owns a large portion of RHP's communities, was in advanced talks to acquire Yes Communities for around $10 billion.

vii. **Inspire Communities:** During the Relevant Time Period, Inspire Communities has acquired over 100 manufactured home communities across the United States.

26

viii. **Kingsley:** In 2015, Kingsley purchased a manufactured home community in Palm Harbor, Florida with 213 lots for nearly $20 million.

ix. **Cal-Am:** In 2017, Cal-Am purchased Far Horizon East Mobile Home Park in Tucson, Arizona, for $33 million, gaining 415 new manufactured home lots.

x. ~~**Murex:** In 2017, Murex purchased The Gardens in Parrish, Florida, gaining 635 manufactured home lots.~~

~~73.~~75.  Many of the Manufactured Home Community Defendants publicly advertise their appetite to purchase new manufactured home communities. For example, ELS and Sun Communities each offer "all cash transactions," "quick closings" and the ability for the seller to receive corporate stock or ownership to defer the seller's tax liabilities. Lakeshore advertises that it "is always actively acquiring manufactured home communities" and that it "offer[s] flexible and fast transactions, with no financing contingencies." RHP advertises that it has the "ability to close deals fast-no brokers and no commissions."

~~74.~~76.  After purchasing manufactured home communities, these corporate buyers, including the Manufactured Home Community Defendants, have significantly raised manufactured home lot rents based on the unlawful conduct alleged herein, which has caused considerable financial pressure on manufactured home residents who are typically older, lower income, and less wealthy than residents of traditional site-built homes.

~~75.~~77.  On ELS's Q2 2023 earnings call, CEO Marguerite Nader explained that the company's lot rent increases have historically outpaced social security cost of living adjustments ("COLA"). Nader recognized that ELS's residents, 70% of whom live in age qualified communities and are dependent on social security checks—the average social security check is

27

$1,700 for an individual and $2,700 for a couple—are focused on COLA. Yet, ELS touts its outperformance of annual lot rent increases compared to COLA in its investor presentations.

76. 78.  The Manufactured Home Community Defendants have prioritized acquiring properties that will allow them to raise lot rents. For example, Sun Communities has specifically targeted acquiring properties with a "minimum rent growth potential of 3% per annum."

77. 79.  Over the past several years, private equity and other investment firms have become increasingly involved in the manufactured home lot space. Commentators agree that this trend, which has led to management of manufactured communities from afar (rather than by a local "mom and pop" operation) by profit-drive enterprises, has had a significant effect on conditions in the communities and on the lot rents. One investment executive noted that because "mom-and-pop owners have kept their rents more or less low," private equity firms have taken the opportunity to dramatically increase rents to quickly increase profits once those firms purchase the communities. A business school professor commented that a private equity firm's "challenge is to turn something they bought for $100 million into something that's worth $300 million. That's the end game for a private equity fund."

78. 80.  The recent involvement of private equity and other investment firms includes the following:

- One of the first private equity investors in manufactured home communities was Equity Group Investments. Defendant ELS, a publicly traded real estate investment trust (or REIT), is currently one of the largest manufactured home community owners in the United States. Large investment managers such as The Vanguard Group, Blackrock, Price T Rowe Associates, and Aristotle Capital Management are ELS's largest investors. The immediate past chairman of the board of ELS, billionaire Sam Zell, who passed

28

away earlier this year, reportedly earned millions of dollars in director's fees and stock awards from ELS.

- Defendant Yes Communities was formed in 2008 by Stockbridge Capital, a private equity real estate manager which then sold 71% of Yes Communities to two institutional investors, the sovereign wealth fund Government of Singapore Investment Company (GIC) and the Pennsylvania Public School Employees Retirement System, a pension fund. Adam Gallistel, Regional Head for Americas, GIC Real Estate, said, "The manufactured housing sector is a unique and highly-attractive niche in the U.S. residential market, which GIC has been exploring for some time. Given the relative lack of consolidation, it is very difficult to enter this sector in scale." Notably, as of the end of 2017, Pennsylvania PSERS reported that its investment in Yes Communities has increased in value by 33% since the pension fund invested in August 2016. Yes Communities' home site rental business accounted for 60% of the company's revenues in 2016.

- In May 2016, Brookfield Asset Management, a real estate and private equity manager, acquired 135 manufactured home communities in 13 states with a total of 33,010 home sites for approximately $2 billion in 2017. More specifically, Brookfield Strategic Real Estate Partners II, a $9 billion private equity real estate fund, acquired four portfolios of manufactured home communities operated by Defendant RHP Properties: RHP Western Portfolio Group, American Home Portfolio Group, AMC Portfolio and MHC Portfolio IV.

- In June 2013, private equity firm Centerbridge Capital acquired National RV Communities, which, among other things, owned senior manufactured home

29

communities. After renaming it Carefree Communities, Inc., Centerbridge continued to expand Carefree, spending, according to a Wall Street Journal report, more than $1 billion. In March 2016, by which point Centerbridge and Carefree had acquired more than 40 additional manufactured housing communities, Centerbridge sold Carefree for $1.68 billion to publicly-traded manufactured housing REIT Defendant Sun Communities.

- In 2013, the private equity firm the Carlyle Group, which has $382 billion in assets under management, purchased its first two manufactured home communities. Since then, the Carlyle Group has made additional purchases of manufactured home communities, reportedly owning several thousand lots or 30 communities as of 2022. The Carlyle Group's recent purchases include a community in Florida for $72 million and four in Arizona for $230 million total.

- In 2017, Apollo Global Management, a private equity firm with $631 billion in assets under management, acquired Defendant Inspire Communities, an owner of manufactured home communities around the country.

- In early 2018, private equity firm TPG Capital purchased dozens of manufactured home communities across the country that were managed by RV Horizons. According to government-sponsored mortgage lender Fannie Mae, TPG had invested $400 million in manufactured housing properties in the 24 months prior to August 2019, making it one of the top 10 investors in manufactured home communities during the two-year period. RV Horizons became Impact Communities, and TPG named their manufactured home community arm Strive Communities. Notably, the co-owner of RV Horizons, Frank

30

Rolfe, is the person who notoriously quipped that a manufactured home community "is
like a Waffle House where the customers are chained to their booths."

- In July 2018, private equity firm Blackstone Group LP acquired a portfolio of 14
  manufactured home communities for approximately $172 million and subsequently, with
  its operating partner, Treehouse Communities, has continued to acquire additional
  manufactured home communities and is reportedly looking to acquire more. Notably,
  Blackstone, which has $1 trillion in assets under management and owns manufactured
  home communities in California, recently contributed $6.2 million in a campaign in
  California to limit rent control.

- In 2018, the Texas Employees Retirement System, a $35.9 billion public pension fund,
  invested $50 million in MH Legacy Fund II. MH Legacy Fund II is a real estate fund that
  is jointly managed by Horizon Land Company and the private equity firm Federal Capital
  Partners. Horizon Land Company operates more than 170 manufactured home
  communities in the eastern half of the United States.

   **D. High Rents and Deteriorating Conditions Follow Acquisitions**

   79. 81.  While corporate buyers, including the Manufactured Home Community
Defendants, have touted the acquisitions as being beneficial to the residents of manufactured
home communities, residents strongly disagree. Across the United States, manufactured home
residents have been very vocal about issues with their new landlords, including the Manufactured
Home Community Defendants. For instance, according to a *Los Angeles Times* report, residents
of Florence Commons, a manufactured home community in Tennessee owned by Defendant Yes
Communities, have complained that between 2013-2019 rents increased almost 30%, but
community conditions have worsened and basic requests for repairs went unanswered.

31

80.82.  Similarly, in Michigan, manufactured home residents living in communities owned by Defendants Kingsley and Yes Communities saw their lot rents increase substantially after those companies purchased manufactured home communities from small operators. According to a 2022 article from the *Oakland Press*, residents have complained that "[these companies] buy these parks just to make money with no intentions of doing any good for the community . . . They don't add anything to make it better. You don't see where your dollars go."

81.    Likewise, after Murex Properties's 2022 purchase of Caribbean Isles, a 55+ mobile home community in Largo, Florida, lot rents for new residents nearly doubled. Real estate agents report that these extreme rent increases have made the resident-owned homes in the community virtually impossible to sell, according to reporting in a 2023 *Chattanooga Times Free Press* article.

82.83.  And in Florida, residents of ELS's Down Yonder manufactured home community near Tampa received a 7.5% rent increase in 2023 after rents rose an average of 4.4% over the past five years. Additionally, residents are now also charged separately for water and sewage, services that used to be included in the lot rent, according to a 2023 *The Guardian* article. These increased charges have come while residents are facing a host of issues in the community such as disrepair and lack of disability accommodations.

83.84.  In Minnesota, according to a report in *The Guardian*, in another ELS manufactured home community, Cimmaron, residents were faced with a 2023 lot rent increase of 7.75%, twice as much as the prior year, while similarly facing issues with lack of repairs and upkeep in the community.

84.85.  After Lakeshore purchased Viking Terrace in Northfield, Minnesota, a notice to "All Residents of Viking Terrace," dated March 31, 2022, increased lot rents by $65.00 per

month, to $485.00, effective June 1, 2022. The notice also stated there was a $4.00 pet fee, and a late fee of $1.00 per day for late rental payments. A resident speaking on an audio report regarding Lakeshore's ownership of the community, called the increases "horrendous." Viking Terrace contains more than 100 homes, with many residents who are low-income and who speak Spanish as their primary or only language.

85.86.  The complaints of residents have caught the attention of government officials. For instance, earlier this yearin 2023, Connecticut Attorney General William Tong launched an investigation into Defendant Sun Communities over its mismanagement of a manufactured home community in Killingworth, Connecticut that it had acquired in 2019. The Attorney General's office reported that it had received, following the Sun Communities acquisition, numerous complaints from residents "who have seen sustained, escalating rent hikes despite deteriorating conditions."

86.87.  Last yearIn 2022, Minnesota Attorney General Keith Ellison investigated Defendant Lakeshore for how it handled its acquisition of Viking Terrace. Shortly after purchasing Viking Terrace in April 2022, Lakeshore raised lot rents by 20% and imposed draconian rules, including prohibiting vegetable gardens without Lakeshore's permission, forbidding outdoor laundry lines, forbidding neighborhood walks after 10:00 PM, and banning fenced-in-yards for pets. Viking Terrace residents reported to the Minnesota Attorney General's Office that the new rules felt like substantial modifications to prior rules and were being enforced against them aggressively. Each demand was accompanied with a threat that a failure to comply could result in an eviction. Even when they did not receive an eviction notice, the rules and threats alone terrified the residents. The investigation uncovered multiple violations of

33

Minnesota law and the Attorney General demanded that Lakeshore "cease and desist enforcing its new rules and leases."

87.88.  Also in 2022, in response to complaints from manufactured home residents about out-of-state corporate owners controlling more and more manufactured home communities and substantially raising rents, the Colorado state legislature passed a law offering greater protections to residents, including giving residents 120 days to buy a community from a landlord looking to sell its land. Defendants ELS, RHP, and Kingsley were three of the manufactured home community operators in Colorado that received the most complaints on the state system. Additionally, in 2020, Kingsley reached a six-figure settlement agreement with the State of Colorado, in which it agreed to repay manufactured home residents in seven manufactured home communities for illegally withholding security deposits, imposing arbitrary fees, and improperly charging attorney fees. Colorado's Attorney General Phil Weiser stated that the investigation served as a warning to other community managers who have also been the subject of complaints across the state.

88.89.  In 2020, New York state senators Jen Metzger, James Skoufis, and David Carlucci wrote a letter to Defendant RHP, calling on RHP to maintain current rental lot rates. Citing complaints from residents about exorbitant annual lot rent increases, ignored requests for maintenance, and unusable property amenities, the senators wrote, "The business policies and practices cited above undercut any possible justification for yet another substantial lot rent increase."

90.     In 2025, New Hampshire Senator Maggie Hassan, the ranking member of the Congressional Joint Economic Committee, launched a probe into private equity ownership of manufactured home communities, sending letters to large owners including Sun Communities,

34

specifically regarding how ownership by investment firms have affected community residents and how much profit has been generated.

89.91.  Despite the flood of complaints from manufactured home residents and attention from government officials, manufactured home community owners, including the Manufactured Home Community Defendants, have continued to substantially raise rents for manufactured home lots, including during the Relevant Time Period. The large corporate owners of manufactured home communities have been clear about their intentions to turn manufactured home communities into cash cows, and manufactured home community managers and investors have been hugely successful in accomplishing this. According to real estate research firm Green Street Advisors, between 2004 and 2018, operating income from manufactured home communities rose 87% and never declined, even during the 2008 financial crisis. Green Street Advisors analyst John Pawlowski referred to players in the industry as "rocket ships" and stated, "It's baffling how good of a business it has been."

90.92.  Indeed, in communications with Plaintiffs and members of the class about rent increases, the Manufactured Home Community Defendants do not cite objective criteria to justify rent increases. Oftentimes, the Manufactured Home Community Defendants do not give any reason at all for a rent increase, and the increase is provided to residents on a take-it-or -leave -it basis. Other times, Manufactured Home Community Defendants cite nebulous "market conditions" or "market rates."

91.93.  Defendants ELS and Sun Communities, which are both public companies, have reported huge returns for their shareholders. Between March 2009 and February 2020, ELS and Sun Communities returned 1,186% and 4,137% respectively—far higher than the S&P 500's

return of 499%. These massive returns are attributable to the business model described in this complaint: acquire more manufactured home lots and raise lot rents.

~~92.~~94.  This business model, which has been employed by all the Manufactured Home Community Defendants and others, crosses the line from egregious to illegal on account of Defendants' conspiracy.

**E. Defendants' Anticompetitive Scheme**

~~93.~~95.  During the Relevant Time Period, manufactured home community owners, including the Manufactured Home Community Defendants~~,~~ have ~~coordinated with each other~~ been able to ~~systematically increase manufactured home~~implement supracompetitive lot ~~rents~~rent price increases by ~~purchasing and relying on~~exchanging competitively sensitive information ~~contained within,~~ including information about lot rent pricing, with each other through two methods: (1) sharing competitively sensitive information through the JLT Market Reports ~~that are published by Defendant Datacomp.~~; and (2) direct competitor-to-competitor communications. Manufactured Home Community Defendants also used the ~~reports~~JLT Market Reports to coordinate strategic acquisitions of manufactured home communities to consolidate market share and acquire significant market power.

    **1.  Manufactured Home Community Defendants Shared Competitively Sensitive Information Through the JLT Market Reports to Increase Lot Rent Prices**

    **a.  History of Datacomp**

~~94.~~96.  Founded in 1987 as an appraiser of pre-owned manufactured homes, Datacomp subsequently expanded its business to become the go-to source of information for all facets of the manufactured home industry.

~~95.~~97.  Datacomp's first major expansion was in the early 2000s when it launched MHVillage, a listing site for manufactured home sales. It is the largest manufactured home

36

marketplace in the world, generating leads for about $3 billion in sales annually. When creating MHVillage, Datacomp leveraged the information about manufactured homes that it had gathered while appraising manufactured homes.

96.98.  Datacomp expanded again in 2014 when it acquired JLT & Associates, a firm which published industry reports for manufactured home community operators. After acquiring JLT & Associates, Datacomp published these reports under the name "JLT Market Reports," and it continues to do so today. As explained below, the JLT Market Reports provide manufactured home community operators, including the Manufactured Home Community Defendants, with a one-stop-shop for highly detailed, and highly specific, information about manufactured home communities across the United States.

97.99.  In December 2021, Defendant ELS purchased Datacomp and its companion website MHVillage for $43 million. With this acquisition, one of the largest manufactured home community operators, ELS, gained control of the largest database of information about the manufactured home industry, Datacomp. This made the unlawful conduct even more egregious. Prior to this acquisition, ELS was a Datacomp *customer* that used Datacomp's JLT Market Reports to price manufactured home lot rents in coordination with its direct competitors. By acquiring Datacomp, ELS became the *owner* of a product that it provided to its competitors to facilitate a price fixing conspiracy, thus making it even easier for it and the other Manufactured Home Community Defendants—direct competitors in the manufactured home lot market—to exchange information and coordinate manufactured home lot rent pricing.

### b.   Datacomp's JLT Market Reports

98.100.        The JLT Market Reports provide detailed research and information on manufactured home communities located in as many as 187 geographic areas, referred to as metropolitan statistical areas ("MSAs"), throughout the United States. The reports include

37

~~MSAs~~areas throughout the country and, in some states—Florida, for instance—the reports cover

*the entire state.*

~~99.~~101.     Datacomp holds itself out as "the nation's largest provider of

manufactured and mobile home value reports" that provides "price information":



**Figure 5.**

38

~~100.~~102.    Datacomp also describes itself as the "leading provider" of "competitive market data":



**Figure 6**.

101.103.     During the Relevant Time Period, Datacomp sellssold JLT Reports for as many as 187 markets across the United States.

102.104.     JLT Reports are not available for free. Instead, they can only be accessed if they are purchased for prices ranging from $149.00–$419.00.as high as $465. For example:



**Figure 7.**

40



2025 Orange County California
$ 465.00

2025 Orange/Seminole Counties Florida
$ 325.00

2025 Orange/Ulster New York
$ 325.00

2025 Osceola County Florida
$ 285.00

2025 Palm Beach County Florida
$ 335.00

2025 Pasco County Florida
$ 355.00

2025 Philadelphia MSA Pennsylvania
$ 375.00

2025 Pinellas County Florida
$ 435.00

2025 Pittsburgh MSA Pennsylvania
$ 325.00

105.    Purchasing every JLT report would cost tens of thousands of dollars. Even just purchasing a handful of reports costs thousands of dollars.

103.106.       Each JLT Report includes "specific information about each community" including "the latest rent increase information":

41



< All Reports       Next >

### 2023 Northern Colorado

$ 259.00

We are pleased to present our *July 2023 Northern Colorado Manufactured Home Communities Rent Survey*.

**21 land lease communities** consisting of **5,686 homesites** are included in the survey. The report includes our findings and observations, specific information about each community including marketing programs and latest rent increase information and various management reports.

*In addition, we include a report that compares July 2023 occupancy and average rents to July 2022 as well as a report that presents average rents and occupancy rates from 1999 to 2023.*

Delivery Method:

Download Edition

Add to Cart

---

< All Reports       Next >

### 2023 Northern Colorado

$ 259.00

We are pleased to present our *July 2023 Northern Colorado Manufactured Home Communities Rent Survey*.

**21 land lease communities** consisting of **5,686 homesites** are included in the survey. The report includes our findings and observations, specific information about each community including marketing programs and latest rent increase information and various management reports.

*In addition, we include a report that compares July 2023 occupancy and average rents to July 2022 as well as a report that presents average rents and occupancy rates from 1999 to 2023.*

Delivery Method:

Download Edition

Add to Cart

42



**Figure 8**.

43

~~104.~~107.     The reports include the following detailed information:



**Figure 9.**

~~105.~~108.     Information published in the JLT Market Reports comes directly from Datacomp's customers, including the Manufactured Home Community Defendants and Unnamed Co-Conspirators. Datacomp and its customers exchange via telephone surveys, among other means, competitively sensitive, ordinarily non-public, information that is published in the JLT Market Reports. JLT Market Reports are published annually and previous reports are taken offline once subsequent reports are published.

109.     Additionally, Datacomp sends written questionnaires directly to manufactured home community owners and operators, including the Manufactured Home Community

44

Defendants and Unnamed Co-Conspirators, to collect information about their manufactured home communities. The questionnaires ask manufactured home community owners and operators to provide competitively sensitive information and future looking information such as "date of next rent increase," "amount of next rent increase," and "# of [manufactured home] sites that are vacant."

~~106.~~110.     Each Datacomp JLT Market Report begins with a high-level summary of findings, followed by utility price assumptions that are used to adjust prices for communities in which utilities are included in the rent. Then, a series of maps are provided to show all communities included in the report. The report then provides a "Historical Recap of Rent and Occupancy," which reports the annual average rent for all communities as well as the average rent for all 55+ communities, specifically.

~~107.~~111.     The next section of the report provides tables of current community-level price and occupancy data. It provides the "# of Home Sites," "Home Sites Occ [Occupied]," "% Occ," "Monthly Market Rent" (with estimates provided for low, high, and avg priced sites), "Services in Rent" (which details what utilities are included in rent), and "Adjusted Market Rent" (which adjusts the monthly market rent amounts by the utility estimates). Each row reports this data for an individual manufactured home community, by specific name. The rent displayed is the current, up-to-date rent that manufactured home residents are paying at the time the report is published. Figure 10 below shows an example of this from the ~~2023~~2025 Phoenix MSA Report.

| Phoenix, Arizona MSA JLT Market Report - January 2023 ~~Ranked By Community Name~~ | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| COMMUNITY | # OF HOME SITES | HOME SITES OCC* | % OCC | MONTHLY MARKET RENT | | | SERVICES* IN RENT | ADJUSTED MARKET RENT | | |
| | | | | LOW | HIGH | AVG** | | LOW | HIGH | AVG** |
| **All Ages Communities** | | | | | | | | | | |
| Aspenwood | 269 | 267 | 99% | $850 | $865 | $850 | None | $850 | $865 | $850 |
| Belaire Manor | 320 | 307 | 96% | $640 | $640 | $640 | None | $640 | $640 | $640 |
| Bonaventure MHP | 281 | 281 | 100% | $650 | $650 | $650 | None | $650 | $650 | $650 |

| Phoenix, Arizona MSA JLT Market Report - January 2025 Ranked By Community Name | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| COMMUNITY | # OF HOME SITES | HOME SITES OCC* | % OCC | MONTHLY MARKET RENT | | | SERVICES* IN RENT | ADJUSTED MARKET RENT | | |
| | | | | LOW | HIGH | AVG** | | LOW | HIGH | AVG** |
| **All Ages Communities** | | | | | | | | | | |
| Aspenwood | 269 | 269 | 100% | $995 | $1,010 | $995 | None | $995 | $1,010 | $995 |
| Belaire Manor | 320 | 319 | 100% | $795 | $795 | $795 | None | $795 | $795 | $795 |
| Bonaventure MHP | 281 | 281 | 100% | $750 | $750 | $750 | None | $750 | $750 | $750 |

**Figure 10.**

~~108.~~112.     The reports also give each manufactured home community within an MSA its own page with specific data about that community. Information includes the name and contact information of the manufactured home community owner and information about the "last" and "next" lot rent increase, among other things. Figures 11 and 12 below show pages for two manufactured home communities in Hillsborough County, Florida ~~(Tampa-St. Petersburg-Clearwater, FL MSA).~~. The first, Kingswood Mobile Home Community, is owned by Defendant ELS, and the second, Fountainview Estates, is owned by Defendant Cal-Am.

46





**Figure 11.**

47

**Hillsborough County, Florida JLT Market Report**
**May 2022**



| Community Information | | Site Info | |
|---|---|---|---|
| **Fountainview Estates** | | Total Sites | 546 |
| 8800 Berkshire Lane | | Shareholder Sites | 0 |
| Tampa FL 33635 | | Leased Sites | 546 |
| 813-884-3407 | | Vacant Sites | 7 |
| cap813a@cal-am.com | | Physical Occupancy | 539 |
| | | Repossessions | 0 |
| 55+ Community | | Inventory Homes | 1 |
| Owned by Cal-Am Properties, Inc. | | Occupied Sites* | 538 |
| | | Occupied Percent | 99% |
| | | Rent Control | No |
| | | Single Section | 50% |
| | | Multiple Section | 50% |

| Customer Incentives | Notes |
|---|---|
| • A resident referral program is offered. | • The community unbundled trash removal service from the market rent in 2022. |
| | • Residents pay $45 for trash removal service. |
| | • Market Rent does not include an annual Tax pass thru of $743. |

| Market Rent Increases | Last | Next |
|---|---|---|
| Date | Oct 2021 | Jan 2023 |
| Amount | $70 | $60 |

| Community Amenities | | | |
|---|---|---|---|
| Beauty Shop | Billiards | Bocce | Card Room |
| Clubhouses - 2 | Computer Room | Exercise Room | Game Room |
| Gated Entrance | Grocery Store | Horseshoes | Jacuzzi |
| Laundry Room | Library | Neighborhood Watch | Night Security |
| Pets Allowed | RV Storage | Shuffleboard | Swimming Pools - 2 |
| Tennis | Video Library | Woodworking | |

| Service | Included In Rent | Value |
|---|---|---|
| Water | No | |
| Sewer | No | |
| Trash | No | |
| Cable | No | |
| Lawn | No | |

| Site Type | Market Rent | Adjusted Rent** |
|---|---|---|
| All Homesites | $755 | $755 |

*Rent Paying Resident Occupied Homesites    50    **The Adjusted Rent is the Current Rent less the value of the Included Services

---

**Hillsborough County, Florida JLT Market Report**
**May 2025**



| Community Information | | Site Info | |
|---|---|---|---|
| **Fountainview Estates** | | Full Buildout | 548 |
| 8800 Berkshire Lane | | Total Sites | 546 |
| Tampa FL 33635 | | Shareholder Sites | 0 |
| 813-884-3407 | | Leased Sites | 546 |
| cap813a@cal-am.com | | Vacant Sites | 1 |
| | | Physical Occupancy | 545 |
| 55+ Community | | Repossessions | 0 |
| Owned by Cal-Am Properties, Inc. | | Inventory Homes | 12 |
| | | Occupied Sites* | 533 |
| | | Occupied Percent | 98% |
| | | Rent Control | No |
| | | Single Section | 50% |
| | | Multiple Section | 50% |

| Customer Incentives | Notes |
|---|---|
| • Various incentives are offered throughout the year. | • Market Rent does not include an annual Tax pass thru of $789. |

| Market Rent Increases | Last | Next |
|---|---|---|
| Date | Jan 2025 | TBD |
| Amount | $85 | TBD |

| Community Amenities | | | |
|---|---|---|---|
| Beauty Shop | Billiards | Bocce | Card Room |
| Clubhouses - 2 | Computer Room | Exercise Room | Game Room |
| Gated Entrance | Grocery Store | Horseshoes | Jacuzzi |
| Laundry Room | Library | Neighborhood Watch | Night Security |
| Pets Allowed | RV Storage | Shuffleboard | Swimming Pools - 2 |
| Tennis | Video Library | Woodworking | |

| Service | Included In Rent | Value |
|---|---|---|
| Water | No | |
| Sewer | No | |
| Trash | No | |
| Cable | No | |
| Lawn | No | |

| Site Type | Market Rent | Adjusted Rent** |
|---|---|---|
| All Homesites | $1,002 | $1,002 |

*Rent Paying Resident Occupied Homesites    47    **The Adjusted Rent is the Current Rent less the value of the Included Services

**Figure 12.**

48

109.113.    As shown in Figure 11, the Hillsborough County JLT Market Report reveals that, from January 2022 to January 2023, Defendant ELS charged $662 per month in lot rent for all 229 manufactured home lots in Kingswood Mobile Home Community and $60 per month (combined) for garbage and sewer services. From January 2025 to January 2026, Defendant ELS charged $851 per month in lot rent. The page also shows that Kingswood Mobile Home Community had 100% of its sites occupied in both time periods. In addition, the page indicates that ELS planned a future $37 lot rent increase for January 2023.

110.114.    Figure 12 shows that, from October 2021 to January 2023, Defendant Cal-Am charged $755 per month in lot rent for all 546 manufactured home lots in Fountainview Estates and $45 for trash services. From January 2025 to January 2026, Defendant Cal-Am charged $1,002 per month in lot rent, with an annual "Tax pass thru" of $789. The page shows that Fountainview Estates had 99% of its sites occupied, with only seven vacant lots remaining and from January 2025 to January 2026 it had 98% of its sites occupied with only 13 vacant lots remaining. In addition, this page indicates that Cal-Am planned a future $60 lot rent increase for January 2023.

115.    The same information reporting occurs in recent JLT Market Reports outside of Hillsborough County. Figures 13 and 14 below show pages for two manufactured home communities in the Phoenix, Arizona JLT Market Report. The first, La Montana del Sur, is owned by Defendant Kingsley, and the second, San Estrella Estates, is owned by Defendant Cal-Am.

49

**Phoenix, Arizona MSA JLT Market Report**
**Phoenix Area January 2025**



| Community Information | | | |
|---|---|---|---|
| **La Montana del Sur** | | | |
| 8218 South 7th Street | | | |
| Phoenix AZ 85042 | | | |
| 602-276-3281 | | | |
| lamontana@kmcmh.com | | | |
| All Ages Community | | | |
| Owned by Kingsley Management Corp. | | | |

| Site Info | |
|---|---|
| Total Sites | 174 |
| Shareholder Sites | 0 |
| Leased Sites | 174 |
| Vacant Sites | 0 |
| Physical Occupancy | 174 |
| Repossessions | 0 |
| Inventory Homes | 0 |
| Occupied Sites* | 174 |
| Occupied Percent | 100% |
| Rent Control | No |
| Single Section | 58% |
| Multiple Section | 42% |

| Customer Incentives | Notes |
|---|---|
| • Various incentives are offered throughout the year. | • The community also has 48 rental homes ranging from $910 - $1,710. |

| Market Rent Increases | | |
|---|---|---|
| | Last | Next |
| Date | Apr 2024 | Apr 2025 |
| Amount | $49 | $49 |

| Community Amenities | | | |
|---|---|---|---|
| Basketball | Clubhouse | Gym | Playground |
| RV Storage | Swimming Pool | Zumba | |

| Service | Included In Rent | Value |
|---|---|---|
| Water | No | |
| Sewer | No | |
| Trash | No | |
| Cable | No | |
| Lawn | No | |

| Site Info | Market Rent | Adjusted Rent** |
|---|---|---|
| All Homesites | $735 | $735 |

### Figure 13.

**Phoenix, Arizona MSA JLT Market Report**
**Phoenix Area January 2025**



| Community Information | | | |
|---|---|---|---|
| **San Estrella Estates** | | | |
| 500 North 67th Ave | | | |
| Phoenix AZ 85043 | | | |
| 623-936-1488 | | | |
| cap803a@cal-am.com | | | |
| All Ages Community | | | |
| Owned by Cal-Am Properties, Inc. | | | |

| Site Info | |
|---|---|
| Total Sites | 305 |
| Shareholder Sites | 0 |
| Leased Sites | 305 |
| Vacant Sites | 5 |
| Physical Occupancy | 300 |
| Repossessions | 0 |
| Inventory Homes | 5 |
| Occupied Sites* | 295 |
| Occupied Percent | 97% |
| Rent Control | No |
| Single Section | 40% |
| Multiple Section | 60% |

| Customer Incentives | Notes |
|---|---|
| • Various incentives are offered throughout the year. | • One unusable site is not included in total sites. |

| Market Rent Increases | | |
|---|---|---|
| | Last | Next |
| Date | Feb 2024 | Feb 2025 |
| Amount | $62 | $51 |

| Community Amenities | | | |
|---|---|---|---|
| Billiards | Clubhouse | Game Room | Horseshoes |
| Jacuzzi | Laundry Room | RV Storage | Sauna |
| Shuffleboard | Swimming Pool | Tennis | |

| Service | Included In Rent | Value |
|---|---|---|
| Water | No | |
| Sewer | No | |
| Trash | No | |
| Cable | No | |
| Lawn | No | |

| Site Type | Market Rent | Adjusted Rent** |
|---|---|---|
| All Homesites | $907 | $907 |

**Figure 14.**

116.    As shown in Figure 13, the Phoenix, Arizona MSA JLT Market Report reveals that, from April 2024 to April 2025, Defendant Kinglsey charged $735 per month in lot rent for all 174 manufactured home lots in La Montana del Sur. The community also had rental homes available ranging from $910 - $1,710. The page also shows that La Montana del Sur had 100% of its sites occupied. In addition, the page indicates that Kingsley planned a future $49 lot rent increase for April 2025.

117.    Figure 14 shows that, from February 2024 to February 2025, Defendant Cal-Am charged $907 per month in lot rent for all 305 manufactured home lots in San Estrella Estates. The page shows that San Estrella Estates had 97% of its sites occupied, with only five vacant lots remaining. In addition, this page indicates that Cal-Am planned a future $51 lot rent increase for February 2025.

111.118.      As exemplified in Figures 11 and, 12, 13, and 14, the JLT Market Reports contain highly specific, non-aggregated information about manufactured home communities owned by the Manufactured Home Community Defendants and Unnamed Co-Conspirators. It also demonstrates that JLT Market Reports are not just based on a single Defendant's own data. Defendants used that competitive information to carry out their conspiracy to increase manufactured home lot rents.

112.119.      There are a few key factors that allowed the conspiracy to thrive. First, the data presented in the JLT Market Reports has no anonymization. Competing owners of manufactured home communities, including the Manufactured Home Community Defendants, can explicitly identify, among other things, what their direct competitors are *currently* charging for lot rent and utilities. Taking Figures 11 and 12 as examples, Defendants ELS and Cal-Am,

51

who are supposed to be competing in the market for manufactured home lot rentals, can learn an abundance of non-public, competitively sensitive information, including lot rent pricing information, about each other's properties by reading the Hillsborough County JLT Market Report. They can then use that information to coordinate and calculate price increases on manufactured home lot rents—knowing that they are each using the reports as customers of Datacomp.

113.120.    Next, the JLT Market Reports allow competing manufactured home community operators to see occupancy rates for the manufactured home communities in an MSA. This information is critical because it allows operators, including the Manufactured Home Community Defendants, to see whether residents living in their communities have nearby alternative communities to which they could move if their rents increased.

114.121.    Finally, through the JLT Market Reports, the Manufactured Home Community Defendants, and competing manufactured home community operators, exchange information with each other about the timing and amount of *future* rent increases. For instance, as shown in Figures 11 and 12, ELS and Cal-Am were able to communicate to each other, through the May 2022 Hillsborough County JLT Market Report, that they were both planning to raise rents in January 2023; ELS planned to raise rent by $37 and Cal-Am planned to raise rent by $60. In JLT Market Reports published between September 2022 and August 2023, over 90% of the reports contain at least one instance of a future price increase, either the date of the future increase or the date and the amount of the future increase. In addition, more than 25% of the 4,000+ manufactured home communities surveyed by Datacomp in thethese reports provided either the amount of their next (future) rent increase, the month the next (future) price increase

52

would be implemented, or, in many cases, *both*. Such information about future increases allows Defendants to coordinate manufactured home lot rent hikes.

~~115.~~122.     In sum, the JLT Market Reports provided the Manufactured Home Community Defendants with non-public, competitively sensitive information—information that the Manufactured Home Community Defendants would never have in a competitive market—and were the essential component of the conspiracy to artificially inflate manufactured home lot rents.

### c.   Datacomp Offers Real-Time Information Market Reports

~~116.~~123.     Datacomp also provides "live updates and electronic status reports" to its clients, as well as "real-time information on the web, phone calls or any combination that serves you best":



**Flexibility**

Datacomp understands that each client has unique needs. We have no set "way to do things"; we customize our processes to best serve your needs. With a simple tech request, we provide live updates and electronic status reports, real-time information on the web, phone calls, or any combination that serves you best. We conform to your program.

**Figure ~~13.~~15.**

117.124.    In addition, Datacomp provides the most "accurate and comprehensive

manufactured housing market data" to provide "unique custom data projects" that are used to

make "informed, strategic business decisions":

**The Industry's Most Accurate & Comprehensive Manufactured
Housing Market Data**

From unique custom data projects to the heralded annual and historical JLT Market Reports, Datacomp provides the precise
manufactured housing data and intelligence that industry professionals rely on to make informed, strategic business
decisions.

**Figure 14.16.**

d.    **Defendants Agree to Exchange Non-Public Competitively
Sensitive Information through the JLT Market Reports
and Artificially Increase Manufactured Home Lot Prices**

118.125.    Through Datacomp's JLT Market Reports, each Manufactured Home

Community Defendant knew that the other Manufactured Home Community Defendants as well

as Unnamed Co-Conspirators would exchange non-public, competitively sensitive information

about the manufactured home communities they owned. Knowing that their competitors would

share such information reciprocally, Defendants were certain that their conspiracy would be

effective.

119.126.    Datacomp publicly advertises that its client list "includes the 'top 10'

largest community owners, regional property management companies, developers, lenders,

appraisers, homeowner associations and real estate brokers nationwide." Datacomp's website

includes a list of clients who purchase and use Datacomp's JLT Market Reports. By publishing

this list on its website, Datacomp communicated to the Manufactured Home Community

Defendants who else was purchasing the reports, thus giving additional assurances to each

Defendant that its competitors were also part of the conspiracy. The client list, provided below as

Figure 15, includes all the Manufactured Home Community Defendants as well as several other

Unnamed Co-Conspirators.

54



**Figure ~~15.~~17.**

~~120.~~127.　　Manufactured home community owners, including certain Manufactured Home Community Defendants, have admitted that they use Datacomp's JLT Market Reports when making decisions about manufactured home lot rent price increases and new manufactured home community acquisitions.

~~121.~~128.　　For instance, Ross Partrich, CEO of Defendant RHP, said, "We find the JLT Market Reports to be an excellent guide when analyzing local market conditions for acquisitions, as well as extremely helpful for rent increases across our portfolio throughout the country."

55

122.129.    Jon Colman, Executive Vice President of Defendant Sun Communities, said, "We use the surveys to gain insight into markets when analyzing an acquisition opportunity."

123.130.    Cory Sukert, President/CEO of Defendant Cal-Am, said, "The surveys provide a comprehensive analysis of competing communities in those markets in which we operate. The information is a valuable part of our marketing efforts nationwide. The management reports, including the comparative report, provide a quick determination of relevant market conditions."

124.131.    Nate Nelson, CFO of Kingsley, emphasized the fact that the information in the JLT Market Reports is current: "The surveys make our business decisions more accurate and timely. The reports are independent, unbiased and very comprehensive and provide accurate and timely information. The information helps us determine how our communities compare to the competition."

125.132.    David Lentz of Green Courte Partners, LLC, a private equity firm that previously owned a portfolio of nearly 60 manufactured home communities in several states prior to selling that portfolio to Defendant Sun Communities in 2015, similarly said, "We use the surveys to analyze markets nationwide and to support our due diligence reviews of potential acquisitions. The surveys provide accurate and timely information about market conditions including occupancy levels and rent rates and helps us determine where a given property is positioned in the market."

126.133.    By exchanging non-public, competitively sensitive information through the JLT Market Reports, Defendants have been able to artificially increase the price of rent for manufactured home lots throughout the United States.

56

**2.   Manufactured Home Community Defendants Engaged in Regular Direct Communications Involving Rental Lot Pricing**

134.    During the Relevant Time Period, the Manufactured Home Community Defendants and their agents directly communicated with each other within the same local market to obtain and exchange competitively sensitive information about lot rent pricing. These communications occurred regularly, including in advance of annual rent-increase cycles, and would include the exchange of current rent levels and occupancy rate information.

135.    By reducing uncertainty about rivals' pricing, these communications facilitated parallel rent price increases that would have been less likely under competitive conditions.

136.    Communications occurred in multiple markets, and within the Regional Markets (defined below).

137.    The Manufactured Home Community Defendants relied on these communications to calibrate and implement rent increases that track or match competitors' pricing rather than competing on price.

138.    Plaintiffs' allegations of direct communication between Defendants and/or their Unnamed co-conspirators are derived through cooperation from a settling defendant.

**2.3.Defendants' Systematic Exchange of Competitively Sensitive Information via the JLT Market Reports Violates Section 1 of the Sherman Act**

127.139.    Defendants' information exchange amounts to an unlawful agreement in violation of Section 1 of the Sherman Act and violates the information exchange safety zone promulgated by the Federal Trade Commission ("FTC") and the U.S. Department of Justice ("DOJ").

128.140.    In 1996, FTC and DOJ published "Statements of Antitrust Enforcement Policy in Health Care" (the "1996 Policy"). The 1996 Policy gave guidance to the health care

industry on various antitrust issues, including information sharing, and this has since been applied to industries outside of healthcare. Among other things, the 1996 Policy provided an "antitrust safety zone" for information exchanges. According to the 1996 Policy, an information exchange that fell within the safety zone was unlikely to raise antitrust concerns and would unlikely be challenged by the agencies.

129.141.    To qualify for the safety zone, the information exchange must meet *all* of the following requirements:

      i.    The information exchange is managed by a third-party, like a trade association or government agency;

      ii.    the information provided by participants is relatively old (e.g. more than three months old); ***and***

      iii.    the information is aggregated to protect the identity of the underlying sources, and enough sources are aggregated to prevent competitors from linking particular data to an individual source.

130.142.    The agencies published this policy "to ensure that an exchange of price or cost data is not used by competing providers for discussion or coordination of provider prices or costs." It was important to the agencies that "providers [were] aware of the potential antitrust consequences of information exchanges among competitors." The agencies explained that these conditions were carefully crafted to balance a competitor's individual interests in obtaining useful information "against the risk that the exchange of such information may permit [competitors] to communicate with each other regarding a mutually acceptable level of prices."

131.143.    Since 1996, the agencies have used this safety zone as a general guideline for the legality of information exchanges in other industries. For instance, FTC issued general

58

guidance in 2014 that referred to the safety zone requirements as necessary criteria for a legal

data exchange. In that guidance, FTC confirmed that when "competing companies seek market

intelligence by exchanging price or other commercially sensitive information, that may facilitate

collusion . . . in violation of the antitrust laws."

132.144.    Accordingly, the safety zone requirements are a useful test for assessing

the legality of the information exchange described in this complaint. The safety zone

requirements are not met here.

133.145.    ***First***, the information exchange is not operated by a neutral third party.

Defendant Datacomp operates the exchange of information through its JLT Market Reports. As

described above, Datacomp was purchased by Defendant ELS for $43 million in 2021. ELS,

which is one of the largest manufactured home community operators in the United States, is not

a third-party because it competes with other owners of manufactured home communities for

manufactured home lot renters. Even before ELS purchased Datacomp, Datacomp was not a

neutral third party. Unlike a trade association or a government agency that may collect

information as a service to an industry, upon information and belief, Datacomp's business model

relied on owners of manufactured home communities, such as the Manufactured Home

Community Defendants, to provide it with competitively sensitive information that it could sell

back to the owners for a profit. Datacomp therefore had a vested interest with an expectation of

financial gain as it stood to profit from the illegal information exchange. Additionally,

information is exchanged *directly* from competitor-to-competitor.

134.146.    ***Second,*** the information published in the JLT Market Reportsexchanged is

not old. To the contrary, at the time a reportJLT Market Report is published, the rent information

is current (*i.e.*, the rent published in the report is the rent that residents are actually paying at that

time). In some cases, the JLT Market Reports even include *forward-looking* information, such as the timing and amount of future rent increases. Indeed, as the quotes from Defendants' executives above demonstrated, Defendants recognized and valued the timeliness of the information provided in the reports. When competitors communicated directly, they exchanged information about current rent levels.

135.147. **Third, and most significantly,** the data contained in the JLT Market Reports has no anonymization and is disaggregated. Competitors can explicitly identify the rent prices that their rivals—by name—are currently charging in their manufactured home communities and, in some cases, see when and to what level competitors will increase lot rent in the future. Additionally, competitors can identify exactly how many manufactured home lots there are in a competitor's community, the occupancy level of those lots, and whether their competitors are including services with lot rent.

136.148. Thus, Defendants' exchange of information via the JLT Market Reports fails to meet *any* of the safety zone requirements and constitutes an illegal data exchange.

137.149. DOJ recently has demonstrated a renewed focus on anticompetitive information sharing. On February 3, 2023, DOJ withdrew three antitrust policy statements, including the 1996 Policy discussed above. Critically, when announcing the withdrawal, DOJ said that "the statements *are overly permissive on certain subjects, such as information sharing,* and no longer serve their intended purposes of providing encompassing guidance to the public on relevant healthcare competition issues in today's environment." Thus, Defendants' information sharing practice violates a government policy that the DOJ deemed "too permissive," demonstrating the particularly egregious nature of the conduct being challenged here.

138.150.     The withdrawal of the policy statements was preceded by remarks made by principal Deputy Assistant Attorney General Doha Mekki on February 2, 2023, in which she said that "throughout its enforcement and policy work, the DOJ has had 'serious concerns' about whether the factors set out in the safety zones are appropriate for the industry as it exists today." Mekki noted that "[e]xchanges facilitated by [third-party] intermediaries can have the same anticompetitive effect as direct exchange among competitors." Additionally, she said that "the suggestion that data that's at least three months old is unlikely to be competitively sensitive or valuable is underpinned by the rise of pricing algorithms that can increase the competitive value of historical data."

139.151.     Following the withdrawal of the policy statements, at a conference in March 2023, Deputy Assistant Attorney General Michael Kades commented on DOJ's new position related to information sharing. Responding to questions on what proper information sharing looks like without safe harbors, Kades said that "top-of-mind questions should be what information is being shared, how it is being used, and what the impacts are of that sharing. Any time information sharing appears to be suppressing price competition or eliminating other forms of competition, 'that should send red sirens off.'"

152.     Expanding further, at the 2024 American Bar Association Antitrust Spring Meeting, DOJ antitrust division attorney Kathleen Kiernan stated that "information may be a couple of years old" and still run afoul of antitrust laws forbidding anticompetitive information exchanges. She emphasized that "DOJ looks at the nature of information exchanged and the age of the information . . . there's not a one-size-fits-all approach to ensuring information exchanges have 'absolutely no concern' for antitrust enforcers."

61

153.    Later in 2024, DOJ filed a Statement of Interest in *In re Pork Antitrust Litigation*, 18-cv-01776 (D. Minn.), where it reiterated its stance against anticompetitive information exchanges. In the Statement, DOJ stated that it filed the Statement to make clear that "(1) information sharing alone can violate Section 1, even without proof of an agreement to fix prices; and (2) information exchanges that report only aggregated data can violate the antitrust laws, even where the information is not linked to specific competitors."[2]

154.    DOJ's position has not changed during the current Administration. In March 2025, Ryan Tansey, the section chief of the DOJ antitrust division's Washington Criminal Section, said at a conference "If I make no other point today, I just want to be very clear that that is not correct. . . Characterizing conduct as an information exchange shouldn't be thought of as a way to insulate businesses from criminal antitrust scrutiny."[3]

155.    That same month, DOJ submitted a Statement of Interest in *In re Multiplan Health Insurance Provider Litigation*, 1:24-cv-06795 (N.D. Ill.), in which it stated that "[c]oncerted action is conduct that joins together separate decisionmakers and thus deprives the marketplace of independent centers of decisionmaking. . . . Such joint action can take a variety of forms, from a written contract, to a trust agreement, to a secret conspiracy, ***to the joint delegation of decisionmaking power to a common agent***."[4] (emphasis added; internal quotations and citations omitted).

~~140.~~156.        Here, Defendants' information exchange existed for the purpose of increasing manufactured home lot rents above competitive levels and aiding manufactured home

---

[2] *In Re Pork Antitrust Litigation*, 18-cv-01776 (D. Minn.), Dkt. 2616.
[3] Chris May, "Outsourced pricing doesn't 'skirt' antitrust liability, US DOJ official says," mLex (March 11, 2025), *available at* https://content.mlex.com/#/content/1637762/outsourced-pricing-doesn-t-skirt-antitrust-liability-us-doj-official-says?referrer=portfolio_openrelatedcontent.
[4] *In re Multiplan Health Insurance Provider Litigation*, 1:24-cv-06795 (N.D. Ill.), ECF No. 382.

community owners in consolidating market power. Accordingly, Defendants' information exchange violates Section 1 of the Sherman Act. DOJ's withdrawal of the 1996 Policy and the comments made by Mekki, Kades, and ~~Kades~~Tansey exemplify DOJ's current position that information exchanges can be anticompetitive regardless of their exact form.

### ~~3.~~4. Preliminary Pricing Analysis by Consulting Economic ~~Analysis~~Experts Supports the Existence of a Cartel

~~141.~~157.      Economic data supports the existence of the conspiracy described in this complaint. Specifically, experts retained by Plaintiffs have analyzed U.S. Census data on manufactured home lot rental prices, and that analysis reveals that manufactured home rental lot prices increased significantly beginning around 2017-2019 and that these price increases diverge from comparable single-family rental property prices.

~~142.~~158.      Plaintiffs' analysis uses the Public Use Microdata Sample from the American Community Survey ("ACS"), which is an annual supplementary survey to the decennial Census that covers a wide range of topics. The ACS surveys, among other things, the cost of ownership for a manufactured home, which primarily includes "land or site rent," as well as fees imposed on manufactured ~~home owners~~homeowners, such as registration fees and license fees. This cost of ownership figure is termed "manufactured home lot rents" in the graphs below. Figure ~~16~~18 below shows that, at a national level, the cost of manufactured home lot rents experienced a sharp increase beginning in 2019.



**Figure ~~16:~~18: Average Monthly Manufactured Home Lot Rents in the U.S.**

~~143.~~159.    Figure ~~16~~18 above shows that the average monthly manufactured home lot rent jumped from $203 in 2019 to $257 in 2021, a 27% increase. This significant jump in prices is at odds with the long-run trend of manufactured home lot rents. Manufactured home lot rental prices steadily increased by approximately 2.3% per year between 2010 and 2018, approximately in line with the average annual inflation (CPI) of 1.8% during this period. However, consistent with Plaintiffs' conspiracy allegations, manufactured home lot rental prices have significantly increased at a rate of 9.1% per year between 2019 and 2021, while inflation was only 3%.

~~144.~~160.    Defendants have publicly touted their ability to raise manufactured home lot rents above the rate of inflation. In a September 2023 Investor Presentation, Sun Communities shared its "consistent, annual rental rate increases that exceeded expected inflationary cost pressures." On October 26, 2023, during Sun ~~Communities's~~Communities' Q3

64

2023 Earnings Conference Call, CEO, President, and Chairman Gary Shiffman explained that "[l]ooking ahead to 2024, *we expect rental rate growth in our same-property portfolio to exceed inflation*" (emphasis added). Similarly, ELS's 2022 10-K explained that "[s]ubstantially all of the leases at our MH communities allow for monthly or annual rent increases which provide us with the ability to increase rent, where justified by the market. Such types of leases generally minimize our risks of inflation."

145.161.    Manufactured home lot rents increased above the rental prices for similar housing. The next most comparable rental market for manufactured home lots is the rental market for detached single family homes, because both rental properties must be large enough to support a detached home (as opposed to townhome or rowhouse) and are typically found in more suburban and rural areas. Figure 17 compares the rise in manufactured home lot rental prices to the prices of detached single-family homes. Using comparable rental price data from the ACS, Figure 17 shows the percentage increase in price experienced by both types of rentals from a 2010 baseline level.

65



**Figure ~~17~~19: Percent Increase in U.S. Rent from 2010.**

~~146.~~162.        Figure ~~17~~19 demonstrates that rental prices of manufactured home lots and single-family detached homes followed the same trend from 2010 through 2019 but that starting in 2019 manufactured home lot rental prices spiked with no comparable increase in the rents of detached single-family homes. For example, while rental prices for manufactured home lots and detached single family housing were approximately 22% higher in 2019 than their 2010 baseline, by 2020 manufactured home lot rentals had increased by 45% over its 2010 levels while detached manufactured homes only grew by 27% over its 2010 levels. In other words, something caused the rent of manufactured home lots to rise sharply in 2019 and 2020 that did *not* affect the rent of similarly situated detached single-family homes. That something was Defendants' unlawful agreement to raise manufactured home lot rent facilitated by the exchange of information through the JLT Market Reports.

66

147.163.    The increase in manufactured home lot rental prices persists at the subnational level. Plaintiffs analyzed three of the largest Metropolitan Statistical Areas ("MSAs") by manufactured home site count covered by the ACS, all of which are also covered by Datacomp reports: (1) Tampa-St. Petersburg-Clearwater (Florida) MSA; (2) Riverside-San Bernardino-Ontario (California) MSA; and (3) Phoenix-Mesa-Scottsdale (Arizona) MSA. Figures 18-20-22 below compare the rent of manufactured home lots at each of the MSAs over time, juxtaposed to the rent for comparable single-family detached homes. In each case, the figures show that manufactured home lot rents in these MSAs increased significantly relative to their 2010 levels starting in 2018-2019. While detached single-family homes rental prices also increased as a percentage of their 2010 levels during this period, they did not rise as quickly or as steeply as rental prices for manufactured home lots.



**Figure ~~18~~20: Percent Increase in Monthly Rent from 2010 Levels Tampa-St. Petersburg-Clearwater, FL MSA**



**Figure ~~19:~~21: Percent Increase in Monthly Rent from 2010 Values Riverside-San Bernardino-Ontario, CA MSA**



**Figure ~~20:~~22: Percent Increase in Monthly Rent from 2010 Values Phoenix-Mesa-Scottsdale, AZ MSA**

~~148.~~164.    Most of the Manufactured Home Community Defendants own manufactured home communities in one or more of these MSAs. Below is a list of manufactured home communities owned by Manufactured Home Community Defendants in each of these MSAs, per the 2022-2023 Datacomp JLT Market Reports:

    i.    **Tampa-St. Petersburg-Clearwater, FL MSA:**

        a)  **ELS:** (1) Carefree Village; (2) Featherock; (3) Kingswood Mobile Home Community; (4) Silver Dollar Resort; (5) The Lakes at Countrywood; (6) The Meadows and Arbors at Countrywood; and (7) The Oaks at Countrywood.

        b)  **Hometown America:** (1) Little Manatee Springs.

      c) **Sun Communities:** (1) Lakeshore Villas; (2) Meadowbrook Village; (3) Riverside Club; and (4) Spanish Main MH & RV Resort.

      d) **RHP:** (1) Chalet Village.

      e) **Inspire Communities:** (1) Rose Lake Estates.

      f) **Cal-Am:** (1) Fountainview Estates; and (2) the Village of Tampa.

ii.    **Riverside-San Bernardino-Ontario, CA MSA:**

      a) **ELS:** (1) Las Palmas Estates; (2) Los Ranchos; (3) Parque La Quinta; (4) Royal Holiday; and (5) Date Palm Country Club.

      b) **Hometown America:** (1) Arrowhead Estates; (2) Grand Royal Estates; (3) Green River; (4) Jurupa Hills Cascade; and (5) The Colony.

      c) **Sun Communities:** (1) Alta Laguna; (2) Lakeview Mobile Estates; (3) Pembroke Downs; (4) Victor Villa; (5) Bel Air Mobile Estates; (6) Caliente Sands; (7) Heritage; (8) Rancho Caballero; (9) Royal Palms; and (10) Sunrise Estates.

      d) **Inspire Communities:** (1) Hillside Mobile Home Estates; (2) Old Plantation MHP; and (3) Tramview Mobile Park.

      e) **Cal-Am:** (1) Colonial Country Club; and (2) Mountain View Mobile Home Park.

      f) **Kingsley:** (1) Country Meadows.

71

iii. **Phoenix-Mesa-Scottsdale, AZ MSA:**

    a) **ELS:** (1) Apache East; (2) Denali Park; (3) Dolce Via at Superstition Mountain; (4) Sunshine Valley; (5) Palm Shadows; (6) Hacienda De Valencia; (7) Seyenna Vistas; (8) The Highlands at Brentwood; (9) Viewpoint Golf Resort; (10) Apollo Village; (11) Casa Del Sol Resort East; (12) Casa Del Sol Resort West; (13) Carefree Manor; (14) Central Park; (15) Desert Skies; (16) Sunrise Heights; (17) Whispering Palms; and (18) The Meadows.

    b) **Hometown America:** (1) Crescent Run.

    c) **Sun Communities:** (1) Desert Harbor; (2) Le Casa Blanca; (3) Lost Dutchman; (4) Rancho Mirage; (5) Sun Valley; (6) Brentwood West; and (7) Mountain View.

    d) **RHP:** (1) Holiday Village.

    e) **Kingsley:** (1) Quail Run; (2) Brentwood Southern Mobile Home Park; (3) Cielo Grande; (4) Fountain East; (5) Sunny Crest; (6) Casa De Francisco; (7) Friendly Village of Orangewood; and (8) La Montana Del Sur.

    f) **Cal-Am:** (1) Montesa at Gold Canyon; (2) Glendale Cascade; (3) Holiday Palms Community; (4) Pueblo Grande; (5); Sierra Estates; (6) Silver Spur Village; (7) San Estrella Estates; and (8) Chaparral Village.

72

149.165.    During the Relevant Time Period, the Manufactured Home Community

Defendants increased rents in their manufactured home communities in each of these MSAs.

These parallel price increases can be seen in the 2022-2023 Datacomp JLT Market Reports.

Although the amount of the changes in lot rents are not identical, the data provided in the JLT

Market Reports demonstrates that rents did increase in each of the MSAs, as shown in the

following tables:

**Figure 21.23: Rent Changes in Tampa-St. Petersburg-Clearwater (Hillsborough County), FL MSA**

| PARK OWNER/ MANAGER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT May-22 | AVERAGE ADJUSTED RENT May-21 | % INCREASE |
|---|---|---|---|---|
| ELS | Carefree Village | $603 | $571 | 5.6% |
| RHP | Chalet Village | $518 | $507 | 2.2% |
| ELS | Featherock | $656 | $625 | 5.0% |
| Cal-Am | Fountainview Estates | $755 | $654 | 15.4% |
| ELS | Kingswood Mobile Home Community | $662 | $610 | 8.5% |
| Sun Communities | Lakeshore Villas | $616 | $599 | 2.8% |
| Hometown America | Little Manatee Springs | $545 | $503 | 8.3% |
| Sun Communities | Meadowbrook Village | $565 | $541 | 4.4% |
| Sun Communities | Riverside Club | $909 | $887 | 2.5% |
| Inspire Communities | Rose Lake Estates | $520 | $520 | 0.0%<br><br>**Note:** Last market rent increase was April 2021 ($30) |

| PARK OWNER/ MANAGER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT May-22 | AVERAGE ADJUSTED RENT May-21 | % INCREASE |
|---|---|---|---|---|
| ELS | Silver Dollar Resort | $826 | $781 | 5.8% |
| Sun Communities | Spanish Main MH & RV Resort | $479 | $468 | 2.3% |
| ELS | The Lakes at Countrywood | $648 | $614 | 5.5% |
| ELS | The Meadows and Arbors at Countrywood | $621 | $588 | 5.6% |
| ELS | The Oaks at Countrywood | $667 | $632 | 5.5% |
| Cal-Am | Village of Tampa | $737 | $666 | 10.7% |

**Figure ~~22:~~24: Rent Changes in Riverside and San Bernardino Counties, CA MSAs**

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT Aug-22 | AVERAGE ADJUSTED RENT Aug-21 | % INCREASE |
|---|---|---|---|---|
| Sun Communities | Alta Laguna | $1,190 | $1,137 | 4.7% |
| Hometown America | Arrowhead Estates | $854 | $825 | 3.5% |
| Sun Communities | Bel Air Mobile Estates | $506 | $506 | 0.0% |
| Sun Communities | Caliente Sands | $649 | $614 | 5.8% |
| Cal-Am | Colonial Country Club | $869 | $825 | 5.3% |
| Kingsley | Country Meadows | $1,248 | $1,248 | 0.0%<br><br>**Note:** Last controlled rent increase was July 2021 (4%) |
| ELS | Date Palm Country Club | $1,150 | $1,095 | 5.0% |

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT Aug-22 | AVERAGE ADJUSTED RENT Aug-21 | % INCREASE |
|---|---|---|---|---|
| Hometown America | Green River | $1,459 | $1,350 | 8.1% |
| Sun Communities | Heritage | $875 | $850 | 2.9% |
| Inspire Communities | Hillside Mobile Home Estates | $610 | $568 | 7.4% |
| Hometown America | Jurupa Hills Cascade | $1,000 | $897 | 11.5% |
| Sun Communities | Lakeview Mobile Estates | $464 | $467 | -0.6% |
| ELS | Las Palmas Estates | $653 | $636 | 2.7% |
| ELS | Los Ranchos | $714 | $677 | 5.5% |
| Cal-Am | Mountain View Mobile Home Park | $521 | $521 | 0.0%<br><br>**Note:** Last controlled rent increase was July 2021 (3%) |
| Inspire Communities | Old Plantation MHP | $976 | $864 | 12.9% |
| ELS | Parque La Quinta | $738 | $720 | 2.5% |
| Sun Communities | Pembroke Downs | $650 | $642 | 1.2% |
| Sun Communities | Rancho Caballero | $879 | $837 | 5.0% |
| ELS | Royal Holiday | $625 | $610 | 2.5% |
| Sun Communities | Royal Palms | $672 | $627 | 7.2% |
| Sun Communities | Sunrise Estates | $706 | $675 | 4.6% |
| Hometown America | The Colony | $770 | $722 | 6.6% |
| Inspire Communities | Tramview Mobile Park | $650 | $630 | 3.2% |

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT Aug-22 | AVERAGE ADJUSTED RENT Aug-21 | % INCREASE |
|---|---|---|---|---|
| Sun Communities | Victor Villa | $630 | $630 | 0.0%<br><br>**Note:** Last market rent increase was Aug. 2018 ($0-$5) |

**Figure ~~23:~~25: Rent Changes in Phoenix-Mesa-Scottsdale, AZ MSA**

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT JAN-23 | AVERAGE ADJUSTED RENT JAN-22 | % INCREASE |
|---|---|---|---|---|
| ELS | Apache East | $690 | $626 | 10.2% |
| ELS | Apollo Village | $768 | $697 | 10.2% |
| Kingsley | Brentwood Southern Mobile Home Park | $810 | $737 | 9.9% |
| Sun Communities | Brentwood West | $833 | $784 | 6.3% |
| ELS | Carefree Manor | $769 | $711 | 8.2% |
| Kingsley | Casa De Francisco | $650 | $601 | 8.2% |
| ELS | Casa Del Sol Resort East - Glendale | $877 | $796 | 10.2% |
| ELS | Casa Del Sol Resort West Peoria | $799 | $783 | 2.0% |

76

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT JAN-23 | AVERAGE ADJUSTED RENT JAN-22 | % INCREASE |
|---|---|---|---|---|
| ELS | Central Park | $950 | $846 | 12.3% |
| Cal-Am | Chaparral Village | $809 | $715 | 13.1% |
| Kingsley | Cielo Grande | $703 | $663 | 6.0% |
| Hometown America | Crescent Run | $712 | $712 | 0%<br><br>**Note:** Last market rent increase was Nov. 2022 ($97) |
| ELS | Denali Park | $538 | $494 | 8.9% |
| Sun Communities | Desert Harbor | $778 | $730 | 6.6% |
| ELS | Desert Skies | $748 | $733 | 2.0% |
| ELS | Dolce Vita At Superstition Mountain | $806 | $790 | 2.0% |
| Kingsley | Fountain East | $714 | $676 | 5.6% |
| Kingsley | Friendly Village of Orangewood | $778 | $741 | 5.0% |
| Cal-Am | Glendale Cascade | $773 | $687 | 12.5% |
| ELS | Hacienda De Valencia | $787 | $767 | 2.6% |

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT JAN-23 | AVERAGE ADJUSTED RENT JAN-22 | % INCREASE |
|---|---|---|---|---|
| Cal-Am | Holiday Palms Community | $766 | $685 | 11.8% |
| RHP | Holiday Village | $557 | $539 | 3.3% |
| Sun Communities | La Casa Blanca | $749 | $710 | 5.5% |
| Kingsley | La Montana Del Sur | $626 | $577 | 8.5% |
| Sun Communities | Lost Dutchman | $685 | $631 | 8.6% |
| Cal-Am | Montesa at Gold Canyon | $913 | $824 | 10.8% |
| Sun Communities | Mountain View | $761 | $711 | 7.0% |
| ELS | Palm Shadows | $683 | $637 | 7.2% |
| Cal-Am | Pueblo Grande | $682 | $594 | 14.8% |
| Kingsley | Quail Run | $731 | $647 | 13.0% |
| Sun Communities | Rancho Mirage | $794 | $745 | 6.6% |
| Cal-Am | San Estrella Estates | $749 | $749 | 0.0% |

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT JAN-23 | AVERAGE ADJUSTED RENT JAN-22 | % INCREASE |
|---|---|---|---|---|
| ELS | Seyenna Vistas | $698 | $683 | 2.2% |
| Cal-Am | Sierra Estates | $717 | $648 | 10.6% |
| Cal-Am | Silver Spur Village | $762 | $702 | 8.5% |
| Sun Communities | Sun Valley | $669 | $620 | 7.9% |
| Kingsley | Sunny Crest | $646 | $606 | 6.6% |
| ELS | Sunrise Heights | $913 | $813 | 12.3% |
| ELS | Sunshine Valley | $802 | $713 | 12.5% |
| ELS | The Highlands at Brentwood | $976 | $877 | 11.3% |
| ELS | The Meadows | $936 | $849 | 10.2% |
| ELS | Viewpoint Golf Resort | $678 | $629` | 7.8% |
| ELS | Whispering Palms | $679 | $665 | 2.1% |

79

150.167. Additionally, the Manufactured Home Community Defendants increased rents in the manufactured home communities where the Plaintiffs reside, as well as in the surrounding communities.

151.167. Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home Community Defendants made the following changes to lot rents in the manufactured home communities in the area covered by the San Antonio, TX MSA JLT Report, the MSAarea where Plaintiff Steven Brown resides:

**Figure 24:26: Rent Changes in San Antonio, TX MSA JLT Report**

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT Sep-22 | AVERAGE ADJUSTED RENT Sep-21 | % INCREASE |
|---|---|---|---|---|
| Sun Communities | Comal Farms | $613 | $584 | 5.0% |
| RHP | North Valley | $459 | $433 | 6.0% |
| Sun Communities | Stonebridge | $615 | $585 | 5.1% |
| Sun Communities | Summit Ridge | $623 | $593 | 5.1% |
| Kingsley | Westwood Estates | $543 | $513 | 5.8% |
| Sun Communities | Woodlake Trails | $634 | $594 | 6.7% |

152.168. Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home Community Defendants made the following changes to lot rents in the manufactured home communities in the area covered by the Duval-St. Johns CountyCounties, FL MSAJLT Report, the MSAarea where Plaintiff Todd Caldwell resides:

80

**Figure 25:27: Rent Changes in Duval-St. Johns CountyCounties, FL MSAJLT**

**Report**

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT Jan-23 | AVERAGE ADJUSTED RENT Jan-22 | % INCREASE |
|---|---|---|---|---|
| RHP | Connie Jean | $474 | $451 | 5.1% |
| Inspire Communities | Continental Village | $606 | $520 | 16.5% |
| ELS | Coquina Crossing | $1,062 | $926 | 14.7% |
| Inspire Communities | Country Roads | $522 | $507 | 3.0% |
| RHP | Countryside Village | $700 | $664 | 5.4% |
| RHP | Deerpointe | $552 | $514 | 7.4% |
| Inspire Communities | Jamestown Estates MHC | $482 | $442 | 9.0% |
| RHP | Magnolia Circle | $548 | $512 | 7.0% |
| RHP | Ortega Village | $535 | $499 | 7.2% |
| Inspire Communities | Paradise Village MHC | $530 | $485 | 9.3% |
| RHP | Portside East | $689 | $652 | 5.7% |
| RHP | Portside West | $728 | $688 | 5.8% |

153.169.    Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured

Home Community Defendants made the following changes to lot rents in the manufactured

home communities in the area covered by the Southern Colorado MSAJLT Report, the MSAarea

where Plaintiff Mary Galusha resides:

81

**Figure 26:28: Rent Changes in Southern Colorado MSAJLT Report**

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT Jul-23 | AVERAGE ADJUSTED RENT Jul-22 | % INCREASE |
|---|---|---|---|---|
| RHP | Canterbury | $603 | $567 | 6.3% |
| RHP | Canyon Ridge | $590 | $564 | 4.6% |
| RHP | Crestline Manor | $623 | $592 | 5.2% |
| ELS | Holiday Village | $1,004 | $894 | 12.3% |
| RHP | Lamplighter | $629 | $591 | 6.4% |
| RHP | Monument Creek | $634 | $600 | 5.7% |
| Sun Communities | North Point Estates | $599 | $562 | 6.6% |
| ELS | Pueblo Grande | $600 | $521 | 15.2% |

154.170.    Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home Community Defendants made the following changes to lot rents in the manufactured home communities in the area covered by the Chicago, IL MSA JLT, the MSAarea where Plaintiffs Carla Hajek and Ronald Kazmirzak reside:

**Figure 27:29: Rent Changes in Chicago, IL MSA JLT Report**

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT October-22 | AVERAGE ADJUSTED RENT May-21 | % INCREASE |
|---|---|---|---|---|
| Inspire Communities | Alpine Village | $667 | $630 | 5.9% |
| RHP | Country Club Woods | $718 | $675 | 6.4% |
| ELS | Golf Vista Estates | $875 | $841 | 4.0% |
| Sun Communities | Maple Brook | $883 | $834 | 5.9% |

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT October-22 | AVERAGE ADJUSTED RENT May-21 | % INCREASE |
|---|---|---|---|---|
| Inspire Communities | Paradis Park | $667 | $643 | 3.7% |
| ELS | Pheasant Lake Estates | $837 | $785 | 6.6% |
| RHP | River Oaks Mobile Estates | $626 | $585 | 7.0% |
| RHP | Sterling Estates | $959 | $941 | 1.9% |
| Inspire Communities | Weatherstone Lakes | $720 | $670 | 7.5% |
| RHP | Whippletree Village | $1,070 | $1,034 | 3.5% |
| Sun Communities | Wildwood Community | $646 | $617 | 4.7% |
| ELS | Willow Lake Estates | $927 | $890 | 4.2% |

155.171.    Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home Community Defendants made the following changes to lot rents in the manufactured home communities in the area covered by the Lee County, FL MSAJLT Report, the MSAarea where Plaintiff David Klein resides:

**Figure 28:30: Rent Changes in Lee County, FL MSAJLT Report**

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT May-23 | AVERAGE ADJUSTED RENT May-22 | % INCREASE |
|---|---|---|---|---|
| Murex | Bonita Terra | $919 | $841 | 9.3% |
| ELS | Buccaneer Estates | $866 | $827 | 4.7% |
| Hometown America | Del Tura Country Club | $1,203 | $1,106 | 8.8% |
| ELS | Island Vista Estates | $666 | $596 | 11.7% |
| ELS | Lake Fairways Country Club | $953 | $872 | 9.3% |

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT May-23 | AVERAGE ADJUSTED RENT May-22 | % INCREASE |
|---|---|---|---|---|
| ELS | Pine Lakes Country Club | $1,061 | $971 | 9.3% |
| ELS | Pioneer Village | $772 | $644 | 12.1% |
| Sun Communities | Serendipity | $665 | $627 | 6.1% |
| Hometown America | Southern Pines | $868 | $799 | 8.6% |
| Hometown America | Tara Woods | $854 | $783 | 9.1% |
| ELS | The Heritage | $940 | $842 | 11.6% |
| Murex | Tropicana Sands | $847 | $770 | 10.0% |
| ELS | Windmill Village | $672 | $629 | 6.8% |

156.172.    Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home Community Defendants made the following changes to lot rents in the manufactured home communities in the area covered by the Oakland County, MI MSAJLT Report, the MSAarea where Plaintiff Colleen Levins resided:

**Figure 29:31: Rent Changes in Oakland County, MI MSAJLT Report**

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT Feb-23 | AVERAGE ADJUSTED RENT Feb-22 | % INCREASE |
|---|---|---|---|---|
| Kingsley | Childs Lake Estates | $622 | $572 | 8.7% |
| RHP | College Heights | $494 | $474 | 4.2% |
| Sun Communities | Hawaiian Gardens/Holy Village | $563 | $537 | 4.8% |
| Sun Communities | Highland Greens Estates | $456 | $423 | 7.8% |
| Kingsley | Independence Woods | $631 | $582 | 8.4% |

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT Feb-23 | AVERAGE ADJUSTED RENT Feb-22 | % INCREASE |
|---|---|---|---|---|
| Kingsley | Lake Villa | $580 | $525 | 10.5% |
| Kingsley | Lake Villa-Haven Cove | $580 | $525 | 10.5% |
| Sun Communities | Meadow Lake | $727 | $679 | 7.1% |
| Kingsley | Oakland Estates | $637 | $588 | 8.3% |
| Sun Communities | Sheffield Estates | $731 | $683 | 7.0% |
| RHP | South Lyon Woods | $615 | $594 | 3.5% |
| RHP | The Woodlands | $471 | $445 | 5.8% |
| Sun Communities | Troy Villa | $488 | $489 | -0.2% |
| Sun Communities | White Lake | $685 | $657 | 4.3% |

157.173.      Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home Community Defendants made the following changes to lot rents in the manufactured home communities in the area covered by the Palm Beach County, FL MSAJLT Report, the MSAarea where Plaintiff Kevin McDonough resides:

**Figure 30: Rent Changes in Palm Beach County, FL MSAJLT Report**

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT May-23 | AVERAGE ADJUSTED RENT May-22 | % INCREASE |
|---|---|---|---|---|
| RHP | Colonial Estates | $817 | $785 | 4.1% |
| ELS | Lake Worth Village | $827 | $751 | 10.1% |
| RHP | Lantana Cascade | $807 | $776 | 4.0% |
| ELS | Maralago Cay | $1,083 | $992 | 9.2% |

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT May-23 | AVERAGE ADJUSTED RENT May-22 | % INCREASE |
|---|---|---|---|---|
| ELS | Palm Beach Colony | $865 | $786 | 10.1% |
| Cal-Am | Palm Beach Plantation | $1,082 | $999 | 8.3% |
| Cal-Am | Palm Breezes Club | $1,019 | $920 | 10.8% |
| ELS | Palm Lake Estates | $996 | $927 | 7.4% |
| Murex | Sea Meadow | $789 | $752 | 4.9% |
| Hometown America | Sunny South Estates | $971 | 903 | 7.5% |
| ELS | The Meadows | $1,076 | $979 | 9.9% |

158.174.    Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home Community Defendants made the following changes to lot rents in the manufactured home communities in the Palm Beach County area covered by the Orange-Seminole Counties, FL MSA JLT Report, the MSA area where Plaintiff Luis Melendez resides:

**Figure 31:33:** Rent Changes in Orange-Seminole County, FL MSA JLT Report

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT May-23 | AVERAGE ADJUSTED RENT May-22 | % INCREASE |
|---|---|---|---|---|
| ELS | Audubon Village | $598 | $548 | 9.2% |
| RHP | Carriage Court Central | $657 | $618 | 6.3% |
| RHP | Carriage Court East | $661 | $622 | 6.3% |
| Sun Communities | Carriage Cove | $559 | $526 | 6.3% |
| RHP | Chalet North | $690 | $650 | 6.2% |
| Sun Communities | Deerwood | $748 | $706 | 5.9% |

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT May-23 | AVERAGE ADJUSTED RENT May-22 | % INCREASE |
|---|---|---|---|---|
| Hometown America | Fairways Country Club | $772 | $697 | 10.8% |
| Sun Communities | Gulfstream Harbor | $742 | $669 | 6.2% |
| ELS | Hidden Valley | $800 | $714 | 12.0% |
| Sun Communities | Lakeshore Landings | $670 | $632 | 6.0% |
| Hometown America | Palm Valley | $878 | $717 | 22.5% |
| RHP | Shadow Hills | $737 | $694 | 6.2% |
| RHP | Silver Star | $599 | $584 | 2.6% |
| ELS | Starlight Ranch | $790 | $714 | 10.6% |
| Sun Communities | The Hills | $604 | $570 | 6.0% |
| Sun Communities | The Valley | $523 | $491 | 6.5% |
| RHP | Wheel Estates | $524 | $494 | 6.1% |

159.175.        Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home Community Defendants made the following changes to lot rents in the manufactured home communities in the area covered by the Las Vegas, NV MSA JLT Report, the MSAarea where Plaintiff Deborah Norvise residesresided during part of the Relevant Time Period:

**Figure 32:34: Rent Changes in Las Vegas, NV MSA JLT Report**

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT Jan-23 | AVERAGE ADJUSTED RENT Jan-22 | % INCREASE |
|---|---|---|---|---|
| ELS | Bonanza Village | $712 | $665 | 7.1% |
| ELS | Boulder Cascade | $708 | $687 | 3.1% |

87

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT Jan-23 | AVERAGE ADJUSTED RENT Jan-22 | % INCREASE |
|---|---|---|---|---|
| ELS | Cabana | $785 | $733 | 7.1% |
| Kingsley | Carefree Country MHC | $733 | $692 | 5.9% |
| ELS | Flamingo West | $847 | $814 | 4.1% |
| RHP | Millennium Estates | $813 | $775 | 4.9% |
| ELS | Mountain View Nevada | $848 | $815 | 4.0% |
| RHP | River Oaks | $695 | $669 | 3.9% |
| Lakeshore | Sunrise Gardens | $769 | $715 | 7.6% |
| RHP | Sunrise Oaks | $675 | $659 | 2.4% |
| RHP | Three Crowns | $801 | $774 | 3.5% |
| Cal-Am | Tropicana Palms Manufactured Home Community | $927 | $859 | 7.9% |
| RHP | Valley Vista | $693 | $674 | 2.8% |
| ELS | Villa Borega | $712 | $666 | 6.9% |

160.176.        Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home Community Defendants made the following changes to lot rents in the manufactured home communities in the area covered by the Pinellas County, FL MSAJLT Report, the MSAarea where Plaintiff Carol Rachelle Roach resides:

**Figure 33:35: Rent Changes in Pinellas County, FL MSAJLT Report**

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT May-23 | AVERAGE ADJUSTED RENT May-22 | % INCREASE |
|---|---|---|---|---|
| Murex | Bayside Waters | $778 | $702 | 10.8% |

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT May-23 | AVERAGE ADJUSTED RENT May-22 | % INCREASE |
|---|---|---|---|---|
| RHP | Boulevard Estates I | $500 | $479 | 4.4% |
| RHP | Boulevard Estates II | $553 | $531 | 4.1% |
| Murex | Caribbean Isles | $1,008 | $956 | 5.4% |
| Lakeshore | Crosswinds Mobile Home Park | $641 | $606 | 5.8% |
| ELS | Down Yonder Village | $782 | $725 | 7.9% |
| ELS | East Bay Oaks | $713 | $644 | 10.7% |
| ELS | Eldorado Village | $713 | $644 | 10.7% |
| ELS | Glen Ellen | $532 | $458 | 16.2% |
| Sun Communities | Grand Bay | $714 | $683 | 4.5% |
| ELS | Hillcrest | $710 | $642 | 10.6% |
| ELS | Holiday Ranch | $668 | $604 | 10.6% |
| Cal-Am | Island In The Sun | $1,031 | $951 | 8.4% |
| Inspire Communities | Lake Bon Bon Manufactured Home Community | $592 | $492 | 20.3% |
| ELS | Lake Haven | $822 | $730 | 12.6% |
| ELS | Paradise Park | $829 | $670 | 23.7% |
| Sun Communities | Park Royale | $710 | $667 | 6.4% |
| Sun Communities | Regency Heights | $621 | $597 | 4.0% |
| RHP | Satellite Bay | $435 | $427 | 1.9% |

89

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT May-23 | AVERAGE ADJUSTED RENT May-22 | % INCREASE |
|---|---|---|---|---|
| ELS | Serendipity Mobile Home Park | $771 | $682 | 13.0% |
| ELS | Shady Lane Oaks | $659 | $593 | 11.1% |
| ELS | Shady Lane Village | $687 | $617 | 11.3% |
| ELS | Shangri La | $549 | $539 | 1.9% |
| ELS | Silk Oak Lodge | $688 | $622 | 10.6% |
| Kingsley | Southwind MHC | $807 | $729 | 10.7% |
| ELS | Tarpon Glen | $548 | $551 | -0.5% |
| ELS | Whispering Pines Largo | $789 | $697 | 13.2% |

161.177.    Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home Community Defendants made the following changes to lot rents in the manufactured home communities in the area covered by the Denver-Aurora-Boulder, CO MSACSA JLT Report, the MSAarea where Plaintiff Barbara Rowley resides:

**Figure 34:36: Rent Changes in Denver-Aurora-Boulder, CO MSACSA JLT Report**

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT Jul-23 | AVERAGE ADJUSTED RENT Jul-22 | % INCREASE |
|---|---|---|---|---|
| Kingsley | Arbordale Acres | $1,009 | $920 | 9.7% |
| ELS | Bear Creek Village | $987 | $866 | 14.0% |

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT Jul-23 | AVERAGE ADJUSTED RENT Jul-22 | % INCREASE |
|---|---|---|---|---|
| Kingsley | Casa Estates | $1,024 | $935 | 9.5% |
| Ascentia | Cedar Village Mobile Home Park | $825 | $750 | 10% |
| ELS | Cimarron Village | $1,062 | $946 | 12.3% |
| RHP | Commerce Heights | $820 | $772 | 6.2% |
| RHP | Countryside Village Denver | $876 | $830 | 5.5% |
| RHP | Countryside Village Longmont | $888 | $832 | 6.7% |
| Sun Communities | Eagle Crest | $831 | $776 | 7.1% |
| Acentia | Foxridge Farm | $862 | $779 | 10.7% |
| Kingsley | Friendly Village of Aurora | $1,008 | $919 | 9.7% |
| Kingsley | Friendly Village Of The Rockies | $1,017 | $928 | 9.6% |
| Kingsley | Front Range | $1,023 | $934 | 9.5% |
| RHP | Garden Meadows | $960 | $908 | 5.7% |
| ELS | Golden Terrace | $1,119 | $997 | 12.2% |

91

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT Jul-23 | AVERAGE ADJUSTED RENT Jul-22 | % INCREASE |
|---|---|---|---|---|
| ELS | Golden Terrace South | $1,119 | $997 | 12.2% |
| ELS | Golden Terrace Village | $1,119 | $997 | 12.2% |
| RHP | Garden Meadows | $960 | $908 | 5.7% |
| RHP | Grand Meadow | $788 | $736 | 7.1% |
| ELS | Hillcrest Village | $1,024 | $906 | 13.0% |
| ELS | Holiday Hills Village | $1,077 | $959 | 12.3% |
| RHP | Inspiration Valley | $942 | $892 | 5.6% |
| Kingsley | Kimberly Hills | $1,013 | $924 | 9.6% |
| Kingsley | Lamplighter Village | $1,013 | $924 | 9.6% |
| RHP | Longview | $876 | $829 | 5.7% |
| RHP | Mountainside Estates | $1,010 | $953 | 6.0% |
| RHP | Pine Lakes Ranch | $934 | $869 | 7.5% |
| RHP | Redwood Estates | $930 | $877 | 6.0% |

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT Jul-23 | AVERAGE ADJUSTED RENT Jul-22 | % INCREASE |
|---|---|---|---|---|
| Ascentia | River Valley Village Mobile Home Community | $920 | $845 | 8.9% |
| RHP | Shady Lane | $792 | $743 | 6.6% |
| RHP | Sheridan | $943 | $894 | 5.5% |
| Sun Communities | The Grove at Alta Ridge | $909 | $850 | 6.9% |
| RHP | The Meadows | $972 | $919 | 5.8% |
| RHP | Thornton Estates | $871 | $818 | 6.5% |
| RHP | Wikiup | $948 | $894 | 6.0% |
| ELS | Woodland Hills | $1040 | $926 | 12.3% |

162.178.    Per the 2022-2023 Datacomp JLT Market Reports, the Manufactured Home Community Defendants made the following changes to lot rents in the manufactured home communities in the area covered by the Dallas County, TX MSA JLT Report, the MSA area where Plaintiff Amber Sailer resides:

**Figure 35:37: Rent Changes in Dallas County, TX MSA JLT Report**

| PARK OWNER/ MANAGER | PARK NAME | AVERAGE ADJUSTED RENT Sep-22 | AVERAGE ADJUSTED RENT Sep-21 | % INCREASE |
|---|---|---|---|---|

| Inspire Communities | Cimarron Meadows MHC | $615 | $605 | 1.7% |
|---|---|---|---|---|
| RHP | Glen Knoll | $581 | $556 | 4.5% |
| RHP | Grand Place | $654 | $626 | 4.5% |
| Kingsley | Pecan Lake | $524 | $491 | 6.7% |
| Inspire Communities | Pine Meadows Estates | $560 | $475 | 17.9% |
| Sun Communities | Sandy Lake | $604 | $574 | 5.2% |
| RHP | Shady Grove Ranch | $659 | $631 | 4.4% |
| Kingsley | Wintergreen Terrace | $523 | $490 | 6.7% |

163.179.    As shown in Figures 21-3523-37, the Manufactured Home Defendants substantially raised lot rents in parallel to Plaintiffs and members of the Class.

164.180.    The existence of manufactured home lot rent price increases, at rates which exceed price increases for detached single-family homes, is consistent with Plaintiffs' allegations of Defendants' unlawful agreement to systemically raise the price of manufactured home lot rents above competitive levels during the Relevant Time Period.

### 4.5. "Plus Factors" in the Manufactured Home Industry Provide Additional Evidence of a Conspiracy

165.181.    Prominent legal and economic antitrust scholars studying collusive behavior have identified certain "plus factors," which are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[5] Each plus factor that is present constitutes a piece of

---

[5] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 393 (2011).

circumstantial evidence supporting active collusion, as opposed to mere conscious parallelism. The factors that provide the most probative value and lead to a strong inference of explicit collusion are referred to as "super plus factors."[6]

166.182.    Here, several plus and super plus factors support the plausible inference that Defendants are members of a *per se* unlawful price fixing cartel. These include: (1) Defendants' exchange of competitively sensitive information; (2) the presence of a price-verification scheme; (3) a motive to conspire; (4) opportunities and invitations to collude; (5) an increasingly concentrated market; (6) high barriers to entry; and (7) high switching costs for manufactured home lot renters; (8) highly inelastic demand for manufactured home lots; and (9) manufactured home lots are highly similar, fungible products which facilitates collusion.

167.183.    ***First***, the reciprocal sharing of firm-specific competitively sensitive information that would normally remain private is a "super plus factor" that leads to a strong inference of active collusion.[7] As described aboveThroughout the Relevant Time Period, the Manufactured Home Community Defendants and their agents directly communicated with competing community operators within the same local market to obtain and exchange competitively sensitive information about lot rents. Additionally, Defendant Datacomp publishes non-anonymized rent and occupancy data, including current and future pricing information, for manufactured home communities across the United States in its JLT Market Reports. This data, which would normally be kept confidential, given its competitively-sensitive nature, is provided to competing manufactured home community owners who set manufactured home lot rents. Because a manufactured home community owner would be competitively disadvantaged by

---

[6] *See id.* at 396-97.
[7] Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. Univ. L. Rev. 1581, 1608 (2021).

providing private data to other manufactured home community owners unilaterally, a rational actor would only do so with the expectation that it will benefit from similar private information shared by its competitors.

168.184. ***Second,*** Datacomp provides participating manufactured home community owners with a price-verification scheme, or "the practice of a seller reporting to its competitors the details of completed transactions with specific customers."[8] "[P]ostsale price verifications are more likely to be used as a monitoring device because they reveal to a firm's cartel partners its actual prices, which a firm in a competitive market would wish to keep secret."[9] With the JLT Market Reports, manufactured home community owners, including the Manufactured Home Community Defendants, are able to see actual annual rents charged by their competitors in any given MSA. This type of price-verification makes little sense absent collusion.

169. ***Third,*** Datacomp provides manufactured home community owners, including the Manufactured Home Community Defendants, with a motive to conspire by advertising that JLT Market Reports provide valuable information to support lot rent increases and acquisition opportunities.

185. ***Third,*** the structure of the market, characterized by high concentration, high barriers to entry, and inelastic demand provides a motive to conspire and is a plus factor. The Manufactured Home Community Defendants are some of the largest community owners and operators in the country, and each other's direct and biggest competitors. This market structure provided ample opportunity for the Manufactured Home Community Defendants to collude. Rather than compete on price and risk losing revenue, the Manufactured Home Community

---

[8] *Id.* at 1601.

[9] *Id.* at 1601-02.

Defendants had the motive to exchange pricing and occupancy information with each other to facilitate their collusive, supercompetitive rents.

170.186.        ***Fourth,*** Datacomp's JLT Market Reports themselves are provided an opportunity to coordinate and raise prices, and Datacomp's advertisements about the reports are naked invitations to collude. Additionally, as of July 2019, Defendants Datacomp, ELS, Hometown America, Sun Communities, RHP, Yes Communities, and Inspire Communities, and Murex are all members of the Manufactured Housing Institute ("MHI"). MHI is the only national trade association representing all sectors of the manufactured and modular housing industries. Executives from Defendants ELS and Sun Communities have been on the MHI Board of Directors during the Relevant Time Period. Additionally, MHI organizes numerous industry meetings and events throughout the year, including MHI Congress & Expo, the MHI National Communities Council ("NCC") Spring Forum, the MHI Annual Meeting, the NCC Fall Leadership Forum, and the MHI Winter Meeting. Defendants, including Datacomp, ELS, RHP, and Yes Communities, have all been exhibitors at MHI Congress & Expo during the Relevant Time Period. Datacomp uses these events to sell the benefits and advantages of the JLT Market Reports directly to the Manufactured Home Community Defendants. Additionally, the acquisition market for manufactured home communities is a topic that is sometimes discussed at these events. Trade association membership and events provide Defendants additional opportunities to collude.

171.187.        ***Fifth,*** the manufactured home community market is increasingly becoming more concentrated. While the industry was once highly fragmented, in recent years large, manufactured home community owners, including the Manufactured Home Community Defendants, have been buying up communities across the United States to create massive

97

portfolios. As shown in Figures 38-40, there are several areas around the United States where the Manufactured Home Defendants and their Unnamed Co-conspirators have collective market shares that exceed 50%. A conspiracy is easier to effectuate, maintain, and enforce in a concentrated industry.

172.188.    ***Sixth***, manufactured home community owners and operators face significant entry barriers. These include the high cost of acquiring property and establishing a property management infrastructure as well as ongoing costs of maintenance and regulatory compliance. Large manufactured home communities run into the hundreds of millions of dollars to purchase. Market analyst, Ron Trinh, noted that "barriers to entry to compete [are] very high" in this industry, giving established companies, like the Manufactured Home Community Defendants, a significant advantage. Another analyst has noted that "[o]ne of the distinct features of the [manufactured housing] sector is the complete lack of new supply expected to be constructed. With essentially zero net supply coming online for the foreseeable future, manufactured housing is relatively immune from the oversupply fears that encumber other REIT sectors." Further, ELS has admitted that the supply of new properties in locations it targets "will be constrained by barriers to entry" in particular, securing zoning permits, and that "growing demand coupled with almost no new supply is a strategic advantage for ELS." Likewise, Sun Communities has explained that the manufactured home segment has "low supply, outsized demand, and high barriers to entry" and that "virtually no new supply has been added for years." Thus, new entrants into the market are unlikely to discipline cartel pricing.

173.189.    ***Seventh***, there are significant switching costs that prevent effective price competition in the manufactured home lot rental market. In other markets with low switching costs, consumers can stop purchasing a particular manufacturer's product when its prices are no

98

longer competitive. Manufactured homes are not easy or inexpensive to move, if they can be moved at all. They require special hauling vehicles, escorts, and permits to transport. These services are costly, typically ranging from about $5,000-$~~15~~20,000, depending on the size of the home and the distance the home is moving. In 2022, the average cost to move a manufactured home was $9,000. As described above, many manufactured ~~home owners~~homeowners are low-income earners who may not be able to afford these high moving costs. According to a study, these costs may represent "five to seven years' worth of accrued equity for mobile homeowners." In its 2022 10-K, ELS explained that "moving a factory-built home from one property involves substantial cost and effort." On its Q2 2023 Earnings Call, ELS's CEO Marguerite Nader explained that a customer picking out a manufactured home community is "making a long-term commitment for themselves and a long-term commitment to the home that they're putting in the community or buying." Likewise, Sun Communities acknowledges that the cost to move a manufactured home results in low turnover. Therefore, when a manufactured home community owner raises lot rent, residents are often forced to accept the price increase—or leave their home. These factors are what led Frank Rolfe, an investor who has owned thousands of manufactured home lots, to make the controversial, and often quoted, remark that a manufactured home community "is like a Waffle House where the customers are chained to their booths."

190.    This inability of a manufactured home residents to easily and affordably switch when rents rise creates a certain degree of natural market power for manufactured home community owners and makes collusion more effective because even if competing manufactured home community owners were to offer lower prices on available lots, renters will not typically be able to move to the lower cost lots given the substantial cost and difficulty in doing so. Moreover, where price increases are occurring throughout broad geographics areas—as they do

when dominant manufactured home community owners and operators all enter a pricing cartel—manufactured home residents often do not have any lower-priced options available in reasonable proximity to their work, school, or home. As such, manufactured home residents cannot simply turn to alternative manufactured home community owners to discipline cartel pricing.

191.    *Eighth*, the demand for manufactured home lots is highly inelastic, meaning an increase in lot rents tends to result in increased profits to the manufactured home community owners without triggering substitutions sufficient to outweigh the benefit of profits reaped from lots rented at the higher price points. The only reasonable alternative to renting is purchasing a lot, and for many manufactured home residents, that is not an option either financially or logistically. Owing to this and the high switching costs discussed above, no reasonable substitutes exist to discipline cartel pricing.

192.    In addition, manufactured home lot demand is inelastic because moving imposes substantial costs on manufactured home residents, including disruption to the most basic and important aspects of life, such as keeping their jobs, sending their kids to school, or having access to medical care. Renters are therefore less likely to react to a moderate price increase, which allowed Manufactured Home Community Defendants to collectively maintain and increase rents every year.

193.    *Ninth*, when controlling for certain characteristics of manufactured home communities such as location and access to public transportation, manufactured home lots are fungible products that are highly similar. That is, each manufactured home lot has the basic requirements for all manufactured home residents which drive marketing, sales, and leasing decisions for manufactured home lots.

100

194.    Indeed, many lots in manufactured home communities have access to similar amenities and services, including parking, swimming pools, club houses, cable, laundry rooms, and internet access, and are thus readily comparable based on these objective features, as well as by rent and square footage. Defendant Datacomp itself recognizes this and includes the services and community amenities available in its reports. Defendant Datacomp also includes how much each manufactured home community owner charges for such services. Accordingly, lot rent prices can be easily determined and compared. The homogenous nature of manufactured home lots and their similar pricing structure provides community owners with a strong incentive to collude, the ability to easily compare and coordinate pricing, and the ability to detect any deviations from a price fixing conspiracy.

### V.    ANTICOMPETITIVE EFFECTS AND RELEVANT ANTITRUST MARKET

174.195.    Defendants' anticompetitive conduct had the following effects, among others:

   i. Competition among the Manufactured Home Community Defendants has been restrained or eliminated with respect to manufactured home lot rent prices;

   ii. The price of manufactured home lot rent has been fixed, stabilized, or maintained at artificially high levels; and

   iii. Individuals have been deprived of free and open competition.

175.196.    Defendants' violations of the antitrust laws have caused Plaintiffs and members of the Class to pay higher prices for manufactured home lot rents than they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, Plaintiffs and members of the Class have suffered damages in the form of overcharges paid on their manufactured home lot rentals. This is an injury of the type that the antitrust laws were

101

meant to punish and prevent. Defendants' price fixing agreement and information exchange are *per se* unlawful, or alternatively are unlawful under either a quick look or rule of reason analysis.

176.197.    Under the *per se* standard, and additionally where, as here, there are demonstrable anticompetitive effects, a relevant product and geographic market need not be defined. However, Plaintiffs define such markets below in case their allegations are ultimately analyzed under a quick look or rule of reason analysis.

**A. The Relevant Product Market Is Manufactured Home Lots**

177.198.    To the extent a relevant product market needs to be defined in this action, it is the market for manufactured home lots located in manufactured home communities.

178.199.    There are no reasonable substitutes for manufactured home lots. While a manufactured or modular home can be placed on private land, land ownership is prohibitively expensive for many manufactured home residents. Additionally, many jurisdictions prevent the installation of manufactured homes as infill housing in areas zoned residential or restrict placement of manufactured homes to manufactured home communities only. By renting a manufactured home lot, manufactured home residents get to enjoy the benefit of owning their own home but are not burdened with the expense of landownership. Additionally, many manufactured home residents specifically choose to live in manufactured home parks for their community benefits, which may include community or recreation centers, playgrounds, and dog parks. Many manufactured home communities are 55+ communities and provide other specific benefits to older residents.

**B. The Relevant Geographic Market Is National**

179.    Should a geographic market need to be defined in this action, it is the United States. The Manufactured Home Community Defendants own manufactured home parks across the United States and have increased rental prices universally.

102

C. Regional Submarkets

180. In addition, there are the 187 markets for which Datacomp produces (or has produced) JLT Market Reports (the "Regional Submarkets").

181. Given that commuting distance to a place of work or school is a geographic constraint on where a manufactured home lot renter chooses to live, the manufactured home housing market can be regional and tied to a center of commerce or education and the immediately surrounding areas.

182. Additionally, manufactured home lot renters, particularly elderly residents who require assistance, will choose to live within close distances to their relatives and health care providers for support.

200. Manufactured home lot renters in any given Regional SubmarketThe manufactured home lot rental market satisfies the test for market definition used by federal antitrust enforcement agencies, widely known as the "SSNIP test." The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%), non-transitory increase in price (a "SSNIP"), without causing a sufficient number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist. If the SSNIP is profitable, the market is properly defined. If the SSNIP is not profitable, the market is too narrowly defined and does not encompass sufficient economic substitutes.

201. Here, the SSNIP test is satisfied, and the market is properly defined. As described above and below, pursuant to Defendants' agreement not to compete on price, the Manufactured Home Defendants were able to increase rents during the Relevant Period by 9.1% per year between 2019 and 2021. The average annual rent increase from 2019-2024 was 7.2%. These increases have not driven enough renters out of the market such that the SSNIP has become

103

unprofitable to Defendants. Because Manufactured Home Defendants are able to increase prices by a SSNIP without losing sufficient sales to render the increase unprofitable, the market for manufactured home lots located in manufactured home communities is properly defined.

**B.  Defendants' Market Power in the Manufactured Home Lot Market**

202.    The Manufactured Home Defendants and their Unnamed Co-conspirators are able to collectively exercise market power in each geographic market in which they operate, as detailed below. While traditional antitrust doctrine uses market share as a rough proxy for market power, that proxy does not tell the full story in the manufactured home lot market for at least two reasons. First, as alleged above, there are considerable costs associated with moving. Second, because of the staggered nature of the rental leases, many of the lots nominally part of the housing stock in a given area will not actually be available to a renter at the time of their lease renewal. Units filled by other renters on longer term contracts are not reasonably interchangeable, because renters cannot simply choose to be homeless until a unit at a competitive price becomes available. These factors give Defendants greater market power at lower market share levels than might be the case in other industries.

203.    Switching costs give the Manufactured Home Defendants and their Unnamed Co-conspirators significant market power even in a competitive market. As noted above, manufactured homes are not easy to move, if they can be moved at all. They require special hauling vehicles, escorts, and permits for transport. The cost of moving a manufactured home is also substantial. Moreover, moving requires a substantial commitment of time and effort for the residents. They will have to search for a new manufactured home lot and community; sign a new lease; pack up their possessions; move those possessions— often including furniture—often in a single day between leases; unpack in a new location; learn a new neighborhood and a new route to work or school. The list goes on and on.

104

204.    As additional evidence that manufactured housing residents do not move for small but significant changes in lot rental prices, manufactured housing communities often see 90–95%+ occupancy rates. Additionally, they typically have low tenant turnover rates. Indeed, turnover rates for manufactured housing are lower than traditional multifamily housing developments (i.e. apartments), despite the Manufactured Home Defendants and their Unnamed Co-conspirators regularly imposing SSNIPs on renewed lot leases.

205.    The Manufactured Home Defendants and their Unnamed Co-conspirators are also able to impose SSNIPs with lower market share than in traditional markets because, while there is a nominal supply of manufactured home lots in any given area, in practice most of those lots are occupied by others, most of whom have signed long term leases. Because housing is a necessity, lot renters cannot choose simply to be homeless until more lots open for renewal, allowing additional competition.

206.    In other words, for any given manufactured home lot renter, their options to find an alternative lot is not every rentable lot in a geographic area, but rather only those lots which are available at the time their previous lot lease ends.

207.    Nevertheless, there are several areas around the United States where the Manufactured Home Defendants and their Unnamed Co-conspirators do have significant market shares.

208.    For instance, in the geographic areas covered by the following JLT Market Reports, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that are equal to or greater than 50 percent (as shown in "Collective Share" column). Note that the number of "Units" corresponds to the number of manufactured home lots in the area.

105

**Figure 38. Highly Concentrated JLT Market Report Areas**

| Report Area | Market Size (Units) | Collective Share |
|---|---|---|
| PHOENIX MSA ARIZONA | 28,471 | 51.8% |
| DENVER AURORA BOULDER CSA COLORADO | 16,259 | 70.8% |
| HILLSBOROUGH COUNTY FLORIDA | 12,700 | 50.7% |
| ORANGE SEMINOLE COUNTIES FLORIDA | 12,524 | 51.8% |
| LEE COUNTY FLORIDA | 12,245 | 61.3% |
| LAKE COUNTY FLORIDA | 10,330 | 55.0% |
| PASCO COUNTY FLORIDA | 10,153 | 53.5% |
| AUSTIN MSA TX | 9,405 | 72.3% |
| SALT LAKE CITY MSA UTAH | 6,678 | 77.2% |
| WASHTENAW COUNTY MICHIGAN | 5,786 | 55.9% |
| NORTHERN COLORADO | 5,686 | 61.0% |
| MONROE COUNTY MICHIGAN | 5,604 | 51.5% |
| BREVARD COUNTY FLORIDA | 5,552 | 59.3% |
| DUVAL ST. JOHNS COUNTIES FLORIDA | 5,455 | 68.0% |
| INDIAN RIVER COUNTY FLORIDA | 5,048 | 74.8% |
| CITRUS HERNANDO SUMTER COUNTIES FLORIDA | 4,523 | 54.8% |
| OSCEOLA COUNTY FLORIDA | 3,785 | 70.6% |
| LONG ISLAND NY | 3,321 | 60.5% |
| DENTON LEWISVILLE TEXAS | 2,800 | 64.9% |
| COLLIER COUNTY FLORIDA | 2,501 | 61.7% |
| CHARLOTTE COUNTY FLORIDA | 2,430 | 75.2% |
| CHARLOTTE MSA NORTH CAROLINA | 2,160 | 55.4% |
| ALACHUA COUNTY FLORIDA | 1,228 | 100.0% |
| ESCAMBIA COUNTY FLORIDA | 1,059 | 63.2% |

209.    Additionally, in the following Commuting Zones (or "CZs") the Manufactured

Home Defendants and their Unnamed Co-conspirators collectively wield market shares that are

106

equal to or greater than 50 percent (as shown in "Collective Share" column). The USDA's Economic Research Service determines CZs by "group[ing] the 3,222 counties and county-equivalents in the United States and Puerto Rico into 598 distinct labor markets. These CZs are based on commuting flows to and from small counties. They allow researchers to aggregate county-level data to examine the socioeconomic differences across rural labor markets."

107

**Figure 39. Highly Concentrated CZs**

| CZ | CZ Code | Market Size (Units) | Collective Share |
|---|---|---|---|
| Citrus County, FL / Lake County, FL / Marion County, FL / Orange County, FL / Osceola County, FL / Seminole County, FL / Sumter County, FL | 98 | 34,457 | 54.5% |
| Gila County, AZ / Maricopa County, AZ / Pinal County, AZ | 35 | 28,716 | 52.2% |
| Collier County, FL / Glades County, FL / Hendry County, FL / Lee County, FL / Okeechobee County, FL | 99 | 15,619 | 57.9% |
| Adams County, CO / Arapahoe County, CO / Boulder County, CO / Broomfield County, CO / Douglas County, CO / Jefferson County, CO | 72 | 15,608 | 69.6% |
| Hays County, TX / Travis County, TX / Williamson County, TX | 502 | 9,405 | 72.3% |
| Davis County, UT / Salt Lake County, UT / Tooele County, UT / Weber County, UT | 536 | 6,678 | 77.2% |
| Larimer County, CO / Weld County, CO | 84 | 5,941 | 62.7% |
| Duval County, FL / St. Johns County, FL | 93 | 5,455 | 68.0% |
| Suffolk County, NY | 382 | 3,321 | 60.5% |
| Charles County, MD / Fairfax County, VA / Manassas City, VA / Prince George's County, MD / Prince William County, VA | 91 | 2,736 | 59.9% |
| Cabarrus County, NC / Gaston County, NC / Mecklenburg County, NC / Rowan County, NC | 394 | 2,160 | 55.4% |
| Jefferson County, WI / Rock County, WI | 576 | 2,020 | 63.7% |
| Gwinnett County, GA / Hall County, GA | 109 | 1,679 | 80.2% |
| Alachua County, FL | 92 | 1,228 | 100.0% |
| Escambia County, FL / Santa Rosa County, FL | 100 | 1,059 | 63.2% |
| Madison County, IL | 143 | 984 | 88.6% |
| Manistee County, MI / Mason County, MI | 276 | 352 | 85.8% |
| Grafton County, NH / Sullivan County, NH | 367 | 232 | 100.0% |

210.    Similarly, in the following core based statistical areas ("CBSAs") the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that are equal to or greater than 50 percent (as shown in "Collective Share" column). A CBSA is a combination of metropolitan statistical areas (MSAs) and micropolitan statistical areas. The U.S. Office of Management and Budget "generally defines a CBSA as an area that contains a *central county* that has a substantial urban population, along with any adjacent communities that have a high level of integration with the central county. In 2020, OMB defined CBSAs to consist of a county or multiple counties (or other equivalent entities) that contain a core urban area with a minimum population of 10,000."

**Figure 40. Highly Concentrated CBSAs**

| CBSA | CBSA Code | Market Size (Units) | Collective Share |
|---|---|---|---|
| Phoenix-Mesa-Chandler, AZ | 38060 | 28,471 | 51.8% |
| Orlando-Kissimmee-Sanford, FL | 36740 | 26,639 | 55.7% |
| Grand Rapids-Wyoming-Kentwood, MI | 24340 | 16,245 | 50.8% |
| Denver-Aurora-Centennial, CO | 19740 | 13,191 | 76.1% |
| Cape Coral-Fort Myers, FL | 15980 | 12,245 | 61.3% |
| Austin-Round Rock-San Marcos, TX | 12420 | 9,405 | 72.3% |
| Ann Arbor, MI | 11460 | 6,252 | 55.7% |
| Palm Bay-Melbourne-Titusville, FL | 37340 | 5,552 | 59.3% |
| Jacksonville, FL | 27260 | 5,455 | 68.0% |
| Salt Lake City-Murray, UT | 41620 | 5,341 | 75.8% |
| Sebastian-Vero Beach-West Vero Corridor, FL | 42680 | 5,048 | 74.8% |
| Washington-Arlington-Alexandria, DC-VA-MD-WV | 47900 | 2,736 | 59.9% |
| Naples-Marco Island, FL | 34940 | 2,501 | 61.7% |
| Punta Gorda, FL | 39460 | 2,430 | 75.2% |
| Greeley, CO | 24540 | 2,259 | 100.0% |
| Charlotte-Concord-Gastonia, NC-SC | 16740 | 2,160 | 55.4% |

| | | | |
|---|---|---|---|
| Homosassa Springs, FL | 26140 | 1,765 | 53.2% |
| Ogden, UT | 36260 | 1,337 | 82.7% |
| Gainesville, FL | 23540 | 1,228 | 100.0% |
| Janesville-Beloit, WI | 27500 | 1,129 | 59.9% |
| Pensacola-Ferry Pass-Brent, FL | 37860 | 1,059 | 63.2% |
| Wildwood-The Villages, FL | 48680 | 897 | 77.5% |
| Watertown-Fort Atkinson, WI | 48020 | 891 | 68.6% |
| South Bend-Mishawaka, IN-MI | 43780 | 716 | 74.0% |
| Murrells Inlet, SC | 34680 | 661 | 55.4% |
| Manchester-Nashua, NH | 31700 | 629 | 76.3% |
| Breckenridge, CO | 14720 | 565 | 57.7% |
| Glens Falls, NY | 24020 | 342 | 53.5% |
| Lebanon-Claremont, NH-VT | 30150 | 232 | 100.0% |

**C. Relevant Geographic Markets**

211.    Defendant Datacomp operates nationwide and provides its JLT Market Reports and related products across the United States. Likewise, each Manufactured Home Community Defendant owns or operates manufactured home communities in multiple states and regions. Plaintiffs allege that Defendants implemented a common scheme nationwide through Datacomp, but that the scheme operates within—and harms competition in—distinct local and regional markets for manufactured home lot leases.

212.    Because commuting distance to work or school and other location-specific factors (including ties to family and medical providers) are significant constraints on where a manufactured home lot renter can practicably reside, renters do not treat manufactured home leases that are located far away as reasonable substitutes. Owners/operators of manufactured home communities do not view lots that are located far away as useful comparators for the same reason.

213.    Accordingly, the relevant geographic markets for manufactured home lot leases, as defined below, are local or regional.

110

214.    Datacomp produces (or has produced) JLT Market Reports for as many as 187 geographic markets. These JLT Market Reports identify competing manufactured home communities and disclose competitively sensitive rent and rent-increase information for those communities within smaller geographic areas defined by Datacomp for reporting purposes. Defendants' scheme harmed competition in, at a minimum, the Datacomp/JLT market areas listed below (the "Regional Markets").

215.    These Regional Markets are the bounded market areas defined and used by Datacomp in its JLT Market Reports to identify competing manufactured home communities and to report rents, rent price increases, occupancy, and other competitive variables within the area. Many JLT Market Reports are further subdivided into smaller "areas" for competitive comparison, reflecting localized competitive conditions within the broader report geography. In addition to the broader Regional Markets defined below, in the alternative, each individual "area" identified in the JLT Market Reports is its own relevant geographic market ("Area Submarkets").

216.    The Regional Markets (and, where applicable, Area Submarkets) based on JLT Market Reports are not arbitrary geographic groupings. They are standardized market areas developed by Datacomp as part of a long-standing commercial product that is marketed to and used by manufactured home community owners and operators for market analysis, including benchmarking rent prices, rent increases, occupancy, and other competitive variables across the set of communities Datacomp identifies as competing within a defined market area. Datacomp has a strong business incentive to define market boundaries that reflect meaningful competitive realities because the value of its reports to customers depends on identifying the communities that actually could constrain one another's pricing. That Datacomp uses these bounded markets

111

and further subdivides many markets into smaller "areas" for comparison corroborates that these groupings reflect logical, industry-recognized competitive regions.

183.217.    Manufactured home lot renters in any given Regional Market do not consider manufactured home lot leases in otherlocated outside that Regional SubmarketsMarket to be adequate substitutes for manufactured home lot leases in their own submarketwithin the market. Leases outside a Regional SubmarketMarkets are not substitutable forreasonably interchangeable with leases inside a submarketthe market because theyrelocating outside the market would leavetypically impose impracticable commuting burdens and sever renters with inordinately long commutes to schools, jobsfrom established employment, education, family, or doctorsand medical ties. Consequently, manufactured home lots located outside thea Regional SubmarketMarket are not within the relevant geographic marketsmarket for antitrust purposes.

218.    The plausibility of the Regional Markets as relevant geographic markets is corroborated by widely used governmental geographic frameworks that capture how individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. CZs and CBSAs are designed to capture real-world patterns of commuting, economic integration, and day-to-day activity. Because the relevant geographic market for manufactured home lot leases is defined by practical substitutability (including the ability of renters to relocate without incurring prohibitive commuting and life-disruption costs), CZs and CBSAs provide an objective external benchmark for the type of local and regional boundaries that track where people realistically live, work, and attend school. In many instances, the Datacomp/JLT Regional Markets are nested within one or more CZs and/or CBSAs, which supports the inference that the pleaded Regional Markets reflect the practical area within which renters can seek substitutes and within which a

112

hypothetical monopolist could profitably impose a small but significant nontransitory increase in lot rent prices.

184.219.     Plaintiffs allege upon information and belief that Defendants' scheme harmed competition nationally, including in at least the following Regional Submarkets (listed in order of the number of manufactured home communities, following the Chicago, IL MSA),Markets, each of which comprises a separate and distinct relevant regional geographic market under any potential Rule of Reason analysis:

   i. Chicago, IL MSA: Regional Submarket consists of at least 57 manufactured home communities and approximately 18,000 manufactured home lots.

   ii. Phoenix-Mesa-Scottsdale, AZ MSA: Regional Submarket consists of at least 108 manufactured home communities and approximately 28,000 manufactured home lots.

   iii. Orange County, CA: Regional Submarket consists of at least 100 manufactured home communities and approximately 19,000 manufactured home lots.

   iv. San Diego County, CA: Regional Submarket consists of at least 100 manufactured home communities and approximately 19,000 manufactured home lots.

   v. Los Angeles County, CA: Regional Submarket consists of at least 94 manufactured home communities and approximately 21,000 manufactured home lots.

113

vi. **Riverside County, CA:** Regional Submarket consists of at least 94 manufactured home communities and approximately 21,000 manufactured home lots.

vii. **Polk County, FL:** Regional Submarket consists of at least 90 manufactured home communities and approximately 22,000 manufactured home lots.

viii. **Pinellas County, FL:** Regional Submarket consists of at least 87 manufactured home communities and approximately 20,000 manufactured home lots.

ix. **San Bernadino County, CA:** Regional Submarket consists of at least 78 manufactured home communities and approximately 15,000 manufactured home lots.

1. **Minneapolis Saint Paul, MN MSA:Phoenix Regional Market**

220. The Phoenix Regional Market corresponds to the geographic areas covered by the Phoenix, Arizona MSA JLT Market Report. The Phoenix, Arizona MSA JLT Market Report further breaks down the Phoenix Regional Market by a number of Area Submarkets, specifically: (1) Apache Junction; (2) Avondale; (3) Chandler; (4) Glendale; (5) Mesa; (6) Peoria; (7) Phoenix; (8) Scottsdale; and (9) Tempe. There are approximately 28,000 manufactured home lots in the Phoenix Regional Market.

**Figure 41. Maps of Area Submarkets Identifying Manufactured Home Communities within Phoenix** Regional ~~Submarket consists of at least 57~~Market





115





116



**Phoenix, Arizona MSA Report Overview Map**
**Mesa Area**

| | | | | | |
|---|---|---|---|---|---|
| A | Alma Meadows | D | Riviera Mobile Home Park | G | Tempe Cascade Estates |
| B | Vista Del Sol | E | Chaparral Village | H | Sage Point |
| C | Seyenna Vistas | F | Contempo Tempe | I | Casas Del Campo |



**Phoenix, Arizona MSA Report Overview Map**
**Mesa Area - East**

| | | | | | |
|---|---|---|---|---|---|
| A | Aspenwood | F | Fountain East | K | Palmas Del Sol |
| B | Brentwood West | G | Hacienda De Valencia | L | Sunrise Village |
| C | Citrus Gardens | H | The Highlands at Brentwood | M | Sunrise Vista |
| D | Cypress Estates | I | Mesa Shadows | N | Deseriama |
| E | Saguaro Sun | J | Mesa Village | O | Dorado Canyon |

117







221.    The plausibility of the Phoenix Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that capture how individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Phoenix Regional Market includes the areas covered by CZ 35 (Gila County, AZ / Maricopa County, AZ / Pinal County, AZ) and CBSA 38060 (Phoenix-Mesa-Chandler, AZ).

222.    Within the Phoenix Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that exceed 51%. Manufactured Home Defendants who own or operate manufactured home communities and approximately 15within the Phoenix Regional Market include at least the following: ELS, Hometown America, Kingsley, RHP, Sun Communities, Cal-Am and Yes Communities.

223.    Within the Phoenix Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent price increases.

**2. Denver Regional Market**

~~185.~~224.     The Denver Regional Market corresponds to the geographic areas covered by the Denver-Aurora-Boulder JLT Market Report. The Denver-Aurora-Boulder JLT Market Report further breaks down the Denver Regional Market by a number of Area Submarkets, specifically: (1) Denver West; (2) Thornton; (3) Federal Heights; (4) Arvada; (5) Golden; (6) Littleton; (7) Boulder; and (8) Aurora. There are approximately 16,000 manufactured home lots in the Denver Regional Market.

~~Santa Clara County, CA: Regional Submarket consists of at least 55~~**Figure 42. Maps of Area Submarkets Identifying Manufactured Home Communities within Denver Regional Market**

Denver/Aurora/Boulder, Colorado CSA Report Overview Map
Denver (West)



A       Castle Park                    B       Foxridge Farms

120

**Denver/Aurora/Boulder, Colorado CSA Report Overview Map**
**Thornton Area**



| A | Boulder Ridge MHP | D | Franklin Mobile Home Park | G | Shady Lane |
| B | Commerce Heights | E | North County Village | H | Thornton Estates |
| C | Eastgate Village | F | Pine Lakes Ranch | I | Wikiup |

**Denver/Aurora/Boulder, Colorado CSA Report Overview Map**
**Federal Heights Area**



| A | Countryside Village Denver | E | Highview MHC | H | Lamplighter Village |
| B | Denver Cascade | F | Holiday Hills Village | I | Redwood Estates |
| C | Friendly Village Rockies | G | Kimberly Hills | J | Woodland Hills |
| D | The Grove at Alta Ridge | | | | |

121

**Denver/Aurora/Boulder, Colorado CSA Report Overview Map**
**Arvada Area**



| | | | | | |
|---|---|---|---|---|---|
| A | Garden Meadows | C | Inspiration Valley | D | Sheridan |
| B | Berkeley Village MHP | | | | |

**Denver/Aurora/Boulder, Colorado CSA Report Overview Map**
**Golden Area**



| | | | | | |
|---|---|---|---|---|---|
| A | Mountainside Estates | C | Golden Terrace Village | D | Golden Terrace West |
| B | Golden Terrace South | | | | |

122







225.    The plausibility of the Denver Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that capture how individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Denver Regional Market includes the areas covered by CZ 72 (Adams County, CO / Arapahoe County, CO / Boulder County, CO / Broomfield County, CO / Douglas County, CO / Jefferson County, CO) and CZ 84 (Larimer County, CO / Weld County, CO). The Denver Regional Market includes the areas covered by CBSA 14500 (Boulder, CO), CBSA 19740 (Denver-Aurora-Centennial, CO), and CBSA 24540 (Greely, CO).

226.    Within the Denver Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that exceed 70%. Manufactured Home Defendants who own or operate manufactured home communities and approximately

124

~~14,000~~within the Denver Regional Market include at least the following: ELS, Kingsley, RHP, Sun Communities, Yes Communities, and Ascentia.

227.    Within the Denver Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent price increases.

### 3.   Hillsborough County Regional Market

~~186.~~228.        The Hillsborough County Regional Market corresponds to the geographic areas covered by the Hillsborough County, Florida JLT Market Report. The Hillsborough County, Florida JLT Market Report further breaks down the Hillsborough County Regional Market by a number of Area Submarkets, specifically: (1) Plant City; (2) Little Manatee/Ruskin; (3) Tampa; (4) Greater Northdale; (5) Thonotosassa; and (6) East Tampa. There are approximately 12,700 manufactured home lots in the Hillsborough County Regional Market.

**Figure 43. Maps of Area Submarkets Identifying Manufactured Home Communities within Hillsborough County Regional Market**



125



**Hillsborough County, Florida Report Overview Map**
**Little Manatee/Ruskin Area**

| | | |
|---|---|---|
| A Chulavista Landings | D Riverside Club | F Bedrock Little Manatee |
| B Little Manatee Springs | E River Haven MHP | G Shell Pointe MHC |
| C Neptune Mobile Village | | |



**Hillsborough County, Florida Report Overview Map**
**Tampa Area**

| | | |
|---|---|---|
| A Bay West Club | H Silver Dollar Resort | O Carefree Village |
| B Countryside Village MHC | I Spanish Main Resort | P Plantation Oaks MHP |
| C Lakeshore Villas | J Sunrise MHC | Q Casa Verde MH Park |
| D Lamplighter | K Terrace Crossings | R Highland Oaks |
| E Bedrock Mount Carmel | L Tyrone Village | S Bay Landings East |
| F Oakhill Village | M Village of Tampa | T Riverlawn MHP |
| G Paradise Village | N Winward Lakes MHP | U Madison Lane Estates |

126

**Hillsborough County, Florida Report Overview Map**
**Greater Northdale Area**



| | | | | | |
|---|---|---|---|---|---|
| A | Chalet Village | C | Rose Lake Estates MHP | E | Meadowbrook Village |
| B | Fountainview Estates | D | Three Lakes MHC | | |

**Hillsborough County, Florida Report Overview Map**
**Thonotosassa Area**



| | | | | | |
|---|---|---|---|---|---|
| A | Feathersck | C | Windward Knoll MHP | E | Ranch Oaks Estates |
| B | The Oaks (Thono) | D | Chateau Forrest MHP | | |

127



229.    The plausibility of the Hillsborough County Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that capture how individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Hillsborough County Regional Market includes the areas covered by CZ 105 (Hernando County, FL / Hillsborough County, FL / Pasco County, FL / Pinellas County, FL) and CBSA 45300 (Tampa-St. Petersburg-Clearwater **(Hillsborough County), FL MSA:** Regional Submarket consists of at least 53, FL).

230.    Within the Hillsborough County Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that exceed 50%. Manufactured Home Defendants who own or operate manufactured home communities ~~and~~ within the Hillsborough County Regional Market include at least the following: ELS, Hometown America, Sun Communities, RHP, Inspire, and Cal-Am.

128

231.     Within the Hillsborough County Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent price increases.

#### 4.   Orange-Seminole Regional Market

187.232.      The Orange-Seminole Regional Market corresponds to the geographic areas covered by the Orange Seminole Counties Florida JLT Market Report. The Orange Seminole Counties Florida JLT Market Report further breaks down the Orange-Seminole Regional Market by a number of Area Submarkets, specifically: (1) Orlando; (2) Apoka; and (3) Union Park. There are approximately 13,000 12,500 manufactured home lots in the Orange-Seminole Regional Market.

**Volusia County, FL: Regional Submarket consists of at least 52 Figure 44. Maps of Area Submarkets Identifying Manufactured Home Communities within Orange-Seminole Regional Market**



**Orange/Seminole Counties, Florida Report Overview Map**
**Apopka Area**



| | | | | | |
|---|---|---|---|---|---|
| A | Brighwood Manor | C | Chalet North | E | The Valley |
| B | Carriage Cove | D | Palm Isles Village | | |

**Orange/Seminole Counties, Florida Report Overview Map**
**Union Park Area**



| | | | | | |
|---|---|---|---|---|---|
| A | Alafaya Palms | C | Deerwood | E | Palm Valley |
| B | Carriage Court East | D | Fairways Country Club | F | Riverside |

130

233.    The plausibility of the Orange-Seminole Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that capture how individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Orange-Seminole Regional Market includes the areas covered by CZ 98 (Citrus County, FL / Lake County, FL / Marion County, FL / Orange County, FL / Osceola County, FL / Seminole County, FL / Sumter County, FL) and by CBSA 3674 (Orlando-Kissimmee-Sanford, FL).

234.    Within the Orange-Seminole Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that exceed 51%. Manufactured Home Defendants who own or operate manufactured home communities within the Orange-Seminole Regional Market include at least the following: ELS, RHP, Sun Communities, and Hometown America.

235.    Within the Orange-Seminole Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent price increases.

**5.   Lee County Regional Market**

188.236.    The Lee County Regional Market corresponds to the geographic areas covered by the Lee County Florida JLT Market Report. The Lee County Florida JLT Market Report further breaks down the Lee County Regional Market by a number of Area Submarkets, specifically: North Fort Myers and Fort Myers. There are approximately 1412,000 manufactured home lots in the Lee County Regional Market.

~~Denver-Aurora-Boulder, CO MSA:~~**Figure 45. Maps of Area Submarkets Identifying Manufactured Home Communities within Lee County** **Regional** ~~Submarket consists of at least 49~~**Market**



| | | | |
|---|---|---|---|
| A | Bayshore Village | H | Pine Lakes CC | N | The Heritage |
| B | Buccaneer Estates | I | Eagles Estates X | O | Windmill Village |
| C | Del Tura Country Club | J | Serendipity | P | River Estates |
| D | Horizon Village Co-op | K | Swan Lake MHP | Q | Royal Coach Estates |
| E | Island Vista Estates | L | Tamiami Village | R | Bedrock Swfts |
| F | Lake Fairways CC | M | Tara Woods | S | Southwind Village |
| G | Old Bridge Village | | | | |



237.    The plausibility of the Lee County Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that capture how individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Lee County Regional Market includes the areas covered by CZ 99 (Collier County, FL / Glades County, FL / Hendry County, FL / Lee County, FL / Okeechobee County, FL.) and the areas covered by CBSA 15980 (Cape Coral-Fort Myers, FL).

238.    Within the Lee County Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that exceed 61%. Manufactured Home Defendants who own or operate manufactured home communities and within the Lee County Regional Market include at least the following: ELS, Hometown America, and Sun Communities.

133

239.    Within the Lee County Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent price increases.

**6.  Lake County Regional Market**

~~189.~~240.    The Lake County Regional Market corresponds to the geographic areas covered by the Lake County Florida JLT Market Report. The Lake County Florida JLT Market Report further breaks down the Lake County Regional Market by a number of Area Submarkets, specifically: (1) Dona Vista; (2) Leesburg; (3) Lake Eustis; and (4) Lake Apopka. There are approximately ~~16~~10,000 manufactured home lots in the Lake County Regional Market.

~~Broward County, FL: Regional Submarket consists of at least 47~~**Figure 46. Maps of Area Submarkets Identifying Manufactured Home Communities within Lake County Regional Market**



Lake County, Florida Report Overview Map
Dona Vista Area

134

**Lake County, Florida Report Overview Map**
**Leesburg Area**



| | | |
|---|---|---|
| A   Coachwood Colony | F   Lakeside Village | J   Sunshine MHP |
| B   Corley Island | G   Lake Shore | K   Water Oak CC |
| C   Lady Lake MHP | H   Palm Ridge Mobile Village | L   Cypress Creek MHP |
| D   Lake Griffin Isles | I   Piccola Landing | M   Country Life MHC |
| E   Lakeside Terrace | | |

---

**Lake County, Florida Report Overview Map**
**Lake Eustis Area**



| | | |
|---|---|---|
| A   Grand Island Resort | E   Mid Florida Lakes | I   Sunlake Estates |
| B   Hibiscus | F   Riverest Waterfront | J   Tiki Village MHP |
| C   Lake Point | G   Sandpiper Manor | K   Hideaway MHP |
| D   Lakes at Leesburg | H   Southernaire | L   Hickory Hollow Estates |

---

135



241.    The plausibility of the Lake County Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that capture how individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Lake County Regional Market includes the areas covered by CZ 98 (Citrus County, FL / Lake County, FL / Marion County, FL / Orange County, FL / Osceola County, FL / Seminole County, FL / Sumter County, FL) and the areas covered by CBSA 36740 (Orlando-Kissimmee-Sanford, FL).

242.    Within the Lake County Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that exceed 55%. Manufactured Home Defendants who own or operate manufactured home communities within the Lake County Regional Market include at least the following: ELS, Sun Communities, and Hometown America.

243.    Within the Lake County Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent increases.

### 7.  Pasco County Regional Market

~~190.~~244.    The Pasco County Regional Market corresponds to the geographic areas covered by the Pasco County Florida JLT Market Report. The Pasco County Florida JLT Market Report further breaks down the Pasco County Regional Market by a number of Area Submarkets, specifically: (1) Zephyrhills West; (2) Zephyrhills; (3) Dade City; (4) Hudson; and (5) Port Richey. There are approximately ~~11~~10,000 manufactured home lots in the Pasco County Regional Market.

~~Las Vegas, NV MSA: Regional Submarket consists of at least 46~~**Figure 47. Maps of Area Submarkets Identifying Manufactured Home Communities within Pasco County Regional Market**



137









245.    The plausibility of the Pasco County Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that capture how

139

individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Pasco County Regional Market includes the areas covered by CZ 105 (Hernando County, FL / Hillsborough County, FL / Pasco County, FL / Pinellas County, FL) and the areas covered by CBSA 45300 (Tampa-St. Petersburg-Clearwater, FL).

246.    Within the Pasco County Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that exceed 53%. Manufactured Home Defendants who own or operate manufactured home communities within the Pasco County Regional Market include at least the following: ELS, Sun Communities, and Kingsley.

247.    Within the Pasco County Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent price increases.

### 8.   Austin Regional Market

191.248.        The Austin Regional Market corresponds to the geographic areas covered by the Austin MSA TX JLT Market Report. The Austin MSA TX JLT Market Report further breaks down the Austin Regional Market by a number of Area Submarkets, specifically: (a) Austin; (b) Austin (north); and (c) Austin (south). There are approximately 11,0009,400 manufactured home lots in the Austin Regional Market.

Sacramento County, CA: Regional Submarket consists of at least 46**Figure 48. Maps of Area Submarkets Identifying Manufactured Home Communities within Austin Regional Market**

**Austin, Texas MSA Report Overview Map**
**Austin**



| A | Country Aire MHP | C | Oak Ranch | E | River Ranch |
|---|---|---|---|---|---|
| B | North Bluff Estates | D | Pecan Park | | |

**Austin, Texas MSA Report Overview Map**
**Austin (North)**



| A | Boulder Ridge | D | Dessau Fountain Estates | G | Stonegate Austin |
|---|---|---|---|---|---|
| B | Branch Creek | E | Oak Crest | H | Loma Vista |
| C | Chisholm Point | F | Pecan Branch | | |

141



**Austin, Texas MSA Report Overview Map**
**Austin (South)**

| | | | | | |
|---|---|---|---|---|---|
| A | Chateau at Onion Creek | E | Saddlebrook | H | Woodview Estates |
| B | Paisano | F | Sunset Ridge TX | I | The Reserve at Oak Ranch |
| C | River Ridge Estates | G | The Trails Of Oak Hill | J | Creeks Crossing |
| D | Royal Palms Community | | | | |

249.    The plausibility of the Austin Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that capture how individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Austin Regional Market includes the areas covered by CZ 502 (Hays County, TX / Travis County, TX / Williamson County, TX) and the areas covered by 12420 (Austin-Round Rock-San Marcos, TX).

250.    Within the Austin Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that exceed 72%. Manufactured Home Defendants who own or operate manufactured home communities within the Austin Regional Market include at least the following: Sun Communities, RHP, and Ascentia.

251.    Within the Austin Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent price increases.

142

### 9. Salt Lake City Regional Market

~~192.~~252.     The Salt Lake City Regional Market corresponds to the geographic areas covered by the Salt Lake City MSA Utah JLT Market Report. The Salt Lake City MSA Utah JLT Market Report further breaks down the Salt Lake City Regional Market by a number of Area Submarkets, specifically: (a) North Ogden and North Salt Lake; (b) Layton, Sandy, West Valley City; (c) Salt Lake City South; (d) Salt Lake City; and (e) Tooele. There are approximately ~~9,000~~6,600 manufactured home lots in the Salt Lake City Regional Market.

~~Seattle-Tacoma, WA MSA: Regional Submarket consists of at least 45~~**Figure 49. Maps of Area Submarkets Identifying Manufactured Home Communities within Salt Lake City Regional Market**





143

**Salt Lake City, Utah MSA Report Overview Map**
**Layton, Sandy and West Valley City**



| A | Crescentwood Village | C | Lakeview Estates | E | Park Village MHC |
| B | Kopper View | D | Quail Ridge | F | Byde A Wyle Haciendas |

**Salt Lake City, Utah MSA Report Overview Map**
**Salt Lake City - South**



| A | Brookside | E | Monte Vista MHC | I | Villa West |
| B | Cottonwood Coves | F | Redwood Village | J | Westcrest |
| C | Country Club Estates | G | Riverside | K | Winchester Estates |
| D | Majestic Meadows MHP | H | Shadow Ridge | L | Meadowbrook Village |

144





253.    The plausibility of the Salt Lake City Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that capture how

145

individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Salt Lake City Regional Market includes the areas covered by CZ 536 (Davis County, UT / Salt Lake County, UT / Tooele County, UT / Weber County, UT). The Salt Lake City Regional Market includes the areas covered by CBSA 41620 (Salt Lake City-Murray, UT) and CBSA 36260 (Ogden, UT).

254.    Within the Salt Lake City Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that exceed 77%. Manufactured Home Defendants who own or operate manufactured home communities within the Salt Lake City Regional Market include at least the following: ELS, RHP, and Kingsley.

255.    Within the Salt Lake City Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot price increases.

### 10. Washtenaw County Regional Market

193.256.    The Washtenaw County Regional Market corresponds to the geographic areas covered by the Washtenaw County Michigan JLT Market Report. The Washtenaw County Michigan JLT Market Report further breaks down the Washtenaw County Regional Market by a number of Area Submarkets, specifically: (a) Ann Arbor and (b) Ypsilanti. There are approximately 8,0005,700 manufactured home lots in the Washtenaw County Regional Market.

**Kent County, MI: Regional Submarket consists of at least 44Figure 50. Maps of Area Submarkets Identifying Manufactured Home Communities within Washtenaw County Regional Market**

146



**Washtenaw County, Michigan Report Overview Map**
**Ann Arbor Area**

| | | |
|---|---|---|
| A Arbor Meadows | E River Ridge | I Saline Meadows |
| B Northfield Estates | F Scio Farms | J University Mobile Estates |
| C Northville Crossing | G Sylvan Crossing | K Saline Mobile Home Park |
| D Orchard Grove | H Manchester Manor | |



**Washtenaw County, Michigan Report Overview Map**
**Ypsilanti Area**

| | | |
|---|---|---|
| A Arbor Woods | C Lakeview | E Whittaker Oaks |
| B Augusta Woods | D Westridge MHP | F Greenbriar Estates |

257. The plausibility of the Washtenaw County Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that

147

capture how individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Washtenaw County Regional Market includes the areas covered by CZ 272 (Genesee County, MI / Lapeer County, MI / Livingston County, MI / Macomb County, MI / Monroe County, MI / Oakland County, MI / Sanilac County, MI / St. Clair County, MI / Washtenaw County, MI / Wayne County, MI). The Washtenaw County Regional Market includes the areas covered by CBSA 11460 (Ann Arbor, MI) and CBSA 19820 (Detroit-Warren-Dearborn, MI).

258.  Within the Washtenaw County Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that exceed 55%. Manufactured Home Defendants who own or operate manufactured home communities within the Washtenaw County Regional Market include at least the following: RHP and Sun Communities.

259.  Within the Washtenaw County Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent price increases.

**11. Northern Colorado Regional Market**

~~194.~~260.  The Northern Colorado Regional Market corresponds to the geographic areas covered by the Northern Colorado JLT Market Report. The Northern Colorado JLT Market Report further breaks down the Northern Colorado Regional Market by a number of Area Submarkets, specifically: (a) Greely; (b) Rocky Mountain National Park; (c) Fort Collins; and (d) Loveland. There are approximately ~~9,000~~5,600 manufactured home lots in the Northern Colorado Regional Market.

~~Rochester, NY MSA: Regional Submarket consists of at least 43~~**Figure 51. Maps of Area Submarkets Identifying Manufactured Home Communities within Northern Colorado Regional Market**

148



**Northern Colorado Report Overview Map**
**Greeley Area**

| A | Cave Creek | C | Friendly Village of Greeley | E | Villa West |
| B | Countryside of Greeley | D | Stoneybrook MHP | | |



**Northern Colorado Report Overview Map**
**Rocky Mountain National Park Area**

| A | Dream Island MHP | B | Smith Creek Crossing |

149





261.   The plausibility of the Northern Colorado Regional Market as a relevant

geographic market is corroborated by widely used governmental geographic frameworks that

150

capture how individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Northern Colorado Regional Market includes the areas covered by CZ 81 (Grand County, CO), CZ 84 (Larimer County, CO / Weld County, CO) and CZ 86 (Routt County). The Northern Colorado Regional Market includes the areas covered by CBSA 22660 (Fort Collins-Loveland, CO), CBSA 44460 (Steamboat Springs, CO, and CBSA 24540 (Greeley, CO).

262.    Within the Northern Colorado Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that exceed 61%. Manufactured Home Defendants who own or operate manufactured home communities within the Northern Colorado Regional Market include at least the following: RHP, Sun Communities, and Ascentia.

263.    Within the Northern Colorado Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent price increases.

### 12. Monroe County Regional Market

195.264.    The Monroe County Regional Market corresponds to the geographic areas covered by the Monroe County Michigan JLT Market Report. The Monroe County Michigan JLT Market Report further breaks down the Monroe County Regional Market by a number of Area Submarkets, specifically: (a) Monroe West; (b) Monroe South; (c) Monroe North; and (d) Carleton. There are approximately 6,0005,600 manufactured home lots in the Monroe County Regional Market.

Allegan-Muskegon-Ottawa Counties, MI:Figure 52. Maps of Area Submarkets Identifying Manufactured Home Communities within Monroe County Regional Submarket consists of at least 42Market

**Monroe County, Michigan Report Overview Map**
**Monroe Area - West**



A    Mill Race Shores MHC      B    Dundee Meadows

**Monroe County, Michigan Report Overview Map**
**Carleton Area**



A    Flat Rock Village      C    Yorkshire Manor      D    Carleton MHP
B    The Orchards

152



**Monroe County, Michigan Report Overview Map**
**Monroe Area - South**

A   Inverness MHC          B   Northtowne Meadows          C   Hidden Creek

---



**Monroe County, Michigan Report Overview Map**
**Monroe Area - North**

A   Frenchtown Villa          C   Meadowbrook Estates          E   Elizabeth Woods
B   Kimberly Estates          D   Newport Farms              F   Willow Green

---

265.    The plausibility of the Monroe County Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that capture how

153

individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Monroe County Regional Market includes the areas covered by CZ 272 (Genesee County, MI / Lapeer County, MI / Livingston County, MI / Macomb County, MI / Monroe County, MI / Oakland County, MI / Sanilac County, MI / St. Clair County, MI / Washtenaw County, MI / Wayne County, MI) and the areas covered by CBSA 33780 (Monroe, MI).

266.    Within the Monroe County Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that exceed 51%. Manufactured Home Defendants who own or operate manufactured home communities ~~and~~ within the Monroe County Regional Market include at least the following: Sun Communities and Yes Communities.

267.    Within the Monroe County Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent price increases.

### 13. Brevard County Regional Market

~~196.~~268.    The Brevard County Regional Market corresponds to the geographic areas covered by the Brevard County Florida JLT Market Report. Brevard County Florida JLT Market Report further breaks down the Brevard County Regional Market by a number of Area Submarkets, specifically: (a) Palm Bay; (b) Cocoa Beach; (c) Titusville; and (d) Melbourne. There are approximately ~~11,000~~5,500 manufactured home lots in the Brevard County Regional Market.

154

~~Baltimore, MD MSA:~~ ~~Regional Submarket consists of at least 42~~**Figure 53. Maps of Area Submarkets Identifying Manufactured Home Communities within Brevard County Regional Market**



---

**Brevard County, Florida Report Overview Map**
**Cocoa Beach Area**



| A | Cape Canaveral Village | D | Island Lakes | G | Sunrise Village |
| B | Colony Park MHP | E | Maplewood Village MHP | H | West Gate MHP |
| C | Indian Oaks | F | Sun Lake Village Estates | | |



**Brevard County, Florida Report Overview Map**
**Titusville Area**



| A | Missile View MHP | C | Pinewood Village MHP | D | Swan Lake Estates |
| B | Northgate MHP | | | | |

156



269.    The plausibility of the Brevard County Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that capture how individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Brevard County Regional Market includes the areas covered by CZ 95 (Brevard County, FL / Indian River County, FL / Martin County, FL / Palm Beach County, FL / St. Lucie County, FL) and CBSA 37340 (Palm Bay-Melbourne-Titusville, FL).

270.    Within Brevard County Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that exceed 59%. Manufactured Home Defendants who own or operate manufactured home communities and within the Brevard County Regional Market include at least the following: ELS, Hometown America, Sun Communities, Cal-Am, and Riverstone.

157

271.     Within the Brevard County Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent price increases.

**14. Duval-St. Johns Regional Market**

~~197.~~272.     The Duval–St. Johns Regional Market corresponds to the geographic areas covered by the Duval–St. Johns Counties Florida JLT Market Report. The Duval–St. Johns Counties Florida JLT Market Report further breaks down the Duval–St. Johns Regional Market by a number of Area Submarkets, specifically: (a) Jacksonville/Jacksonville Beach; (b) St. Augustine; (c) Jacksonville East; and (d) Jacksonville South/West. There are approximately ~~10,000~~5,400 manufactured home lots in the Duval–St. Johns Regional Market.

**~~Houston, TX MSA:~~ ~~Regional Submarket consists of at least 42~~Figure 54. Maps of Area Submarkets Identifying Manufactured Home Communities within Duval-St. Johns Regional Market**



Duval/St. Johns Counties, Florida Report Overview Map
Jacksonville/Jacksonville Beach

A   Admiral's Walk MHP          C   Fleetwood MH & RV Park          E   Three Seasons MHV
B   Portside East               D   Sunny Acres MHP                 F   Garden City Park



**Duval/St. Johns Counties, Florida Report Overview Map**
**St. Augustine Area**

A    Moultrie Oaks          B    Juniper Sands          C    Coquina Crossing



**Duval/St. Johns Counties, Florida Report Overview Map**
**Jacksonville (East)**

A    Countryside Village          B    Portside West

159



273.     The plausibility of the Duval–St. Johns Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that capture how individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Duval–St. Johns Regional Market includes the areas covered by CZ 93 (Duval County, FL / St. Johns County, FL) and CBSA 27260 (Jacksonville, FL).

274.     Within the Duval–St. Johns Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that exceed 68%. Manufactured Home Defendants who own or operate manufactured home communities within the Duval–St. Johns Regional Market include at least the following: ELS, RHP, and Inspire.

275.     Within the Duval–St. Johns Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent price increases.

160

### 15. Indian River County Regional Market

~~198.~~276.    The Indian River County Regional Market corresponds to the geographic areas covered by the Indian River County Florida JLT Market Report. The Indian River County Florida JLT Market Report further breaks down the Indian River County Regional Market by a number of Area Submarkets, specifically: (a) Sebastian and (b) Vero Beach. There are approximately ~~9~~5,000 manufactured home lots in the Indian River County Regional Market.

~~Columbus, OH MSA: Regional Submarket consists of at least 42~~**Figure 55. Maps of Area Submarkets Identifying Manufactured Home Communities within Indian River County Regional Market**





Indian River County, Florida Report Overview Map
Sebastian Area

---



277.    The plausibility of the Indian River County Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that capture how individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Indian River County Regional Market includes the areas covered by CZ 95 (Brevard County, FL / Indian River County, FL / Martin County, FL / Palm Beach County, FL / St. Lucie County, FL) and CBSA 42680 (Sebastian-Vero Beach-West Vero Corridor, FL).

278.    Within the Indian River County Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that exceed 74%. Manufactured Home Defendants who own or operate manufactured home communities within the Indian River County Regional Market include at least the following: ELS and Sun Communities.

162

279. Within the Indian River County Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent price increases.

**16. Citrus-Hernando-Sumter Regional Market**

~~199.~~280. The Citrus–Hernando–Sumter Regional Market corresponds to the geographic areas covered by the Citrus–Hernando–Sumter Counties Florida JLT Market Report. The Citrus–Hernando–Sumter Counties Florida JLT Market Report further breaks down the Citrus–Hernando–Sumter Counties Regional Market by a number of Area Submarkets, specifically: (a) Hernando County and (b) Citrus/Sumter County. There are approximately ~~8,000~~4,500 manufactured home lots in the Citrus–Hernando–Sumter Counties Regional Market.

~~Southern New Hampshire:~~**Figure 56. Maps of Area Submarkets Identifying Manufactured Home Communities within Citrus–Hernando–Sumter** Regional ~~Submarket consists of at least 41~~**Market**



Citrus/Hernando/Sumter Counties, Florida Report Overview Map
Hernando County Area

---

**Citrus/Hernando/Sumter Counties, Florida Report Overview Map**
**Citrus/Sumter County Area**



| | | | | | |
|---|---|---|---|---|---|
| A | Crystal River Village MHP | F | Fort Cooper MHC | H | Walden Woods |
| B | Dogwood MHP | E | Parkwood Communities | I | Bedrock Singing Forest |
| C | Edgewater Oaks MHP | G | Stonebrook | J | Inverness Park |
| D | Forest View | | | | |

281. The plausibility of the Citrus–Hernando–Sumter Counties Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that capture how individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Citrus–Hernando–Sumter Counties Regional Market includes the areas covered by CZ 98 (Citrus County, FL / Lake County, FL / Marion County, FL / Orange County, FL / Osceola County, FL / Seminole County, FL / Sumter County, FL) and CZ 105 (Hernando County, FL / Hillsborough County, FL / Pasco County, FL / Pinellas County, FL). The Citrus–Hernando–Sumter Counties Regional Market includes the areas covered by CBSA 26140 (Homosassa Springs, FL). CBSA 45300 (Tampa-St. Petersburg-Clearwater, FL), and CBSA 48680 (Wildwood-The Villages, FL).

282. Within the Citrus–Hernando–Sumter Counties Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market

164

shares that exceed 54%. Manufactured Home Defendants who own or operate manufactured home communities and within the Citrus–Hernando–Sumter Counties Regional Market include at least the following: ELS and Sun Communities.

283.     Within the Citrus–Hernando–Sumter Counties Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent price increases.

### 17. Osceola County Regional Market

200.284.     The Osceola County Regional Market corresponds to the geographic areas covered by the Osceola County Florida JLT Market Report. The Osceola County Florida JLT Market Report further breaks down the Osceola County Regional Market by a number of Area Submarkets, specifically: (a) Saint Cloud and (b) Kissimmee and Sugar Hill North. There are approximately 6,0003,700 manufactured home lots in the Osceola County Regional Market.

**Cleveland–Akron, OH MSA: Regional Submarket consists of at least 41Figure 57. Maps of Area Submarkets Identifying Manufactured Home Communities within Osceola County Regional Market**



---



285.    The plausibility of the Osceola County Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that capture how individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Osceola County Regional Market includes the areas covered by CZ 98 (Citrus County, FL / Lake County, FL / Marion County, FL / Orange County, FL / Osceola County, FL / Seminole County, FL / Sumter County, FL) and CBSA 36740 (Orlando-Kissimmee-Sanford, FL).

286.    Within the Osceola County Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that exceed 70%. Manufactured Home Defendants who own or operate manufactured home communities within the Osceola County Regional Market include at least the following: ELS, Sun Communities, and RHP.

166

287.     Within the Osceola County Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent price increases.

### 18. Long Island Regional Market

~~201.~~288.     The Long Island Regional Market corresponds to the geographic areas covered by the Long Island NY JLT Market Report. The Long Island NY JLT Market Report further breaks down the Long Island Regional Market by a number of Area Submarkets, specifically: (a) Bohemia; (b) East Long Island; and (c) Riverside. There are approximately ~~9,000~~3,300 manufactured home lots~~–~~ in the Long Island Regional Market.

~~Philadelphia, PA MSA:~~ ~~Regional Submarket consists of at least 41~~**Figure 58. Maps of Area Submarkets Identifying Manufactured Home Communities within Long Island Regional Market**



Long Island, New York Report Overview Map
Bohemia Area

A   Bunker / Valley          B   Valley Forge Village          C   Lincoln Village

**Long Island, New York Report Overview Map**
**East Long Island Area**



| A | East Hampton | B | East Quogue MHP |
|---|---|---|---|

**Long Island, New York Report Overview Map**
**Riverside Area**



| A | Calverton Meadows | E | Lakewood | H | Riverhaven |
|---|---|---|---|---|---|
| B | Foxwood Village | F | Oakland MHP | I | Riverwoods |
| C | Glenwood Village | G | Ramblewood MHP | J | Aquebogue MHC |
| D | Greenwood Village | | | | |

168

289.    The plausibility of the Long Island Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that capture how individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Long Island Regional Market includes the areas covered by CZ 382 (Suffolk County, NY) and CBSA 35620 (New York-Newark-Jersey City, NY-NJ).

290.    Within the Long Island Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that exceed 60%. Manufactured Home Defendants who own or operate manufactured home communities within the Long Island Regional Market include at least the following: ELS, Hometown America, RHP, and Kingsley.

291.    Within the Long Island Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent price increases.

### 19. Denton–Lewisville Regional Market

202.292.        The Denton–Lewisville Regional Market corresponds to the geographic areas covered by the Denton–Lewisville Texas JLT Market Report. The Denton–Lewisville Texas JLT Market Report further breaks down the Denton–Lewisville Regional Market by a number of Area Submarkets, specifically: Lewisville/Roanke and Denton. There are approximately 9,0002,800 manufactured home lots in the Denton–Lewisville Regional Market.

~~Portland, OR MSA:~~ ~~Regional Submarket consists of at least 41~~**Figure 59. Maps of Area Submarkets Identifying Manufactured Home Communities within Denton–Lewisville Regional Market**



**Denton/Lewisville, Texas Report Overview Map**
**Lewisville/Roanke**

A  Creekside - Lewisville          C  Greenhill Estates MHP          D  Village Oaks MHP
B  Northwood



**Denton/Lewisville, Texas Report Overview Map**
**Denton**

A  Lake Haven Estates          D  Stonewood Ranch          F  Woodhaven MHC
B  Lakewood - Denton          E  Sherwood MHP          G  Country View MHP
C  Pecan Creek MHC

170

293.    The plausibility of the Denton–Lewisville Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that capture how individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Denton–Lewisville Regional Market includes the areas covered by CZ 445 (Collin County, TX / Dallas County, TX / Denton County, TX / Ellis County, TX) and CZ 527 (Johnson County, TX / Tarrant County, TX). The Denton–Lewisville Regional Market includes the areas covered by CBSA 19100 (Dallas-Fort Worth-Arlington, TX).

294.    Within the Denton–Lewisville Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that exceed 64%. Manufactured Home Defendants who own or operate manufactured home communities within the Denton–Lewisville Regional Market include at least the following: RHP and Kingsley.

295.    Within the Denton–Lewisville Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent price increases.

### 20. Collier County Regional Market

~~203.~~296.    The Collier County Regional Market corresponds to the geographic areas covered by the Collier County, Florida JLT Market Report. The Collier County, Florida JLT Market Report further breaks down the Collier County Regional Market by a number of Area Submarkets, specifically (a) South Naples; (b) Naples; and (c) North Naples. There are approximately ~~7,000~~2,200 manufactured home lots in the Collier County Regional Market.

~~Oakland~~Figure 60. Maps of Area Submarkets Identifying Manufactured Home Communities within Collier County, ~~MI~~: Regional ~~Submarket consists of at least 39~~Market

**Collier County, Florida Report Overview Map**
**South Naples Area**



Marco Shores     B   Tall Oaks Of Naples     C   Hitching Post Park

**Collier County, Florida Report Overview Map**
**Naples Area**



A   Naples Estates      B   Southwind Village

172



**Collier County, Florida Report Overview Map**
**North Naples Area**

A   Caribbean Naples     B   Landmark Naples     C   Palm River MHP

297.    The plausibility of the Collier County Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that capture how individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Collier County Regional Market includes the areas covered by CZ 99 (Collier County, FL / Glades County, FL / Hendry County, FL / Lee County, FL / Okeechobee County, FL) and CBSA 34940 (Naples-Marco Island, FL).

298.    Within the Collier County Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that exceed 61%. Manufactured Home Defendants who own or operate manufactured home communities within the Collier County Regional Market include at least the following: Hometown America, RHP, and Cal-Am.

173

299.     Within the Collier County Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent price increases.

**21. Charlotte County Regional Market**

~~204.~~300.     The Charlotte County Regional Market corresponds to the geographic areas covered by the Charlotte County Florida JLT Market Report. The Charlotte County Florida JLT Market Report further breaks down the Charlotte County Regional Market by a number of Area Submarkets, specifically: (a) Charlotte County East and (b) Charlotte County West. There are approximately ~~1~~42,000 manufactured home lots in the Charlotte County Regional Market.

~~St Louis, MO MSA: Regional Submarket consists of at least 39~~**Figure 61. Maps of Area Submarkets Identifying Manufactured Home Communities within Charlotte County Regional Market**





301.    The plausibility of the Charlotte County Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that capture how individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Charlotte County Regional Market includes the areas covered by CZ 97 (Charlotte County, FL / Desoto County, FL / Manatee County, FL / Sarasota County, FL) and CBSA 39460 (Punta Gorda, FL).

302.    Within the Charlotte County Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that exceed 75%. Manufactured Home Defendants who own or operate manufactured home communities within the Charlotte County Regional Market include at least the following: ELS and Sun Communities.

303.    Within the Charlotte County Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent price increases.

175

### 22. Charlotte (NC) Regional Market

205.304.    The Charlotte (NC) Regional Market corresponds to the geographic areas covered by the Charlotte MSA NC JLT Market Report. The Charlotte MSA NC JLT Market Report further breaks down the Charlotte (NC) Regional Market by a number of Area Submarkets, specifically: (a) Cabarrus and (b) Charlotte. There are approximately 82,000 manufactured home lots in the Charlotte (NC) Regional Market.

**Albany-Schenectady, NY MSA: Regional Submarket consists of at least 38Figure 62. Maps of Area Submarkets Identifying Manufactured Home Communities within Charlotte (NC) Regional Market**



**Charlotte, North Carolina MSA Report Overview Map**
**Charlotte**



| | | | | | |
|---|---|---|---|---|---|
| A | Alpine Village | C | Silver Maples Community | E | Cato Mobile Home Park |
| B | Meadowbrook | D | Woodward MHP | F | Charlotte Hills MHP |

_____

305.    The plausibility of the Charlotte (NC) Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that capture how individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Charlotte (NC) Regional Market includes the areas covered by CZ 394 (Cabarrus County, NC / Gaston County, NC / Mecklenburg County, NC / Rowan County, NC) and CBSA 16740 (Charlotte-Concord-Gastonia, NC-SC).

306.    Within the Charlotte (NC) Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that exceed 55%. Manufactured Home Defendants who own or operate manufactured home communities within the Charlotte (NC) Regional Market include at least Sun Communities and Riverstone.

307.    Within the Charlotte (NC) Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent price increases.

177

### 23. Alachua County Regional Market

~~206.~~308. The Alachua County Regional Market corresponds to the geographic areas covered by the Alachua County Florida JLT Market Report. There are approximately ~~6,000~~1,200 manufactured home lots~~,~~ in the Alachua County Regional Market.

~~Lake County, FL:~~**Figure 63. Map Identifying Manufactured Home Communities within Alachua County** Regional ~~Submarket consists~~**Market**



Alachua County, Florida Report Overview Map
Alachua County

| A | Brittany Estates | C | Lamplighter MHP | E | Westgate MHP |
| B | Candlelight MHP | D | Oak Park Village | F | Whitney |

309. The plausibility of ~~at least 38~~the Alachua County Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that capture how individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Alachua County Regional Market includes the areas covered by CZ 92 (Alachua County, FL) and CBSA 23540 (Gainesville, FL).

310. Within the Alachua County Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield a 100% market share.

Manufactured Home Defendants who own or operate manufactured home communities within the Alachua County Regional Market include at least the following: RHP and Inspire.

311.     Within the Alachua County Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent price increases.

### 24. Escambia County Regional Market

~~207.~~312.     The Escambia County Regional Market corresponds to the geographic areas covered by the Escambia County Florida JLT Market Report. There are approximately ~~10~~1,000 manufactured home lots in the Escambia County Regional Market.

      i.   ~~Pasco County, FL: Regional Submarket consists of at least 38 manufactured home communities and approximately 10,000 manufactured home lots.~~

      ii.  ~~Virginia Beach, VA MSA: Regional Submarket consists of at least 37 manufactured home communities and approximately 7,000 manufactured home lots.~~

      iii.  ~~Eugene-Springfield, OR MSA: Regional Submarket consists of at least 37 manufactured home communities and approximately 6,000 manufactured home lots.~~

      iv.  ~~Genesee County, MI: Regional Submarket consists of at least 36 manufactured home communities and approximately 11,000 manufactured home lots.~~

      v.  ~~Indianapolis-Anderson, IN MSA: Regional Submarket consists of at least 36 manufactured home communities and approximately 9,000 manufactured home lots.~~

vi.   **Palm Beach County, FL:** Regional Submarket consists of at least 34 manufactured home communities and approximately 11,000 manufactured home lots.

vii.  **Jersey Shore, NJ:** Regional Submarket consists of at least 34 manufactured home communities and approximately 8,000 manufactured home lots.

viii. **San Antonio, TX MSA:** Regional Submarket consists of at least 34 manufactured home communities and approximately 7,000 manufactured home lots.

ix.   **Lancaster, PA MSA:** Regional Submarket consists of at least 34 manufactured home communities and approximately 5,000 manufactured home lots.

x.    **Wayne County, MI:** Regional Submarket consists of at least 33 manufactured home communities and approximately 12,000 manufactured home lots.

xi.   **Sussex County, DE:** Regional Submarket consists of at least 33 manufactured home communities and approximately 10,000 manufactured home lots.

xii.  **Atlanta GA, MSA:** Regional Submarket consists of at least 33 manufactured home communities and approximately 9,000 manufactured home lots.

180

xiii.    ~~**Manatee County, FL:** Regional Submarket consists of at least 33 manufactured home communities and approximately 9,000 manufactured home lots.~~

xiv.    ~~**Toledo, OH MSA:** Regional Submarket consists of at least 33 manufactured home communities and approximately 7,000 manufactured home lots.~~

xv.    ~~**Buffalo-Niagara, NY MSA:** Regional Submarket consists of at least 33 manufactured home communities and approximately 7,000 manufactured home lots.~~

xvi.    ~~**Ventura County, CA:** Regional Submarket consists of at least 33 home communities and approximately 6,000 manufactured home lots.~~

xvii.    ~~**Madison, WI MSA:** Regional Submarket consists of at least 33 manufactured home communities and approximately 5,000 manufactured home lots.~~

xviii.    ~~**Orange-Seminole Counties, FL:** Regional Submarket consists of at least 32 manufactured home communities and approximately 13,000 manufactured home lots.~~

xix.    ~~**Salt Lake City, UT MSA:** Regional Submarket consists of at least 31 manufactured home communities and approximately 7,000 manufactured home lots.~~

xx.    ~~**Pittsburgh, PA MSA:** Regional Submarket consists of at least 31 manufactured home communities and approximately 6,000 manufactured home lots.~~

181

xxi.     **Arlington–Fort Worth, TX MSA:** Regional Submarket consists of at least 31 manufactured home communities and approximately 5,000 manufactured home lots.

xxii.    **York–Hannover, PA MSA:** Regional Submarket consists of at least 30 manufactured home communities and approximately 4,000 manufactured home lots.

xxiii.   **Cincinnati, OH MSA:** Regional Submarket consists of at least 29 manufactured home communities and approximately 6,000 manufactured home lots.

xxiv.    **Dallas County, TX:** Regional Submarket consists of at least 29 manufactured home communities and approximately 5,000 manufactured home lots.

xxv.     **Orange–Ulster, NY MSA:** Regional Submarket consists of at least 28 manufactured home communities and approximately 3,000 manufactured home lots.

xxvi.    **Oklahoma City, OK MSA:** Regional Submarket consists of at least 28 manufactured home communities and approximately 5,000 manufactured home lots.

xxvii.   **Macomb County, MI:** Regional Submarket consists of at least 27 manufactured home communities and approximately 12,000 manufactured home lots.

182

xxviii.    ~~**Lee County, FL:** Regional Submarket consists of at least 26 manufactured home communities and approximately 11,000 manufactured home lots.~~

xxix.    ~~**Albuquerque, NM MSA:** Regional Submarket consists of at least 26 manufactured home communities and approximately 6,000 manufactured home lots.~~

xxx.    ~~**Myrtle Beach, SC MSA:** Regional Submarket consists of at least 26 manufactured home communities and approximately 6,000 manufactured home lots.~~

xxxi.    ~~**Brevard County, FL:** Regional Submarket consists of at least 26 manufactured home communities and approximately 6,000 manufactured home lots.~~

xxxii.    ~~**Sonoma County, CA:** Regional Submarket consists of at least 26 manufactured home communities and approximately 5,000 manufactured home lots.~~

xxxiii.    ~~**Highlands Counties, FL:** Regional Submarket consists of at least 25 manufactured home communities and approximately 6,000 manufactured home lots.~~

xxxiv.    ~~**South Jersey, NJ:** Regional Submarket consists of at least 25 manufactured home communities and approximately 6,000 manufactured home lots.~~

xxxv.　~~**Sarasota County, FL:** Regional Submarket consists of at least 24 manufactured home communities and approximately 7,000 manufactured home lots.~~

xxxvi.　~~**Kansas City, MO MSA:** Regional Submarket consists of at least 24 manufactured home communities and approximately 6,000 manufactured home lots.~~

xxxvii.　~~**Elkhart-Goshen-South Bend, ID MSA:** Regional Submarket consists of at least 24 manufactured home communities and approximately 6,000 manufactured home lots.~~

xxxviii.　~~**Hidalgo County, TX:** Regional Submarket consists of at least 24 manufactured home communities and approximately 6,000 manufactured home lots.~~

xxxix.　~~**Lansing, MI MSA:** Regional Submarket consists of at least 24 manufactured home communities and approximately 5,000 manufactured home lots.~~

xl.　~~**Western Colorado:** Regional Submarket consists of at least 24 manufactured home communities and approximately 5,000 manufactured home lots.~~

xli.　~~**Salem, OR MSA:** Regional Submarket consists of at least 24 manufactured home communities and approximately 3,000 manufactured home lots.~~

xlii.　~~**Boise, ID MSA:** Regional Submarket consists of at least 24 manufactured home communities and approximately 3,000 manufactured home lots.~~

xliii. **Austin, TX MSA:** Regional Submarket consists of at least 23 manufactured home communities and approximately 9,000 manufactured home lots.

xliv. **Wichita, KS MSA:** Regional Submarket consists of at least 23 manufactured home communities and approximately 5,000 manufactured home lots.

xlv. **Bay-Midland-Saginaw, MI MSA:** Regional Submarket consists of at least 23 manufactured home communities and approximately 4,000 manufactured home lots.

xlvi. **Medford-Grants Pass, OR MSA:** Regional Submarket consists of at least 23 manufactured home communities and approximately 3,000 manufactured home lots.

xlvii. **Olympia, WA MSA:** Regional Submarket consists of at least 23 manufactured home communities and approximately 2,000 manufactured home lots.

xlviii. **Santa Barbara County, CA:** Regional Submarket consists of at least 22 manufactured home communities and approximately 4,000 manufactured home lots.

xlix. **Contra Costa County, CA:** Regional Submarket consists of at least 22 manufactured home communities and approximately 4,000 manufactured home lots.

185

l. ~~**Northern Colorado:** Regional Submarket consists of at least 21 manufactured home communities and approximately 6,000 manufactured home lots.~~

li. ~~**Southern Colorado:** Regional Submarket consists of at least 21 manufactured home communities and approximately 5,000 manufactured home lots.~~

lii. ~~**Fort Wayne, IN MSA:** Regional Submarket consists of at least 20 manufactured home communities and approximately 6,000 manufactured home lots.~~

liii. ~~**Gary-Michigan City, IN MSA:** Regional Submarket consists of at least 20 manufactured home communities and approximately 6,000 manufactured home lots.~~

liv. ~~**Marion County, FL:** Regional Submarket consists of at least 20 manufactured home communities and approximately 5,000 manufactured home lots.~~

lv. ~~**Alameda County, CA:** Regional Submarket consists of at least 20 manufactured home communities and approximately 5,000 manufactured home lots.~~

lvi. ~~**Northern Michigan:** Regional Submarket consists of at least 20 manufactured home communities and approximately 4,000 manufactured home lots.~~

186

lvii. **Nashville, TN MSA:** Regional Submarket consists of at least 20 manufactured home communities and approximately 3,000 manufactured home lots.

lviii. **Des Moines, IA MSA:** Regional Submarket consists of at least 19 manufactured home communities and approximately 3,000 manufactured home lots.

lix. **Duval-St. Johns County, FL:** Regional Submarket consists of at least 18 manufactured home communities and approximately 5,000 manufactured home lots.

lx. **Citrus-Hernando-Sumter Counties, FL MSA:** Regional Submarket consists of at least 18 manufactured home communities and approximately 4,000 manufactured home lots.

lxi. **Indian River County, FL:** Regional Submarket consists of at least 18 manufactured home communities and approximately 5,000 manufactured home lots.

lxii. **Charleston, SC MSA:** Regional Submarket consists of at least 18 manufactured home communities and approximately 3,000 manufactured home lots.

lxiii. **Washtenaw County, MI:** Regional Submarket consists of at least 17 manufactured home communities and approximately 6,000 manufactured home lots.

lxiv. **Barry-Kalamazoo Counties, MI:** Regional Submarket consists of at least 17 manufactured home communities and approximately 4,000 manufactured home lots.

lxv. **Barry-Kalamazoo Counties, MI:** Regional Submarket consists of at least 17 manufactured home communities and approximately 4,000 manufactured home lots.

lxvi. **Tulsa, OK MSA:** Regional Submarket consists of at least 17 manufactured home communities and approximately 3,000 manufactured home lots.

lxvii. **Prescott, AZ MSA:** Regional Submarket consists of at least 17 manufactured home communities and approximately 3,000 manufactured home lots.

lxviii. **Berrien County, MI:** Regional Submarket consists of at least 17 manufactured home communities and approximately 3,000 manufactured home lots.

lxix. **Topeka, KS MSA:** Regional Submarket consists of at least 17 manufactured home communities and approximately 2,000 manufactured home lots.

lxx. **Brownsville, TX MSA:** Regional Submarket consists of at least 17 manufactured home communities and approximately 2,000 manufactured home lots.

lxxi. **Ames, IA MSA:** Regional Submarket consists of at least 17 manufactured home communities and approximately 2,000 manufactured home lots.

188

lxxii.   ~~**Greenville, SC MSA:** Regional Submarket consists of at least 17 manufactured home communities and approximately 2,000 manufactured home lots.~~

lxxiii.   ~~**Birmingham, AL MSA:** Regional Submarket consists of at least 16 manufactured home communities and approximately 3,000 manufactured home lots.~~

lxxiv.   ~~**St. Clair County, MI:** Regional Submarket consists of at least 16 manufactured home communities and approximately 4,000 manufactured home lots.~~

lxxv.   ~~**Dayton-Springfield, OH MSA:** Regional Submarket consists of at least 16 manufactured home communities and approximately 3,000 manufactured home lots.~~

lxxvi.   ~~**Monroe County, MI:** Regional Submarket consists of at least 15 manufactured home communities and approximately 6,000 manufactured home lots.~~

lxxvii.   ~~**Miami Dade County, FL:** Regional Submarket consists of at least 15 manufactured home communities and approximately 5,000 manufactured home lots.~~

lxxviii.   ~~**Osceola County, Fl:** Regional Submarket consists of at least 15 manufactured home communities and approximately 4,000 manufactured home lots.~~

lxxix.   **Long Island, NY:** Regional Submarket consists of at least 15 manufactured home communities and approximately 3,000 manufactured home lots.

lxxx.   **Kent County, DE:** Regional Submarket consists of at least 14 manufactured home communities and approximately 3,000 manufactured home lots.

lxxxi.   **Livingston County, MI:** Regional Submarket consists of at least 14 manufactured home communities and approximately 4,000 manufactured home lots.

lxxxii.   **Champaign-Urbana, IL MSA:** Regional Submarket consists of at least 14 manufactured home communities and approximately 3,000 manufactured home lots.

lxxxiii.   **St. Lucie County, FL:** Regional Submarket consists of at least 13 manufactured home communities and approximately 8,000 manufactured home lots.

lxxxiv.   **Louisville, KY MSA:** Regional Submarket consists of at least 13 manufactured home communities and approximately 3,000 manufactured home lots.

lxxxv.   **Jackson County, MI:** Regional Submarket consists of at least 13 manufactured home communities and approximately 3,000 manufactured home lots.

lxxxvi. **Richmond, VA MSA:** Regional Submarket consists of at least 13 manufactured home communities and approximately 3,000 manufactured home lots.

lxxxvii. **Raleigh, NC MSA:** Regional Submarket consists of at least 13 manufactured home communities and approximately 3,000 manufactured home lots.

lxxxviii. **Santa Fe, NM MSA:** Regional Submarket consists of at least 13 manufactured home communities and approximately 2,000 manufactured home lots.

lxxxix. **Spokane County, WA:** Regional Submarket consists of at least 13 manufactured home communities and approximately 2,000 manufactured home lots.

xc. **Martin County, FL:** Regional Submarket consists of at least 12 manufactured home communities and approximately 3,000 manufactured home lots.

xci. **San Luis Obispo County, CA:** Regional Submarket consists of at least 12 manufactured home communities and approximately 2,000 manufactured home lots.

xcii. **Yuma, AZ MSA:** Regional Submarket consists of at least 12 manufactured home communities and approximately 2,000 manufactured home lots.

191

xciii.    **Charlotte County, FL:** Regional Submarket consists of at least 11 manufactured home communities and approximately 2,000 manufactured home lots.

xciv.    **Denton-Lewisville, TX:** Regional Submarket consists of at least 11 manufactured home communities and approximately 3,000 manufactured home lots.

xcv.    **Lapeer County, MI:** Regional Submarket consists of at least 11 manufactured home communities and approximately 2,000 manufactured home lots.

xcvi.    **Las Cruces, NM MSA;** Regional Submarket consists of at least 11 manufactured home communities and approximately 2,000 manufactured home lots.

xcvii.    **Napa County, CA:** Regional Submarket consists of at least 11 manufactured home communities and approximately 2,000 manufactured home lots.

xcviii.    **Columbia, SC MSA:** Regional Submarket consists of at least 11 manufactured home communities and approximately 2,000 manufactured home lots.

xcix.    **New Castle County, DE:** Regional Submarket consists of at least 10 manufactured home communities and approximately 3,000 manufactured home lots.

192

c. **Charlotte, NC MSA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 2,000 manufactured home lots.

ci. **Greensboro, NC MSA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 2,000 manufactured home lots.

cii. **Omaha, NE MSA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 2,000 manufactured home lots.

ciii. **Fresno County, CA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 2,000 manufactured home lots.

civ. **Savanah, GA MSA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 2,000 manufactured home lots.

cv. **Gillette, WY MSA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 2,000 manufactured home lots.

cvi. **El Paso County, TX:** Regional Submarket consists of at least 10 manufactured home communities and approximately 2,000 manufactured home lots.

193

cvii.     **Dauphin County, PA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 1,000 manufactured home lots.

cviii.    **Bend, OR MSA:** Regional Submarket consists of at least 10 manufactured home communities and approximately 1,000 manufactured home lots.

cix.      **Tyler, TX MSA;** Regional Submarket consists of at least 10 manufactured home communities and approximately 1,000 manufactured home lots.

cx.       **Calhoun County, MI:** Regional Submarket consists of at least nine manufactured home communities and approximately 2,000 manufactured home lots.

cxi.      **Solano County, CA:** Regional Submarket consists of at least nine manufactured home communities and approximately 1,000 manufactured home lots.

cxii.     **Monterey County, CA:** Regional Submarket consists of at least nine manufactured home communities and approximately 1,000 manufactured home lots.

cxiii.    **Hendry-Okeechobee Counties, FL:** Regional Submarket consists of at least nine manufactured home communities and approximately 1,000 manufactured home lots.

194

cxiv.    ~~**Collier County, FL:** Regional Submarket consists of at least eight manufactured home communities and approximately 2,000 manufactured home lots.~~

cxv.    ~~**Flagstaff, AZ MSA:** Regional Submarket consists of at least eight manufactured home communities and approximately 1,000 manufactured home lots.~~

cxvi.    ~~**Memphis, TN MSA:** Regional Submarket consists of at least seven manufactured home communities and approximately 2,000 manufactured home lots.~~

cxvii.    ~~**Albany, GA MSA:** Regional Submarket consists of at least seven manufactured home communities and approximately 1,000 manufactured home lots.~~

cxviii.    ~~**Sant Cruz County, CA:** Regional Submarket consists of at least seven manufactured home communities and approximately 1,000 manufactured home lots.~~

cxix.    ~~**Gettysburg, PA MSA:** Regional Submarket consists of at least seven manufactured home communities and approximately 1,000 manufactured home lots.~~

cxx.    ~~**Leon County, FL:** Regional Submarket consists of at least seven manufactured home communities and approximately 1,000 manufactured home lots.~~

cxxi.     **Alachua County, Fl:** Regional Submarket consists of at least six manufactured home communities and approximately 1,000 manufactured home lots.

cxxii.    **Lexington-Fayette, KY MSA:** Regional Submarket consists of at least six manufactured home communities and approximately 2,000 manufactured home lots.

cxxiii.   **Escambia County, FL:** Regional Submarket consists of at least five manufactured home communities and approximately 1,000 manufactured home lots.

cxxiv.    **Bay County, FL:** Regional Submarket consists of at least four manufactured home communities and approximately 500 manufactured home lots.

cxxv.     **Lynchburg, VA MSA:** Regional Submarket consists of at least four manufactured home communities and approximately 500 manufactured home lots.

196

**Figure 64. Map Identifying Manufactured Home Communities within Escambia County Regional Market**



313.    The plausibility of the Escambia County Regional Market as a relevant geographic market is corroborated by widely used governmental geographic frameworks that capture how individuals organize their lives around work, school, and other core activities, namely CZs and CBSAs. Specifically, the Escambia County Regional Market includes the areas covered by CZ 100 (Escambia County, FL / Santa Rosa County, FL) and CBSA 37860 (Pensacola-Ferry Pass-Brent, FL).

314.    Within the Escambia County Regional Market, the Manufactured Home Defendants and their Unnamed Co-conspirators collectively wield market shares that exceed 63%. Manufactured Home Defendants who own or operate manufactured home communities within the Escambia County Regional Market include at least the following: RHP and Inspire.

197

315. Within the Escambia County Regional Market, Defendants' conspiracy has enabled them to implement supracompetitive lot rent price increases.

**25. Additional Regional Markets**

316. While Plaintiffs have identified the foregoing distinct Regional Markets and corresponding Area Submarkets as the relevant geographic markets, Plaintiffs anticipate that additional Regional Markets and co-conspirators will be uncovered in the course of discovery and upon expert analysis of the data produced, given that Defendants operate nationwide. Additional Regional Markets will be included as appropriate, after sufficient discovery.

**D. Preliminary Analysis by Consulting Economic Experts—Showing Low Pricing Variance—Supports Plaintiffs' Allegations of Collusion in Regional Markets**

317. According to Plaintiffs' economic analysis, pricing variance is lower in markets with high Defendant concentration, such as the Regional Markets, which is consistent with the presence of a cartel.

318. Plaintiffs computed the variability in rent increase percentages using the inner-quartile range ("IQR"), which is equal to the difference between the 75th and 25th percentile of rent increase percentages for each market. High price increase volatility results in a higher IQR. One can test for parallel pricing by analyzing whether volatility in markets allegedly subject to coordination is lower compared to markets not subject to coordination

319. As shown below, the average IQR tends to be lower in markets where Defendants and Unnamed Co-conspirators collectively hold high market shares. This finding is consistent with the economics literature on screening for collusion—those markets that Plaintiffs allege have been subject to collusive activity show less price volatility (consistent with parallel pricing).

320. Plaintiffs limited their analysis to ten of the largest markets (by number of lots) in which Defendants and Unnamed Co-conspirators have collective market shares of at least 50

198

percent (excluding the Phoenix Regional Market, which lacks any close comparable market). These markets are (in descending order based on total units): (1) Denver Regional Market; (2) Hillsborough County Regional Market; (3) Orange-Seminole Regional Market; (4) Lee County Regional Market; (5) Lake County Regional Market; (6) Pasco County Regional Market; (7) Austin Regional Market; (8) Salt Lake City Regional Market; (9) Washtenaw County Regional Market; and (10) Northern Colorado Regional Market.

321.    For each of these markets, Plaintiffs identified a "control" market that is most similar to the target market analyzed.

322.    The ten high-collective share markets are referred to as "target" markets. To find a most "similar" market for each target market, Plaintiffs employed a standard methodology known as nearest-neighbor matching. This procedure involves comparing market specific attributes of the ten target markets relative to potential matching lower share markets and finding other markets that have the most similar combined attributes. It bears noting that while this method is referred to as "nearest-neighbor" matching, that name does not imply close geographic proximity—rather, it refers to closeness with respect to market attributes.

323.    Plaintiffs used six market attributes to identify a closest match for each of the target markets: (a) total number of mobile home lots; (b) total number of communities; (c) the average year-over-year percentage increase in mobile home lot rent; (d) the average mobile home lot rent; (e) the population change between 2020 and 2024; and (f) the average county median income (averaged across counties within the market).

324.    Figure 65 compares the ten target markets to the matching markets found using this methodology.

**Figure 65. Comparison of Target Markets to Matching Markets**

| | | [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Market | Target | DENVER AURORA BOULDER CSA COLORADO | HILLSBOROUGH COUNTY FLORIDA | ORANGE SEMINOLE COUNTIES FLORIDA | LEE COUNTY FLORIDA | LAKE COUNTY FLORIDA | PASCO COUNTY FLORIDA | AUSTIN MSA TX | SALT LAKE CITY MSA UTAH | WASHTENAW COUNTY MICHIGAN | NORTHERN COLORADO |
| | Match | SEATTLE TACOMA MSA WASHINGTON | OKLAHOMA CITY MSA OKLAHOMA | ST. LUCIE COUNTY FLORIDA | SALEM MSA OREGON | TUCSON MSA ARIZONA | HIGHLANDS COUNTY FLORIDA | ATLANTA MSA GEORGIA | PORTLAND MSA OREGON | SOUTH JERSEY AREA NEW JERSEY | OLYMPIA MSA WASHINGTON |
| Collective Share | Target | 70.8% | 50.7% | 51.8% | 61.3% | 55.0% | 53.5% | 72.3% | 77.2% | 55.9% | 61.0% |
| | Match | 9.9% | 0.0% | 22.6% | 10.3% | 29.5% | 24.9% | 25.9% | 30.0% | 16.9% | 0.0% |
| Market Sites | Target | 16,259 | 12,700 | 12,524 | 12,245 | 10,330 | 10,153 | 9,405 | 6,678 | 5,786 | 5,686 |
| | Match | 7,739 | 4,628 | 9,018 | 3,398 | 9,591 | 6,498 | 9,031 | 7,168 | 6,098 | 2,316 |
| # Communities | Target | 49 | 48 | 32 | 27 | 37 | 38 | 23 | 31 | 17 | 21 |
| | Match | 45 | 28 | 13 | 24 | 38 | 25 | 33 | 41 | 25 | 23 |
| Avg. Monthly MHL Rent | Target | $922 | $728 | $786 | $859 | $514 | $552 | $671 | $812 | $529 | $789 |
| | Match | $821 | $412 | $581 | $713 | $518 | $470 | $536 | $785 | $588 | $595 |
| Average YoY % Change in MHL Rent | Target | 8.4% | 7.6% | 5.9% | 6.7% | 8.9% | 10.3% | 5.8% | 8.4% | 4.2% | 11.5% |
| | Match | 7.1% | 9.3% | 5.7% | 11.9% | 6.5% | 7.6% | 6.6% | 7.9% | 5.3% | 9.2% |
| Median Income | Target | $80,090 | $60,566 | $62,350 | $59,608 | $55,792 | $53,431 | $79,552 | $78,274 | $76,233 | $75,655 |
| | Match | $91,282 | $62,013 | $55,237 | $61,495 | $54,809 | $43,139 | $64,996 | $80,225 | $77,902 | $75,867 |
| Population Change (2020-2024) | Target | 75,296 | 121,652 | 187,729 | 100,137 | 60,240 | 97,224 | 242,999 | 72,517 | 4,717 | 57,120 |
| | Match | 132,513 | 63,805 | 61,446 | 11,485 | 37,509 | 139,157 | 169,295 | -1,002 | 36,226 | 8,110 |
| Similarity Score (Distance) | | 1.36 | 0.49 | 0.69 | 1.73 | 0.79 | 1.74 | 1.45 | 1.78 | 0.91 | 1.57 |

325.    In Figure 66, Plaintiffs compare the IQR for each of the target markets versus their closest matching markets. As reflected in the "Defendant + Co-Conspirator" collective share columns, the target markets have collective shares greater than 50 percent, whereas the control (matching) markets all have collective shares less than or approximately 30 percent. The column under IQR labeled, "Target IQR < Control IQR," equals "Y" (Yes) if the volatility of the high-collective share target market is less than the lower-share control market. Nine out of the ten target markets have lower volatility relative to their matching control markets as measured via IQR.

**Figure 66. IQR Analysis**

| Market | | Defendant + Co-Conspirator Collective Share | | IQR | | |
|---|---|---|---|---|---|---|
| Target | Control (Matched) | Target Market | Control Market | Target Market | Control Market | Target IQR < Control IQR |
| DENVER AURORA BOULDER CSA COLORADO | SEATTLE TACOMA MSA WASHINGTON | 70.8% | 9.9% | 4.93% | 6.43% | Y |

200

| | | | | | | |
|---|---|---|---|---|---|---|
| HILLSBOROUGH COUNTY FLORIDA | OKLAHOMA CITY MSA OKLAHOMA | 50.7% | 0.0% | 5.47% | 6.46% | Y |
| ORANGE SEMINOLE COUNTIES FLORIDA | ST. LUCIE COUNTY FLORIDA | 51.8% | 22.6% | 2.44% | 2.57% | Y |
| LEE COUNTY FLORIDA | SALEM MSA OREGON | 61.3% | 10.3% | 3.51% | 5.34% | Y |
| LAKE COUNTY FLORIDA | TUCSON MSA ARIZONA | 55.0% | 29.5% | 3.53% | 5.79% | Y |
| PASCO COUNTY FLORIDA | HIGHLANDS COUNTY FLORIDA | 53.5% | 24.9% | 5.57% | 6.27% | Y |
| AUSTIN MSA TX | ATLANTA MSA GEORGIA | 72.3% | 25.9% | 1.50% | 9.36% | Y |
| SALT LAKE CITY MSA UTAH | PORTLAND MSA OREGON | 77.2% | 30.0% | 2.69% | 4.59% | Y |
| WASHTENAW COUNTY MICHIGAN | SOUTH JERSEY AREA NEW JERSEY | 55.9% | 16.9% | 3.71% | 5.60% | Y |
| NORTHERN COLORADO | OLYMPIA MSA WASHINGTON | 61.0% | 0.0% | 6.86% | 4.82% | N |

326.    As shown above, economic analysis supports the proposition that markets where Defendants plus Unnamed Co-conspirators collectively hold market shares greater than 50 percent tend to have less price volatility relative to markets where they do not collectively hold high market shares. Such a finding is indicative of collusion.

## VI.   CLASS ACTION ALLEGATIONS

208.327.    Plaintiffs bring this action individually and on behalf of all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages, as well as equitable and injunctive relief, on behalf of the following Class:

> All persons and entities who paid rent directly to a Manufactured Home Community Defendant or an Unnamed Co-Conspiratorconspirator for a manufactured or modular home lot situated in a manufactured home community included in a JLT Market Report or located in a Regional SubmarketMarket between August 31, 2019 and the present.

209.328.    The following persons and entities are excluded from the above-described proposed Class:

      i.    Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

      ii.    All governmental entities;

      iii.    All Counsel of Record; and

201

iv.   The Court, Court personnel, and any member of their immediate families.

210.329.     The Class is so numerous as to make joinder impracticable. Plaintiffs do not know the exact number of Class members because such information is presently in the exclusive control of Defendants. Plaintiffs believe that due to the nature of the manufactured home industry there are likely, at a minimum, hundreds of thousands of Class members in the United States and its territories.

211.330.     Common questions of law and fact exist as to all members of the Class. Plaintiffs and the Class were injured by the same unlawful scheme, Defendants' anticompetitive conduct was generally applicable to all the members of the Class, and relief to the Class as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

i.   Whether Defendants exchanged competitively sensitive information;

ii.   Whether Defendants and their Unnamed Co-conspirators engaged in a combination or conspiracy to fix, raise, maintain or stabilize manufactured home lot rents;

iii.   The duration of the conspiracy alleged herein and the acts performed by Defendants and their Unnamed Co-conspirators in furtherance of the conspiracy;

iv.   Whether such combination or conspiracy violated the federal antitrust laws;

v.   Whether the conduct of Defendants and their Unnamed Co-conspirators, as alleged in this complaint, caused injury to the Plaintiffs and other members of the Class;

202

vi.      Whether Defendants caused Plaintiffs and the Class to suffer damages in the

form of overcharges on manufactured home lot rents;

vii.     The appropriate class-wide measure of damages; and

viii.    The nature of appropriate injunctive relief to restore competition in the

manufactured home lot market.

212.331.     Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs

will fairly and adequately protect the interests of the Class. Plaintiffs and all members of the

Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated

rent for manufactured home lots.

213.332.     Plaintiffs' claims arise out of the same common course of conduct giving

rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with and

typical of, and not antagonistic to, those of the other members of the Class.

214.333.     Plaintiffs have retained counsel with substantial experience litigating

complex antitrust class actions in myriad industries and courts throughout the nation.

215.334.     The questions of law and fact common to the members of the Class

predominate over any questions affecting only individual members, including issues relating to

liability and damages.

216.335.     Class action treatment is a superior method for the fair and efficient

adjudication of the controversy, in that, among other things, such treatment will permit a large

number of similarly situated persons to prosecute their common claims in a single forum

simultaneously, efficiently and without the unnecessary duplication of evidence, effort and

expense that numerous individual actions would engender. The benefits of proceeding through

the class mechanism, including providing injured persons or entities with a method for obtaining

203

redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

217.336.    Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

### VII. CLAIMS FOR RELIEF

### COUNT 1

**Price Fixing in Violation of
Section 1 of the Sherman Act (15 U.S.C. § 1)**

**(Against All Defendants)**

218.337.    Plaintiffs repeat the allegations set forth in Paragraphs 1-336, above, as if fully set forth herein.

219.338.    Beginning at a time currently unknown to Plaintiffs, but at least as early as August 31, 2019 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

220.339.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the rents they charge for manufactured home lots and involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

204

221.340.    Plaintiffs and members of the Class have been injured and will continue to be injured in the form of overcharges on manufactured home lot rent.

222.341.    Defendants' anticompetitive conduct had the following effects, among others:

      i.    Competition among Defendants has been restrained or eliminated with respect to manufactured home lots;

      ii.    The price of manufactured home lot rents has been fixed, stabilized, or maintained at artificially high levels; and

      iii.    Manufactured home residents have been deprived of the benefits of free and open competition between and among Defendants.

223.342.    This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

224.343.    Plaintiffs and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT 2

**Information Exchange in Violation of
Section 1 of the Sherman Act (15 U.S.C. § 1)**

**(Against All Defendants)**

225.344.    Plaintiffs repeat the allegations set forth in Paragraphs 1-336, above, as if fully set forth herein.

226.345.    Beginning at a time currently unknown to Plaintiffs, but at least as early as August 31, 2019 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

227.346.    The contract, combination, or conspiracy involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

228.347.    Plaintiffs and members of the Class have been injured and will continue to be injured in the form of overcharges on manufactured home lot rent.

229.348.    This information exchange has been undertaken in furtherance of a price fixing agreement, which is unlawful *per se*. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the exchange is facially anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

230.349.    Plaintiffs and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT 3

### Unjust Enrichment

### (Against the Manufactured Home Community Defendants)

231.350.    Plaintiffs repeat the allegations set forth in Paragraphs 1-336, above, as if fully set forth herein.

206

232.351.    Alternatively, from the acts of Defendants as alleged above, the Manufactured Home Community Defendants have been unjustly enriched at the expense of Plaintiffs and members of the Class.

233.352.    Through Defendants' systematic exchange of competitively sensitive non-public information, the Manufactured Home Community Defendants have artificially increased the price of manufactured home lot rents charged to Plaintiffs and members of the Class.

234.353.    The Manufactured Home Community Defendants have collected from Plaintiffs and members of the Class artificially high manufactured home lot rents.

235.354.    The Manufactured Home Community Defendants have been unjustly enriched by retaining the artificially high manufactured home lot rents collected from Plaintiffs and members of the Class.

236.355.    The retention of these rents by the Manufactured Home Community Defendants violates the fundamental principles of justice, equity, and good conscience and should be returned to Plaintiffs and members of the Class.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully request that:

A.    The Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Co-Lead Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.    The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance

207

thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal under a quick look or rule of reason standard) of Section 1 of the Sherman Act (15 U.S.C. § 1);

C.    The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.    The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications;

E.    The Court grant Plaintiffs and members of the Class all other equitable relief in the nature of disgorgement, restitution, and/or the creation of a constructive trust to remedy the Manufactured Home Community Defendants' unjust enrichment;

F.    The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this complaint to the extent provided by law; and

G.      The Court award Plaintiffs and members of the Class such other and further relief

as the case may require and the Court may deem just and proper under the circumstances.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

Dated: ~~December 15, 2023~~January 26, 2026

Respectfully submitted,

By: /s/ *~~Brian M. Hogan~~Adam J. Levitt*

~~Brian M. Hogan~~
**DICELLO LEVITT LLP**
~~Ten North Dearborn Street, Sixth Floor~~
~~Chicago, Illinois 60602~~
~~(312) 214-7900~~
~~bhogan@dicellolevitt.com~~


Adam J. Levitt (Liaison Counsel ~~*for Plaintiffs*~~)

~~Adam J. Levitt~~
John E. Tangren
~~**DICELLO LEVITT LLP**~~
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
(312) 214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com

209

Gregory S. Asciolla* *(pro hac vice)*
~~Karin E. Garvey*~~
Geralyn J. Trujillo *(pro hac vice)*
Jonathan S. Crevier* *(pro hac vice)*
Noah Cozad* *(pro hac vice)*
**~~DICELLO LEVITT LLP~~**
485 Lexington Avenue, Suite 1001
New York, New York 10017
(646) 933-1000
gasciolla@dicellolevitt.com
~~kgarvey~~gtrujilo@dicellolevitt.com
jcrevier@dicellolevitt.com
ncozad@dicellolevitt.com

~~Reena Gambhir*~~
**HAUSFELD LLP**
~~888 16th~~
Reena Gambhir *(pro hac vice)*
1200 17th Street NW, Suite ~~300~~600
Washington, DC ~~20006~~20036
(202) 540-7200
rgambhir@hausfeld.com

Scott Martin* *(pro hac vice)*
Kyle Bates *(pro hac vice)*
Kartik S. Madiraju** *(pro hac vice)*
**~~HAUSFELD LLP~~**
33 Whitehall Street, 14th Floor
New York, New York 10004
(646) 357-1100
smartin@hausfeld.com
kbates@hausfeld.com
kmadiraju@hausfeld.com

Megan E. Jones* *(pro hac vice)*
~~Kyle G. Bates*~~
**~~HAUSFELD LLP~~**
~~600 Montgomery~~ 580 California Street,
~~#320~~12th floor
San Francisco, California ~~94111~~94104
(415) 633-1908
mjones@hausfeld.com
~~kbates@hausfeld.com~~

210

*Interim Co-Lead Class Counsel for the*
*Proposed Class*

Shannon M. McNulty
**CLIFFORD LAW OFFICES, P.C.**
120 N. LaSalle Street, 36th Floor
Chicago, Illinois 60602
(312) 899-9090
smm@cliffordlaw.com

Marc H. Edelson*
**EDELSON LECHTZIN LLP**
411 S. State Street
Suite N300
Newtown, Pennsylvania 18940
(215) 867-2399
medelson@edelson-law.com

John G. Emerson**
**EMERSON FIRM, PLLC**
2500 Wilcrest, Suite 300
Houston, Texas 77042
(800) 551-8649
jemerson@emersonfirm.com

Kimberly A. Justice
**FREED KANNER LONDON**
**& MILLEN LLC**
923 Fayette Street
Conshohocken, Pennsylvania 19428
(610) 234-6487
kjustice@fklmlaw.com

211

Michael Moskovitz
Robert Wozniak
Nia Barberousse Binns
FREED KANNER LONDON
& MILLEN LLC
100 Tri-State Dr, 128
Lincolnshire, Illinois 60069
(224) 632-4500
mmoskovitz@fklmlaw.com
rwozniak@fklmlaw.com
nbinns@fklmlaw.com

Joshua H. Grabar*
GRABAR LAW OFFICE
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(267) 507-6085
jgrabar@grabarlaw.com

Heidi M. Silton*
Jessica N. Servais*
Joseph C. Bourne*
Eura Chang*
LOCKRIDGE GRINDAL NAUEN
P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401
(612) 339-6900
hmsilton@locklaw.com
jnservais@locklaw.com
jcbourne@locklaw.com
echang@locklaw.com

Vincent Briganti*
Raymond Girnys
Nicole A. Veno*
LOWEY DANNENBERG P.C.
44 South Broadway, Suite 1100
White Plains, New York 10601
(914) 997-0500
vbriganti@lowey.com
rgirnys@lowey.com
nveno@lowey.com

212

Myron M. Cherry
Jacie Zolna
Benjamin Swetland
MYRON M. CHERRY & ASSOCIATES
LLC
30 North LaSalle Street, Suite 2300
Chicago, Illinois 60602
(312) 372-2100
mcherry@cherry-law.com
jzolna@cherry-law.com
bswetland@cherry-law.com

Charles Barrett*
Daniella Bhadare-Valente**
NEAL & HARWELL, PLC
1201 Demonbreun St.
Suite 1000
Nashville, Tennessee 37203
(615) 244-1713
cbarrett@nealharwell.com
dbhadare-valente@nealharwell.com

Garrett D. Blanchfield**
REINHARDT WENDORF &
BLANCHFIELD
222 So. 9th Street, Suite 1600
Minneapolis, MN 55402
(651) 287-2100
g.blanchfield@rwblawfirm.com

William G. Caldes**
SPECTOR ROSEMAN & KODROFF PC
2001 Market Street Suite 3420
Philadelphia, PA 19103
(215) 496-0300
bcaldes@srkattorneys.com

Bruce W. Steckler**
STECKLER WAYNE
CHERRY & LOVE PLLC
12720 Hillcrest Road, Suite 1045
Dallas, Texas 75230
(972) 387-4040
bruce@swclaw.com

213

*Counsel for the Proposed Class*

\* Admitted *pro hac vice*
\*\* *Pro hac vice* applications forthcoming

214